**NO. 23-2765**

**UNITED STATES COURT OF APPEALS**

**FOR THE SEVENTH CIRCUIT**

**Nikkolai Anderson,**

      **Plaintiff-Appellant,**

**v.**

**Mott Street**

      **Defendant-Appellee.**

Appeal from the United States District Court
For the Northern District of Illinois
Case No. 20-cv-7721
The Honorable Judge Thomas M. Durkin

**BRIEF AND REQUIRED SHORT APPENDIX OF
PLAINTIFF-APPELLANT, NIKKOLAI ANDERSON**

THE LAW OFFICE OF SEAN BROWN, LLC
Sean Brown
*Attorney for Plaintiff-Appellant, Nikkolai Anderson*
111 West Jackson Blvd, Suite 1700
Chicago, Illinois 60604
(312) 675-6116
attorneyseanbrown@gmail.com

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2765

Short Caption: Anderson v. Mott Street

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Nikkolai Anderson

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Law Office of Sean Brown, LLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: *Sean Brown*      Date: 2/3/2024

Attorney's Printed Name: Sean Brown

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      Yes ☑      No ☐

Address: 111 West Jackson Blvd, suite 1700

Chicago, IL 60604

Phone Number: 312-675-6116      Fax Number: 312-675-6001

E-Mail Address: attorneyseanbrown@gmail.com

rev. 12/19 AK

# APPELLANT BRIEF

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT……………………………………………1

STATEMENT OF THE ISSUES……………………………………………2

STATEMENT OF THE CASE………………………………………………...3

SUMMARY OF ARGUMENT……………………………………………14

ARGUMENT………………………………………………………………16

    I.    Plaintiff Should Have Survived Summary
        Judgment because Plaintiff Offered Sufficient
        Evidence such that a Reasonable Jury Could Find in Her Favor…….16

        A.  Standard of Review…………………………………………...16

        B.  A Jury Could Find that Plaintiff Made
            a Prima Facie Claim for Sexual Harassment…………...………17

            1.  Anderson was Subjected to Unwanted
               Harassment that Created Intimidating, Hostile,
               and Offensive Working Conditions…………………………17

        C.  Plaintiff Produced Sufficient Evidence to
            Create Genuine Issues of Material Fact with
            Respect to Her Claim for Sexual Discrimination………………21

            1.  Anderson was Treated Less Favorably than
                Similarly Situated Male Employees………………………...22

            2.  Anderson's Testimony that Her Work
                Performance was Satisfactory was Sufficient
                Evidence of Pretext to Preclude Summary Judgement……..24

        D.  A Jury Could Find that Plaintiff Made a Prima
            Facie Claim for Retaliation……………………………………...26

            1.  Anderson Engaged in Protected Activities
                Prior to an Adverse Employment Action……………………26

# APPELLANT BRIEF

2.  Appellees Committed Adverse Employment
    Actions against Anderson…………………………………...30

3.  There is a Causal Nexus Between Anderson's Protected
    Activities and the Adverse Employment Actions…………...30

II.  The District Court Erred in Admitting Paragraphs
7, 16, 17, 18, 19, 20, 21, 22, 26, 32, 35, 37, 42, 44,
45, 46, and 50 of Defendant's Rule 56.1 Statement
of Material Facts because Plaintiff Specifically Denied
the Allegations…..………………………………………...…………31

A.  Standard of Review……………………………...…………31

B.  Anderson Complied with Local Rule 56.1………………………31

CONCLUSION……………………………………………………………..37

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Casino Queen, Inc.*,
739 F. 3d 972 (7th Cir. 2014)……………………………………………………………..16

*Benitez v. Am. Std. Circuits, Inc.*,
68 F. Supp. 2d 745 (N.D. Ill. 2010)……………………………………………………….26, 27

*Breneisen v. Motorola*,
512 F. 3d 972, 978 n.2 (7th Cir. 2008)……………………………………………………..32

*Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S. 53 (2006)………………………………………………………………………26, 30

*Carr v. Allison Gas Turbine Div.*,
32 F. 3d 1007 (7th Cir. 1994)………………………………………..……………………...17

*Casna v City of Loves Park*,
574 F. 3d 420 (7th Cir. 2009)………………………………………………....…………..31

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)……………………………………………....................................................16

*Chaib v. GEO Group, Inc.*,
819 F. 3d 337 (7th Cir. 2016)………………………………………………..…………16

*Courtney v. Biosound, Inc.*,
42 F. 3d 414 (7th Cir. 1994)…………………………………………………..…16-17

*Cuddington v. Northern Indiana Public Service Co.*,
33 F. 3d 813 (7th Cir. 1994)……………………………………………………………..16, 30

*Curry v. Menard, Inc.*,
270 F. 3d 473 (7th Cir. 2001)……………………………………………………..…………25

*Curtis v. Costco Wholesale Corp.*,
807 F. 3d 215 (7th Cir. 2015)……………………………………………………………..31

*DeClue v. Central Ill. Light Co.*,
223 F. 3d 434 (7th Cir. 2000)……………………………………………………..…22

v

*Henson v. Dundee*,
682 F. 2d 897 (11th Cir. 1982)………………………………………………………...18

*Howland v. Kilquist*,
833 F. 2d 639 (7th Cir. 1987)………………………………………………...............16

*Jackson v. County of Racine*,
474 F. 3d 493 (7th Cir. 2007)………………………………………………...…19

*Jarvis v. Sigmatron International Inc.*,
223 F. Supp. 2d 981 (N.D. Ill. 2002)…………………………...…………………17, 19

*Johnson v. Cambridge Indus., Inc.*,
325 F. 3d 892, 902 (7th Cir. 2003)………………………………….…………30

*Kampmier v. Emeritus Corp.*,
472 F. 3d 930 (7th Cir. 2006)………………………………………...…………20

*Loudermilk v. Best Pallet Co., LLC*,
636 F. 3d 312 (7th Cir. 2011)………………………………………...…………30

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)……………………………………….……………16, 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)……………………………...…………………16, 30

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)………………………………………………21, 26

*Payne v. Pauley*,
337 F. 3d 767 (7th Cir. 2003)…………………………………...16, 24, 36

*Perez v. Thorntons, Inc.*,
731 F. 3d 699 (7th Cir. 2013)……………………….…………………36

*Reed v. Shepard*,
939 F. 2d 484 (7th Cir. 1991)……………………………………...………18

*Simon v. City of Naperville*,
88 F. Supp. 2d 872 (N.D. Ill. 2000)……………………………………22

*Texas Department of Community Affairs v. Burdine*,
450 U.S. 248 (1981)………………………………………………...…21

*Worth v. Tyler*,
276 F. 3d 249 (7th Cir. 2001)…………………………………………………..……………..19

**Statutes**

Fed. R. Civ. P. 56……………….……………..………..………………………………16

N.D. Ill. L.R. 56.1……………………………………………………………..….31

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331. Plaintiff filed this civil action for declaratory and injunctive relief and damages to redress the deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964 resulting from sexual harassment and sexual discrimination in the workplace, as well as retaliation. A-1.

On August 14, 2023, the District Court granted Defendant-Appellee's motion for summary judgment and dismissed Plaintiff's action with prejudice under case number 20-cv-7721. A-204. Plaintiff-Appellant timely filed a notice of appeal from that judgment on September 10, 2023. R. 73. Accordingly, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

1.  Was there a material issue of fact that precluded summary judgment where Plaintiff testified that her employer permitted patrons and co-workers to grope her, that she was treated differently than male co-workers, and that she was terminated after she complained to management?

2.  Whether the District Court properly deemed admitted paragraphs 7, 16, 17, 18, 19, 20, 21, 22, 26, 32, 35, 37, 42, 44, 45, 46, and 50 of Defendant's Rule 56.1 statement of material facts where Plaintiff entered a denial of the allegations and explained why she denied the allegations?

## STATEMENT OF THE CASE

From September 15, 2015, to September 22, 2017, Plaintiff-Appellant, Nikkolai Anderson, endured sexual harassment, sexual discrimination, and was terminated from her employment with Mott Street after speaking out to superiors about her hostile work environment. A-45, A-126.

**Factual Background**

Mott Street is a high-end Asian-fusion restaurant located in Chicago. A-14 at ¶ 1. It is co-owned by CEO Edward Kim ("Edward"), General Manager Nathaniel Chung ("Chung"), Jennifer Kim ("Jennifer"), and Victoria Kim ("Victoria"). *Id.* at ¶ 2.

In the fall of 2015, Anderson was hired at Mott Street as a host, and she worked alongside several other hosts. A-45, A-54. At the time she was hired, Anderson had also a full-time job at a law firm as a receptionist. A-45 – A-46. Due to Anderson's commitment to her primary job, Anderson's shift at Mott Street started at 6:00 p.m. A-48.  Ultimately, Anderson began working full time at Mott Street during her last six months of employment with them. *Id.*

During her time at Mott Street, Anderson fell victim to the negative culture and double standards at the establishment. A-46 – A-47. For example, Mott Street claims to have terminated Anderson because of customer complaints, but, on more than one occasion, customers complained about Simon, a male server, but he was never reprimanded or terminated by management. A-47, A-52; A-220 – A-221. In addition to the double standards, Anderson experienced pervasive sexual harassment and sexual discrimination, which she soon learned that other women employees, to wit: Emma, Lola, Jaelen, Johanna, Mya, and Emily, also complained about the hostile work environment. A-103. In one incident, Anderson complained to Chung and Emma Domach, a manager, that she was touched by a patron in a sexual manner on her "chest and behind." A-62.

As a result, Anderson complained to Chung that the incident made her uncomfortable wearing short shorts and crop tops at work, and she wanted to wear loose clothing. *Id.* Chung, however, told her to continue wearing tight clothing. *Id.* Anderson complained about the patrons groping a lot, so she requested to change positions and become a server to avoid such behavior. A-61; A-69.

A second incident occurred with Gabe Freeman, a chef at Mott Street, where he touched Anderson's behind during the winter of 2016 going into 2017. A-67. Anderson complained to several managers, to wit: Lola Olajetju, Emma, and Mia, about the incident. *Id.* Freeman also hugged Anderson by grabbing her at the waist on numerous occasions, which further made her feel uncomfortable. A-96.

Anderson also complained to Lola about Mike Melazzo calling her a bitch and Matty harassing her and making inappropriate comments to her. A-69 – A-70. On August 26, 2017, Anderson sent Lola an email stating:

> The work environment is extremely hostile, men at Mott St. do and say very inappropriate things which I find to be very disrespectful and uncomfortable. From my clothes to even me just following the Mott Rules, I get criticized. I have talked to you many times about most of my concerns, [so] I'm just sending this, because now it's a point where I feel unappreciated, dismissed, disrespected, degrading [sic] for women, unfairly treated, and torn down...Not only as an employee, but as a human.

A-200 – A-201. Chung was aware of the August email because Chung started acting more passive-aggressive with Anderson from the time she sent the August email up to the time of her termination. A-65, A-177. Lola even told Anderson that the email bothered Chung. A-115.

On September 22, 2017, at 3:56 p.m., Anderson sent another email to Lola expressing her concerns about men mocking her menstrual cycle, about men doing and saying inappropriate things, including telling her to wear tight clothing. A-202. The email was sent prior to 5:00 p.m.,

4

at which time Anderson arrived for the family meal. A-65. Anderson sent this email because the

previous Saturday, on September 16, 2017, she was raped by an Uber driver, and the police officer

investigating the case told Anderson the attack occurred because of what she was wearing. A-60;

A-166. Anderson then informed Lola about the rape, who in turn informed Chung. A-167.

Anderson was subsequently terminated from Mott Street on September 22nd or September 23rd

of 2017, shortly after she sent the e-mail. A-62, A-65, A-177.

Anderson filed a complaint with EEOC, and EEOC investigated Anderson's allegations

and issued findings in the form of a Determination which states:

> I have determined that the evidence obtained in the investigation
> establishes reasonable cause to believe that Respondent
> discriminated against the Charging Party and a class of individuals
> because of their sex, female, when they were subjected to sexual
> harassment, in violation of Title VII. I have further determined that
> Respondent retaliated against the Charging Party when she was
> discharged, in violation of Title VII.

A-10. To Anderson's detriment, Mott Street engaged in a pattern and practice of subjecting

Anderson to unwelcome and unwanted sexual advances; unwanted and unwelcome touching and

groping by employees and restaurant patrons; Anderson was subjected to jeers, lewd comments,

and sexual suggestions; Anderson was referred to as "bitch" and as having a "phat ass"; and this

harassment occurred in the presence of the managers who would either take no disciplinary action

or insufficient action against patrons and employees who engaged in such sexually offensive

conduct. A-61, A-65, A-67 – A-68, A-70 – A-71; A-91, A-94 – A-95, A-98 – A-100, A-167, A-

172 – A-179. The male employees were typically assigned better work schedules and were allowed

to take time off or be late without impunity, while Anderson and other female employees were not

given equal treatment. A-71. In 2017, Mott Street promoted Anderson to the position of lead host.

A-57. Mott Street told Anderson to wear tight clothing when she worked as a host. A-99. Even after she was raped, Mott Street wanted Anderson to continue to wear form-fitting clothing when she worked as a host. A-60 – A-61.

Shortly after Anderson sent an email displaying her frustration with Mott Street's failure to stop the sexual harassment and sexual discrimination, she was terminated. A-202 – A-203. Upon her termination, Anderson filed a Complaint with the Equal Employment Opportunity Commission and received a notice of right to sue on September 25, 2020. A-9. On December 24, 2020, she filed the instant action in the United States District Court for the Northern District of Illinois against her former employer, Defendant-Appellee, Mott Street ("Mott"), alleging she was subject to sexual harassment, discrimination on the basis of her sex, retaliation for complaining about the harassment and discrimination, and intentional infliction of emotional distress ("IIED"). A-1.

**Procedural History**

After approximately six months of negotiations, the parties reached a tentative settlement and informed the District Court that they were working to finalize the settlement paperwork. R. 20. The case was subsequently dismissed without prejudice, with leave to reinstate within 30 days. *Id.* On July 29, 2021, the District Court granted Anderson's motion to reinstate the case after the parties were unable to reach an agreement regarding the post-settlement conduct of the parties. R. 22. On September 27, 2021, Defendant Mott Street moved to enforce the parties' settlement agreement, but the District Court denied the motion, and the parties began to engage in discovery. R. 24, 37, 43.

**Summary Judgment & Disputed Facts**

At the close of discovery, Defendant moved for summary judgment. R. 57. In Defendant's

56.1 statement of facts, it alleged numerous facts spread out over 68 numbered paragraphs. A-12

– A-30. Plaintiff filed a responsive statement of facts with 68 numbered paragraphs, which

corresponded to the 68 paragraphs filed in Defendant's statement of facts. A-32 – A-39 Plaintiff

specifically denied the following relevant paragraphs provided in Defendant's statement of facts:

> 4. Mott Street employs between 20-30 employees, depending on the
> time of year. (Chung Decl. ¶ 8.) It is an equal opportunity employer
> with a diverse workforce and management team. (*Id.* at ¶ 13.) Every
> applicant or employee has an equal opportunity with respect to all
> terms and conditions of employment, including hiring, pay,
> discipline, and termination (if appropriate), regardless of one's sex
> or any other protected characteristic. (*Id.*) In fact, GM Chung, who
> is primarily responsible for hiring "Front of the House" ("FOTH")
> employees, including hosts, identifies as "Asian and Queer," which
> involves individuals from two marginalized communities. (*Id.* at ¶
> 7, 12, and 19.) As a result, Chung makes every effort to ensure that
> minorities and people from underrepresented communities are given
> opportunities to succeed at Mott Street. (*Id.*). A-32.
>
> 7. Mott Street strictly prohibits harassment, discrimination, and
> retaliation of any kind, including harassment or discrimination
> based on sex. (Chung Decl. ¶ 10.) Indeed, the FOTH Handbook,
> specifically states that employees are prohibited from "[d]isplaying
> any form of rudeness, discourtesy or discrimination against an
> employee or guest because of race, nationality, gender, religion, age
> [or] orientation." (Chung Decl. ¶ 10; Chung Decl. Ex. A and B,
> Bates #MOTT000055.) In addition, Mott Street has "zero tolerance"
> for harassment and prohibits "[s]exual advances, requests for sexual
> favors or other verbal or physical conduct of a sexual nature that has
> the purpose or effect of interfering with an employee's work
> performance or creating a[n] offensive work environment." (Chung
> Decl. ¶ 10; Chung Decl. Ex. A and B, Bates #MOTT000055 and
> MOTT000062.) The Restaurant encourages any employee who
> witnesses or is a victim of harassment or discrimination to
> immediately report the offending conduct to their supervisor or any
> of the Mott Street partners. (Chung Decl. ¶ 11.) Mott Street
> investigates each report of harassment or discrimination thoroughly,

7

with sensitivity to confidentiality, and prohibits retaliation against any employee who makes such a report. (*Id.*) Any employee found to have violated the anti-harassment/discrimination policy is subject to discipline, up to and including termination. (*Id.*) Mott Street also has an "open door" policy and encourages employees to bring any issue to the attention of any partner. (*Id.*) Mott Street's management team reviews its strong stance against harassment and discrimination with new employees at orientation and periodically throughout employment. (*Id.*) A-32 – A-33.

14. On multiple occasions throughout her employment, Chung reiterated to Anderson the importance of being friendly to guests and coworkers. (Chung Decl. ¶ 25.) A-33.

16. Numerous times throughout Anderson's employment, Chung observed Anderson being impatient with guests or displaying a negative demeanor. It was Chung's impression that Anderson was "short" or "cold" with guests rather than warm and inviting. Chung observed Anderson avoiding eye contact with guests, failing to smile, and failing to exchange pleasantries with guests. On numerous occasions, Chung witnessed Anderson answer the phone by curtly saying "Mott Street," instead of warmly saying "Good afternoon, Mott Street, how may I help you?" which is the "script" that the FOTH Handbook requires and that Chung instructed Anderson to follow. (Chung Decl. ¶ 26.) A-33.

17. Chung also witnessed Anderson become edgy or outright unpleasant with guests on occasion. (Chung Decl. ¶ 27.) At least one time per month during Anderson's employment, a negative guest interaction involving Anderson escalated to a point to where Chung had to intervene, calm the guest down, and deescalate the situation. (*Id.*) A-33.

18. Chung did not observe the same negative demeanor with respect to any other host. (Chung Decl. ¶ 28.) No other host had interactions with guests that deteriorated to the point where Chung had to intervene. (*Id.* at ¶ 29.) A-33.

19. CEO/Executive Chef Edward Kim also observed Anderson display a negative demeanor toward guests. (E. Kim Decl. ¶ 7.) Edward Kim also witnessed Anderson using an electronic device in front of customers, which was disturbing and contrary to the policies in the FOTH Handbook. (E. Kim Decl. ¶ 9; see also Chung Decl. ¶ 41; Chung Decl. Ex. B, Bates #MOTT000056.) Kim also overheard

Anderson curtly answer the phone on multiple occasions without following the phone script. (E. Kim Decl. ¶ 7.) It was Kim's impression that Anderson was "short" or "cold" with guests rather than warm and inviting. (*Id.* at ¶ 7-9.) A-33.

20. Partner Victoria Kim also observed Anderson display a negative demeanor toward guests. (Victoria Kim Decl. ¶ 5.) Victoria observed that Anderson did not smile during guest interactions, and she avoided eye contact. (*Id.*) Victoria observed that Anderson greeted guests with a curt "hi," rather than a warm welcome, such as "Welcome to Mott Street," which is what Anderson was required to do. (*Id.*) It was Victoria's impression that Anderson was "short" with guests and came across as "pretentious." (*Id.*) A-34.

21. Victoria Kim also dined at Mott Street on approximately three occasions between September 2016 and April 2017 while she was on a leave of absence. (V. Kim Decl. ¶ 6.) During Victoria's dining experiences, Anderson treated Victoria with the same negative and short demeanor. (*Id.*) Anderson failed to smile at Victoria or welcome her with a warm greeting. (*Id.*) It was Victoria's impression as a guest/diner at Mott Street that Anderson was "disengaged, cold, rude, unwelcoming, pretentious, and dismissive." (*Id.*) Victoria Kim reported her negative experiences involving Anderson and her impressions of Anderson to GM Chung. (V. Kim Decl. ¶ 7; Chung Decl. ¶ 37.) A-34.

22. Partner Jennifer Kim dined at Mott Street at some point during Anderson's employment. Jennifer recalls that Anderson was not hospitable at the host stand, responded with one- or two-word answers, and did not feel welcomed by Anderson. (Jennifer Kim Decl. ¶ 6.) Jennifer Kim reported her negative experiences involving Anderson to CEO/Executive Chef Edward Kim (her husband). (J. Kim Decl. ¶ 7; E. Kim Decl. ¶ 10.) A-34.

26. Upon receiving these negative reviews, Chung reviewed the FOTH schedules and found that Anderson was the only host working on November 6, and November 13, 2016. (Chung Decl. ¶ 32.) Anderson admitted in her deposition that this would be a "way to get proof" as to whether the complaints were about her. (Pl. Tr. 58:2-24.) This correlation plus Chung's own observations of similar behavior from Anderson, led Chung to conclude that Anderson was the "rude" host referenced by the three different guests. (Chung Decl. ¶ 32.) A-34.

30. Chung did not believe that Anderson showed any significant improvement in her demeanor towards guests after the retraining session. (Chung Decl. ¶ 36.) In fact, her negative demeanor with guests seemed to get worse over time. (*Id.*) Chung noticed that Anderson continued to avoid eye contact, was short with guests, failed to smile, and displayed an overall unpleasant demeanor. (*Id.*) A-34.

32. Chung was very disturbed by the second batch of emails. (Chung Decl. ¶ 39.) Once again, Chung reviewed the host schedules and found that Anderson was the host on all of the dates that the customers lodged the above complaints. (*Id.*) As before, Chung concluded that Anderson was the "rude" host referenced by these four guests. (*Id.*) A-34.

33. All hosts and servers are required to enter their work availability and scheduling preferences into an app called "When I Work." Anderson did not enter her work availability or scheduling preferences into this app during her employment. (Chung Decl. ¶ 40.) A-35.

35. In addition, while the FOTH Handbook makes it clear that hosts and servers are not permitted to use personal electronic devices while in view of guests, Anderson defied this policy on several occasions. (Chung Decl. ¶ 41; Chung Decl. Ex. B, Bates#MOTT000056.) This is considered a serious policy violation since it can be upsetting to guests who expect a host's undivided attention. (Chung Decl. ¶ 41.) Chung observed Anderson using an electronic device when she should have been working on at least two occasions, one of which occurred in early/mid- August 2017. (*Id.*) Anderson acknowledged that she used an electronic device for personal reasons on at least one occasion. (Pl. Tr. 44:13-15; 46:1-6.) A-35.

36. On approximately August 26, 2017, Chung observed Anderson utilizing an iPad for personal reasons, when she should have been attending to guests. (Chung Decl. ¶ 42; Pl. Tr. 69:15-17; see also Pl. Dep. Ex. 5). Since Chung had recently made it clear to Anderson that she was prohibited from using an electronic device for personal reasons, Chung instructed Anderson to clock out and leave for the day. (Chung Decl. ¶ 42.) A-35.

10

37. Chung considered all three of these refusals to comply with his instructions to be acts of insubordination by Anderson. (Chung Decl. ¶ 40-43.) A-35.

42. At approximately that same time, FOTH Manager Lola Olateju reported to Chung that she believed that Anderson should be terminated because of Anderson's overall rude behavior. (Chung Decl. ¶ 45.) A-35.

44. As before, Chung reviewed schedules and determined Anderson was working as the host during the interaction. (Chung Decl. ¶ 47.) A-35.

45. At that point, Chung determined that Anderson's termination was appropriate. (Chung Decl. ¶ 48.) In making his determination, Chung relied on his own interactions and observations with Anderson, the repeated negative guest reviews, his belief that Anderson was insubordinate, Lola Olateju's recommendation that Anderson be terminated, and Victoria Kim's report of Anderson's rude demeanor. (*Id.*) A-36.

46. Chung also discussed his decision to terminate Anderson with CEO/Executive Chef Edward Kim to see if Kim had any objections to terminating Anderson. (Chung Decl. ¶ 49; E. Kim Decl. ¶ 12-14.) Based on Edward Kim's own interactions and observations regarding Anderson, Chung's recommendation to terminate Anderson, the negative guest reviews, and Jennifer Kim's report of Anderson's negative demeanor, Edward Kim agreed that Anderson's termination was appropriate. (E. Kim Decl. ¶ 14.) A-36.

47. On September 22, 2017 at approximately 3:00 p.m., Chung informed Anderson that her employment was terminated, effective immediately. (Chung Decl. ¶ 50.) A-36.

48. Chung and Edward Kim, the primary decision makers, did not terminate Anderson because of her sex. (Chung Decl. ¶ 53; E. Kim Decl. ¶ 17.) A-36.

49. Chung and Edward Kim, the primary decision makers, did not know about Anderson's August 26th Email to Lola Olateju, and did not terminate Anderson due to any complaint of discrimination or harassment that she claims she made. (Chung Decl. ¶ 51-52, 54; E. Kim Decl. ¶ 15-16, 18.) A-36.

11

51. During her deposition, Anderson testified as to the basis of her sexual harassment claim. (Pl. Tr. 103:4-117:10; P. Tr. II 137:17-147:3.) Other than vague, generalized, and conclusory assertions, Anderson identified five instances of objectionable conduct that formed the basis of her claim. (*Id.*) A-37.

57. During her deposition, Anderson testified that she believed that she was terminated because of her gender. (Pl. Tr. 122:11-13.) Other than generalized assertions, such as "women quit," Anderson stated that she was treated differently than Simon DuFour, a male server, who showed late to work on numerous occasions, and he was not "written up" or terminated for tardiness. (Pl. Tr. 125:1-9; 117:23-118:19; Pl. Tr. II 147:4-148:13.) A-37.

60. Anderson testified that she believed she was terminated on September 22, 2017 in retaliation for sending Lola Olateju the August 26th Email. (Pl. Tr. 83:1-18, referencing Pl. Dep. Ex. 5; Pl. Tr. II 155:20-162:5, referencing Pl. Dep. Ex. 5.) A-38.

62. Anderson acknowledged that the only fact to support her claim that she was terminated in retaliation for sending the August 26, 2017 Email was "the time frame." (Pl. Tr. II 161:13-162:5.) A-38.

65. Anderson essentially conceded that her intentional infliction of emotional distress claim was premised on her civil rights claims: "the sexual harassment, the retaliation, and the discrimination against my sex." (Pl. Tr. II 173:4-16.) A-38.

66. Anderson could not provide any facts to show that managers intended to cause her severe emotional distress. (Pl. Tr. II 171:10-21.) A-38.

*Compare* A-12 – A-30 *to* A-32 – A-39 (in its responsive statement of facts, Plaintiff explicitly denies paragraphs numbered 4, 7, 14, 16-22, 26, 30, 32-33, 35-37, 42, 44-49, 51, 57, 60, 62, 65-66 that correspond to the paragraphs in Defendant's statement of facts).

**Ruling Presented for Review**

On August 14, 2023, the District Court granted Defendant's motion for summary judgment. A-229. The District Court stated, "Anderson filed a response to Mott Street's SOF

12

that asserted additional facts but failed to file a SOAF. . . [thus] this Court should therefore disregard any additional facts to which Anderson cited in her brief and response to Mott Street's SOF, as well as those which are not supported by the evidence. But ultimately, it does not matter, because even if this Court considered Anderson's additional facts, Mott Street's motion must still be granted." A-205 – A-206.

In the District Court's written opinion, its facts statement, however, relied almost exclusively on the factual allegations provided in Defendant's statement of facts. *Id.* Although Plaintiff denied the factual allegations presented in Defendant's statement of facts for paragraphs numbered 7, 16, 17, 18, 19, 20, 21, 22, 26, 32, 35, 37, 42, 44, 45, 46, and 50, the District Court disregarded Plaintiff's denials. *Compare* A-12 – A-30 *to* A-32 – A-39 at ¶¶ 7, 16-22, 26, 32, 35, 37, 42, 44-46, 50 (although Plaintiff denied approximately 17 significant factual allegations, the District Court gave no consideration to Plaintiff's denials as it deemed admitted practically all of Defendant's statement of facts).

On September 10, 2023, Plaintiff filed a timely notice of appeal from the District Court's grant of Defendant's summary judgment motion. R. 73. Plaintiff now brings the instant appeal.

## SUMMARY OF THE ARGUMENT

The District Court erred in finding that Appellees were not liable for Sexual Harassment, Sexual Discrimination, and Retaliation against Anderson. First, the District Court failed to view conflicting facts in the light most favorable to the nonmoving party, the Plaintiff. Anderson presented sufficient evidence to create genuine issues of material fact as to these Counts.

The District Court, however, engaged in impermissible fact finding and erroneously failed to view all reasonable inferences in Anderson's favor when it determined that Mott Street did not engage in sexual harassment. The District Court unreasonably determined that Anderson's harassment was not severe or pervasive. Anderson presented evidence that her breasts and behind was groped by patrons and co-workers, she was hugged without consent by male staff on multiple occasions, she was called derogatory names, she was subjected to unwanted sexual comments and advances, and she was forced to wear tight provocative clothing even after she expressed concerns that it led to patrons touching her. Anderson's complaints to management fell on deaf ears. Regrettably, while wearing the provocative clothing that management forced her to wear against her will, she was raped by an Uber driver on or about September 16, 2017, after her shift ended.

The District Court also engaged in impermissible fact finding and erroneously failed to view all reasonable inferences in Anderson's favor when it found that Anderson did not establish a prima facie case of discrimination. Anderson presented sufficient evidence to create genuine issues of material fact. For example, Mott Street claims that Anderson was terminated for being rude to customers. Anderson, however, provided evidence of Simon Dufour being rude to customers, yet he experienced no consequence.

The District Court erred in finding that Anderson did not create genuine issues of material fact with respect to her Retaliation claims. The District Court failed to both consider and view the evidence presented in the light most favorable to Anderson when it determined that she did not engage in a statutorily protected activity. With respect to Anderson's claims of Intentional Infliction of Emotional Distress against Defendant-Appellee, Anderson concedes that the claim is time-barred as her complaint to EEOC did not toll the statute of limitations for this charge.

Finally, the District Court abused its discretion by practically admitting all of Defendant's 56.1 statement of facts while giving minimal consideration to Plaintiff's differing version of the facts, in part, because Plaintiff cited to no evidence outside of her deposition testimony.

With respect to Count I, Count II, and Count III of Anderson's Complaint, this Court should reverse the District Court's Orders granting summary judgment and remand this matter for a trial on the merits.

## ARGUMENT

### I. Plaintiff Should Have Survived Summary Judgment because Plaintiff Offered Sufficient Evidence such that a Reasonable Jury Could Find in Her Favor.

#### A. <u>Standard of Review</u>

A District Court's grant of summary judgment is reviewed de novo. As such, the reviewing court must decide if there exist genuine issues of material fact and whether the movants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue of material fact is one that is outcome determinative under the governing substantive law. *Howland v. Kilquist*, 833 F. 2d 639, 642 (7th Cir. 1987). In deciding whether the District Court decisions were appropriate, this Court views all evidence, and any reasonable inferences that may be drawn from the evidence, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cuddington v. Northern Indiana Public Service Co.*, 33 F. 3d 813, 815 (7th Cir. 1994); *Chaib v. GEO Group, Inc.*, 819 F. 3d 337, 340 (7th Cir. 2016). Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. *Payne v. Pauley*, 337 F. 3d 767, 770 (7th Cir. 2003). These credibility disputes are for fact finders to resolve. *Alexander v. Casino Queen, Inc.*, 739 F. 3d 972, 982 (7th Cir. 2014).

With respect to summary judgment motions in employment discrimination cases, the burden on the moving party is increased. *Courtney v. Biosound, Inc.*, 42 F. 3d 414 (7th Cir. 1994). The Court stated that, "a grant of summary judgment which turns on discriminatory intent should be approached with special caution. The summary judgment standard is applied with added rigor

in employment discrimination cases, where intent and credibility are crucial issues." *Id.* at 423. (Emphasis added). Since evidence supporting a claim of discrimination is rare, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination. *Id.* at 418.

## B. A Jury Could Find that Plaintiff Made a Prima Facie Claim for Sexual Harassment.

In order to prevail on a claim of sexual harassment, a party must establish that "(1) she was subject to unwanted harassment; (2) the harassment was based on sex; (3) the harassment created an intimidating, hostile or offensive working environment; and (4) there is a basis for employer liability." *Jarvis v. Sigmatron International Inc.*, 223 F. Supp. 2d 981, 984 (N.D. Ill. 2002). It is undisputed that the harassment Anderson experienced was based on her sex. Further, in its summary judgment Order, the District Court did not even dispute that a reasonable jury could find in favor of Anderson on the first and third elements of her sexual harassment claim. Instead, the focus of the Order, as to this claim, revolved around whether there was a basis for a hostile work environment. In assessing this claim, the District Court mistakenly failed to view all evidence in the light most favorable to Anderson and made improper credibility determinations. Consequently, the Court wrongly concluded that no employer liability existed.

### 1. Anderson was Subjected to Unwanted Harassment that Created Intimidating, Hostile, and Offensive Working Conditions.

It cannot reasonably be disputed that the conduct of Mott Street patrons and employees was unwelcome or that it created a hostile work environment. In order to be considered actionable sexual harassment, the relevant conduct must be unwelcome to the plaintiff. *Carr v. Allison Gas Turbine Div.*, 32 F. 3d 1007, 1008-1009 (7th Cir. 1994). "The question whether particular conduct

17

was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Reed v. Shepard*, 939 F. 2d 484, 491 (7th Cir. 1991)(*citing Henson v. Dundee*, 682 F. 2d 897, 904 (11th Cir. 1982)). "The correct inquiry is whether [the victim] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation … was voluntary." *Id.* Here, Anderson's actions show that the conduct was unwelcome; Mott Street was even aware of this when Anderson sent an email to the manager, Lola, on August 26, 2017, stating:

> *The work environment is extremely hostile, men at Mott St. do and say very inappropriate things which I find to be very disrespectful and uncomfortable. From my clothes to even me just following the Mott Rules, I get criticized. I have talked to you many times about most of my concerns, [so] I'm just sending this, because now it's a point where I feel unappreciated, dismissed, disrespected, degrading [sic] for women, unfairly treated, and torn down...Not only as an employee, but as a human.*

A-200 – A-201 (emphasis added).

This evidence, in and of itself, demonstrates a genuine issue of material fact that the sexual harassment was discussed with management "many times," that the work environment was "extremely hostile," and that Anderson was being "degraded as a woman." *Id.* In contrast, the District Court only identified four instances over a two-year period that Anderson alleged harassment directed at her. A-215. Anderson brought forth clear and specific claims that Gabe touched her behind; that Gabe hugged her several times grabbing her at the waist and caressed his hand over her butt; that Mike called her a "bitch"; that a patron grabbed her breasts and butt; that she was directed to wear tight form-fitted clothing against her requests; that patrons touched her inappropriately "a lot"; and that she complained many times to management but to no avail. A-200 – A-201; A-61, A-67, A-69 – A-70; A-95 – A-96. Accordingly, there is a genuine issue of material

18

fact as to whether the conduct experienced by Anderson was unwelcome. The District Court, however, focused its analysis solely on whether Anderson's harassment was severe or pervasive. A-214.

The same facts discussed above also created a severe and pervasive hostile work environment for Anderson, both objectively and subjectively. *Jarvis*, 223 F. Supp. 2d at 985. Sexual harassment that creates a hostile work environment need not be both severe and pervasive. *Jackson v. County of Racine*, 474 F. 3d 493, 499 (7th Cir. 2007). Objectively, a jury could easily find that the harassment Anderson experienced at Mott Street was severe and pervasive enough to create a hostile working environment. The District Court, however, did not view the evidence in the light most favorable to Anderson, but instead couched her evidence as "vague and unspecified claims." A-215. The District Court went even further to say that Anderson's claims were not serious. *Id.* Yet, the instances of sexual harassment that Anderson complained of were very specific, and this appellate court has found such conduct to be one of the most severe forms of sexual harassment. *Worth v. Tyler*, 276 F. 3d 249, 268 (7th Cir. 2001)("direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment"). As stated above, Anderson testified that Gabe touched her behind; that Gabe hugged her several times grabbing her at the waist and caressed his hand over her butt; that Mike called her a "bitch"; that a patron grabbed her breasts and butt; that she was directed to wear tight form-fitted clothing against her requests; that patrons touched her inappropriately "a lot"; and that she complained many times to management but to no avail. A-202 – A-203; A-61, A-67, A-69 – A-70; A-95 – A-96; *Worth*, 276 F. 3d at 268. Moreover, six other female employees complained about the hostile work environment for women, which indicates sufficient pervasiveness. A-103. Anderson found

19

the sexually harassing behavior to be so subjectively severe and pervasive that she requested to be placed in a different position. A-61, A-69. The District Court clearly failed to view this evidence in the light most favorable to Anderson, which, had it done so, would have precluded summary judgment.

The District Court also ignored one fact that is dispositive to this issue: Anderson's complaints to management about the sexually inappropriate behavior of co-workers and patrons. A-202 – A-203; A-47, A-52, A-62, A-67, A-69  A-70; A-200 – A201. The case of *Kampmier v. Emeritus Corp.*, 472 F. 3d 930 (7th Cir. 2006), is instructive on this point.

In *Kampmier*, the court considered the subjective hostility of the plaintiff's sexual harassment allegations. In that case, it was undisputed that the plaintiff allowed the harasser's significant other to babysit the plaintiff's daughter, the plaintiff gave the harasser a get-well card after the harasser had surgery, the plaintiff spent time with the harasser's son, and the plaintiff provided medical assistance to the harasser's mother. *Id.* at 942. Despite this seemingly cordial social relationship with the harasser, the *Kampmier* court held that "[the plaintiff's] repeated complaints regarding [the harasser's] harassment is sufficient to raise a genuine issue of material fact as to whether she found [the harasser's] harassment subjectively offensive." *Id.* In the present case, there is substantial evidence that Anderson repeatedly opposed the harassing conduct she experienced at Mott Street. A-202 – A-203; A-47, A-52, A-62, A-67, A-69 – A-70; A-200 – A201. These facts weigh in favor of the fact that Anderson was subjected to a hostile work environment for which Mott Street is liable for their failure to remedy the harassment. Thus, distinct issues of material fact exist as to these elements of a sexual harassment claim, so a jury must be allowed to weigh the evidence and make a determination.

### C. Plaintiff Produced Sufficient Evidence to Create Genuine Issues of Material Fact with Respect to Her Claim for Sexual Discrimination.

From the evidence presented to the District Court, a reasonable jury could infer that Anderson's claims were meritorious and that she presented sufficient circumstantial evidence of sex discrimination under the *McDonnell-Douglas* framework.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the United States Supreme Court outlined a burden-shifting approach for proving employment discrimination cases. Under that approach, Anderson must produce enough evidence to establish a prima facie case that he was a member of a protected class and that she was treated less favorably than someone who was not in the protected class "under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (explaining the *McDonnell Douglas* approach).

Anderson's deposition testimony showed that working at Mott Street was a hostile work environment for women. A-103. Anderson presented evidence in the form of emails she sent to Mott Street complaining that "men at Mott St. do and say very inappropriate things which [Anderson] found to be very disrespectful and uncomfortable." A-200 – A-201. Anderson also complained that the harassment had gotten to the point where she felt degraded as a woman." *Id.* At this point, the District Court should have found that Anderson shifted the burden to Mott Street to articulate a legitimate, nondiscriminatory reason for taking the action it did. *Id.* Mott Street indicated that it terminated Anderson for performance reasons, so Anderson would then have to show that the reasons offered by Mott Street were not its true reason but a pretext for discrimination. *Id.*

"Sexual harassment is the form of sex discrimination in the terms or conditions of employment." *DeClue v. Central Ill. Light Co.*, 223 F. 3d 434, 437 (7th Cir. 2000). As sexual harassment has been established as a form of sex discrimination, a finding of harassment in Anderson's case necessitates a finding of discrimination as well. *See Simon v. City of Naperville*, 88 F. Supp. 2d 872, 875-76 (N.D. Ill. 2000) (interpreting the Illinois Human Rights Act); *see also DeClue*, 223 F. 3d at 437. Anderson's allegations support both claims because sexual harassment and sexual discrimination claims are so closely linked. The District Court, however, engaged in improper fact-finding and weighing of evidence when it found that Anderson did not establish a prima facie case of discrimination because there are genuine issues of material fact pertaining to Anderson's sex discrimination claim.

It is undisputed that Anderson is a member of a protected class and that she experienced an adverse employment action when she was terminated. A-218. Mott Street only alleges that the second and fourth elements were not met. *Id.* However, a jury could have properly determined that Anderson's evidence established a prima facie case of unlawful discrimination for the following reasons: (1) Anderson was in a protected class, to wit: a female; (2) Anderson had satisfactory job performance; (3) she experienced an adverse act; and (4) male co-workers who were similarly situated to Anderson were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802.

### 1. Anderson was Treated Less Favorably than Similarly Situated Male Employees.

The District Court focuses its attention on whether male employees were subject to the same disciplinary actions by management as female employees. A-218 – A-219. In viewing the evidence in the light most favorable to Anderson, the District Court should have also addressed whether male employees were subjected to the same harassing conduct and termination that

22

Anderson endured; but it did not. The District Court erroneously stated that "Anderson herself was never disciplined for being late or drinking on the job, and she does not allege that [Simon] DuFour was the subject of negative reviews, was observed being unfriendly to customers, or was insubordinate to supervisors." A-219. To the contrary, Anderson evidence shows that, on more than one occasion, customers complained about Simon, but he was never reprimanded or terminated by management. A-47, A-52. This is a genuine issue of material fact. The District Court, however, relies on Mott Street's evidence that "male employees were also terminated when they engaged in similar wrongdoing as Anderson." A-219. Yet, Anderson, provided evidence that at least six other females employees believed that women were treated differently than men. A-67 Here, the District Court resolved the conflict in favor of Mott Street rather than viewing the evidence in the light most favorable to Anderson and letting a jury make the determination.

Mott Street has averred throughout this litigation that they are equal opportunity employers which do not discriminate against anyone. A-15. Effectively, this operates as a denial that males were subjected to the same harassment and ostracism described in Anderson's claims. Significantly, the District Court failed to address whether male employees at Mott Street were subjected to harassment and ostracism because of their sex – as Anderson was – that resulted in complaints to management and requests to change positions. Similarly situated males had different working conditions from Anderson, and there is a genuine issue of material fact as to this element of Anderson's sex discrimination claim.

**2. Anderson's Testimony that Her Work Performance was Satisfactory was Sufficient Evidence of Pretext to Preclude Summary Judgement.**

The District Court further found that Mott Street gave legitimate performance reasons for

Anderson's termination. A-220 – A-221. It indicated that Mott Street terminated Anderson for the
following reasons:

> [S]he was insubordinate and rude to customers based on their own
> observations, guest complaints, and the reports of other employees
> and managers. All four owners of Mott Street claim they
> independently observed Anderson being rude, curtly answering the
> phone, avoiding eye contact, and displaying a cold demeanor. Then,
> throughout late 2016 and 2017, Mott Street received eight negative
> guest reviews about a rude female host. Chung determined these
> complaints to be about Anderson based on the days she worked and
> his own observations. Further, according to Chung, Anderson was
> insubordinate by failing to enter her scheduling preferences into the
> correct software, storing her personal belongings at the host stand,
> and repeatedly using electronic devices for personal reasons in front
> of guests. The final straw, according to Mott Street, was when
> FOTH manager Olateju forwarded to Chung the eighth negative
> review which she attributed to Anderson and recommended she be
> terminated.

A-220 – A-221. The District Court erred in finding Anderson's deposition testimony that her work

performance was satisfactory to be "inconsequential." A-221. The court in *Payne v. Pauley*, 337

F. 3d 767 (7th Cir. 2003), stated even "a self-serving affidavit is an acceptable method for a non-

moving party to present evidence of disputed material facts." *Id.* at 773. Here, Anderson has

deposition testimony taken on two separate dates that provide sufficient evidence that genuine

issues of material fact exist to preclude summary judgment. In reviewing a motion for summary

judgment where each party's testimony relays a different version of the facts, the facts must be

viewed in the light most favorable to the party opposing the motion. *Id.* Here, Anderson testified

that she was terminated because she was different from her male counterparts in that she was a

"black woman," and "she never got a write-up, she never got anything done to her, and she was

rarely late."  A-57, A-59, A-72. Anderson further presented evidence that non-black and non-

female workers were not terminated despite receiving write-ups or being late. *Id.* This

24

inconsistency created a genuine issue of material fact as to whether Mott Street's stated reason for discharging her was a pretext for discrimination. *See Curry v. Menard, Inc.*, 270 F. 3d 473, 479 (7th Cir. 2001).

Furthermore, the District Court failed to compare Mott Street's testimony that Anderson was terminated for receiving 8 negative internet reviews against Anderson's testimony that she received a promotion, she was never written up, and no manager or owner of Mott Street confronted her about any negative internet reviews. A-220 – A-221; A-57, A-60, A-72. This contradictory evidence constitutes a genuine issue of material fact that should have been determined by a jury. In reviewing the evidence in the light most favorable to Anderson, the District Court should have questioned why it took so long for Mott Street to terminate Anderson if she truly received so many bad reviews and complaints because the Mott Street handbook lists out potential forms of discipline depending on the severity of conduct, and states that first-time violations such as insubordination "may result in disciplinary action up to and including termination." A-222.

Ultimately, Mott Street claims the reviews were about Anderson and, in turn, Anderson denies the reviews were about her; the issue becomes one of credibility because the positions of the parties rely solely on *he-say she-say* evidence. Although issues of credibility cannot be resolved at the summary judgment stage, here, the District Court improperly found credible Mott Street's belief that it had "legitimate, non-discriminatory reasons for terminating Anderson." *Id.*; A-220. A jury is tasked with making credibility determinations, and a reasonable jury could have found that Anderson showed Mott Street's reasons for termination were pretext, so Anderson should have been precluded from summary judgment. *Id.*

**D.  A Jury Could Find that Plaintiff Made a Prima Facie Claim for Retaliation.**

From the evidence presented to the District Court, a reasonable jury could infer that Anderson has presented sufficient evidence of retaliation. There is a genuine issue of material fact as to whether Anderson was subjected to actionable retaliation. To establish retaliation, Anderson must show that (1) she engaged in a protected activity; (2) Mott Street committed a material adverse act against her; and (3) a causal nexus existed between the protected activity and the adverse act. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). If Mott Street articulates a legitimate reason for the adverse employment action, Anderson must show that the stated reason was pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 804-805.

Once again, the District Court chose *not* to consider and view the evidence in the light most favorable to Anderson, and it erroneously determined that Anderson's email sent on August 26, 2017, was not a protected activity. *See Benitez v. Am. Std. Circuits, Inc.*, 68 F. Supp. 2d 745, 761 (N.D. Ill. 2010)(holding that protected activities range from formal complaints to voicing complaints to supervisors).   As a result, summary judgment was improper.

**1.  Anderson Engaged in Protected Activities Prior to an Adverse Employment Action.**

Anderson engaged in, and attempted to engage in, multiple protected activities prior to any adverse employment action. Anderson made many complaints to her manager, Lola. These allegations created a genuine issue of material fact and consequently, a jury must decide if Anderson engaged in a protected activity prior to an adverse employment action. Most importantly, Anderson complained to her manager throughout her employment at Mott Street, with the most intense complaints occurring on August 26, 2017, and September 22, 2017. A-202 – A-203; **A-200**

26

– A-201; *Benitez*, 68 F. Supp. 2d at 761 (holding that protected activities range from formal complaints to voicing complaints to supervisors).

The District Court wholly ignored Anderson's assertions that she had complained on multiple occasions to Lola about the harassing behavior of co-workers, patrons, and Chung. A-200 – A-201. Instead, the District Court chose to improperly weigh the evidence surrounding Anderson's attempts to report her allegation of sexual harassment and discrimination. Anderson's August 26, 2017, complaint to Lola resulted in Chung being passive-aggressive with Anderson until her termination in September. A-65; A-177. Even after she informed Mott Street that she had been raped, Anderson was placed on the schedule to be a host, - a position in which Chung directed her to wear tight provocative clothing. A-202 – A-203. Further, Anderson has presented evidence that Mott Street was on notice of the sexually harassing behavior and willfully chose not to take action. Anderson presented specific evidence that the harassing behavior was degrading to women. *Id.* On September 22, 2017, Anderson again complained to Lola via email prior to starting her shift. A-202 – A-203; A-64 – A-65. The District Court, however, stated Anderson did not present evidence to create a genuine issue of fact as to whether Mott Street knew about the protected activity prior to the termination because Anderson said she could not remember. A-224 – A-225. The District Court again failed to view the evidence in the light most favorable to Anderson because, in her deposition, when Anderson was questioned about whether her September 22, 2017, email at 3:56 p.m. occurred before or after her termination, the following discussion occurred:

> **Q.** [When that email was sent] 3:56 p.m., does that refresh your memory as far as whether that was before or after your termination?
>
> **A.** It doesn't because if you said -- you said -- you talked about family meal. Family meal is usually at 5:00, so it would have been --

27

**Q.** I asked about family meal as a side issue. I didn't -- I didn't connect it necessarily to this, but –

**A.** It was a part of that conversation. You said -- you asked me about my –

**Q.** Was it –

**A.** -- around family meal.

**Q.** Was it before the family meal?

**A.** So family meal's at 5:00; so if I came at 5:00, this is before 5:00.

**Q.** Does it refresh -- my question is simply this.

**A.** Does it refresh, no.

**Q.** Let me finish my question.· It goes a lot smoother if you just let me finish my question.

**A.** Okay.

**Q.** Now that you see the time stamp on this e-mail was at 3:56 p.m., does this refresh your memory as far as whether this was before or after your termination?

**A.** It does not refresh anything.

**Q.** So if it was after your termination, it could not have been -- your termination could not have been in retaliation for this e-mail; correct?

**A.** No, because if I came -- what time did I -- I always arrived for family meal; so if I was there for family meal, then that's 5:00 o'clock, so then it would be before. I don't remember.

A-64 – A-65. In the above choppy exchange, Anderson twice answered she sent the email *before* she was terminated. *Id.* [Emphasis added]. She explained that she would arrive at Mott Street at 5:00 p.m., so the email was sent an hour before her arrival at Mott Street for the family meal. *Id.*

Mott Street's position is that the email was sent an hour *after* she was terminated. A-224. The above exchange clearly shows that Anderson was confused about the line of questioning, but she maintained that she sent the email before her arrival at Mott Street at 5:00 p.m.  A-64 – A-65. The District Court failed to view this evidence in the light more favorable to Anderson, which would have precluded summary judgment.

The District Court then improperly determined that Anderson's August 26, 2017, email was not a protected activity because the email was "ambiguous." A225 – A-226. The email, however, was not ambiguous, and clearly stated, in pertinent part:

> I just don't understand why my preference of the shifts is not accommodated, when people like Simon, Raffy, and Madonna's are . . . Another concern I have been battling with, is the fact that I feel as though I'm being disrespected and dismissed and regards to progression and other tasks I wish to take on. I have asked for several months to begin as a SA [serving assistant] since Nate and you were weren't giving me this hosts shifts I have requested I would do another job so I could accommodate out the days that I don't work. The work environment is extremely hostile, men at Mott St. do and say very inappropriate things which I find to be very disrespectful and uncomfortable. From my clothes to even me just following the Mott Rules, I get criticized. I have talked to you many times about most of my concerns, [so]  I'm just sending this, because now it's a point where I feel unappreciated, dismissed, disrespected, degrading [sic] for women, unfairly treated, and torn down...Not only as an employee, but as a human.

A-200 – A-201. Based on this email, the District Court should have drawn a reasonable inference in Anderson's favor that she was being terminated due to her complaints about being told what clothing to wear and feeling degraded as a woman. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Cuddington*, 33 F. 3d at 815; *Chaib*, 819 F. 3d at 340.

Furthermore, Anderson's complaints put Mott Street on sufficient notice of the harassment. This creates a reasonable inference that must be left to a jury to decide whether or not Mott Street

prevented Anderson from fully engaging in a protected activity by dismissing her requests and terminating her. The District Court's summary judgment Order as to this claim must be vacated because it impermissibly ignores and weighs Anderson's evidence of complaints.

### 2. Appellees Committed Adverse Employment Actions against Anderson.

Mott Street's actions against Anderson would have dissuaded a reasonable employee from complaining of sexual harassment. An "adverse employment action" might "dissuade a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 68. There can be no dispute that Mott Street's refusal to place Anderson as a serving assistant and her subsequent termination qualify as adverse employment actions. *Johnson v. Cambridge Indus., Inc.,* 325 F. 3d 892, 902 (7th Cir. 2003).

### 3. There is a Causal Nexus Between Anderson's Protected Activities and the Adverse Employment Actions.

There is a genuine issue of material fact as to whether Anderson's protected activities caused her adverse employment actions. Suspicious timing is evidence of causation. *See Loudermilk v. Best Pallet Co., LLC*, 636 F. 3d 312, 315 (7th Cir. 2011). On September 22, 2017, at 3:56 p.m., Anderson made her most intense opposition to sexual harassment, directly to Lola, via email. A-202 – A-203. According to Mott Street, an hour prior to the email, with Lola's input, it decided to terminate Anderson. R. 58-Ex. 5 at pp. 10-11. Anderson, however, claims that she would not have arrived to Mott Street to learn of her termination until 5:00 p.m., an hour after sending the email. A-64 – A-65. This is sufficient to establish causation. *See Casna v City of Loves Park*, 574 F. 3d 420, 427 (7th Cir. 2009)(leaving question of causation to the jury where the plaintiff was recommended for termination one day after protected activity). As a genuine issue of

material fact exists as to whether Anderson's protected activities caused her adverse employment actions, it was improper for the District Court to grant summary judgment to Mott Street; a jury must be allowed to evaluate this claim.

## II. The District Court Erred in Admitting Paragraphs 7, 16, 17, 18, 19, 20, 21, 22, 26, 32, 35, 37, 42, 44, 45, 46, and 50 of Defendant's Rule 56.1 Statement of Material Facts because Plaintiff Specifically Denied the Allegations.

### A. Standard of Review

Appellate Courts review a trial court's decisions regarding strict compliance with local rules for an abuse of discretion only. *Curtis v. Costco Wholesale Corp.*, 807 F. 3d 215, 219 (7th Cir. 2015).

### B. Anderson Complied with Local Rule 56.1

This District's Local Rule 56.1 requires each party opposing a summary judgment motion to file a response to the movant's Local Rule 56.1 Statement of Material Facts ("SOF"), either admitting, denying, or admitting/denying in part each numbered paragraph of the SOF. N.D. Ill. L.R. 56.1(b)(2). The Rule also provides that in its response, a party "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." *Id.* § 56.1(e)(2). If the respondent desires the Court to consider facts not set forth in the movant's SOF, the party is required to file a separate Statement of Additional Material Facts ("SOAF"). *Id.* § 56.1(b)(3).

In the instant case, the District Court abused its discretion in not considering Anderson's responsive statement of facts. A-205 – A-206. The District Court deemed that Anderson failed to properly contest statements made in Mott Street's Rule 56.1 Statement of Material Facts. *Id.* "The record suggests otherwise. " *Breneisen v. Motorola*, 512 F. 3d 972, 978

n.2 (7th Cir. 2008). In Anderson's response to Mott Street's 56.1 Statement of Facts, in pertinent part, she stated the following:

4. Denied. Mott Street did not enforce its policies equally because female employees would be subject to discipline for tardiness or drinking on the job, but the male employees would receive no discipline. [Ex. 3, Anderson dep. II, 219-220]. A-32.

7. Denied. Mott Street does not prohibit discrimination, harassment, or retaliation based on sex. Plaintiff experienced sexual harassment when a co-worker grabbed her butt [Ex. 2, Anderson dep. I, 105:19-24]; Plaintiff experienced sexual harassment when a patron grabbed her butt [Ex. 3, Anderson dep. II, 216:21-24]; Plaintiff testified that women were not treated right at Mott Street [Plaintiff experienced sexual harassment when a co-worker grabbed her butt [Ex. 2, Anderson dep. I, 105:19-24]; Plaintiff also testified that Mott Street retaliated against her when she emailed superiors complaining about the work conditions. [Ex. 2, Anderson dep. I, 83:15-18]. A-32 – A-33.

14. Denied. Chung never reiterated to Plaintiff the importance of being friendly. [Ex. 2, Anderson dep. I, 61:22-24, 62:1-3]. A-33.

16. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22]. A-33.

17. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22]. A-33.

18. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22]. A-33.

19. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22]. A-33.

20. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22]. A-34.

21. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22]. A-34.

22. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22]. A-34.

26. Denied. Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24]. A-34.

30. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24]. A-34.

32. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24]. A-34.

33. Denied. Plaintiff entered her work availability into the software application,  but management did not assign her the times she preferred. [Ex. 2, Anderson dep. I, 77:15-24, 78:1-9, 120:14-17]. A-35.

35. Denied. Plaintiff was yelled at once about using her phone. [Ex. 2, Anderson dep. I,  44:13-24]. A-35.

36. Denied. Plaintiff did not use an iPad for personal reasons on August 26, 2017. [Ex. 2, Anderson dep. I, 51:2-10]. A-35.

37. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was insubordinate. [Ex. 2, Anderson dep. I, 65:3-22]. A-35.

42. Denied. Plaintiff testified that Lola said Nate wanted to terminate her employment. [Ex. 3, Anderson dep. II,  153:4-20]. A-35.

44. Denied. Plaintiff would have received a write-up, and she would

not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24]. A-35.

45. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her [Ex. 2, Anderson dep. I, 59:1-24]; Plaintiff testified that Lola said Nate wanted to terminate her employment. [Ex. 3, Anderson dep. II, 153:4-20]. A-36.

46. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her [Ex. 2, Anderson dep. I, 59:1-24]; Plaintiff testified that Lola said Nate wanted to terminate her employment. [Ex. 3, Anderson dep. II, 153:4-20]. A-36.

47. Denied. Chung did not terminate Anderson at 3:00 p.m. [Ex. 2, Anderson dep. I, 71:12-24, 72, 73:1-15]. A-36.

48. Denied. Plaintiff testified that Nate discriminated against her because of her sex in terminating her employment. [Ex. 3, Anderson dep. II, 153:4-20]. A-36.

49. Denied. Plaintiff testified that Nate discriminated against her because of her sex in terminating her employment [Ex. 3, Anderson dep. II, 153:4-20]; Chung was aware of the August 26, 2017, e-mail because Lola copied Chung on her reply to Plaintiff's e-mail on September 12, 2017. [Ex. 4] A-36.

51. Denied. Plaintiff gave specific instances of conduct to support her sexual harassment claim, to wit: (1) Gabe grabbed Plaintiff's buttocks and told her, "You have a nice butt"; (2) Male co-workers and patrons of the restaurant touched, caressed, and squeezed Plaintiff's body in ways that were offensive, unwanted, and sexually harassing; (3) Restaurant patrons and co-workers regularly referred to Plaintiff as a bitch; (4) Restaurant patrons and co-workers would regularly rub their hands on Plaintiff and touch her waist, breasts, or buttocks without her consent and in a sexually offensive manner; (5) Male

co-workers regularly made lewd and offensive statements to Plaintiff; (6) Male employees requested sex or sexual acts from Plaintiff which were offensive, unwanted, and sexually harassing. [Ex. 1, pp. 4-5 of Complaint; Ex. 2, Anderson dep. I, 40:15-20]. A-37.

57. Denied. Plaintiff testified that women were not treated right at Mott Street [Ex. 2, Anderson dep. I, 105:19-24]; Plaintiff testified that men, in particular, were doing wrong things, unprofessional things, things that were not in the policy, and they would not get fired [Ex. 3, Anderson dep. II, 219:13-24]; Plaintiff stated that Mott Street would not terminate men for being tardy or drinking on the job, but they terminated women if they engaged in such conduct. [Ex. 3, Anderson dep. II, 220-222:1-9]. A-37.

60. Denied. Plaintiff testified that she believed she was terminated on September 22, 2017, in retaliation for sending Lola Olateju the August 26th e-mail [Ex. 2, Anderson dep. I, 83:1-18]; Plaintiff also stated that she was terminated for repeatedly complaining to Mott Street managers about the sexual harassment and demeaning work environment. [Ex. 1, p. 5 of Complaint]. A-38.

62. Denied. Plaintiff acknowledged that her retaliation claim is supported by "the time frame" between the email and her termination, and because Lola told her the email bothered Nate. [Ex. 3, Anderson dep. II, 161:13-24, 162:1-8]. A-38.

65. Plaintiff has insufficient information to admit or deny because paragraph 63 is vague, confusing, and incomprehensible. Plaintiff has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny. A-38.

66. Admitted in part, Denied in part. Plaintiff indicated that her complaints in general resulted in the retaliation by Mott Street of terminating her employment. [Ex. 3, Anderson dep. II, 155:20-24, 156:1-13]. A-38.

A-32 – A-39. As shown in each of the numbered paragraphs above, Anderson explicitly denies the factual allegations provided by Mott Street and provides a brief response to Mott Street's asserted

facts. Despite these facts, the District Court did not draw reasonable inferences in favor of Anderson because, had it done so, Anderson would have certainly survived summary judgment. The District Court's fact statement, however, relied almost entirely on Mott Street's 56.1 statement of facts. A-206 – A-207. The District Court should have wholly considered the evidence provided in Anderson's 56.1 responsive statement to find that there were genuine issues of material fact in dispute. *See Perez v. Thorntons, Inc.*,  731 F. 3d 699, 706 (7th Cir. 2013).

Accordingly, where the material facts specifically averred by the party moving for summary judgment are denied by the non-moving party, the motion must be denied. *See Lujan*, 497 U.S. at 888). "A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true." *Payne*, 337 F. 3d at 770. Thus, it was error for the District Court to deem admitted those facts alleged by Mott Street that were clearly denied by Anderson.

## CONCLUSION

This Court should reverse the District Court's Order and Judgment and remand this case for further proceedings.

Dated: February 3, 2024                          Respectfully Submitted,


/s/ *Sean Brown*
SEAN BROWN
The Law Office of Sean Brown, LLC
Attorney for Plaintiff-Appellant
ARDC# 6308654
111 West Jackson Blvd, Suite 1700
Chicago, Illinois 60604
(312) 675-6116
attorneyseanbrown@gmail.com

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Plaintiff-Appellant, Nikkolai Anderson, furnishes the following in compliance with F.R.A.P Rule 32(a)(7), and I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a proportionally spaced font in 12-point Times New Roman style font. The length of this brief is 10,645 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

Dated: February 3, 2024

By:   /s/ *Sean Brown*
SEAN BROWN
The Law Office of Sean Brown
111 West Jackson Blvd, Suite 1700
Chicago, Illinois 60604
(312) 675-6116
attorneyseanbrown@gmail.com

Attorney for Defendant-Appellant

**PROOF OF SERVICE**

The undersigned, counsel for the Plaintiff-Appellant, Nikkolai Anderson, hereby certifies that on February 3, 2024, a copy of the Brief and Required Short Appendix of Appellant were filed electronically with the Clerk of the Court using the ECF system, which will send notification to such filing to the counsel of record for the Defendant-Appellee, Mott Street, via email.

Dated: February 3, 2024

By:    /s/ *Sean Brown*

    SEAN BROWN
    The Law Office of Sean Brown
    111 West Jackson Blvd, Suite 1700
    Chicago, Illinois 60604
    (312) 675-6116
    attorneyseanbrown@gmail.com

    Attorney for Defendant-Appellant

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit

Rule 30(a) and (b) are included in the appendix.


Dated: February 3, 2024

By:   /s/ _Sean Brown_
       SEAN BROWN
       The Law Office of Sean Brown
       111 West Jackson Blvd, Suite 1700
       Chicago, Illinois 60604
       (312) 675-6116
       attorneyseanbrown@gmail.com

       <u>Attorney for Defendant-Appellant</u>

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Complaint (Doc. 1)……………………………………………………..………………A-1

Exhibit 1 to Complaint
EEOC Right to Sue Letter (Doc. 1-1)…....................................................................... A-9

Exhibit 2 to Complaint
EEOC Determination Letter (Doc. 1-2)…..................................................................... A-10

Defendant's 56.1 Statement of Material Facts (Doc. 58)……………...….……………A-12

Plaintiff's Response to 56.1 Statement of Material Facts (Doc. 62)…………………………A-32

Plaintiff's Deposition on 12/30/2022 (Doc. 62-2)………………………………......A-41

Plaintiff's Deposition on 1/12/2023 (Doc. 62-3)…………………………………..….A-85

Defendant's 56.1 Statement of Additional Material Facts (Doc. 69)…………..……....A-195

August 26, 2017 E-mail (Doc. 62-4)...………………………………………………A-200

September 22, 2017 E-mail (Doc. 58-4)...……………………………………....A-202

Opinion and Order Granting Defendant's
Motion for Summary Judgment ) (Doc.71)..........................................................A-204

Final Judgment filed August 14, 2023 (Doc. 72) ..............................................A-229

**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NIKKOLAI ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-7721 |
| v. | ) | |
| | ) | |
| MOTT STREET | ) | |
| | ) | Plaintiff Requests Trial by Jury |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, NIKKOLAI ANDERSON, by and through her attorney, the Law Office of Sean Brown, for her Complaint against defendant, MOTT STREET, allege as follows:

## PARTIES

1. This is a proceeding for declaratory and injunctive relief and damages to redress the deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. '2000e et seq. ("Title VII").

2. Plaintiff NIKKOLAI ANDERSON is an African American female and is a resident of Chicago, Cook County, Illinois.

3. Defendant MOTT STREET is a domestic corporation incorporated under the laws of the State of Illinois.

4. Defendant Mott Street operates the Mott Street restaurant in Chicago, Cook County, Illinois and does business within this judicial district.

5. At all relevant times, the Plaintiff worked at the Chicago Mott Street restaurant where she was subjected to - and worked within - a hostile working environment.

## JURISDICTION AND VENUE

6. This action arises under Title VII, 42 U.S.C. 2000e-5 and 42 U.S.C. § 1981 and § 1981a.

7.  This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. Sections 1331, 1337, and 1343(a).

8.  This Court has personal jurisdiction over defendant as it is a resident of Illinois, and all actions complained of herein occurred in Illinois.

9.  Venue is proper in this district because the unlawful employment practices stated herein were committed within the Northern District of Illinois.

10. Defendant Mott Street does business in this judicial district.

11. Defendant further constitutes an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e-(b), based on their engagement in an industry affecting commerce and their employment of fifteen (15) or more employees for each workup day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

12. Prior to filing this civil action, the Plaintiff timely filed written charges under oath asserting employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). The Plaintiff received a notice of Right to Sue. (Exhibit A).

13. The Plaintiff timely filed this action in federal court.

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

14. The Plaintiff is asserting claims for sex discrimination and sexual harassment under Title VII, as well as claims on other bases.

15. The EEOC investigated Plaintiff's allegations, and, as a result of those investigations, the EEOC has issued findings in the form of a Determination which states:

> I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent discriminated against the Charging Party and a class of individuals because of their sex, female, when they were subjected to sexual harassment, in violation of Title VII. I have further determined that Respondent retaliated against the Charging Party when she was discharged, in violation of Title VII. (Exhibit B.)

2

16. Mott Street has engaged in a pattern and practice of discrimination, harassment, and
retaliation, and the Plaintiff has been subjected to harassment, discrimination and a hostile
working environment including, but not limited to:

    a. Unwelcome and unwanted sexual advances;

    b. Unwanted and unwelcome touching and groping by employees and restaurant
patrons;

    c. Being subjected to jeers, lewd comments, and sexual suggestions;

    d. Being stared at by male employees who were focused on certain parts of
Plaintiff's body;

    e. Being subjected to comments or offers of sexual contact or males telling Plaintiff
what they could or would like to do for Plaintiff or to Plaintiff;

    g. Being subjected to men making Plaintiff touch their genitals over their clothing;

    h. Being ridiculed for having complained and/or being admonished not to
complain in the future;

    i. Plaintiff was referred to as "bitch" on an ongoing basis.

    j. Male employees would routinely make crude and lewd comments directed at
Plaintiff, such as "You have a nice ass? You have nice titties. Are your titties
fake?"

    k. Plaintiff and other female employees were subjected to whistles, offensive
touching, and gazing on a daily basis.

    l. In many instances, this harassment occurred in the presence of the managers and
Mott Street would take no disciplinary action, or insufficient action,
against employees who engaged in such sexually offensive conduct.

    m. The male employees were typically assigned better work schedules;

n. Male employees were allowed to take time off or be late without impunity, while Plaintiff and other female employees were not given the same treatment.

o. Male employees routinely made discriminatory and harassing remarks and gestures in front of supervisors and managers who took no action to discipline employees, or to eradicate the harassment or maintain an appropriate workplace environment.

n. Mott Street was aware of the ongoing discrimination and harassment which occurred on a daily basis in an open manner, such that it was observed by employees and managers, and Mott Street turned a blind eye toward it.

## TITLE VII

## COUNT I: SEXUAL HARASSMENT

17. Plaintiff realleges and incorporates herein by reference paragraphs one to seventeen (1-17) as if set forth in full herein.

18. Plaintiff started working with Mott Street in October of 2015.

19. Plaintiff has been sexually harassed, discriminated against and has been subjected to a sexually offensive and hostile working environment in the following ways:

a. A male co-worker named Gabe grabbed Plaintiff's hand and placed it on his genitals over his clothes.

b. On or about February 12, 2017, Gabe grabbed Plaintiff's buttocks and told her, "You have a nice butt." Gabe performed similar acts to Plaintiff that same year on or about the dates of March 11th, April 22nd, and again on or about May 19th.

c. Male co-workers and patrons of the restaurant touched, caressed, and squeezed Plaintiff's body in ways that were offensive, unwanted, and sexually harassing.

    d.   Restaurant patrons and co-workers, to wit: Charles, Sam, and Mike, regularly referred to Plaintiff as a bitch.

    e.   Restaurant patrons and co-workers, to wit: Matty, Gabe, and Mike, would regularly rub their hands on Plaintiff and touch her waist, breasts, or buttocks without her consent and in a sexually offensive manner;

    f.   Male co-workers regularly made lewd and offensive statements to Plaintiff;

    g.   Male employees requested sex or sexual acts from Plaintiff which were offensive, unwanted, and sexually harassing.

20. Plaintiff complained about the harassment, discrimination and the events described above to managers and owners but to no avail.

21. Plaintiff was simply told by managers that she could change positions.

22. Despite Plaintiff's complaints, Mott Street did not take appropriate or timely remedial action.

## <u>TITLE VII</u>

### COUNT II: SEXUAL DISCRIMINATION

23. The Plaintiff incorporates by reference the allegations contained in paragraphs one to twenty-three (1-23) as if set forth in full herein.

24. Plaintiff and other women have been treated differently than their male counterparts.

25. Plaintiff and other women have been subjected to discriminatory comments from supervisors and co-workers, which have not been directed to male counterparts, and which males are not required to endure as a condition of their employment.

26. The Plaintiff has been subjected to comments of a derogatory nature concerning her menstrual cycle. For instance, one of the managers, Nathaniel Chung, asked Plaintiff, "Are you on your period? You must be on your period."

## TITLE VII

### COUNT III: RETALIATION

27. Plaintiff realleges and incorporates herein by reference paragraphs one to twenty-seven (1-27) as if set forth in full herein.

28. The Plaintiff has been retaliated against for complaining about the work environment which offered no protection to her from groping, sexual advances by employees and restaurant patrons, and lewd and offensive comments of a sexual nature.

29. Nathaniel Chung, one of Mott Street's managers, terminated Plaintiff from her job on September 28, 2017 in retaliation for her repeatedly complaining to Mott Street mangers about the sexual harassment and demeaning work environment.

30. Mott Street's retaliatory acts against Plaintiff constitute materially adverse employment actions.

### COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

31. Plaintiff realleges and incorporates herein by reference paragraphs one to thirty-two (1-32) as if set forth in full herein.

32. The Defendant, through its owners, managers, and employees, intended to cause severe emotional distress in the Plaintiff.

33. The Defendant's conduct and the conduct of its owners, employees, and managers was extreme, outrageous and beyond the bounds of moral decency.

34. The Defendant's conduct and the conduct of its managers and employees was so outrageous that no reasonable person could be expected to endure it.

35. As a result of the Defendant's conduct and the conduct of its managers and employees, the Plaintiff suffered severe emotional distress.

6

A- 6

WHEREFORE, for the foregoing reasons, the Plaintiff respectfully request that this Court provide the following equitable and monetary relief:

      a. Order Mott Street to implement effective steps to eliminate and remediate harassment and discrimination in the workplace;

      b. Enjoin Mott Street from discriminating or harassing the Plaintiff and other employees;

      c. Appoint a monitor to supervise workplace conditions for a period of at least 5 years;

      d. Retain jurisdiction for the monitoring period to enforce the terms of any injunction, agreement, or order;

      e. Award back pay, lost future earnings, and reimbursement for income and fringe benefits to the present;

      f. Award compensatory damages;

      g. Award punitive damages;

      h. Award prejudgment interest;

      i. Award reasonable attorney's fees and expert witness fees and expenses and other costs;

      j. Grant such other relief as the Court deems equitable and just.

RESPECTFULLY SUBMITTED,

/s/ *Sean Brown*
Sean Brown
Plaintiff's Attorney
The Law Office of Sean Brown
111 W. Jackson Blvd, Suite 1700
Chicago, IL 60604
Tel: 312-675-6116
Fax: 312-675-6001
attorneyseanbrown@gmail.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that a copy of the foregoing Complaint will be served upon the following, or an agent thereof, via personal delivery by an individual over the age of 18 who is not a party to this action, and that a notice certifying the same will be filed upon service.


MOTT STREET
C/O LEMA KHORSHID
200 W SUPERIOR ST STE 410
CHICAGO , IL 60654




/s/ *Sean Brown*

Sean Brown
Attorney for Plaintiff

8

EEOC Form 161-A (11/16)      **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE
*(CONCILIATION FAILURE)*

To: **Nikka F. Anderson**
**c/o Michael Schmiege, Esq.**
**LAW OFFICE OF MICHAEL P. SCHMIEGE**
**33 East Wacker Drive**
**Suite 1980**
**Chicago, IL 60601**

From: **Chicago District Office**
**230 S. Dearborn**
**Suite 1866**
**Chicago, IL 60604**

| | |
|---|---|
| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2017-06376** | **Katarzyna Hammond,**<br>**Investigator** | **(312) 872-9703** |

**TO THE PERSON AGGRIEVED:**

This notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally signed by Ernestine Harris FOR Julianne Bowman, District Director
DN: cn=Ernestine Harris FOR Julianne Bowman, District Director, o=EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
ou=Chicago District Office, email=ernestine.harris@eeoc.gov, c=US
Date: 2020.09.25 14:41:28 -05'00'

Enclosures(s)

**Julianne Bowman,**
**District Director**

*(Date Mailed)*

cc:   **MOTT STREET**
**c/o Elizabeth Hall, Esq.**
**Vedder Price**
**222 North LaSalle Street, Suite 2400**
**Chicago, IL 60601**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

JCK Federal Building
230 S. Dearborn
Suite 1866 (Enforcement, State and Local & Hearings)
Suite 2920 (Legal & ADR)
Chicago, IL  60604
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Chicago Direct Dial:  (312) 872-9777
Administration Fax:  (312) 588-1255
Enforcement/File Disclosure Fax:  (312) 588-1260
Federal Sector Fax:  (312) 588-1265
Intake FAX:  (312) 588-1286
Legal Fax:  (312) 588-1494
Mediation Fax:  (312) 588-1498
Website:  www.eeoc.gov

Charge Number                                             440-2017-06376

Nikka Anderson                                            Charging Party
808 East 54th Street, Apartment 2E
Chicago, Illinois 60615

            v

Mott Street                                              Respondent
1401 North Ashland
Chicago, Illinois 60622

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII).

The Respondent is an employer within the meaning of Title VII, and all requirements for coverage have been met.

The Charging Party alleges that she was discriminated against because of her sex, female, and her race, Black, when she was subjected to sexual harassment and different terms and conditions of employment; and that she was discharged, in retaliation for engaging in protected activity, in violation of Title VII.

I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent discriminated against the Charging Party and a class of individuals because of their sex, female, when they were subjected to sexual harassment, in violation of Title VII.  I have further determined that Respondent retaliated against the Charging Party when she was discharged, in violation of Title VII.

Charge Number 440-2017-06376
Determination
Page Two

This determination is final. When the Commission finds that violations have occurred, it attempts to eliminate unlawful practices by informal methods of conciliation.  Therefore, I invite the parties to join with the Commission in reaching a just resolution of this matter.  Disclosure of information obtained by the Commission during the conciliation process will be made only in accordance with the Commission's Procedural Regulations (29 C.F.R. Part 1601.26).

If the Respondent wishes to accept this invitation to participate in conciliation efforts, it may do so at this time by proposing terms for a conciliation agreement; that proposal should be provided to the Commission representative within 14 days of the date of this determination.

The remedies for violations of the statutes we enforce are designed to make the identified victims whole and to provide corrective and preventive relief.

These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of identified victims in positions they would have held but for discriminatory actions, back pay, restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process or the conciliation terms it would like to propose, we encourage it to contact the assigned Commission representative. Should there be no response from the Respondent in 14 days, we may conclude that further conciliation efforts would be futile or nonproductive.

On Behalf of the Commission:

Ernestine Harris FOR Julianne Bowman, District Director

Digitally signed by Ernestine Harris FOR Julianne Bowman, District Director
DN: cn=Ernestine Harris FOR Julianne Bowman, District Director, o=EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ou=Chicago District Office, email=ernestine.harris@eeoc.gov, c=US
Date: 2020.05.15 14:58:12 -05'00'

_____
Date

_____
Julianne Bowman
District Director

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Nikkolai Anderson, | ) | |
| | ) | Case No.: 1:20-cv-07721 |
| Plaintiff, | ) | |
| | ) | Honorable Judge Thomas M. Durkin |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| Mott Street, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT MOTT STREET'S**
**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**

---

Martin K. LaPointe (#6195827)
Brian J. Sharpe (#6310156)
Kiran K. Gill (#6332722)
LaPointe Law, P.C.
1200 Shermer Road, Suite 425
Northbrook, IL 60062
Telephone: 847-786-2500
Fax: 847-786-2650
mlapointe@lapointelaw.com
bsharpe@lapointelaw.com
kgill@lapointelaw.com

*Attorneys for Defendant Mott Street*

## DEFENDANT MOTT STREET'S EVIDENCE
## IN SUPPORT OF ITS STATEMENT OF MATERIAL FACTS

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | **Plaintiff's** Complaint filed on December 24, 2020 ("Compl.") |
| 2 | **Plaintiff's** December 30, 2022 Deposition Transcript ("Pl. Tr.") |
| 3 | **Plaintiff's** January 12, 2023 continued Deposition Transcript ("Pl. Tr. II") |
| 4 | Cited Exhibits to **Plaintiff's** December 30, 2022 and January 12, 2023 Deposition Transcripts ("Pl. Dep. Ex.)," including (#2) FOTH Handbook; (#5) Plaintiff's August 26, 2017 Email; (#6) Plaintiff's September 22, 2017 Email to Lola Olateju; and (#9) Plaintiff's Complaint. |
| 5 | **Nathaniel Chung's** Declaration ("Chung Decl.") |
| 6 | Cited Exhibits to **Nathaniel Chung's** Declaration ("Chung Decl. Ex."), including (A) EEO Poster; (B) FOTH Handbook; (C) social media reviews; (D) Charles "Mike" Melazzo's November 15, 2016 Email; (E) Lola Olateju's September 20, 2017 Email, including screenshot; and (F) Plaintiff's August 26, 2017 Email. |
| 7 | **Edward Kim's** Declaration "(E. Kim Decl.)" |
| 8 | Cited Exhibits to **Edward Kim's** Declaration ("E. Kim Decl. Ex."), including (A) social media reviews; and (B) Plaintiff's August 26, 2017 Email. |
| 9 | **Charles "Mike" Melazzo's** Declaration ("Melazzo Decl.)" |
| 10 | Cited Exhibits to **Charles "Mike" Melazzo's** Declaration ("Melazzo Decl. Ex."), including (A) social media reviews; and (B) Melazzo's November 15, 2016 Email. |
| 11 | **Victoria Kim's** Declaration ("V. Kim Decl.") |
| 12 | **Jennifer Kim's** Declaration ("J. Kim Decl.") |

In support of its Motion for Summary Judgment and pursuant to Local Rule 56.1, Defendant Mott Street submits that the following material facts are undisputed:

### **The Parties**

1.    Defendant Mai Chi Corp. d/b/a Mott Street ("Mott Street" or the "Restaurant") is an Asian-inspired family-owned restaurant located in the Wicker Park neighborhood of Chicago/Cook County, Illinois. (Compl. ¶ 3-4; Nathaniel Chung Decl. ¶ 2-3.) The Restaurant opened in 2013. (Chung Decl. ¶ 3.)

2.    Mott Street is a minority-owned business with four "partners." During the time period at issue in this lawsuit, the four partners also owned a second restaurant in Chicago called "Ruxbin," which is no longer in operation. The four partners are:

   a.   CEO and Executive Chef Edward Kim;

   b.   General Manager ("GM") Nathaniel "Nate" Chung, who oversees "Front of the House" ("FOTH") operations;

   c.   Jennifer Kim, who is Edward's wife and primarily worked at the Ruxbin restaurant; and

   d.   Victoria "Vicki" Kim, who is Edward's sister and primarily worked at the Ruxbin restaurant or was on a leave of absence during the relevant times in this lawsuit.

(Chung Decl. ¶ 2-6; Edward Kim Decl. ¶ 2-3; Victoria Kim Decl. ¶ 2-4; Jennifer Kim Decl. ¶ 2-4.)

3.    Plaintiff Nikkolai "Nikka" Anderson worked at Mott Street as a "host" (or sometimes called a "hostess") from approximately September 15, 2015 until her separation of employment on September 22, 2017. (Chung Decl. ¶ 19; *see also* Pl. Tr. 15:15-20.)

**Mott Street's Commitment to Diversity and Inclusion and Equal Enforcement of Policies**

4.      Mott Street employs between 20-30 employees, depending on the time of year. (Chung Decl. ¶ 8.) It is an equal opportunity employer with a diverse workforce and management team. (*Id*. at ¶ 13.) Every applicant or employee has an equal opportunity with respect to all terms and conditions of employment, including hiring, pay, discipline, and termination (if appropriate), regardless of one's sex or any other protected characteristic. (*Id*.) In fact, GM Chung, who is primarily responsible for hiring "Front of the House" ("FOTH") employees, including hosts, identifies as "Asian and Queer," which involves individuals from two marginalized communities. (*Id*. at ¶ 7, 12, and 19.) As a result, Chung makes every effort to ensure that minorities and people from underrepresented communities are given opportunities to succeed at Mott Street. (*Id*.)

5.      The majority of hosts that Mott Street has hired in its ten-year history of operations have been female. (Chung Decl. ¶ 20.) After Anderson's termination in September 2017 (discussed below), Chung hired Claire Wong, who presented as female and who Chung believed was female, to replace Anderson. (*Id*. ¶ 56.) (Several weeks after Claire Wong was hired, she reported to Chung that she identified as "nonbinary." [*Id*.]) After Anderson's termination and through 2018, Mott Street hired ten hosts, and only one of the hosts was male. (*Id*. at ¶ 57.) Further, in addition to two of the four partners being female, the head chef (*i.e.* the "Chef de Cuisine") at Mott Street is female as are a number of managers. (*Id*. at ¶ 58.)

6.      Mott Street enforces its policies equally, regardless of sex, gender, or whether an employee has engaged in any legally-protected activity. (Chung Decl. ¶ 13.)

**Mott Street Prohibits Harassment and Discrimination**

7.      Mott Street strictly prohibits harassment, discrimination, and retaliation of any kind, including harassment or discrimination based on sex. (Chung Decl. ¶ 10.) Indeed, the FOTH

Handbook, specifically states that employees are prohibited from "[d]isplaying any form of rudeness, discourtesy or discrimination against an employee or guest because of race, nationality, gender, religion, age [or] orientation." (Chung Decl. ¶ 10; Chung Decl. Ex. A and B, Bates #MOTT000055.) In addition, Mott Street has "zero tolerance" for harassment and prohibits "[s]exual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature that has the purpose or effect of interfering with an employee's work performance or creating a[n] offensive work environment." (Chung Decl. ¶ 10; Chung Decl. Ex. A and B, Bates #MOTT000055 and MOTT000062.) The Restaurant encourages any employee who witnesses or is a victim of harassment or discrimination to immediately report the offending conduct to their supervisor or any of the Mott Street partners. (Chung Decl. ¶ 11.) Mott Street investigates each report of harassment or discrimination thoroughly, with sensitivity to confidentiality, and prohibits retaliation against any employee who makes such a report. (*Id*.) Any employee found to have violated the anti-harassment/discrimination policy is subject to discipline, up to and including termination. (*Id*.) Mott Street also has an "open door" policy and encourages employees to bring any issue to the attention of any partner. (*Id*.) Mott Street's management team reviews its strong stance against harassment and discrimination with new employees at orientation and periodically throughout employment. (*Id*.)

### Responsibilities of the Host Position

8.      Hosts are the "face" of the restaurant. (Chung Decl. ¶ 21.) They are considered "FOTH employees" along with servers, server assistants, and the bar staff. (*Id*. at ¶ 22.) Hosts are required to comply with all policies contained in the FOTH Handbook. (*Id*.) Mott Street's management team reviews its policies and practices with all hosts, including Anderson, at orientation and periodically throughout employment. (*Id*.)

9.      Specifically, "Chapter 4: Guest Service Duties – Host" of the FOTH Handbook details many of the host's responsibilities. (Chung Decl. ¶ 21; Chung Decl. Ex. B, Bates #MOTT000043-MOTT000052.) Above all else, "[g]uest recognition and satisfaction are the primary goals" of the host position. (Chung Decl. ¶ 21; Chung Decl. Ex. B, Bates #MOTT000043.) Hosts are required to provide each guest a "cheerful and gracious greeting/farewell," smile, make "appropriate eye contact" and use "positive body language," "[do] extra things to make guests feel comfortable and at home," "[identify] something positive to comment about your guest," express appreciation, answer the phone in a friendly manner by stating "Good afternoon/evening, Mott Street, how may I help you?" and ultimately make the guest feel that they are a special and integral part of the Restaurant. Hosts are also responsible for seating guests and managing reservations. (Chung Decl. ¶ 21-22; Chung Decl. Ex. B, Bates#MOTT000043-MOTT000052.)

10.     Hosts, like all other FOTH employees, are required to follow the instructions given by any on-duty "FOTH Manager," GM Chung, or any other Mott Street partner. (Chung Decl. ¶ 22.)

**Anderson's Employment**

11.     GM Chung hired Anderson on approximately September 15, 2015, to work as a "host." (Chung Decl. ¶ 19.)

12.     During Anderson's employment, Mott Street employed up to five hosts at any given time. (Chung Decl. ¶ 19.) At the end of Anderson's employment, four of the five hosts were female (including Anderson). (*Id.*) Typically, only one host worked during any given shift, except during certain Friday and Saturday nights when the restaurant was busier, and two hosts were scheduled. (*Id.* at ¶ 23.)

13.     At the start of her employment, Anderson received a copy of the "FOTH Handbook," which emphasized the "guest experience" and "being friendly to guests." (Pl. Tr. 19:21-21:1; Chung Decl. Ex. B.) Anderson was required to review the handbook and comply with all the policies contained therein. (Chung Decl. ¶ 22.) Mott Street's management team also communicated its strong stance against harassment, discrimination, and retaliation to Anderson, and let her know that she could bring any employment-related issue to management's attention. (*Id.* at ¶ 10-11, 22)

14.     On multiple occasions throughout her employment, Chung reiterated to Anderson the importance of being friendly to guests and coworkers. (Chung Decl. ¶ 25.)

15.     In June 2016, Chung selected Anderson's coworker, host Lola Olateju (female), to become a manager in training. (Chung Decl. ¶ 59.) Chung trained Olateju throughout 2016 and into 2017. (*Id.*) In April 2017, Chung promoted Olateju to FOTH Manager, responsible for overseeing all FOTH employees, including Anderson. (*Id.*)

**Mott Street's Partners Independently Observe Anderson's Negative Demeanor**

16.     Numerous times throughout Anderson's employment, Chung observed Anderson being impatient with guests or displaying a negative demeanor. It was Chung's impression that Anderson was "short" or "cold" with guests rather than warm and inviting. Chung observed Anderson avoiding eye contact with guests, failing to smile, and failing to exchange pleasantries with guests. On numerous occasions, Chung witnessed Anderson answer the phone by curtly saying "Mott Street," instead of warmly saying "Good afternoon, Mott Street, how may I help you?" which is the "script" that the FOTH Handbook requires and that Chung instructed Anderson to follow. (Chung Decl. ¶ 26.)

17.     Chung also witnessed Anderson become edgy or outright unpleasant with guests on occasion. (Chung Decl. ¶ 27.) At least one time per month during Anderson's employment, a negative guest interaction involving Anderson escalated to a point to where Chung had to intervene, calm the guest down, and deescalate the situation. (*Id*.)

18.     Chung did not observe the same negative demeanor with respect to any other host. (Chung Decl. ¶ 28.) No other host had interactions with guests that deteriorated to the point where Chung had to intervene. (*Id*. at ¶ 29.)

19.     CEO/Executive Chef Edward Kim also observed Anderson display a negative demeanor toward guests. (E. Kim Decl. ¶ 7.) Edward Kim also witnessed Anderson using an electronic device in front of customers, which was disturbing and contrary to the policies in the FOTH Handbook. (E. Kim Decl. ¶ 9; *see also* Chung Decl. ¶ 41; Chung Decl. Ex. B, Bates #MOTT000056.) Kim also overheard Anderson curtly answer the phone on multiple occasions without following the phone script. (E. Kim Decl. ¶ 7.) It was Kim's impression that Anderson was "short" or "cold" with guests rather than warm and inviting. (*Id*. at ¶ 7-9.)

20.     Partner Victoria Kim also observed Anderson display a negative demeanor toward guests. (Victoria Kim Decl. ¶ 5.) Victoria observed that Anderson did not smile during guest interactions, and she avoided eye contact. (*Id*.) Victoria observed that Anderson greeted guests with a curt "hi," rather than a warm welcome, such as "Welcome to Mott Street," which is what Anderson was required to do. (*Id*.) It was Victoria's impression that Anderson was "short" with guests and came across as "pretentious." (*Id*.)

21.     Victoria Kim also dined at Mott Street on approximately three occasions between September 2016 and April 2017 while she was on a leave of absence. (V. Kim Decl. ¶ 6.) During Victoria's dining experiences, Anderson treated Victoria with the same negative and short

demeanor. (*Id.*) Anderson failed to smile at Victoria or welcome her with a warm greeting. (*Id.*) It was Victoria's impression as a guest/diner at Mott Street that Anderson was "disengaged, cold, rude, unwelcoming, pretentious, and dismissive." (*Id.*) Victoria Kim reported her negative experiences involving Anderson and her impressions of Anderson to GM Chung. (V. Kim Decl. ¶ 7; Chung Decl. ¶ 37.)

22.    Partner Jennifer Kim dined at Mott Street at some point during Anderson's employment. Jennifer recalls that Anderson was not hospitable at the host stand, responded with one- or two-word answers, and did not feel welcomed by Anderson. (Jennifer Kim Decl. ¶ 6.) Jennifer Kim reported her negative experiences involving Anderson to CEO/Executive Chef Edward Kim (her husband). (J. Kim Decl. ¶ 7; E. Kim Decl. ¶ 10.)

## The First Batch of Negative Yelp Reviews

23.    Mott Street takes customer feedback very seriously, including feedback left on social media websites, such as "Yelp," "OpenTable," and "Facebook." (Chung Decl. ¶ 15-18.) The Restaurant relies on candid customer feedback to ensure the staff is providing exceptional customer service and food. Negative social media reviews can negatively impact the business as a whole. (Pl. Tr. 26:17-27:17; Chung Decl. ¶ 15.) In the event of negative feedback, Mott Street's partners make every effort to take corrective actions to avoid negative reviews in the future. (Chung Decl. ¶ 15-18.) Mott Street generally receives very positive reviews on social media and makes every effort to protect its good reputation on social media. (*Id.* at ¶ 16-18.) Mott Street has also been recognized by the "Michelin Guide" by receiving the prestigious "Bib Gourmand" rating, which is awarded to "friendly establishments that serve good food at moderate prices." (*Id.* at ¶ 17.)

24.    In November 2016, three guests posted reviews about Mott Street on the "Yelp"

website, which stated in relevant part:

> **Reviewed 11/6/2016, Yelp, Reviewed by Duyhien N. from San Mateo, CA.:** Hostess was rude and snobby. Barely acknowledged us when we came in and didn't say anything to us on the way out. I think I literally saw up her nostrils because of how far her nose was turned up. Don't go here. Wish I could've gotten a refund for the horrible experience.
>
> **Reviewed 11/6/2016, Yelp, Reviewed by D N. from Chicago, IL:** . . . Service: waiters are friendly. Hostess was not.
>
> **Reviewed on 11/13/2016, Yelp, Reviewed by Eric C. from San Antonio, TX:** . . . Instead of the host graciously placing us where she would like us, she just pointed said, "here." I have to admit it was pretty weird and we all were in shock over the brash rudeness of it all. . . .

(Chung Decl. ¶ 30; Chung Decl. Ex. C.)

25.    Chung was disturbed by these negative guest reviews. (Chung Decl. ¶ 31.)

26.    Upon receiving these negative reviews, Chung reviewed the FOTH schedules and

found that Anderson was the only host working on November 6, and November 13, 2016. (Chung

Decl. ¶ 32.) Anderson admitted in her deposition that this would be a "way to get proof" as to

whether the complaints were about her. (Pl. Tr. 58:2-24.) This correlation plus Chung's own

observations of similar behavior from Anderson, led Chung to conclude that Anderson was the

"rude" host referenced by the three different guests. (Chung Decl. ¶ 32.)

27.    In response to the "slew" of negative reviews, Bar Manager Charles "Mike"

Melazzo wrote an email on November 15, 2016 to Chung and FOTH Manager Lola Olateju which

stated: "Criticism again mentioned the host specifically . . . [W]e need to work on the host stuff

ASAP. Especially when it comes to communicating with guests." Melazzo further wrote:

Our hosts should be engaging. This is a crucial part of the job, not an optional extra. While hosting requires a lot of technical work, or spacing tables etc; you're also the first impression people have of our restaurant. Guests should be greeted with a smile and a welcome. Mott St is a loud environment, we have to make sure we are making eye contact, speaking clearly and loudly enough with guests, and using our body language as well as our words to let guests know that we are considering them. Simply gesturing at a guest with our hands is not acceptable, waving someone off, or speaking in a curt fashion is not acceptable.

If our hosts do not want to be engaging and warm with guests I think that is unacceptable.

(Chung Decl. ¶ 33-34; Chung Decl. Ex. D; Charles Melazzo Decl. ¶ 10-11; Melazzo Decl. Ex. B.)

28.     Chung agreed with the content of Melazzo's email. (Chung Decl. ¶ 34.)

29.     Shortly thereafter, Chung and Melazzo held a meeting with the hosts, including Anderson, to reiterate the importance of friendly customer service and review each point in Melazzo's email to avoid negative guest reviews in the future. (Chung Decl. ¶ 35; Melazzo Decl. ¶ 12.)

## The Second Batch of Negative Yelp Reviews

30.     Chung did not believe that Anderson showed any significant improvement in her demeanor towards guests after the retraining session. (Chung Decl. ¶ 36.) In fact, her negative demeanor with guests seemed to get worse over time. (*Id.*) Chung noticed that Anderson continued to avoid eye contact, was short with guests, failed to smile, and displayed an overall unpleasant demeanor. (*Id.*)

31.     In the spring/summer of 2017, several guests submitted online reviews about Mott Street's host, which state in relevant part:

**Reviewed 4/12/2017, Visited 4/9/2017, OpenTable, Reviewed by Anonymous:** Went in for Sunday brunch. Great food, decent server, the hostess was terrible. Waited for 35 minutes passed [sic] our reservation time to be sat at a table seated for 5 (we were a party of 6) inside when we

requested to be sat outside. She was rude, frazzled, and there were two 6-tops open outside and her explanation was "we are not seating those tables today"      . . . .

**Reviewed 4/24/2017, Visited 4/23/2017, OpenTable, Reviewed by Lauren:** . . . I decided to give it another try with friends over brunch. Immediately, I found the hostess to be rude. I had a reservation for 4 people at 11:15am, and had made it a week before. When I noticed the outdoor patio had quite a bit of vacancy, she told me there would still be a 30 minute wait, but there was no one waiting anywhere for the patio, which I found odd. She refused to make eye contact when we tried to approach her about sitting outside. She was very unfriendly, and when she noticed that our 4th person was a baby (in previous situations, I have had to note a child as a guest since they're taking up a seat), she made a snarky comment about that only applying to people ordering from the menu. While the food was good, twice now I have found the service to be less than impressive, which is a bummer because the food is really good. Not sure I'll go back.

**Reviewed 6/27/2017, Yelp, Reviewed by Arsalan:** . . . Hostess was rude and not accommodating. We had a reservation and were 10 minutes late due to traffic and ended up being seated at the bar while there were empty tables behind us. . . .

**Reviewed 8/12/2017, Yelp, Reviewed by Nika L,:** I love this restaurant but whoever answered the phone today (hostess probably) was incredibly impatient and rude. When a guest calls to see if there's a table available it's rude to cut them off on the phone and not try and help to figure out how long a wait time is.

(Chung Decl. ¶ 38; Chung Decl. Ex. C.)

32.      Chung was very disturbed by the second batch of emails. (Chung Decl. ¶ 39.) Once again, Chung reviewed the host schedules and found that Anderson was the host on all of the dates that the customers lodged the above complaints. (*Id*.) As before, Chung concluded that Anderson was the "rude" host referenced by these four guests. (*Id*.)

**Anderson's Refusals to Comply with Chung's Instructions**

33.    All hosts and servers are required to enter their work availability and scheduling preferences into an app called "When I Work." Anderson did not enter her work availability or scheduling preferences into this app during her employment. (Chung Decl. ¶ 40.)

34.    Throughout summer 2017, Chung instructed Anderson several times not to store her bag or other personal belongings at the host stand where they were in plain view of guests and cumbersome to get around. (Chung Decl. ¶ 43.) Anderson ignored Chung's directives and continued storing her bag and other personal belongings behind the host stand. (*Id*.)

35.    In addition, while the FOTH Handbook makes it clear that hosts and servers are not permitted to use personal electronic devices while in view of guests, Anderson defied this policy on several occasions. (Chung Decl. ¶ 41; Chung Decl. Ex. B, Bates#MOTT000056.) This is considered a serious policy violation since it can be upsetting to guests who expect a host's undivided attention. (Chung Decl. ¶ 41.) Chung observed Anderson using an electronic device when she should have been working on at least two occasions, one of which occurred in early/mid-August 2017. (*Id*.) Anderson acknowledged that she used an electronic device for personal reasons on at least one occasion. (Pl. Tr. 44:13-15; 46:1-6.)

36.    On approximately August 26, 2017, Chung observed Anderson utilizing an iPad for personal reasons, when she should have been attending to guests. (Chung Decl. ¶ 42; Pl. Tr. 69:15-17; *see also* Pl. Dep. Ex. 5). Since Chung had recently made it clear to Anderson that she was prohibited from using an electronic device for personal reasons, Chung instructed Anderson to clock out and leave for the day. (Chung Decl. ¶ 42.)

37.    Chung considered all three of these refusals to comply with his instructions to be acts of insubordination by Anderson. (Chung Decl. ¶ 40-43.)

### The August 26, 2017 Email

38.     After Chung sent Anderson home for using the iPad on August 26, 2017, Anderson sent Manager Lola Olateju an email ("the August 26th Email") that was labeled as "Confidential." (Pl. Tr. 66:23-67:11; Pl. Dep. Ex. 5.) In the email, Anderson reported several concerns that she had about her schedule, being "disrespected," and having been sent home by Chung that evening for using the iPad for personal reasons. (*Id.*)

39.     Neither Chung nor Edward Kim were aware of the August 26th Email during Anderson's employment. (Chung Decl. ¶ 51; E. Kim Decl. ¶ 15.)

40.     The August 26th Email does not report harassment or discrimination, and Anderson admitted that in her deposition. (Pl. Dep. Ex. 5; Pl. Tr. 70:6-18.)

### The Final Negative Guest Review and Anderson's Termination

41.     Throughout the end of August and into September 2017, Chung and Anderson were not "seeing eye to eye." (Pl. Tr. II 224:15-21; *see* Chung Decl. ¶ 40-43.)

42.     At approximately that same time, FOTH Manager Lola Olateju reported to Chung that she believed that Anderson should be terminated because of Anderson's overall rude behavior. (Chung Decl. ¶ 45.)

43.     On September 20, 2017, Olateju forwarded Chung an email with the subject "**hmmm case in point re: host**." The email contained yet another customer review from Facebook involving the customer's negative experience with the host. The customer review stated in relevant part:

> **Phoebe Taylor reviewed Mott St Chicago – August 24 at 1:15 pm**
> I honestly think the grumpy hostesses would have ruined my night if it were not for the incredible food and the incredible service we received once we (finally sat down). . . . Except for the shit-show that was the hostess station. I understand that is a stressful job – ive worked in fine dining for years.

> But holy shit, you're the first point of contact for a customer and cant 1. Smile 2. Remember my name WHEN ITS LISTED ON A RESERVATION. I know it's a weird name, but I was asked 5 different times who I was by the same hostess, sat 10 minutes lat [sic] to a reservation. We traveled from Toronto to eat at Mott st and id go again and recommend it anyone and everyone. The food id call it genius, I think the best cocktails I've ever had. But someone tighten up the screws at the hostess booth and give them a lesson on customer service.

(Chung Decl. ¶ 46; Chung Decl. Ex. E.)

44.    As before, Chung reviewed schedules and determined Anderson was working as the host during the interaction. (Chung Decl. ¶ 47.)

45.    At that point, Chung determined that Anderson's termination was appropriate. (Chung Decl. ¶ 48.) In making his determination, Chung relied on his own interactions and observations with Anderson, the repeated negative guest reviews, his belief that Anderson was insubordinate, Lola Olateju's recommendation that Anderson be terminated, and Victoria Kim's report of Anderson's rude demeanor. (*Id.*)

46.    Chung also discussed his decision to terminate Anderson with CEO/Executive Chef Edward Kim to see if Kim had any objections to terminating Anderson. (Chung Decl. ¶ 49; E. Kim Decl. ¶ 12-14.) Based on Edward Kim's own interactions and observations regarding Anderson, Chung's recommendation to terminate Anderson, the negative guest reviews, and Jennifer Kim's report of Anderson's negative demeanor, Edward Kim agreed that Anderson's termination was appropriate. (E. Kim Decl. ¶ 14.)

47.    On September 22, 2017 at approximately 3:00 p.m., Chung informed Anderson that her employment was terminated, effective immediately. (Chung Decl. ¶ 50.)

48.    Chung and Edward Kim, the primary decision makers, did not terminate Anderson because of her sex. (Chung Decl. ¶ 53; E. Kim Decl. ¶ 17.)

49.     Chung and Edward Kim, the primary decision makers, did not know about Anderson's August 26th Email to Lola Olateju, and did not terminate Anderson due to any complaint of discrimination or harassment that she claims she made. (Chung Decl. ¶ 51-52, 54; E. Kim Decl. ¶ 15-16, 18.)

50.     Since Anderson's separation in 2017, so for five and a half years now, Mott Street has received no further complaints of any host being "rude." (Chung Decl. ¶ 55.)

## ANDERSON'S CLAIMS

### I.     Anderson's Sexual Harassment Claim

51.     During her deposition, Anderson testified as to the basis of her sexual harassment claim. (Pl. Tr. 103:4-117:10; P. Tr. II 137:17-147:3.) Other than vague, generalized, and conclusory assertions, Anderson identified five instances of objectionable conduct that formed the basis of her claim. (*Id*.)

52.     First, Anderson testified that at some point in late 2016 or early 2017, a coworker named Gabe Freeman "touched [her] behind." (Pl. Tr. 104:19-105:22; Pl. Tr. II 137:17-138:9.) While Anderson stated that she reported this to a manager, Anderson acknowledged that she did not have any other issues with Freeman and "he quit soon after." (Pl. Tr. 107:10-12.)

53.     Second, Anderson asserted that a server named Simon DuFour "bickered" with her. (Pl. Tr. II 139:7-17; Pl. Tr. 110:7-112:12.) When asked to explain what she meant by "bickering," Anderson eventually stated: "he [DuFour] would just say nasty stuff. He just played a lot. He said nasty stuff all the time." (Pl. Tr. 111:11-16.) Anderson further testified that DuFour said that she had a "nice body" or "nice butt" and "just played a lot." (Pl. Tr. 111:22-112:7; Pl. Tr. II 139:7-17.)

54.    Third, Anderson alleged that a customer (not an employee) touched her buttocks on one occasion at some point in approximately August/September 2017. (Pl. Tr. 108:8-109:5; Pl. Tr. II 138:10-24.)

55.    Fourth, Anderson alleged that Bar Manager Mike Melazzo called her a "bitch" on one occasion. (Pl. Tr. II 141:11-17; 144:22-145:2.)

56.    Fifth, Anderson testified that Chung "told [her] that [she] shouldn't wear loose clothing" and that she "looked better in form-fitting clothing." (Pl. Tr. II 145:16-146:9.) Anderson conceded that she wore the same clothing to work at Mott Street as she wore to work another job at a law firm: "I came – I came from work from a law firm. So, I mean, I wore my law firm clothes to the job [at Mott Street]." (Pl. Tr. II 146:10-18.)

## II.    <u>Anderson's Sex Discrimination Claim</u>

57.    During her deposition, Anderson testified that she believed that she was terminated because of her gender. (Pl. Tr. 122:11-13.) Other than generalized assertions, such as "women quit," Anderson stated that she was treated differently than Simon DuFour, a male server, who showed late to work on numerous occasions, and he was not "written up" or terminated for tardiness. (Pl. Tr. 125:1-9; 117:23-118:19; Pl. Tr. II 147:4-148:13.)

58.    Anderson acknowledged that she was not terminated for being tardy, and she was never written up for anything, including for being late. (Pl. Tr. II 147:4-10; 148:14-149:6) Anderson admitted that she did not know anyone who had a "track record" like hers. (Pl. Tr. 126:1-13.)

59.    Anderson maintained during her deposition that she was "never rude"—only "very sarcastic" and "smart." (Pl. Tr. 53:3-23; 66:3-13.) Anderson denied that any of the negative

customer reviews were about her. (Pl. Tr. 51:14-58:24.) She maintained that she was terminated "for no reason." (Pl. Tr. II 222:10-223:18.)

### III.    Anderson's Retaliation Claim

60.    Anderson testified that she believed she was terminated on September 22, 2017 in retaliation for sending Lola Olateju the August 26th Email. (Pl. Tr. 83:1-18, referencing Pl. Dep. Ex. 5; Pl. Tr. II 155:20-162:5, referencing Pl. Dep. Ex. 5.)

61.    Anderson testified that there was nothing specific as far as "sexual harassment" or "discrimination" in the August 26th Email. (Pl. Tr. 70:6-18.)

62.    Anderson acknowledged that the only fact to support her claim that she was terminated in retaliation for sending the August 26, 2017 Email was "the time frame." (Pl. Tr. II 161:13-162:5.)

63.    Anderson did not provide any similarly-situated employees who did not engage in a protected activity who were not terminated for similar policy violations. (Pl. Tr. II 166:4-168:12.)

64.    Anderson confirmed that an email she sent to Lola Olateju on September 22, 2017, the day she was terminated, had nothing to do with her termination and does not support her retaliation claim. (Pl. Dep. Ex. 6; Pl. Tr. 76:6-77:14; 83:1-18.)

### IV.    Anderson's "intentional infliction of emotional distress" claim

65.    Anderson essentially conceded that her intentional infliction of emotional distress claim was premised on her civil rights claims: "the sexual harassment, the retaliation, and the discrimination against my sex." (Pl. Tr. II 173:4-16.)

66.    Anderson could not provide any facts to show that managers intended to cause her severe emotional distress. (Pl. Tr. II 171:10-21.)

## **Mott Street's Comparators**

67.     Other than Anderson, Mott Street has only terminated two other hosts in its history, and the circumstances were quite different than Anderson's. Elizaveta Agarkova was hired several years after Anderson. Agarkova was a host for a short period of time and had difficulties grasping the computer reservation program. Agarkova agreed she was having difficulties and agreed to mutually part ways with Mott Street in October 2021. Alissa Straessle was hired in September 2022 and was terminated several months later for repeatedly failing to show on time. (Chung Decl. ¶ 60.)

68.     Mott Street terminated Jonathan Tribbey, a barback, in 2020 for having a negative demeanor and being combative with coworkers. The Restaurant terminated Eric Blass, a server, in 2022 for being insubordinate. Garrett Douthitt, a server, was terminated in 2018 for numerous cash policy violations. None of these male employees ever reported any form of harassment or discrimination. All three of these workers were FOTH employees and ultimately reported to Chung and Edward Kim. (Chung Decl. ¶ 61; E. Kim Decl. ¶ 6.)

 Dated: April 3, 2023                              Respectfully submitted,
                                                   Mott Street

                                                   By:___/s/ Brian J. Sharpe___
                                                       One of its Attorneys

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on April 3, 2023, I caused a copy of the foregoing **DEFENDANT MOTT STREET'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS** to be filed electronically with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record via email.

                                                   _____ /s/ Brian J. Sharpe _____

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NIKKOLAI ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-7721 |
| v. | ) | |
| | ) | Judge: Honorable Thomas Durkin |
| MOTT STREET | ) | |
| | ) | Magistrate Judge: Honorable Susan E. Cox |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S RULE 56.1 STATEMENT OF FACTS**

Plaintiff, Nikkolai Anderson, by and through her attorney, The Law Office of Sean Brown, LLC, submits the following Responses to Defendants' 56.1 Statement of Facts.

1. Admitted.

2. Admitted.

3. Admitted.

4. Denied. Female employees did not have an equal opportunity with respect to all terms and conditions of employment, including hiring, pay, discipline, and termination. [Ex. 2, Anderson dep. I, 103-112, 117-121].

5. Admitted.

6. Denied. Mott Street did not enforce its policies equally because female employees would be subject to discipline for tardiness or drinking on the job, but the male employees would receive no discipline. [Ex. 3, Anderson dep. II, 219-220].

7. Denied. Mott Street does not prohibit discrimination, harassment, or retaliation based on sex. Plaintiff experienced sexual harassment when a co-worker grabbed her butt [Ex. 2, Anderson dep. I, 105:19-24]; Plaintiff experienced sexual harassment when a patron

grabbed her butt [Ex. 3, Anderson dep. II, 216:21-24]; Plaintiff testified that women were

not treated right at Mott Street [Plaintiff experienced sexual harassment when a co-

worker grabbed her butt [Ex. 2, Anderson dep. I, 105:19-24]; Plaintiff also testified that

Mott Street retaliated against her when she emailed superiors complaining about the work

conditions. [Ex. 2, Anderson dep. I, 83:15-18].

8.  Admitted.

9.  Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. Admitted.

14. Denied. Chung never reiterated to Plaintiff the importance of being friendly. [Ex. 2,
    Anderson dep. I, 61:22-24, 62:1-3].

15. Admitted.

16. Denied. Plaintiff would have received a write-up, and she would not have gotten a
    promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22].

17. Denied. Plaintiff would have received a write-up, and she would not have gotten a
    promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22].

18. Denied. Plaintiff would have received a write-up, and she would not have gotten a
    promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22].

19. Denied. Plaintiff would have received a write-up, and she would not have gotten a
    promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22].

20. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22].

21. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22].

22. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests. [Ex. 2, Anderson dep. I, 65:3-22].

23. Admitted.

24. Admitted.

25. Admitted.

26. Denied. Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24].

27. Admitted.

28. Admitted.

29. Admitted.

30. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24].

31. Admitted.

32. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24].

33. Denied. Plaintiff entered her work availability into the software application, but management did not assign her the times she preferred. [Ex. 2, Anderson dep. I, 77:15-24, 78:1-9, 120:14-17].

34. Denied. Chung did not instruct Plaintiff about storing her personal belongings behind the host stand. [Ex. 2, Anderson dep. I, 49:20-24, 50:1-23, 63:11-19].

35. Denied. Plaintiff was yelled at once about using her phone. [Ex. 2, Anderson dep. I, 44:13-24].

36. Denied. Plaintiff did not use an iPad for personal reasons on August 26, 2017. [Ex. 2, Anderson dep. I, 51:2-10].

37. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was insubordinate. [Ex. 2, Anderson dep. I, 65:3-22].

38. Admitted.

39. Denied. Chung was aware of the August 26, 2017 e-mail because Lola copied Chung on her reply to Plaintiff's e-mail on September 12, 2017. [See Ex. 4]

40. Admitted.

41. Admitted.

42. Denied. Plaintiff testified that Lola said Nate wanted to terminate her employment. [Ex. 3, Anderson dep. II, 153:4-20].

43. Admitted.

44. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her. [Ex. 2, Anderson dep. I, 59:1-24].

45. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her [Ex. 2, Anderson dep. I, 59:1-24]; Plaintiff testified that Lola said Nate wanted to terminate her employment. [Ex. 3, Anderson dep. II, 153:4-20].

46. Denied. Plaintiff would have received a write-up, and she would not have gotten a promotion if she was rude to guests [Ex. 2, Anderson dep. I, 65:3-22]; Plaintiff testified that if the negative reviews concerned Plaintiff, then Lola or Emma would have said something to her [Ex. 2, Anderson dep. I, 59:1-24]; Plaintiff testified that Lola said Nate wanted to terminate her employment. [Ex. 3, Anderson dep. II, 153:4-20].

47. Denied. Chung did not terminate Anderson at 3:00 p.m.  [Ex. 2, Anderson dep. I,  71:12-24, 72, 73:1-15].

48. Denied. Plaintiff testified that Nate discriminated against her because of her sex in terminating her employment. [Ex. 3, Anderson dep. II, 153:4-20].

49. Denied. Plaintiff testified that Nate discriminated against her because of her sex in terminating her employment [Ex. 3, Anderson dep. II, 153:4-20]; Chung was aware of the August 26, 2017, e-mail because Lola copied Chung on her reply to Plaintiff's e-mail on September 12, 2017. [Ex. 4]

50.  Denied. Mott Street has received numerous complaints about hosts being rude after September of 2017; Mott Street has received at least 9 Yelp reviews about the host being rude between May of 2018 and August 2022 -- well after the time Plaintiff had been terminated. [Ex. 5]

51. Denied. Plaintiff gave specific instances of conduct to support her sexual harassment claim, to wit: (1) Gabe grabbed Plaintiff's buttocks and told her, "You have a nice butt"; (2) Male co-workers and patrons of the restaurant touched, caressed, and squeezed Plaintiff's body in ways that were offensive, unwanted, and sexually harassing; (3) Restaurant patrons and co-workers regularly referred to Plaintiff as a bitch; (4) Restaurant patrons and co-workers would regularly rub their hands on Plaintiff and touch her waist, breasts, or buttocks without her consent and in a sexually offensive manner; (5) Male co-workers regularly made lewd and offensive statements to Plaintiff; (6) Male employees requested sex or sexual acts from Plaintiff which were offensive, unwanted, and sexually harassing. [Ex. 1, pp. 4-5 of Complaint; Ex. 2, Anderson dep. I, 40:15-20];]

52. Admitted.

53. Admitted.

54. Admitted.

55. Admitted.

56. Admitted.

57. Denied. Plaintiff testified that women were not treated right at Mott Street [Ex. 2, Anderson dep. I, 105:19-24]; Plaintiff testified that men, in particular, were doing wrong things, unprofessional things, things that were not in the policy, and they would not get fired [Ex. 3, Anderson dep. II, 219:13-24]; Plaintiff stated that Mott Street would not terminate men for being tardy or drinking on the job, but they terminated women if they engaged in such conduct. [Ex. 3, Anderson dep. II, 220-222:1-9].

58. Admitted.

59. Admitted.

60. Denied. Plaintiff testified that she believed she was terminated on September 22, 2017, in retaliation for sending Lola Olateju the August 26th e-mail [Ex. 2, Anderson dep. I, 83:1-18]; Plaintiff also stated that she was terminated for repeatedly complaining to Mott Street managers about the sexual harassment and demeaning work environment. [Ex. 1, p. 5 of Complaint].

61. Admitted.

62. Denied. Plaintiff acknowledged that her retaliation claim is supported by "the time frame" between the email and her termination, and because Lola told her the email bothered Nate. [Ex. 3, Anderson dep. II, 161:13-24, 162:1-8].

63. Plaintiff has insufficient information to admit or deny because paragraph 63 is vague, confusing, and incomprehensible. Plaintiff has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.

64. Admitted in part, Denied in part. Plaintiff indicated that her complaints in general resulted in the retaliation by Mott Street of terminating her employment. [Ex. 3, Anderson dep. II, 155:20-24, 156:1-13].

65. Admitted in part, Denied in part. Plaintiff conceded that her intentional infliction of emotional distress (IIED) claim was premised on Mott Streets conduct concerning her civil rights claims, but the additional fact that Plaintiff suffered severe emotional distress is what gives merit to the IIED claim. [Ex. 3, Anderson dep. II, 173:4-24, 174:1-14].

66. Denied. Plaintiff testified that Mott Street intended to cause her emotional distress because they knew she was recently a rape victim; they knew she was moving to a new residence; and they knew she needed the job to afford her rent, but they fired her for no reason. [Ex. 3, Anderson dep. II, 222:18-24, 223:1-4].

67. Plaintiff has made reasonable inquiry and that the information it knows or can readily

obtain is insufficient to enable it to admit or deny.

68. Plaintiff has made reasonable inquiry and that the information it knows or can readily

obtain is insufficient to enable it to admit or deny.


Dated: May 25, 2023

                        Respectfully submitted,

                        */s/ Sean Brown*
                        Sean Brown (ARDC #6308654)
                        The Law Office of Sean Brown
                        111 West Jackson Blvd., Suite 1700
                        Chicago, IL  60604
                        T:  (312) 675-6116
                        F:  (312) 675-6001
                        attorneyseanbrown@gmail.com
                        Counsel for Plaintiff,

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that a copy of the foregoing Plaintiff's Response to Defendants' Rule 56.1 Statement of Facts was filed electronically with this Court, causing a copy of the foregoing document to be delivered via the Court's CM/ECF Electronic Filing System to all Counsel of Record.

By: <u>/s/ Sean Brown</u>
Attorney for Plaintiff
Nikkolai Anderson

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    NIKKOLAI ANDERSON,              )
                                      )
 4                  Plaintiff,        )
                                      )
 5    vs.                             ) No. 1:20-cv-07721
                                      )
 6    MOTT STREET,                    )
                                      )
 7                  Defendant.        )

 8          Video-recorded deposition of NIKKOLAI

 9    ANDERSON, called as a witness herein, pursuant to

10    the applicable provisions of the Federal Rules of

11    Procedure governing the taking of depositions, taken

12    before Amy K. Bateman, CSR No. 84-003803, RPR, CRR,

13    CRC, on Friday, December 30, 2022, at 10:32 a.m., at

14    1200 Shermer Road, Suite 425, Northbrook, Illinois,

15    pursuant to notice.

16

17

18

19

20

21

22

23

24
```



Page 2

```
 1   APPEARANCES:
 2        THE LAW OFFICE OF SEAN BROWN
          MR. SEAN BROWN
 3        111 West Jackson Boulevard
          Suite 1700
 4        Chicago, Illinois 60604
          Phone:  (708) 858-1402
 5        E-Mail:  attorneyseanbrown@gmail.com
 6                  On behalf of the Plaintiff;
 7
 8        LA POINTE LAW, P.C.
          MR. MARTIN K. LA POINTE, and
 9        MS. KIRAN GILL
          One Lane Center
10        1200 Shermer Road, Suite 425
          Northbrook, Illinois 60062-4500
11        Phone:  (847) 786-2501
          E-Mail:  mlapointe@lapointelaw.net
12
                  On behalf of the Defendant.
13
14
15   ALSO PRESENT:
16        MR. STEPHAN HOOG, Videographer;
17        MS. VICTORIA KIM.
18
                      - - -
19
20
21
22
23
24
```

Page 3

```
 1                 I N D E X
 2   WITNESS:
 3   NIKKOLAI ANDERSON
 4   EXAMINATION BY:              Page      Line
 5    Mr. LaPointe......................... 5      16
 6   EXHIBITS:
 7   ANDERSON
 8    No. 1    Complaint................... 18     15
      No. 2    Handbook.................... 19     19
 9    No. 3    Reviews..................... 51     11
      No. 4    E-mail...................... 60      1
10    No. 5    E-mails..................... 66     24
      No. 6    E-mails..................... 76      4
11    No. 7    E-mails..................... 86     15
      No. 8    Letter...................... 84     15
12    No. 9    Complaint...................102      7
13
14
15
16
17
18
19
20
21
22
23
24   (Exhibits attached/scanned.)
```

Page 4

```
 1        THE VIDEOGRAPHER:  We are now on the record
 2   for the video deposition of Nikkolai Anderson.
 3   Today's date is December 30th, 2022.  The time is
 4   10:32 a.m. as indicated on the video screen.
 5        The caption of the case is Nikkolai
 6   Anderson versus Mott Street, Case No. 20-cv-07721.
 7   This deposition is being held at 1200 Shermer
 8   Road --
 9             (Cell phone interruption.)
10        MR. BROWN:  Sorry.
11        THE VIDEOGRAPHER:  Going off the record at
12   10:32 a.m.
13             (Discussion off the record.)
14        THE VIDEOGRAPHER:  We're back on the record
15   at 10:47 a.m.
16        This deposition is being held at
17   1200 Shermer Road, Northbrook, Illinois.
18        My name is Stephan Hoog.  I am a legal
19   video specialist with Lexitas-Chicago.
20        At this time will Counsel please
21   identify themselves and whom they represent.
22        MR. BROWN:  Attorney Sean Brown, S-E-A-N, on
23   behalf of Nicole Anderson.
24        MR. LA POINTE:  Martin LaPointe on behalf of
```

Page 5

```
 1   the defendant.
 2        MS. GILL:  Kiran Gill on behalf of the
 3   defendant.
 4        THE VIDEOGRAPHER:  Thank you.
 5        MR. LA POINTE:  And Victoria Kim is present
 6   as well for the company.
 7        THE VIDEOGRAPHER:  Our court reporter today
 8   is Amy Bateman.
 9        Can you please swear in the witness.
10        THE REPORTER:  Will you raise your right
11   hand.
12             (Witness sworn.)
13        NIKKOLAI ANDERSON,
14   called as a witness herein, having been first duly
15   sworn, was examined and testified as follows:
16             DIRECT EXAMINATION
17   BY MR. LA POINTE:
18        Q.   Okay.  Can you please state your name
19   for the record.
20        A.   Nikkolai Anderson.
21        Q.   Okay.  Can you spell it?
22        A.   N-I-K-K-O-L-A-I.
23             Last name too?
24        Q.   Yeah.
```



Anderson vs Mott Street
Nikkolai Anderson - 12/30/2022                                                                Pages 6..9

Page 6

1    A.    A-N-D-E-R-S-O-N.
2    Q.    Okay.  And what's your address?
3    A.    2323 West Pershing Road.
4    Q.    Chicago?
5    A.    Mm-hmm.
6    Q.    Okay.  Yes?
7    A.    Yes.
8    Q.    Okay.  So when you respond today --
9    A.    Say yes or no.
10   Q.    -- yes or no, right.  Or whatever the
11   appropriate response is.
12   A.    Okay.
13   Q.    Instead of uh-huh or --
14   A.    Sure.
15   Q.    -- nodding or something like that.
16   A.    Sure.
17   Q.    And do you know why we're here today as
18   far as your deposition?
19   A.    I think.
20   Q.    Do you know what the purpose of the
21   deposition is today?
22   A.    Yes.
23   Q.    Have you talked about that with your
24   attorney?

Page 7

1    A.    Correct.  Yes.
2    Q.    Okay.  And your deposition is under
3    oath, the same oath as in a court of law.  Do you
4    understand that?
5    A.    Yes.
6    Q.    That means if you lie, that's perjury --
7    A.    Okay.
8    Q.    -- and it's a criminal offense.
9    A.    Yes.
10   Q.    Do you understand that?
11   A.    Mm-hmm.
12   Q.    Okay.  If you don't understand a
13   question, let me know and I'll try and rephrase it.
14   Okay?
15         If you do answer my question, I'll
16   assume you understand it and your answer is
17   responsive to my question.  Okay?
18   A.    Okay.
19   Q.    Your answers, again, must be verbal, so
20   try not to nod.  It's kind of human nature and we
21   understand that, but try to not to nod or shake your
22   head or whatever.  Try to be verbal.  Even though
23   it's being videotaped, the court reporter can't take
24   that down.

Page 8

1    A.    Okay.
2    Q.    Have you ever been convicted of a crime?
3    A.    No.
4    Q.    Okay.  Other than this case against Mott
5    Street, have you ever filed a charge of
6    discrimination against any other employer?
7    A.    Yes.
8    Q.    Which one?
9    A.    Fringe.
10   Q.    Fringe Salon?
11   A.    Uh-huh.
12   Q.    And Spa?
13   A.    Uh-huh.
14   Q.    Yes?
15   A.    Yes.
16   Q.    Any others?
17   A.    No.
18   Q.    Did you ever work at a law firm?
19   A.    Yes.
20   Q.    Okay.  What law firm?
21   A.    Deutsch, Levy & Engel.
22   Q.    Okay.  And did you file a claim against
23   them?
24   A.    When you say a claim, do you mean like

Page 9

1    a --
2    Q.    Anything.  Charge?
3    A.    With EEOC or --
4    Q.    Lawsuit?  EEOC or --
5    A.    -- a lawsuit?
6          I think a lawsuit, yes.
7    Q.    You filed a lawsuit --
8    A.    Yes.
9    Q.    -- against them?
10   A.    Yes.  Not a lawsuit, a charge.
11   Q.    A charge?
12   A.    A EEOC charge.
13   Q.    Discrimination charge?
14   A.    Yes, uh-huh.
15   Q.    Okay.  Based on what?
16   A.    I don't recall.  Race.  Race, I think.
17   Race.
18   Q.    Race discrimination?
19   A.    Uh-huh.
20   Q.    Okay.
21   A.    Retaliation for sure.
22   Q.    Okay.  And did you pursue a lawsuit
23   based on that charge?
24   A.    No.



Page 10

1    Q.   Okay.  And what was the result, the end
2  result of that charge?
3    A.   They wanted to settle.
4    Q.   They wanted to settle?
5    A.   Uh-huh.
6    Q.   And how much did that settle for?
7    A.   I think 30,000 or -- no, like 28,000.  I
8  don't remember.
9    Q.   Okay.
10   A.   I don't remember.
11   Q.   And back to Fringe Salon, what happened
12 with that --
13   A.   I was called a nigger, so I went to
14 EEOC.
15   Q.   Okay.  And what -- what happened in that
16 case?  What was the end result in that case?
17   A.   She wanted to settle.
18   Q.   It went to lawsuit; right?
19   A.   No, I don't think -- I don't think it
20 went to lawsuit.  I think he filed a -- he filed a
21 case, I think.
22   Q.   "He" meaning your --
23   A.   My --
24   Q.   -- attorney?

Page 11

1    A.   -- attorney, yeah.
2    Q.   Sean Brown?
3    A.   Yes.
4    MR. BROWN:  That would be a lawsuit.
5    THE WITNESS:  Oh, a lawsuit, yeah.
6    MR. LA POINTE:  Okay.
7    THE WITNESS:  I'm not familiar.
8  BY MR. LA POINTE:
9    Q.   All right.  And then it settled after
10 the lawsuit was filed?
11   A.   Correct, I think.
12   Q.   Okay.
13   A.   Yes.
14   Q.   How much was the settlement for?
15   A.   29,000, 28,000, 29.
16   Q.   Okay.  All right.  When did that settle,
17 by the way?
18   A.   I don't remember.  I don't remember.
19   Q.   Okay.
20   A.   I don't remember.  Recent.
21   Q.   Recently?
22   A.   Yeah, recently.
23   Q.   Any other charges or complaints or
24 lawsuits, anything that you filed against any other

Page 12

1  company?
2    A.   I don't think so.
3    Q.   Other than those two?
4    A.   I don't recall, uh-uh.
5    Q.   Okay.  Any other cases where you've been
6  a defendant in a case?
7    A.   What do you mean?
8    Q.   Where you've been sued.
9    A.   Where I've been sued?
10   Q.   Yeah.
11   A.   I don't know.  Maybe.  I don't know.
12   Q.   You're not aware of?
13   A.   No, I'm not aware.
14   Q.   Okay.
15   A.   I've never been to court.
16   Q.   Okay.  In the case against Fringe
17 Salon --
18   A.   Uh-huh.
19   Q.   -- was there a deposition in that case?
20   A.   No.
21   Q.   No?
22   A.   Like this, no.
23   Q.   You settled before the depositions?
24   A.   Yes, uh-huh.

Page 13

1    Q.   Okay.  Have you ever -- other than these
2  three, Mott Street, Fringe, and the law firm that
3  you mentioned, have you ever accused any other
4  employer that you worked for of discrimination,
5  harassment of any kind?
6    A.   To them?  Sure, yes.
7    Q.   Okay.  Which -- which ones?
8    A.   Firehouse.
9    Q.   Firehouse?
10   A.   Uh-huh.
11   Q.   Okay.  What did you claim against them?
12   A.   The patron touched me.  The patron
13 touched me.
14   Q.   Okay.  And so you claimed sexual
15 harassment?
16   A.   No.  They just banned him from coming,
17 but I -- I brought it to their attention.
18   Q.   Okay.  Any other time you complained to
19 your employer about discrimination or harassment
20 other than the ones we've just talked about?
21   A.   No.
22   Q.   Okay.
23   A.   Not that I know of, no.
24   Q.   What is your highest level of education?



Page 14

```
 1      A.   Associate's degree.
 2      Q.   Okay.  So a two-year college --
 3      A.   Uh-huh.
 4      Q.   -- degree?
 5      A.   I went to Purdue too, but I dropped out.
 6  I left.
 7      Q.   Okay.  When did you go to -- where did
 8  you go for your two-year bach-- or associate's
 9  degree?
10      A.   Harold Washington.
11      Q.   Okay.  And when did you graduate?
12      A.   I don't -- don't remember.  I don't
13  remember.
14      Q.   Any idea?
15      A.   I don't remember.
16      Q.   Okay.
17      A.   Under oath, I don't remember.
18      Q.   All right.  What's your date of birth,
19  by the way?
20      A.   May 11, 1990.
21      Q.   Are you married?
22      A.   No.
23      Q.   Ever been married?
24      A.   No.
```

Page 15

```
 1      Q.   Do you have any children?
 2      A.   No.
 3      Q.   Okay.  Other than Mott Street, have you
 4  ever been discharged from any job?
 5      A.   Yes.
 6      Q.   Which ones?
 7      A.   That I remember?  Fringe.  Yeah, off the
 8  top of my head, Fringe.  Off the top of my head.
 9      Q.   Is that it?
10      A.   From the top of my head.
11      Q.   Okay.  There may be others but you don't
12  recall?
13      A.   There may be others.  I just don't
14  remember.
15      Q.   Okay.  Now you were employed with Mott
16  Street from, I believe, September 15th through --
17  I'm sorry, September 15th, 2015, through
18  September 22, 2017; right?
19      A.   I don't remember.  If you -- if you say
20  that, that's -- sure.
21      Q.   Does that sound about right?
22      A.   I don't remember.
23      Q.   Okay.  Was it September of 2015, then,
24  when you became employed with them?
```

Page 16

```
 1      A.   I don't recall to be honest.
 2      Q.   Okay.
 3      A.   I know it was 2015, though.
 4      Q.   Okay.  Was it the fall?
 5      A.   You could -- I guess, yeah.
 6      Q.   Okay.  Who -- who hired you?
 7      A.   Nate.
 8      Q.   Nate Chung?
 9      A.   Uh-huh.
10      Q.   Okay.  Did he interview you?
11      A.   Yes.
12      Q.   Okay.  Did he hire you on the spot after
13  he interviewed you?
14      A.   It was like a stahj (phonetic), I think,
15  which is like a -- you're working but interviewing,
16  I guess.  So I would say that happened, and then he
17  asked me the next day if I wanted to work there.
18      Q.   Okay.  Were you working at the time
19  or --
20      A.   Yes, uh-huh.
21      Q.   Where were you working?
22      A.   The law firm.
23      Q.   The law firm?
24      A.   Uh-huh.
```

Page 17

```
 1      Q.   Okay.  The law firm we talked about?
 2      A.   Yes, uh-huh.
 3      Q.   Okay.  Were you discharged by the law
 4  firm or no?
 5      A.   Oh, yes, I was.  Yeah.
 6      Q.   You were discharged --
 7      A.   I wouldn't say it was discharge- -- I
 8  was, like, laid off.
 9      Q.   You were laid off?
10      A.   Laid off, yeah.
11      Q.   By the law firm?
12      A.   Yes.
13      Q.   What was your job at the law firm?
14      A.   I was a receptionist.
15      Q.   Okay.  And that would have been around
16  the same time, September of 2015?
17      A.   That I was still there?
18      Q.   Yes.
19      A.   I was still there at that time.
20      Q.   Okay.  So you said you got laid off.
21      A.   Not -- I worked at the law firm
22  throughout my Mott Street venture.
23      Q.   Oh.  So you were working two jobs?
24      A.   Yes, uh-huh.  The law firm was my main
```



Page 18

1  job, my full-time job.
2      Q.  Okay.  All right.  So you were working
3  full-time with the law firm?
4      A.  Correct.
5      Q.  And then you started up with Mott
6  Street --
7      A.  Uh-huh.
8      Q.  -- as a second job?
9      A.  That's correct.
10     Q.  Okay.  With Mott Street, did you receive
11  any training when you started on their procedures or
12  policies?
13     A.  Not so much, no.
14     Q.  Okay.
15         (Anderson Exhibit No. 1 marked.)
16  BY MR. LA POINTE:
17     Q.  Exhibit 1 to your deposition,
18  Ms. Anderson, do you recognize that?
19     A.  I'm sorry, what am I recognizing?
20     Q.  Do you recognize this document?
21     A.  No.
22     Q.  So this looks like your lawsuit against
23  Fringe?
24     A.  Okay.

Page 19

1      Q.  Your complaint that was filed in court
2  against Fringe?
3      A.  Okay.
4      Q.  Is that -- is that true?
5      A.  And do I recognize the document?  No, I
6  don't recognize it as the document.
7      Q.  You never saw this before?
8      A.  No, I never saw the document, no.
9      Q.  Okay.  And this looks like it was
10  filed -- if you look at the top, there's like a
11  header at the top --
12     A.  Okay.
13     Q.  -- for when things are filed; and it
14  looks like it was filed on January 20th, 2021?
15     A.  Okay.
16     Q.  Do you see that?
17     A.  I see that, uh-huh.
18     Q.  Okay.
19         (Anderson Exhibit No. 2 marked.)
20  BY MR. LA POINTE:
21     Q.  Exhibit No. 2 to your deposition,
22  Ms. Anderson, have you seen this before?
23     A.  Yeah, I've seen this before.
24     Q.  Okay.  It's the front of the house

Page 20

1  handbook for Mott Street --
2      A.  Uh-huh.
3      Q.  -- right?
4      Yes?
5      A.  Yes, yes.
6      Q.  Okay.  And so you've read through this
7  before?
8      A.  I don't know if this is the same one I
9  have, but I'm sure I probably have.
10     Q.  Okay.  Now, I see a lot of -- I'm not
11  going to go through all the stuff in here, but I see
12  a lot of emphasis in this handbook on the guest
13  experience and being friendly to guests.
14     A.  Correct.
15     Q.  Does Mott Street emphasize that a lot
16  with their employees?
17     A.  Do they follow this, no.
18     Q.  No.  My question is does Mott Street
19  emphasize -- in their handbook, they certainly
20  emphasize the guest experience and being friendly --
21     A.  In the handbook, sure, yes.  In the
22  handbook, they do emphasize that in the handbook,
23  yes.
24     Q.  And being friendly to guests?

Page 21

1      A.  In the handbook, yes.
2      Q.  Okay.  And do they emphasize that with
3  their employees?
4      A.  It depends on the person, to be honest.
5      Q.  So what do you mean by that?
6      A.  They picked and choosed.
7      Q.  They picked and choosed what?
8      A.  Who they wanted to emphasize it with.
9      Q.  Okay.  Meaning they didn't enforce --
10     A.  Correct.
11     Q.  -- these same kinds of policies --
12     A.  Treatment.
13     Q.  -- with certain people?
14     A.  Correct.
15     Q.  Okay.  And how do you know that?
16     A.  I was there.
17     Q.  And how do you -- who was not -- who
18  was -- who were the employees that the organization
19  Mott Street did not enforce these policies with?
20     A.  What do you mean?
21     Q.  Well, you just said that the -- Mott
22  Street did not necessarily enforce these same
23  policies with everybody; right?
24     A.  Correct.



Page 22

1    Q.   So --
2    A.   You mean to be friendly and all that?
3    Q.   Yes.
4    A.   Yes.  If it was Simon, for instance, he
5  didn't have to -- he did stuff wrong all the time
6  but --
7    Q.   He did what?
8    A.   He did stuff wrong all the time but it
9  was overlooked.
10   Q.   Okay.  When you say he did stuff wrong
11 all the time, what does that mean?
12   A.   Meaning he wasn't always at his best
13 and --
14   Q.   What does that mean?
15   A.   -- they over looked it.
16   Q.   What does that mean?
17   A.   Are we talking about emphasizing --
18   Q.   We're talking about guest experience --
19   A.   Exactly.
20   Q.   -- and being friendly to guests.
21   A.   Exactly.
22   Q.   That's what I'm talking about right now.
23   A.   Correct, yes.
24   Q.   Were there times when Simon wasn't --

Page 23

1    A.   Correct.
2    Q.   -- like that to guests?
3    A.   Yeah, Simon.  Most -- yeah, a lot of
4  them.  Kristen, yeah.
5    Q.   Okay.  Do you know if Simon ever got bad
6  reviews on Yelp?
7    A.   I know that we sat in the office
8  before --
9    Q.   My question is do you know if Simon ever
10 got bad reviews --
11   A.   I don't know.
12   Q.   -- on Yelp?
13   A.   I'm not on Yelp.  I don't know.
14   Q.   Okay.  Do you know if customers ever
15 complained about Simon?
16   A.   Yes.
17   Q.   You do know that?
18   A.   Yes, uh-huh.
19   Q.   How do you know that?
20   A.   They would bring it to the host stand.
21   Q.   Okay.  How many times did you get a
22 complaint --
23   A.   I don't recall.
24   Q.   -- about Simon?

Page 24

1    A.   I don't recall.
2    Q.   Once?
3    A.   More than once for sure.
4    Q.   How many times?
5    A.   I don't recall.
6    Q.   Okay.  Anybody else that the company did
7  not enforce the same --
8    A.   Kristen.  Kristen was one of them.
9    Q.   Okay.  You need to let me finish my
10 question.
11   A.   Oh.
12   Q.   Okay?
13        How many -- what are the other employees
14 that the company did not enforce these same policies
15 to be friendly to customers?
16   A.   Kristen.
17   Q.   Kristen?
18   A.   Kristen.
19   Q.   What's the last name?
20   A.   I don't know her last name.
21   Q.   Okay.  And what -- what did -- what
22 happened with that?  What are you talking about?
23 What exactly happened with Kristen?
24   A.   What do you mean?

Page 25

1    Q.   Were they instances when she was not
2  friendly toward customers?
3    A.   Correct, yes.
4    Q.   And she -- did she get bad reviews from
5  customers?
6    A.   Yes, she has.
7    Q.   How do you know that?
8    A.   They would always bring it to the host
9  stand.
10   Q.   Okay.  And how many times did that
11 happen by Kristen?
12   A.   I don't -- more than once.
13   Q.   More than once?
14   A.   Yes.
15   Q.   How many times?
16   A.   I don't recall.
17   Q.   Okay.  When was this?
18   A.   When I worked there.
19   Q.   When?
20   A.   I don't recall.
21   Q.   When?
22        You worked there for two years.  When
23 was this?
24   A.   I don't recall.



Anderson vs Mott Street
Nikkolai Anderson - 12/30/2022                                                    Pages 26..29

Page 26

1          Q.    You don't have any idea --
2          A.    No.
3          Q.    -- when this was in the two-year
4    period --
5          A.    No.
6          Q.    -- you were there?
7          A.    No.
8          Q.    Okay.  How about same thing with Simon?
9          A.    I don't recall.
10         Q.    When was this -- when -- in this
11   two-year period, when were these complaints about
12   him?
13         A.    I don't recall.
14         Q.    Were there any bad Yelp reviews about
15   Kristen?
16         A.    I don't know.  I don't know.
17         Q.    Okay.  And would you agree that if a
18   customer complaint gets publicized on Yelp that that
19   is pretty serious?
20         A.    I don't know anything about Yelp, so I
21   don't know.
22         Q.    You don't know anything about Yelp?
23         A.    I don't know anything about Yelp.
24         Q.    Okay.  Are you aware that there are

Page 27

1    online reviews by customers --
2          A.    Unaware.
3          Q.    -- for businesses?
4          A.    No, I don't.
5          Q.    Okay.  Well, let's assume that you did
6    know about Yelp --
7          A.    Uh-huh.
8          Q.    -- and if there's an online review
9    that's bad about a company like especially a
10   restaurant --
11         A.    Uh-huh.
12         Q.    -- and for everybody to see on the
13   Internet --
14         A.    Uh-huh.
15         Q.    -- that would be pretty bad for that
16   organization; correct?
17         A.    Possibly.
18         MR. BROWN:  I'll just object as to
19   speculation, but you can answer.
20   BY MR. LA POINTE:
21         Q.    Possibly?
22         A.    I guess.  I don't know.
23         Q.    Okay.
24         A.    I don't know what Yelp is.  I don't

Page 28

1    know.
2          Q.    So what was your position with the
3    company?
4          A.    The host, the lead host.
5          Q.    Okay.  And Mott Street considers the
6    host to be the face of the organization; right?
7          A.    I think.
8          Q.    Face of the restaurant?
9          A.    I think.
10         Q.    Right?
11         A.    I think so.
12         Q.    Okay.  And they're supposed to greet
13   guests with a warm welcome and have a friendly
14   approach with guests; right?
15         A.    I don't know.
16         Q.    You don't know?
17         A.    I don't know.
18         Q.    What was your shift?  When did you
19   start?
20         A.    My shift, when did I start?
21         Q.    Yeah.  What time of the day did you
22   start?
23         A.    When I worked at the law firm, I started
24   like at 6:00, I think.  I don't remember.  I think I

Page 29

1    started like at 6:00 when I worked at the law firm.
2    I started late.  I missed family meal a lot.
3          Q.    Okay.  So you're saying there was a
4    period of time when you worked at the law firm.  Did
5    you stop working for them during your employment at
6    Mott Street?
7          A.    Yes.
8          Q.    Okay.  How -- how long a period of time
9    did you work for both companies?
10         A.    About a year and a half I think.  I
11   don't know.
12         Q.    Okay.  So about the last six months of
13   your employment with Mott Street you were just
14   working --
15         A.    Full-time.
16         Q.    -- there?
17         A.    Uh-huh.
18         Q.    Just let me finish with my questions.
19   Okay?
20         A.    Did your shift change, then, when you
21   stopped working for the law firm?
22         A.    I don't remember.
23         Q.    Did you start earlier in time, like
24   4:00 o'clock?



Page 30

1       A.   I -- I don't know.  I don't remember.
2       Q.   Okay.  Who was your manager at Mott
3  Street?
4       A.   When you say manager, what do you mean?
5       Q.   Who supervised you?
6       A.   Lola.
7       Q.   Okay.  What was her last name?
8       A.   I don't know.  I know it; I just don't
9  know how to say it.
10      Q.   Let me just see if I can spell it out
11  here.  I'm not sure how to pronounce it either, but
12  O-L-A-T-E-G -- I'm sorry, O-L-A-T-E-J-U.
13      A.   I think so.
14      Q.   Does that sound right?
15      A.   I think so.
16      Q.   Okay.  Olateju, does that sound about
17  right?
18      A.   Your guess is better than mine.
19      Q.   All right.  So she was your manager?
20      A.   Yeah, I would say, yeah.
21      Q.   For the whole time you were there?
22      A.   No.  It was Nate and then Lola became a
23  manager and then Emma.  Emma became a manager too.
24  So I guess Emma, then Lola.

Page 31

1       Q.   Okay.  What was Emma's last name?
2       A.   Domach.
3       Q.   Can you spell it?
4       A.   D-O-M-A-C-H.
5       Q.   Okay.  Did you get along with Lola?
6       A.   Of course, yes.
7       Q.   Was she a good manager in your opinion?
8       A.   For the most part.
9       Q.   And was she an honest person as far as
10  you were concerned?  Do you know?
11      A.   I would say 80 percent.
12      Q.   Okay.  What about Emma?  Was she a good
13  manager?
14      A.   I would say for the most part.
15      Q.   Was she an honest person?
16      A.   About 80 percent.
17      Q.   When you say "80 percent," what does
18  that mean?
19      A.   Meaning they had flaws.
20      Q.   Flaws?
21      A.   Uh-huh.
22      Q.   What kinds of flaws do you mean?
23      A.   We're talking about honesty, so they had
24  flaws.  They had -- they had a job, so they wanted

Page 32

1  to protect their job sometimes.
2       Q.   Okay.  Did you know Simon Dufour?
3       A.   Yes.  Well, no, not "know," but I worked
4  with him, sure.
5       Q.   Okay.  He was one of the people you
6  worked with?
7       A.   Uh-huh.
8       Q.   And what was his position?
9       A.   I believe he was a server.
10      Q.   Server?
11      A.   Uh-huh.
12      Q.   Okay.  So on two occasions did you grab
13  Simon in the crotch?
14      A.   In the crotch?
15      Q.   Yeah.
16      A.   No.
17      Q.   No?
18      A.   No.  No.
19      Q.   So that's what he's told us.
20      A.   Oh, okay.  Lucky for Simon, no.  Maybe
21  he's talking about Johanna, but not me.
22      Q.   No, he's talking about you.
23      A.   Impossible.
24      Q.   So he told us that you twice grabbed him

Page 33

1  in the crotch --
2       A.   Okay.
3       Q.   -- toward the end of your employment.
4       A.   Okay.
5       Q.   Okay?  That didn't happen?
6       A.   No.
7       Q.   Is that what you're saying?
8       A.   No.
9       Q.   Okay.  And do you think he's lying,
10  then?
11      A.   It got to be a lie, yes.
12      Q.   And do you have any reason why he would
13  lie about that?
14      A.   I don't know the reason.  I haven't
15  spoken to Simon in years.  I don't know the reason.
16      Q.   Okay.  When you had -- when you knew
17  him, when you were working with him, was there any
18  reason that you would think he would lie about you?
19      A.   Yes.  Me and Simon clashed a lot at
20  work, yes.
21      Q.   Clashed?
22      A.   We clashed, yes.
23      Q.   Okay.  Why -- why do you say that?
24      A.   Because he got favoritism.  He wouldn't



Page 34

1  get any -- any negative feedback, he -- he wouldn't
2  get any repercussions. So yes, we had a lot of
3  clashing.
4      Q.   Okay. Do you think he got favorable
5  treatment --
6      A.   Correct.
7      Q.   -- from management?
8      A.   Correct.
9      Q.   And how do you know that management even
10 knew that he was doing something wrong?
11     A.   Because like I said -- as I said before,
12 we've had several meetings, me and him and Lola. We
13 sat in meetings, me, him, and Nate; and they would
14 overlook his stuff and complain about mine.
15     Q.   When you say "they," who is "they"?
16     A.   Nate or Lola.
17     Q.   Okay. And what would they complain
18 about for you?
19     A.   That I'm -- that I see things in black
20 and white, I need to be more flexible, don't take
21 Simon's jokes literally, don't be emotional, don't
22 be sensitive, stuff like that.
23     Q.   Okay. Who would say that?
24     A.   Nate in particular, Nate.

Page 35

1      Q.   Okay. Would Lola also contribute?
2      A.   Lola would -- Lola would -- she would
3  understand me a little bit more. She would try to
4  diffuse the situation. But a lot of the times at
5  that job, me and Simon didn't speak a lot, so it's
6  very funny that he would say I touched him.
7      Q.   And Simon also told us that Matt Taylor
8  told him that you touched Matt in the crotch as
9  well.
10     A.   Okay. Okay.
11     Q.   So --
12     A.   That's untrue too.
13     Q.   That's untrue too?
14     A.   Yes. I don't know how I could be stoic
15 and be a toucher. None of it makes sense, but okay.
16     Q.   You don't know if what?
17     A.   I was -- I was always told I wasn't
18 emotional or I was sensitive or I was stoic or I
19 wouldn't hug. I wasn't a touchy person, so I guess
20 this is a revelation to me.
21     Q.   Okay.
22     MR. BROWN:  I'm sorry, what was that last
23 name, Matthew?
24     THE WITNESS:  Matty.

Page 36

1      MR. LA POINTE:  I'm going to get to that in a
2  second. Taylor was the last name.
3      MR. BROWN:  Thanks.
4  BY MR. LA POINTE:
5      Q.   So, again, is there any reason why Simon
6  would lie about this stuff?
7      A.   Simon has lied before, so I don't know
8  why he would lie.
9      Q.   Do you lie?
10     A.   Do I lie?
11     Q.   Yeah.
12     A.   No.
13     Q.   No?
14     A.   No, for the most part, no. I try to be
15 as transparent as possible.
16     Q.   Okay. All right. So Matt Taylor, we
17 talked to him too --
18     A.   Okay.
19     Q.   -- just recently, and he also said that
20 you grabbed him --
21     A.   Okay.
22     Q.   -- in the crotch --
23     A.   Okay.
24     Q.   -- and on the butt.

Page 37

1      A.   On the butt. Okay.
2      Q.   Yeah.
3           Is that true or no?
4      A.   No.
5      Q.   And so why would he -- is there any
6  reason why he would lie about this?
7      A.   I think because I voiced that he touched
8  me, so I'm guessing this is the -- this is the
9  repercussion of that because he was in my complaint.
10 So I guess this is the repercussion of that, me
11 telling he touched me. So I guess this is his way
12 of making it make sense. But no, I think he's
13 getting his events confused. I don't touch people;
14 people touch me.
15     Q.   Did you talk to Matt about suing your
16 previous employer?
17     A.   I barely talked to Matt.
18     Q.   Did you talk to Matt about suing --
19     A.   No.
20     Q.   -- your previous employer?
21     A.   No. Not that I know of, no.
22     Q.   And did you ask Matt if he ever had sex
23 with a Black woman?
24     A.   Black woman?

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitalegal.com                  A- 50                  

Page 38

| | | |
|---|---|---|
| 1 | Q. | Yeah. |
| 2 | A. | No.  No.  No. |
| 3 | Q. | That's what he told us too. |
| 4 | A. | Okay. |
| 5 | Q. | That you asked him whether he ever had |
| 6 | sex with a Black woman. | |
| 7 | A. | Okay. |
| 8 | Q. | Did you ever ask -- |
| 9 | A. | No. |
| 10 | Q. | -- him that? |
| 11 | A. | No. |
| 12 | Q. | That would be inappropriate to do; |
| 13 | right? | |
| 14 | A. | I would imagine. |
| 15 | Q. | And grabbing men by the crotch -- |
| 16 | A. | Yeah. |
| 17 | Q. | -- or the butt would be inappropriate |
| 18 | too? | |
| 19 | A. | I would guess they would've told |
| 20 | management that something like that. | |
| 21 | Q. | Well, they also told us they didn't say |
| 22 | anything. | |
| 23 | A. | Oh, I bet. |
| 24 | Q. | Yeah.  Well, they didn't.  That's what |

Page 39

| | | |
|---|---|---|
| 1 | they said. | |
| 2 | A. | They didn't tell management; right? |
| 3 | Q. | That's right. |
| 4 | A. | All right. |
| 5 | Q. | Because they felt like they could handle |
| 6 | it themselves. | |
| 7 | A. | Right.  Okay. |
| 8 | Q. | Yeah.  That's what they told us. |
| 9 | A. | That's beautiful. |
| 10 | Q. | Yeah. |
| 11 | | Any reason to doubt any of that? |
| 12 | A. | Okay. |
| 13 | Q. | Yeah? |
| 14 | A. | If you didn't tell management, why would |
| 15 | you -- I told management.  I had no problem telling | |
| 16 | management.  Why wouldn't you tell management? | |
| 17 | Management knew about mine. | |
| 18 | Q. | Matt also told us that -- that you |
| 19 | routinely talked about your sex life -- | |
| 20 | A. | Sex life. |
| 21 | Q. | -- at work.  About sex and your sex life |
| 22 | at work. | |
| 23 | A. | That's beautiful.  During that time I |
| 24 | was celibate, so that's a lie. | |

Page 40

| | | |
|---|---|---|
| 1 | Q. | Did you ever talk about your sex life -- |
| 2 | A. | No, I did not. |
| 3 | Q. | -- at all -- |
| 4 | A. | No, I do not. |
| 5 | Q. | -- with Mott Street -- at Mott Street? |
| 6 | A. | No, I did not.  Not with him for sure. |
| 7 | Q. | With anybody? |
| 8 | A. | At work? |
| 9 | Q. | At work. |
| 10 | A. | No. |
| 11 | Q. | No? |
| 12 | A. | No, not at work, no. |
| 13 | Q. | You would never do that? |
| 14 | A. | Not that I know of, no. |
| 15 | Q. | So is there any reason that Matt would |
| 16 | lie about any of this stuff? | |
| 17 | A. | I just said that he talk-- he's in my |
| 18 | complaint, so I would imagine that this is his | |
| 19 | retaliation. | |
| 20 | | They all talked about sex, all of them. |
| 21 | Q. | But not you? |
| 22 | A. | No, I didn't -- I wasn't a part of their |
| 23 | group. | |
| 24 | Q. | Gabe Freeman, do you remember him? |

Page 41

| | | |
|---|---|---|
| 1 | A. | Of course. |
| 2 | Q. | Okay.  He also recently told us that you |
| 3 | grabbed his hand and put it on your butt.  Is that | |
| 4 | true? | |
| 5 | A. | No. |
| 6 | Q. | No? |
| 7 | A. | No. |
| 8 | Q. | He also told us your behavior was always |
| 9 | very aggressively sexual. | |
| 10 | A. | I was aggressively sexual? |
| 11 | Q. | Yeah. |
| 12 | A. | Okay. |
| 13 | Q. | Is that true? |
| 14 | A. | That's not true. |
| 15 | Q. | Okay.  Did you engage in any sexual |
| 16 | behavior at all? | |
| 17 | A. | With Gabe? |
| 18 | Q. | With anybody. |
| 19 | A. | No. |
| 20 | Q. | At Mott Street, that is. |
| 21 | A. | No. |
| 22 | Q. | No? |
| 23 | A. | No. |
| 24 | Q. | He also told us you would hug everyone |



Page 42

1   when you came in to say hello.  Is that true?
2       A.   Hug everyone?
3       Q.   Yeah.
4       A.   No.
5       Q.   Or certain people?
6       A.   I didn't hug men, so that's -- that's a
7   lie.
8       Q.   Okay.  You hug women?
9       A.   I hug women.
10      Q.   Okay.  Is Gabe a short -- is he short in
11  stature?
12      A.   I guess.  I mean, I'm five 10, so I
13  guess so.
14      Q.   He says -- he told us he's five five.
15      A.   Okay.
16      Q.   Does that sound about right?
17      A.   I don't remember.  He was shorter than
18  me.  I'm five 10, so I don't know.
19      Q.   Yeah.  What was Gabe's position?
20      A.   I think he was like a chef or something.
21      Q.   And what about -- what about Matt?
22      A.   I don't -- I think he was a server.
23      Q.   And what about Simon?
24      A.   He was a server.

Page 43

1       Q.   So they were -- none of these three were
2   managers; right?
3       A.   No.
4       Q.   Okay.
5       A.   Not that I know of.  I don't know.
6       Q.   Gabe also said that you would press your
7   body up against him in weird ways.
8       A.   Okay.
9       Q.   Is that true?
10      A.   No.
11      Q.   And that you're always flirty.
12      A.   I'm a flirty person now?  Okay.  No.
13      Q.   So none of that is true?
14      A.   No.
15      Q.   Is there any reason Gabe would lie?
16      A.   He's one of the people I complained
17  about, so yeah, I would imagine.
18      Q.   Okay.  So you think all three of these
19  people that --
20      A.   I don't know what Simon's --
21      Q.   Let me finish my question.
22      A.   Oh.
23      Q.   You think all three of these people that
24  talked to us and gave us this information, all of

Page 44

1   them are lying; right?
2       A.   Yes, uh-huh.
3       Q.   And you're telling the truth?
4       A.   Of course.
5       Q.   And you understand you're under oath?
6       A.   Correct.
7       Q.   Under penalty of perjury?
8       A.   Okay.
9       Q.   You understand that?
10      A.   Okay.
11      Q.   Yes?
12      A.   Yes.
13      Q.   Do you recall being counseled about
14  using your phone while working?
15      A.   Once, yes.
16      Q.   Do you remember who did counsel you
17  about that?
18      A.   When you say "counsel," what do you mean
19  by "counsel"?
20      Q.   Talk to you about it.
21      A.   I wasn't talked to.  I was yelled at.  I
22  wasn't talked to.
23      Q.   You were yelled at?
24      A.   Yes.

Page 45

1       Q.   Who yelled at you?
2       A.   Nate.
3       Q.   About using your phone?
4       A.   Correct.
5       Q.   When was this?
6       A.   I don't recall the date.
7       Q.   Toward the end of your employment or --
8       A.   Oh, no.  This was a little early -- I
9   wouldn't say early.  Mid -- maybe mid of my
10  employment maybe.
11      Q.   So 2016?
12      A.   Maybe.
13      Q.   When you say "yelled," Nate yelled at
14  you?  What do you mean by that?
15      A.   He kicked me out of the restaurant.
16      Q.   He kicked you out of the restaurant?
17      A.   Correct.
18      Q.   Okay.  And when you say yelled at you,
19  you still haven't answered my question.  How did he
20  yell at you?
21      A.   Yelling, I thought, was when you raise
22  your voice and you are putting your finger in
23  someone's face.  That's what I consider yelling.  I
24  don't know what you consider yelling.



Page 46

1    Q.   Okay.  And were you sent home, then?
2    A.   I was.
3    Q.   Okay.  All right.  And it's a violation
4  of policy to use your cell phone while working;
5  right?
6    A.   Correct.
7    Q.   And that's what you were doing; correct?
8    A.   I was doing what everybody else did.
9    Q.   I'm asking about you.  That's what you
10 were doing on this occasion; right?
11   A.   No.  No.
12   Q.   You weren't?
13   A.   No.
14   Q.   There was no reason for him to --
15   A.   Overreact?  No.
16   Q.   I didn't say "overreact."
17        (Continuing.) -- to talk to you about
18 this?
19   A.   He didn't talk.  Use the word I used.  I
20 didn't say talk.
21   Q.   Okay.  I'm not going to debate here.
22   A.   Okay.
23   Q.   Okay?
24        You can put -- you're not going to put

Page 47

1  words in my mouth.
2    A.   And don't put words in my mouth.  You
3  keep saying "talk."  He didn't talk to me.
4    MR. BROWN:  I'm going to object as to
5  argumentative.
6  BY MR. LA POINTE:
7    Q.   All right.  So you were not on your
8  personal cell phone at the time --
9    A.   What do you mean "on"?
10   Q.   -- when Nate talked to you about this?
11   A.   What do you consider "on"?
12   Q.   Were you using -- did you have your cell
13 phone out?
14   A.   I did not, no.
15   Q.   So why did he talk to about this or yell
16 at you, whatever you want to say.
17   A.   Uh-huh.
18   Q.   Why did he say this about you being on
19 your cell phone?
20   A.   I wasn't on my cell phone.  I touched my
21 cell phone and then he overreacted.
22   Q.   You touched your cell phone?
23   A.   Correct.
24   Q.   Meaning what?  It was on the desk or

Page 48

1  what?
2    A.   Okay.
3    Q.   Explain to me what happened.
4    A.   Can I explain everything or --
5    Q.   Yes.  Explain to me --
6    A.   Okay.
7    Q.   -- what happened.
8    A.   So there --
9    Q.   Because obviously you're debating every
10 single word that I'm asking you, so let -- you tell
11 me what happened.  Go ahead.
12   A.   I don't like being yelled at.
13   MR. BROWN:  Go ahead.
14 BY MR. LA POINTE:
15   Q.   You obviously don't like being yelled
16 at, do you?
17   A.   I don't, no.
18   Q.   Okay.  Well, then, answer my questions
19 and then this will be a lot easier if it goes that
20 way.  Go ahead.
21   A.   So there was a POS system, and it was --
22 it was by the window.  My phone was behind that --
23 that thing, the POS system.  I pushed it back and I
24 touched it.  Nate proceeded to come to me, yell at

Page 49

1  me.  And I said, Well, everybody else is on their
2  phone; I'm barely -- I'm never on my phone.  So I
3  just touched my -- my phone.  He overreacted.  And
4  that's why I still had a job there because I was
5  kicked out because after that, he called and
6  apologized, and then he brought me back the next day
7  to apologize again because he was wrong for
8  overreacting.  So that's what happened.
9    Q.   Now --
10   A.   He -- he realized his faults and
11 apologized to me.
12   Q.   Now --
13   A.   That's why -- even though it was an
14 employment violation, he still kept me there because
15 he was wrong in that situation.  So that's what
16 happened.
17   Q.   Now, when you answer my questions, can
18 you look at me instead of your attorney?
19   A.   If -- if you don't yell, sure.
20   Q.   In 2016, did Lola ask you not to leave
21 your personal items on the host stand in view of
22 guests?
23   A.   I don't remember.
24   Q.   Do you remember responding rudely and



Page 50

1   defiantly toward her --
2       A.   I don't --
3       Q.   -- about that?
4       A.   I don't remember that, even that
5   situation.
6       Q.   Do you remember being sent home after
7   that happened?
8       A.   I didn't get sent home.  I got sent home
9   one time.
10      Q.   That's not my question, ma'am.
11      A.   Oh, no.
12      Q.   Do you remember being sent home --
13      A.   I don't remember.  I don't remember.
14      Q.   -- after that incident?
15      A.   I don't remember.
16      Q.   Do you remember anything about that
17  either Lola or somebody else told you about not
18  leaving your personal items on --
19      A.   I don't remember that.
20      Q.   Let me finish my question.
21           (Continuing.) -- about leaving your
22  personal items on the host stand?
23      A.   I do not remember.
24      Q.   You don't remember that at all?

Page 51

1       A.   Uh-uh.
2       Q.   Okay.  On August 26th, 2017, Nate
3   observed you using the iPad and browsing on the
4   Internet for personal reasons.  Remember that?
5       A.   I do not remember that.
6       Q.   Do you remember the iPad situation?
7       A.   I do not remember the iPad situation.
8       Q.   Do you remember being asked to clock out
9   by Nate on that occasion?
10      A.   I do not remember that.
11           (Anderson Exhibit No. 3 marked.)
12           THE WITNESS:  Thank you.
13  BY MR. LA POINTE:
14      Q.   Okay.  Exhibit 3 to your deposition,
15  have you seen this before?
16      A.   Never.
17      Q.   Okay.  It's documents that we produced
18  in our discovery here.  These are the Yelp or
19  OpenTable reviews, and these are all negative
20  reviews about you.
21      A.   Okay.
22      Q.   Have you ever -- you've never seen this
23  before?
24      A.   Never been told about it, never.

Page 52

1       Q.   Okay.  The first one from 11/6/2016:
2   Hostess was rude and snobby.  Barely acknowledged us
3   when we came in and didn't say anything to us on the
4   way out.  I think I literally saw up her nostrils
5   because of how far her nose was turned up.  Don't go
6   here.  Wish I -- wish I could've gotten a refund for
7   the horrible experience.
8            Do you see that?
9       A.   Uh-huh, I see it.
10      Q.   If that was about you, that's a pretty
11  negative review; correct?
12      A.   I think "if" was a very good word you
13  used there because my name is nowhere near here.
14      Q.   I didn't say your name was on here,
15  ma'am.
16      A.   Oh, yeah, there was several hosts.
17      Q.   Assuming this was about you --
18      A.   It's not about me.
19      Q.   -- that's a negative -- that's a pretty
20  negative review.
21      A.   It's not about me.
22      Q.   How do you know that?
23      A.   I know for a fact it's not about me.
24           Snobby?  Uh-uh.

Page 53

1       Q.   Not you, that never happens; right?
2       A.   Nope.  Not snobby.
3       Q.   11 -- another one from 11/6/2016:
4   Waiters are friendly.  Hostess was not.
5            Another negative review about the
6   hostess.
7       A.   Okay.
8       Q.   You don't think that was you either?
9       A.   We had several rude hosts, so no.
10      Q.   You had several rude hosts?
11      A.   We did, yes.
12      Q.   Including you?
13      A.   I wasn't rude.
14      Q.   You weren't rude, ever?  Ever.
15      A.   I guess perception is everything, isn't
16  it?
17      Q.   So do you want to answer my question
18  now?
19      A.   No, never.
20      Q.   Never?
21      A.   Never rude.
22      Q.   Never rude?
23      A.   Never rude.
24      Q.   So next one is from 11/13/2016, and



Page 54

```
 1   where it's underlined, it says:  Instead of the host
 2   graciously placing us where we would like us --
 3   where she would like us, she just pointed and said,
 4   "Here."  I have to admit, it was pretty weird and we
 5   were all in shock over the brash rudeness of it all.
 6             Do you see that?
 7        A.   I saw it.
 8        Q.   Do you think that's about you?
 9        A.   No.
10        Q.   You don't think that's about you at all?
11        A.   No.
12        Q.   Do you have any way to show it was not
13   you?
14        A.   I was the lead host, so the lead host
15   doesn't seat people; I -- I instruct people to seat,
16   so.  Just pointed and said, "Here," I would never
17   say "Here."
18        Q.   Were there times when you seated people?
19        A.   When I needed to, sure.
20        Q.   Okay.  So there were times when you --
21        A.   But I would never say "Here."
22        Q.   So there were times when you seated
23   people --
24        A.   Rarely, yes.
```

Page 55

```
 1        Q.   -- just like other hosts; right?
 2        A.   Rarely.
 3        Q.   Rarely?
 4        A.   Uh-huh.
 5        Q.   Yes?
 6        A.   Rarely, yes.
 7        Q.   The next one down is from 4/12/2017:
 8   Great food, decent server, the hostess was terrible.
 9   It says:  She was rude, frazzled, and there were
10   about -- and there were two six-tops open outside
11   and her explanation was "We're not seating those
12   tables today."
13             Do you see that?
14        A.   I saw that.
15        Q.   Do you believe that's about you?
16        A.   Not even a little bit.
17        Q.   What's that?
18        A.   Not -- no.  No.
19        Q.   That's not about you?
20        A.   Uh-uh, no.
21        MR. BROWN:  Just a standing objection to this
22   document with respect to foundation.  There's no
23   indication that any of these comments were directed
24   towards -- or directed about Ms. Anderson.
```

Page 56

```
 1   BY MR. LA POINTE:
 2        Q.   Okay.  And then the next one down is
 3   4/24/2017.  About six or seven lines down, it says:
 4   I found the hostess to be rude.  When I noticed the
 5   outdoor patio had quite a bit of vacancy, she told
 6   me that there would still be a 30-minute wait, but
 7   there was no one waiting anywhere for the patio,
 8   which I found odd.  She refused to make eye contact
 9   when we tried to approach her about sitting outside.
10   She was very unfriendly.  And when she noticed that
11   our fourth person was a baby, in previous -- let's
12   see, in previous situations, I would have -- well,
13   let me just skip that.  She made a snarky comment
14   about that only applying to people ordering from the
15   menu.
16             Do you remember this?
17        A.   No.
18        Q.   Was this about you too?
19        A.   No.
20        Q.   You sure?
21        A.   I'm positive.
22        Q.   So if the time records show that you
23   were working on this occasion, you still don't think
24   this is you?
```

Page 57

```
 1        A.   No, because even servers would seat as
 2   well.  I could've been to the bathroom and it was a
 3   server.
 4        Q.   But you also sat people as well?
 5        A.   Rarely.  Rarely.
 6        Q.   Next one is at the top of the next page,
 7   6/27/17:  Hostess was rude and not accommodating.
 8             Do you think that's about you?
 9        A.   No.
10        Q.   No?
11        A.   Uh-uh.  Nope.
12        Q.   And the next one is from 8/12/2017:
13   Whoever answered the phone today, hostess probably,
14   was incredibly impatient and rude.  When a customer
15   calls to see if there's a table available, it's rude
16   to cut them off on the phone and not try to help to
17   figure out how long a wait time is.
18             Was that you?
19        A.   No.
20        Q.   So I've gone through each one of these
21   and you're saying none of these are you?
22        A.   Nope.
23        Q.   None of these are about your conduct;
24   right?
```



Page 58

1    A.    Nope.
2    Q.    But you have nothing to show that it
3  wasn't about you; right?
4    A.    Where's my name?
5    Q.    Ma'am, do you want to answer my
6  question?
7    A.    No.
8    Q.    I'm asking about you.
9    A.    Okay.
10   Q.    What proof do you have that these are
11 not about you?
12        MR. BROWN:  Objection; relevance, foundation.
13 BY MR. LA POINTE:
14   Q.    Do you have any proof that these are not
15 about you?
16   A.    I don't know.
17   Q.    You don't?
18   A.    No.  It's not about me, no.
19   Q.    But you don't have any proof that it's
20 not about you; right?  Right?
21   A.    I guess if you looked up the dates, of
22 these dates to see if I worked that day and see what
23 other hosts worked that day, I guess that would be
24 some type of way to get proof.

Page 59

1    Q.    Okay.  So if you were working on those
2  day -- on these days that are reflected on this
3  document, Exhibit 3, it's possible these incidents
4  are about you; right?
5    A.    No.  I would need -- I would need -- for
6  me to validate this, I would need -- no, not even
7  that.  No.  Just not true.
8    Q.    Is it possible these are about you if
9  you're working at these times?
10   A.    No, because --
11   Q.    That's my question.
12   A.    No.
13   Q.    Why do you say that?
14   A.    Because Lola would've grabbed me and
15 told me.
16   Q.    Lola would have grabbed you and told
17 you?
18   A.    Uh-huh.
19   Q.    What does that mean?
20   A.    She would've told me there were Yelp
21 reviews about you or Google reviews, or whatever
22 reviews, that people are talking about you.
23        Or Emma.  Somebody would have said
24 something.

Page 60

1             (Anderson Exhibit No. 4 marked.)
2  BY MR. LA POINTE:
3    Q.    Okay.  Exhibit 4, have you seen this
4  document before?
5    A.    Never.
6    Q.    Okay.  It's another document that we
7  produced in discovery.  It's an e-mail from
8  November 15th, 2016, from Mike Melazzo.
9         Who is Mike Melazzo?
10   A.    I don't -- I don't -- I think maybe the
11 bartender.  I don't know.
12   Q.    Was he a manager?
13   A.    I don't know.  I think he was a
14 bartender.
15   Q.    Was he a bartender manager?
16   A.    I don't know.
17   Q.    Okay.  And he sent this e-mail to Lola,
18 Nate Chung, and Emma Domach.
19   A.    Okay.
20   Q.    Do you see that?
21   A.    I see it.
22   Q.    Okay.  One of the -- he references one
23 of these Yelp reviews that we just went through, the
24 one from 11/13/2016.  Do you see that?

Page 61

1    A.    I see it.
2    Q.    Okay.  And he says in this e-mail:  I do
3  think we need to work on host stuff as soon as
4  possible.
5         Do you see that?
6    A.    Yes, I see that.
7    Q.    "Especially when it comes to
8  communicating with guests."  And then he says "I
9  spent the weekend with the hosts.  I have a few
10 notes."  And then he talks about these various
11 issues, communicating with guests, mind your
12 manners, setting expectations, and so forth.
13        Do you remember that there was a
14 discussion with Mike Melazzo about these, treating
15 guests properly?
16   A.    To me?
17   Q.    With hosts.
18   A.    No.
19   Q.    And you were one of them; right?
20   A.    No, I don't -- he never spoke about
21 anything about hosts.
22   Q.    You don't remember him talking to you
23 and other hosts about treating guests in a friendly
24 way?



Anderson vs Mott Street
Nikkolai Anderson - 12/30/2022                                                          Pages 62..65

Page 62

1    A.   No.  Why would he talk to me?  No.
2    Q.   You don't remember that at all --
3    A.   No.
4    Q.   -- is what you're saying?  Okay.
5        So I've asked you about the comments
6  that Simon and Matt and Gabe all told us, their --
7  their interviews with us, and grabbing them by the
8  crotch and so forth.  I talked about you being told
9  by Nate not to be on your phone and not to be using
10 your phone.  I asked you -- you didn't remember
11 this, but I asked you about Lola talking to you
12 about not having personal items at the host stand.
13 I also -- and I'm going to get to this thing with
14 the iPad in second here, about being told not to use
15 the iPad for personal use.  I talked to you about
16 the Yelp reviews, being rude to customers.  You
17 claim that these were not about you.
18       Assuming these issues were about you,
19 all these rude comments that allegedly were made to
20 guests and so forth and all the other items that I
21 just mentioned, those were way -- assuming that's
22 true, assuming those things were true, including
23 grabbing guys by the crotch, those were ways that
24 you were not performing up to the company's

Page 63

1  expectations; correct?
2        MR. BROWN:  Objection; speculation.
3           You can answer it, though.
4  BY THE WITNESS:
5    A.   Well -- (Inaudible.)
6        THE REPORTER:  I didn't hear you.
7  BY THE WITNESS:
8    A.   Am I answering yes or no?  I don't get
9  the question.
10 BY MR. LA POINTE:
11   Q.   Assuming all those things are true, that
12 you engaged in all that behavior that we just went
13 through, grabbing guys by the crotch and using your
14 cell phone and leaving things on the host stand,
15 using the iPad for personal use, being rude to
16 customers, and the Yelp reviews, those are ways the
17 company -- you were not meeting the company's
18 performance expectations; correct?
19   A.   No.
20   Q.   No?
21   A.   Untrue, no.
22   Q.   But I'm asking you to assume that --
23   A.   I can't --
24   Q.   -- those things are true.

Page 64

1    A.   No, I can't assume that.
2    Q.   I'm asking you to assume those things
3  are true.  If you were doing those things, those
4  would be violations of policy for the company;
5  correct?
6    A.   If someone was doing those things, yes.
7    Q.   Okay.  All right.  And those would be
8  grounds for termination; correct?
9    A.   I don't know.
10   Q.   You don't think grabbing a guy by the
11 crotch would be grounds for termination?
12       MR. BROWN:  I'm going to object.
13 BY MR. LA POINTE:
14   Q.   Do you believe that?
15   A.   Can I answer the question, or do I have
16 to yes or no?
17   Q.   I'm asking you do you think grabbing a
18 guy by the crotch would be grounds for termination,
19 yes or no?
20   A.   I don't know.
21   Q.   Yes or no?
22   A.   I don't know.
23   Q.   You don't know.  Why don't you know
24 that?

Page 65

1        MR. BROWN:  Objection; asked and answered.
2  BY MR. LA POINTE:
3    Q.   Why don't you know that?
4    A.   Can I answer fully, or do I have --
5    Q.   Yeah.
6    A.   -- to answer yes or no?
7    Q.   Go ahead.
8    A.   You said that they told them after the
9  fact about the crotch stuff, so that wouldn't be a
10 grounds to fire somebody because they had no clue
11 about that allegation.  So that -- that would be out
12 the way.
13       So the phone, then everybody would be
14 fired.
15       And then I never got a write-up.  So in
16 their -- in this particular handbook, it has, like,
17 policies that they have to implement.  I've never
18 got a write-up ever; and I would love to see if one
19 if that was there, but I never got a write-up ever.
20       So I would've had a lot of -- if I was
21 so rude, I wouldn't have got promoted to be a lead
22 host.  I became the lead host in 2017.  So all these
23 2016 e-mails, that means that they either assumed or
24 they either ignored that I was so rude and so



Page 66

1  snobby, they would've -- they would've did that.
2          So to answer you question --
3      Q.   Well, you don't come across that way at
4  all?
5      A.   I'm sarcastic.  I'm very --
6      Q.   Yeah, I can kind of gather that right
7  now.
8      A.   I'm very sarcastic.  I'm very smart.
9      Q.   I can see you're --
10     A.   Yes.
11     Q.   -- sarcastic.
12     A.   Yes, yes, yes.  I can see that I'm smart
13  too, mm-hmm.
14     Q.   Yeah.
15     A.   Yeah.
16     Q.   But you're not rude?
17     A.   No, uh-uh.
18     Q.   You're sarcastic but not rude?
19     A.   No.  When it's sarcasm --
20     Q.   Is there a difference between --
21          MR. BROWN:  I'm going to object as to this
22  line of questioning.
23          MR. LA POINTE:  You're right.  You're right.
24          (Anderson Exhibit No. 5 marked.)

Page 67

1  BY MR. LA POINTE:
2      Q.   Okay.  Exhibit 5 is an e-mail from you
3  to Lola --
4      A.   Uh-huh.
5      Q.   -- dated August 26th, 2017?
6      A.   Okay.
7      Q.   Do you see that?
8      A.   Yes, I do.
9      Q.   And do you remember preparing this
10  e-mail to Lola?
11     A.   Yes.
12     Q.   Okay.  And do you want time to read
13  it --
14     A.   No.
15     Q.   -- to read through it?  Do you remember
16  it enough, or do you want to read through it again?
17  Because I'm going to ask you some questions about
18  this.
19     A.   Okay.
20          Okay.
21     Q.   Okay?
22     A.   Mm-hmm.
23     Q.   Have you had time to review it?
24     A.   Mm-hmm.

Page 68

1      Q.   Okay.  Okay.  Do you remember this
2  e-mail, then?
3      A.   I do.
4      Q.   Okay.  And it was sent at night.
5  Apparently this is after you went home?
6      A.   I don't know.  If it says that.  I
7  might've still been there.
8      Q.   Okay.  Would you typically send an
9  e-mail while working?
10     A.   I probably was sitting there waiting for
11  somebody.  I don't know.  It was 11:00 o'clock.  I
12  don't stay past 11:00, so I'm sure I probably was
13  sitting there or something.  I don't know.
14     Q.   Well, I mean, this also, further down in
15  the e-mail, talks about the fact that you were told
16  by Nate to go home that day.  Do you remember that?
17     A.   I don't.
18     Q.   Because of the iPad situation?
19     A.   I don't.
20     Q.   You don't remember that?
21     A.   No.
22     Q.   It says today -- these are your words.
23     A.   I see it.  Yeah, I see it.
24     Q.   Third line from the bottom, "Today while

Page 69

1  on the iPad I showed --
2      A.   Karina.
3      Q.   -- "Karina the apartment that I was
4  moving from and Nate came to the host stand," and
5  then it goes on from there.
6      A.   Okay.
7      Q.   Then he ends up sending you home; right?
8      A.   I see it, yeah.
9      Q.   So you were using the iPad for personal
10  reasons -- right? -- not work-related reasons?
11     A.   If that's what it says.
12     Q.   I mean, that's your words?
13     A.   Yeah, I see.  I don't remember this,
14  though.
15     Q.   Okay.  But it's true, then, that you
16  were using the iPad for personal reasons; right?
17     A.   Correct.
18     Q.   Okay.
19     A.   I guess.
20     Q.   Okay.  And you were kind of making
21  complaints about your schedule and other people,
22  other workers and so forth in this e-mail --
23     A.   Uh-huh.
24     Q.   -- right?

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com

A- 58


LEXITAS

Page 70

1    A.    Yes.
2    Q.    And also Nate sending you home, you
3  were, you know, upset about that too --
4    A.    Correct.
5    Q.    -- right?  Okay.
6          But nowhere in this e-mail is there
7  anything about harassment or discrimination;
8  correct?
9    A.    I think I say disrespectful and
10 uncomfortable, the work environment's extremely
11 hostile, men at Mott Street.
12   Q.    But there's nothing specific as far as
13 sexual harassment, anything like that; correct?
14   A.    Not in this e-mail, not that I see right
15 now, no.
16   Q.    Okay.  And nothing about discrimination;
17 correct?
18   A.    Not that I see in this e-mail, no.
19   Q.    And suffice it to say that you were
20 pretty angry when you sent this?
21   A.    No, I wouldn't -- I'm not an angry
22 person, so no.
23   Q.    You're not an angry person?
24   A.    Uh-uh.

Page 71

1    Q.    No?
2    A.    Uh-uh.
3    Q.    Yes?
4    A.    No, I'm not angry.
5    Q.    You're not an angry person?
6    A.    No.
7    Q.    So does this refresh your memory as far
8  as this incident with the iPad?
9    A.    I still don't -- I still don't remember.
10   Q.    You still don't remember that at all?
11   A.    No.
12   Q.    Okay.  Okay.  So do you recall the --
13 when you were terminated from employment with Mott
14 Street?
15   A.    Barely, yeah.
16   Q.    Okay.  And was it on September 22, 2017?
17   A.    Don't remember, but I think it was in
18 September.
19   Q.    Okay.  And who was the person that met
20 with you to terminate your employment?
21   A.    Nate.
22   Q.    Anybody else?
23   A.    Just Nate.
24   Q.    Okay.  And what time of day was this?

Page 72

1    A.    Maybe like 5:30, something like that.
2    Q.    5:30?
3    A.    Something like that.
4    Q.    Was it right when you came in, or was it
5  sometime thereafter?
6    A.    I don't remember.  I don't remember.
7    Q.    Is there a time called family meal?
8    A.    Yeah.
9    Q.    When is that?
10   A.    I don't remem-- I don't -- before the
11 shift.  It's before the shift.
12   Q.    So about 3:00 o'clock?
13   A.    I don't think it's that early.
14   Q.    3:00 or 4:00?
15   A.    I don't remember.
16   Q.    Right around there somewhere, before the
17 dinner?
18   A.    Before whenever the restaurant starts.
19   Q.    Okay.  But it was earlier in time, 3:00
20 or 4:00 o'clock, 4:30 maybe?
21   A.    I don't -- no.  If the restaurant opens
22 at 6:00, it probably was at 5:00.
23   Q.    Okay.  So you believe this meeting with
24 Nate where he terminated your employment took place

Page 73

1  around when?  What time?
2    A.    I don't -- I just said I don't remember.
3    Q.    I thought you said about 5:00 or 5:30.
4    A.    I said 5:00, 5:30, I don't remember.  I
5  don't remember.
6    Q.    I mean, it's either you don't
7  remember --
8    A.    I don't remember.
9    Q.    -- or you think it's 5:30.
10   A.    I don't remember.
11   Q.    You don't remember at all?
12   A.    I don't remember.
13   Q.    Okay.  And what did Nate say to you?
14   A.    He said -- he said, "You look nice
15 today," and then he was talking about his home.
16   Q.    Talking about?
17   A.    His home.  He was talking about his
18 home.
19         And then he said, "We're going to have
20 to part ways."  And I said, "What -- what does that
21 mean?"  And he said, "We're going to have to part
22 ways."  And I said, like, "What are you saying?"
23 He's like, "Like, you know, like, you know," and I'm
24 like, "I don't know what 'You know' means."



Page 74

1      And then he said something like "You
2  were the best host ever but -- and you can get a
3  discount whenever you come here, like whenever you
4  want, you'll always get a discount because you're
5  family, but this, we're not -- we're not working
6  together."
7      And I said:  What do you mean?  I'm
8  not -- I'm not getting what you're saying because
9  you just gave me the uniform to be an SA, a serving
10 assistant.
11     And then he said, "I know, I know, I
12 know, but it's just not working, Nikka, so I'm going
13 to have to let you go."
14     And I said, "I never got writ up or
15 nothing -- like, what are you talking about?"
16     And he said, "I know, I know, but it's
17 beyond me.  I can't -- there's nothing I can do."
18 So I said, "Okay."
19     So I walked out and then he gave me a
20 hug, and he said, "Come back whenever you want to
21 eat," and then I left.
22     Q.   Did he explain why you were being
23 terminated?
24     A.   He never explained.

Page 75

1      Q.   Okay.  Did he talk about the reviews --
2      A.   Never explained.
3      Q.   -- customer reviews?
4      A.   Never explained.  Those were his exact
5  words -- well, for the most part.  That's what he
6  talked about was his house and sugarcoating trying
7  to get me -- letting me go.
8      Q.   Okay.  Did he talk about insubordination
9  at all --
10     A.   No.
11     Q.   -- or anything like that?
12     A.   Never.
13     Q.   Insubordinate conduct?
14     A.   Never.
15     Q.   No?
16     Is that all you recall about that
17 meeting?
18     A.   Yeah.  I'd say it was -- yeah, that was
19 most it for the most part.
20     Q.   Okay.  Just so the record's clear here,
21 you don't recall what time that meeting was --
22     A.   Uh-uh.
23     Q.   -- right?
24     A.   No, I don't.

Page 76

1      Q.   No idea?
2      A.   No, I don't know.
3      Q.   Okay.
4          (Anderson Exhibit No. 6 marked.)
5  BY MR. LA POINTE:
6      Q.   Okay.  Exhibit 6 to your deposition, do
7  you recognize that?  That's -- just worry about the
8  first page.
9      A.   Yes.
10     Q.   Do you know what that is?
11     A.   Mm-hmm, yes.
12     Q.   Okay.  It's an e-mail you sent, as it
13 turns out, on the day you were terminated.  Do you
14 see that?
15     A.   Uh-huh, I see.
16     Q.   September 22nd, 2017, and this is to
17 Lola; right?
18     A.   Correct.
19     Q.   Okay.  Was that -- did you send this
20 e-mail before or after your termination with Nate?
21     A.   It should have been before.
22     Q.   Well, was it, or do you remember at all?
23     A.   Before.
24     Q.   It was before?

Page 77

1      A.   Yeah.  I was --
2      Q.   Is that --
3      A.   I was --
4      Q.   Is that your testimony, it was before?
5      A.   If I recall correctly, it was before, I
6  think.
7      Q.   Are you sure or are you guessing?
8      A.   I'm not -- I don't remember.  I don't
9  remember.
10     Q.   Okay.  All right.  Because if you look
11 in this e-mail on page 1 of Exhibit 6, it doesn't
12 say anything about the fact that you've been
13 terminated; right?
14     A.   Correct, yeah.
15     Q.   Okay.  And do you know what time you
16 would have sent this e-mail?
17     A.   I don't.  I was -- this day -- this was
18 the day -- can I elaborate?
19     So that was my first day back from my
20 rape, so --
21     Q.   For -- for what?
22     A.   My rape.  I was raped that Saturday.  So
23 I was off those days leading up to that -- that day.
24     So I e-mailed that because I saw on the



Page 78

1  schedule that I was a host still and he had gave me
2  the serving assistant clothes, so I -- now, this was
3  anger because I'm like why am I still hosting when
4  you know I just was raped, you know all of this
5  stuff.  They all knew that all that had happened, so
6  I was off those days leading up to that -- this day.
7  So I was angry.  So this e-mail was anger because I
8  was like you know I'm just got raped, why am I still
9  being a host.
10      Q.   Okay.  So let's go back to the server --
11  server assistant?  Is that what you had called it?
12      A.   Uh-huh.
13      Q.   Okay.
14      A.   They called it SA.
15      Q.   Yeah, SA.  Who told you that you were
16  being put in that position?
17      A.   Nate.
18      Q.   Is that a promotion from host?
19      A.   No.  It was in regards to my complaints
20  about the men touching me.
21      Q.   Well, the men touching you, what do you
22  mean by that?
23      A.   I told Lola -- well, we told Nate, Lola
24  and I told Nate about one of the patrons touching

Page 79

1  me.  And Hatha, me, Lola talked to Nate about it,
2  and then I said I can't be hosting anymore.  So that
3  following week, I believe, he gave me -- I stayed
4  longer with Raffy, like, Friday, I think, Thursday,
5  Friday, Saturday, or something, I stayed after to
6  see how she, like, folds and all that stuff like
7  that because the week after I was supposed to start.
8          So he gave me the little cloth, you know
9  with the -- that you put your receipts and stuff in.
10  He gave me that so I could start training for being
11  an SA.
12      Q.   Okay.  When did you talk to Lola about
13  this customer touching you?
14      A.   I don't remember the day.
15      Q.   Was it shortly before this?
16      A.   Oh, yes, it was before.
17      Q.   I mean shortly, like a week, within a
18  week?
19      A.   Maybe two weeks, maybe a week.  It
20  was -- it was very recent.
21      Q.   Week to two weeks before September 22,
22  2017?
23      A.   Oh, yes, mm-hmm.
24      Q.   Okay.

Page 80

1      A.   Maybe two weeks or a weekend.
2      Q.   So not long before this?
3      A.   Yes, uh-huh.
4      Q.   Okay.  And what -- when you said the --
5  told Lola the customer touched you, what -- did you
6  explain what happened to Lola?
7      A.   Yeah.
8      Q.   I mean, how the customer touched you or
9  what --
10      A.   Yeah, Hatha -- I mean, me and Hatha
11  explained it to Lola and Johanna explained it to
12  Lola and -- because they were all up there.  And she
13  said, "I'm going to tell Nate."  And then went to go
14  tell Nate and he said, "Nikka can handle it."  Those
15  were his words.
16      Q.   And did you explain what part of your
17  body was touched by the customer?
18      A.   He touched me, yes.
19      Q.   What?
20      A.   My -- my behind.
21      Q.   Your behind?
22      A.   Yes.
23      Q.   Your butt?
24      A.   Yes.

Page 81

1      Q.   Okay.  Your buttocks?
2      A.   Yes.  He said I had a -- he said I had a
3  phat ass.  That's what he said.
4      Q.   Who said that?
5      A.   The patron.
6      Q.   Oh, the patron.
7      A.   Mm-hmm.
8      Q.   Okay.  Is that the first time you had
9  ever --
10     A.   No.
11     Q.   -- complained to the company about a
12  customer touching you?
13     A.   No.
14     Q.   When were the other times?
15     A.   It was -- it was -- it was -- it was
16  quite -- it was quite a bit.  I think -- answer your
17  question.  It was like -- it was a lot, but that was
18  the most -- that was the one that was, like, the
19  most -- I guess they all were offensive, but that
20  was the one that was like in front of everybody that
21  I was, like, embarrassed about.
22     Q.   Well, do you recall any other times you
23  complained to management about a customer touching
24  you?



Page 82

1     A.   Yeah.  Even when Emma was a manager, I
2  complained to Emma too.
3          Q.   And what did you complain about?
4     A.   I was touched by a patron or I was --
5          Q.   In what way, though?  I mean, there's a
6  touch on the shoulder.
7     A.   No.
8          Q.   Obviously that's --
9     A.   My chest, my behind.  It's always going
10  to be my chest or my behind.
11          And then I even went to Nate and I said
12  to him, me and Emma sat with him and I said, "I
13  don't want to wear these clothes anymore."  Because
14  at Mott Street at that time, everyone was wearing,
15  like, really short shorts, you know, it was very
16  revealing, crop tops up to here.  And I said, "I
17  don't want to wear tight clothing anymore."  And I
18  came in one day with loose clothing on, and he told
19  me to start wearing tight clothing again.  So I told
20  Lola.
21          Q.   Who said that?
22     A.   Nate.  He said, "You look better in
23  tight clothing."  So I told -- I told Lola, I said,
24  I can't -- "I can't do this.  I can't do it."

Page 83

1          Q.   All right.  So I believe I asked this,
2  but I'm not sure.  Do you believe Exhibit 6 was sent
3  before or after you were terminated?
4     A.   I don't remember.
5          Q.   You don't remember.  Okay.
6          Do you believe that this e-mail had
7  anything to do with your termination?
8     A.   No.
9          Q.   No?
10     A.   Uh-uh.
11          Q.   Okay.
12     A.   Uh-uh.  I would have said terminated.  I
13  had an e-mail that was sent when I was terminated.
14  I sent an e-mail when I was terminated.
15          Q.   Well, do you believe you were terminated
16  in retaliation for having sent this e-mail?
17     A.   I think I been -- I think I was
18  terminated in retaliation from the previous e-mail.
19          Q.   Okay.  But do you think if this -- do
20  you think it was sent before your termination or --
21     A.   I don't -- I don't remember.
22          Q.   You don't know.  Okay.
23     A.   This is August.  This is September,
24  yeah.

Page 84

1          (Anderson Exhibit No. 7 marked.)
2  BY MR. LA POINTE:
3          Q.   Exhibit 8, have you seen this before?
4  THE REPORTER:  It's 7.
5  MR. LA POINTE:  Oh, I'm sorry.
6          No, we're going to make this 8.
7  THE REPORTER:  Okay.
8  MR. LA POINTE:  I'm sorry.
9  THE REPORTER:  Can I have it back, please?
10  THE WITNESS:  Oh.
11  MR. LA POINTE:  Sorry.  Sorry about that.
12  THE REPORTER:  I was just going in order.
13  MR. LA POINTE:  I skipped -- yeah, I skipped
14  7.  I'm going to come back to that one.
15          (Anderson Exhibit No. 8 marked.)
16  BY MR. LA POINTE:
17          Q.   But this is Exhibit 8.  Have you seen
18  this document before?
19     A.   Possibly.  I don't remember.
20          Q.   At least the first couple pages is --
21  it's a letter from your attorney to Angela Lam, who
22  used to be at our firm.  Okay?
23     A.   Okay.
24          Q.   And if you turn to, let's see, the

Page 85

1  second to the last -- or actually third to the last
2  page -- I'm sorry.  No, that's not the right one
3  either.  The last page, the very last page.  That's
4  the same e-mail that we were just going through --
5  right? -- Exhibit 6?
6     A.   The last page?
7          Q.   Last page.
8     A.   I think so.
9          Q.   It's the same e-mail, September 22nd,
10  2017?
11     A.   I think, yeah, it looks the same.
12          Q.   From you to Lola?
13     A.   Uh-huh.
14          Q.   Okay.  The one you said you were angry;
15  right?
16     A.   Yes, uh-huh.
17          Q.   Okay.  All right.  Now, if you look in
18  the first page of this exhibit, Exhibit 8, at the
19  bottom, last paragraph at the bottom of the page, it
20  says "On September 22, 2017, my client again tried
21  to address these issues with the owners via
22  e-mail, --
23     A.   Uh-huh.
24          Q.   -- "and she was terminated shortly after



Page 86

1   bringing it to their attention."
2       A.   Okay.
3       Q.   See that?
4       A.   Okay.
5       Q.   And the e-mail, the only e-mail that is
6   attached to this is that same one that we were just
7   going through, September 22nd, 2017.
8       A.   Okay.
9       Q.   So your lawyer, at least, was saying
10  that that e-mail occurred before your termination.
11  Is that true, or -- or do you know?
12      A.   I would have to look at my own records;
13  but if I said that to him, sure.  I don't know.
14      MR. LA POINTE:  Okay.  Now it's 7.
15           (Anderson Exhibit No. 7 marked.)
16      THE WITNESS:  Okay.
17  BY MR. LA POINTE:
18      Q.   Okay.  The first page -- first,
19  actually, two pages of this is a couple e-mails, one
20  from Lola to Nate Chung on the 24th of September,
21  and then the one below that, the one she forwarded
22  to Nate is the same one, same e-mail that we've been
23  going through, the one from you to Lola on the 22nd
24  of September --

Page 87

1       A.   Okay.
2       Q.   -- of 2017; is that correct?
3       A.   Yep.
4       Q.   Now, this -- this e-mail is time-stamped
5   on the 22nd of September of 2017 at 3:56 p.m.;
6   right?
7       A.   Okay.  Yes.
8       Q.   3:56 and 11 seconds; right?
9       A.   Yeah.
10      Q.   And if you'll look at Exhibit 6 --
11      A.   Uh-huh.
12      Q.   -- that's the e-mail that you have that
13  you apparently provided because your attorney is --
14  attorney's e-mail is at the top of that page.  Do
15  you see that?
16      A.   Yes.
17      Q.   So that's a document that you and your
18  attorney provided.  But this is a forwarded e-mail;
19  right?
20      A.   Uh-huh.
21      Q.   Forwarded message, Exhibit 6?
22      A.   I guess.  I don't -- yeah.
23      Q.   See where it says for- --
24      A.   Yeah.

Page 88

1       Q.   No.  Exhibit 6 --
2       A.   Oh.
3       Q.   -- forwarded message; right?
4       A.   Okay.
5       Q.   That's what it says?
6       A.   Okay.
7       Q.   At the top?
8       A.   Okay.
9       Q.   Yes?
10      A.   Yes.
11      Q.   Okay.  But you notice there's no time
12  stamp.  Where it says date, there's no time next to
13  it.
14      A.   Okay.  Okay.  I don't --
15      Q.   So when anyone forwards a message, an
16  e-mail message --
17      A.   Uh-huh.
18      Q.   -- that time stamp will appear
19  typically; right?
20      A.   Okay.
21      Q.   Are you aware of that?
22      A.   I'm not aware of anything you're talking
23  about right now.
24      Q.   When you forward an e-mail --

Page 89

1       A.   Uh-huh.
2       Q.   -- to someone --
3       A.   Uh-huh.
4       Q.   -- or to yourself --
5       A.   Okay.
6       Q.   -- the time stamp will stay on there;
7   right?
8       A.   Okay.
9       Q.   Typically?
10      A.   Okay.
11      Q.   Yes?
12      A.   Yes.
13      Q.   Would you agree with that?
14      A.   I would imagine.  Okay.
15      Q.   Except if you take it off.  There's a
16  way to delete it; right?
17      A.   I wouldn't -- I'm not that tech-savvy.
18      Q.   Really?
19      A.   No.
20      Q.   Well, that's funny because this e-mail
21  is the one you provided, Exhibit 6, doesn't have a
22  time stamp --
23      A.   Okay.
24      Q.   -- and Exhibit 7 does have a time stamp,



Page 90

1   and we know that because it's right on there; right?
2       A.   Okay.  I don't -- okay.
3       Q.   You removed the time stamp on this --
4       A.   I didn't remove anything.
5       Q.   Ma'am, there's no other way to explain
6   it here.
7       A.   I don't -- I don't know what to tell
8   you.  Technology messes up all the time --
9       Q.   What's that?
10      A.   -- so I don't know what to tell you.
11      Q.   Technology messes up all the time?
12      A.   All the time, yes.  Yes.  I don't -- I'm
13  not that tech-savvy.
14      Q.   Well, that's funny because I just talked
15  to our IT person last night --
16      A.   Great.
17      Q.   -- about this very same issue, and he
18  showed me how this is very simple to do --
19      A.   Great.
20      Q.   -- to remove the time stamp from this
21  e-mail.
22      A.   So you're saying that I e-mailed it on
23  3:56; right?
24      Q.   I don't know when you e-mailed it to

Page 91

1   yourself.
2       A.   I e-mailed it to myself?
3       Q.   Or -- I don't know.  It says "Forwarded
4   message."  I don't know who it was forwarded to.
5       A.   I don't know.
6       Q.   Maybe it was forwarded to your attorney.
7   I don't know.
8       A.   On 2017?
9       Q.   But my -- my question is, you -- you're
10  the one that took out the time stamp --
11      A.   I did not.
12      Q.   -- right?
13      A.   I did not.
14      Q.   There's no other explanation for that.
15      A.   I did not.
16      Q.   You didn't?
17      A.   I did not.
18      Q.   Do you know how to do that?
19      A.   I do not.
20      Q.   Of course you don't.
21      A.   If only -- if only you knew.
22      Q.   You realize you're under oath, ma'am?
23      A.   I do realize that.
24      Q.   Do you realize using an altered document

Page 92

1   to help you with your case --
2       A.   It's not altered.
3       Q.   -- is sanctionable conduct?
4       A.   Okay.
5       Q.   Do you realize that?
6       A.   I never altered it, so.
7       Q.   Well, it sure seems that way.
8       A.   Well, I didn't.
9       Q.   There's no other explanation --
10      A.   I didn't.
11      Q.   -- that I can see.
12      MR. BROWN:  Objection --
13  BY THE WITNESS:
14      A.   I didn't.
15      MR. BROWN:  -- argumentative.
16  BY THE WITNESS:
17      A.   I did not.
18  BY MR. LA POINTE:
19      Q.   So --
20      A.   And if there's a date there, I don't --
21      Q.   So Exhibit 7, since we now have the time
22  when that e-mail was sent --
23      A.   Okay.
24      Q.   -- by you to Lola --

Page 93

1       A.   Okay.
2       Q.   -- 3:56 p.m., does that refresh your
3   memory as far as whether that was before or after
4   your termination?
5       A.   It doesn't because if you said -- you
6   said -- you talked about family meal.  Family meal
7   is usually at 5:00, so it would have been --
8       Q.   I asked about family meal as a side
9   issue.  I didn't -- I didn't connect it necessarily
10  to this, but --
11      A.   It was a part of that conversation.  You
12  said -- you asked me about my --
13      Q.   Was it --
14      A.   -- around family meal.
15      Q.   Was it before the family meal?
16      A.   So family meal's at 5:00; so if I came
17  at 5:00, this is before 5:00.
18      Q.   Does it refresh -- my question is
19  simply this.
20      A.   Does it refresh, no.
21      Q.   Let me finish my question.  It goes a
22  lot smoother if you just let me finish my question.
23      A.   Okay.
24      Q.   Now that you see the time stamp on this



Anderson vs Mott Street

Nikkolai Anderson - 12/30/2022

Page 94

1  e-mail was at 3:56 p.m., does this refresh your
2  memory as far as whether this was before or after
3  your termination?
4      A.    It does not refresh anything.
5      Q.    So if it was after your termination, it
6  could not have been -- your termination could not
7  have been in retaliation for this e-mail; correct?
8      A.    No, because if I came -- what time did
9  I -- I always arrived for family meal; so if I was
10  there for family meal, then that's 5:00 o'clock, so
11  then it would be before.  I don't remember.
12      Q.    Do you recall if you were called in
13  early to meet with Nate --
14      A.    No.
15      Q.    -- on this occasion?
16      A.    No, I don't recall.  No.
17      Q.    Is that possible you were called in
18  early?
19      A.    I don't know.  I don't remember.  It was
20  a --
21      Q.    Is it possible you were called in early?
22      A.    I don't remember.
23      Q.    That's not my question.  I'm not asking
24  you if you remember.  I'm asking you is it possible

Page 95

1  you were called in early by Nate --
2      A.    My answer is --
3      Q.    -- on this --
4      A.    I don't remember.
5      Q.    Okay.  And then if you'd look at
6  Exhibit 7 again, there's an e-mail from Lola, who's
7  the one you sent it to, this e-mail, on the 22nd of
8  September, she forwards it to Nate on the 24th.  Do
9  you see that?
10      A.    Uh-huh.
11      Q.    Yes?
12      A.    I see it.
13      Q.    Okay.  And she says to Nate "I didn't
14  see this until today!  However, I wanted to pass
15  this on.  I find it to be a tad concerning on the
16  timing by the way."
17      A.    Okay.
18      Q.    And I presume she was talking about the
19  fact that you were terminated on the same day as
20  this e-mail, the 22nd.
21      A.    Maybe you would have to ask Lola because
22  presumptions, I don't know.
23      Q.    Okay.
24      A.    I don't know what she meant.  She wasn't

Page 96

1  very clear.
2      Q.    So the -- to the extent that you were
3  complaining to Lola in this e-mail, September 22nd,
4  2017, about -- and you do mention discrimination by
5  gender, sexually harassed by men, and so forth --
6      A.    Correct, all things she knew.
7      Q.    -- this -- this could not -- assuming it
8  didn't -- it occurred -- this e-mail was sent before
9  you were terminated, it could not have been -- your
10  termination could not have been in retaliation for
11  this e-mail; correct?
12      A.    I don't know.
13      Q.    If one doesn't occur before the other --
14      A.    I said I don't know.  I don't know.
15      Q.    If one doesn't occur before the other
16  one, how can it be in retali- --
17      A.    Don't know.
18      Q.    -- your termination be in retaliation?
19      A.    I'm -- like I said --
20      Q.    Does it make -- does that make sense to
21  you, ma'am?
22      A.    I said I was --
23      Q.    Do you want to answer my question?
24      MR. BROWN:  I'm going to object as to --

Page 97

1  BY THE WITNESS:
2      A.    I don't know.
3      MR. BROWN:  -- argumentative, form of the
4  question.
5  BY MR. LA POINTE:
6      Q.    If this e-mail came after your
7  termination, after your termination --
8      MR. BROWN:  Which e-mail, the 9/23 or 9/22?
9  BY MR. LA POINTE:
10      Q.    I'm sorry, September 22nd, 2017,
11  assuming this e-mail was sent after your
12  termination --
13      A.    Uh-huh.
14      Q.    -- it could not have been -- your
15  termination could not have been in retaliation for
16  this e-mail -- correct? -- because management
17  wouldn't have known about it, even Lola; right?
18      A.    Knew about it on August 26, 2017.
19      Q.    That's a different e-mail.  I'm not
20  asking --
21      A.    It's the same --
22      Q.    -- about that e-mail.
23      A.    Same e-mail.
24      Q.    I'm not asking about that e-mail.



Case: 1:20-cv-07721 Document #: 68-2 Filed: 05/05/23 Page 27 of 45 PageID #:808

Case: 23-2765    Document: 18    Filed: 02/05/2024    Pages: 278
Anderson vs Mott Street
Nikkolai Anderson - 12/30/2022                                              Pages 98..101

Page 98

1    A.   I was talking about the work environment
2  was hostile.  Same e-mail.  This just got deeper.
3       Q.   That's not --
4       A.   Same situation.
5       Q.   I'm not asking about that e-mail, ma'am.
6       A.   Okay.
7       Q.   Do you want to -- do you want to ask
8  yourself questions here?
9       A.   No.
10      Q.   Or do you want to let me ask you the
11 question?
12      A.   Ask the question.
13      Q.   Okay?
14      A.   Uh-huh.
15      Q.   Because we're not gonna do it that way.
16 We're not gonna do it your way.
17      A.   Okay.  Ask the question.
18      Q.   You seem to have this --
19      MR. BROWN:  Objection.  Move on.
20      MR. LA POINTE:  All right.  All right.  I got
21 it.
22 BY MR. LA POINTE:
23      Q.   Okay.  So under oath, you're saying that
24 you did not remove the time stamp on this e-mail --

Page 99

1       A.   Under oath, yes.
2       Q.   -- Exhibit 6?
3       A.   1,000 percent, uh-huh.
4       Q.   1,000 percent, huh?
5            And if we got an IT expert to testify --
6       MR. BROWN:  Objection; speculation.
7  BY MR. LA POINTE:
8       Q.   -- how would you respond to that?
9       A.   I don't care if you got God, it wouldn't
10 matter.  I didn't do it.
11      Q.   Because you're right; right?
12      A.   I know what I did.
13      Q.   Yeah.
14      A.   Okay.
15      Q.   And you would never do that?
16      A.   I would never.  I'm not that tech-savvy.
17 So you can ask everybody and their -- even my
18 current job you can ask.
19      Q.   Well, I'll say after, you know, the --
20 our IT person showed me how to do it --
21      A.   Okay.
22      Q.   -- it's like, yeah, okay, I could have
23 figured that out pretty easily.  It's not that
24 difficult.

Page 100

1       A.   I guess I'm the dumbest person on Earth.
2       Q.   Do you want to do this, or do you want
3  to keep on --
4       A.   I'm doing it.  I'm doing it.
5       Q.   -- keep on making sarcastic comments?
6       A.   You're making -- you're joking about my
7  intelligence.
8       Q.   No, I didn't.
9       MR. BROWN:  Objection.  Objection.
10 BY MR. LA POINTE:
11      Q.   I didn't ask about you.
12      A.   You're joking about it, though.  You
13 said, you could've got it --
14      Q.   Ma'am.
15      A.   Don't do that to me.
16      Q.   Stop.
17      MR. BROWN:  Objection.
18 BY MR. LA POINTE:
19      Q.   Just stop.
20      A.   Don't do that to me.
21      Q.   Do you have a temper?
22      A.   I don't have a temper.
23      MR. BROWN:  Objection.
24           ///

Page 101

1  BY THE WITNESS:
2       A.   It's a touchy topic.
3       MR. BROWN:  Objection as to line of
4  questioning.
5  BY MR. LA POINTE:
6       Q.   Do you have a temper?
7       A.   I do not have temper.
8       Q.   You seem like you have a temper.
9       A.   Okay.
10      MR. BROWN:  Objection; asked and answered.
11 BY MR. LA POINTE:
12      Q.   Did you ever lose your temper at work --
13      A.   Never.
14      Q.   -- at Mott Street?
15      A.   Never.
16      Q.   No?  Never?
17      A.   They always told me I was too
18 nonchalant.
19      MR. LA POINTE:  Okay.  I think we're going to
20 take a break.  We got lunch brought in just to make
21 it easier --
22      MR. BROWN:  Gotcha.
23      MR. LA POINTE:  -- and quicker, instead of
24 trying to find something around here.



Page 102

1      We can go off.
2      THE VIDEOGRAPHER:  Going off the video record
3  at 12:15 p.m.
4            (Recess taken.)
5      THE VIDEOGRAPHER:  Back on the record at
6  12:51 p.m.
7            (Anderson Exhibit No. 9 marked.)
8  BY MR. LA POINTE:
9      Q.   Exhibit 9 is your complaint filed in
10  this lawsuit.  Do you recognize that?
11     A.   I guess, yes.
12     Q.   Have you seen it before?
13     A.   Possibly.
14     Q.   Okay.  All right.  So you have four
15  claims in this -- in this complaint.  No. 1, Count I
16  on page 4 is sexual harassment.  Do you see that?
17     A.   Uh-huh, I do.
18     Q.   And Count II on the next page, 5, is
19  sexual discrimination.  See that?
20     A.   Yes.
21     Q.   And then next page, Count III is
22  retaliation.  Do you see that?
23     A.   Yes.
24     Q.   And the final count is Count IV,

Page 103

1  intentional infliction of emotional distress.  Do
2  you see that?
3      A.   Yes.
4      Q.   In reading Count I, sexual harassment,
5  it's based on the allegations that are included in
6  the complaint; but can you tell me did you ever
7  complain to the company about -- I know you said you
8  complained to Lola one time toward the end of your
9  employment about being touched by a customer.
10     A.   Mm-hmm.
11     Q.   Other than that one time, did you ever
12  complain to the company about sexual harassment?
13     A.   Yes.
14     Q.   When?
15     A.   Don't recall when.
16     Q.   Do you recall how many times?
17     A.   Maybe -- I don't recall.  Maybe five.
18     Q.   Is that a guess or is that --
19     A.   It's definitely -- it's definitely a
20  guess.  It's more than three.
21     Q.   More than three?
22     A.   Mm-hmm.
23     Q.   Okay.  And who did you -- do you
24  remember who you complained to?

Page 104

1      A.   Emma, Lola, Mia.
2      Q.   Mia?
3      A.   Mm-hmm.
4      Q.   What's Mia's last name?
5      A.   I don't remember.
6      Q.   Is she a manager?
7      A.   She was, yeah.
8      Q.   And Emma is a manager?
9      A.   She was, yes.
10     Q.   Anybody else?
11     A.   Not that I can think of right now, no.
12     Q.   And what -- do you remember when you
13  complained to Emma?
14     A.   When the Gabe thing happened, she was
15  the one I went to first.
16     Q.   When the went?
17     A.   The Gabe thing happened, she's the one I
18  went to first.
19     Q.   Okay.  We haven't talked about the Gabe
20  thing.  What was the Gabe thing?
21     A.   He touched my behind.
22     Q.   Okay.  When was that?
23     A.   I don't recall the date.
24     Q.   Was it during your -- the beginning of

Page 105

1  your employment, the middle, or the end?
2      A.   Emma left -- I don't -- I don't remember
3  when Emma left, so maybe winter of 2016.
4      Q.   I'm sorry?
5      A.   Maybe the winter of 2016 or something
6  like that.
7      Q.   Okay.
8      A.   Or 2017.
9      Q.   So late 2016?
10     A.   Maybe.  I don't remember.
11     Q.   Winter could be in --
12     A.   Yeah, it could be --
13     Q.   -- the end of the year or the beginning
14  of the year.
15     A.   It could, yeah.
16     Q.   So you think it was the end of 2016?
17     A.   I don't recall.  I just know it was
18  cold, I think.
19     Q.   Okay.  And what did you complain to Emma
20  about?
21     A.   That Gabe touched my behind.
22     Q.   Just that one thing?
23     A.   And just other stuff that was bothering
24  me, but that was the main issue.



Page 106

1      Q.   Okay.  What did she say?
2      A.   She said that she wasn't surprised.  She
3  said that Gabe was in an open relationship or
4  something, and she said that but there's nothing
5  that she can do about it basically.
6      Q.   Was Gabe in a relationship with Johanna?
7      A.   No, I don't think so.
8      Q.   No?
9           Who was -- who was he in a relationship
10 with?
11     A.   I wouldn't know her name.  I don't know.
12     Q.   Okay.  Do you know what that had to do
13 with anything, about as far as whether he was in a
14 relationship with somebody, whether he touched your
15 butt?
16     A.   Meaning she was basically explaining,
17 like, he's flirty.  So although he's in a
18 relationship, he was a flirty person.
19     Q.   Okay.  Is it possible he brushed against
20 your butt intentionally?
21     A.   No.  He was sitting in a chair, me and
22 Johanna was in the office with him, and he touched
23 my behind.  He was sitting in the chair and I was
24 standing up.  So there was no way to brush or -- it

Page 107

1  was a grope.  (Indicating.)
2      Q.   And it was in the office?
3      A.   It was in the office.
4      Q.   And who else was there?
5      A.   Johanna.
6      Q.   Johanna?
7      A.   Mm-hmm.
8      Q.   Anybody else?
9      A.   Just us three.
10     Q.   Okay.  And was -- did you have any other
11 issues with Gabe after that?
12     A.   No.  He -- he quit soon after, I think.
13     Q.   Okay.  And the only incident you had
14 with Gabe was just this one time when he touched
15 your butt?
16     A.   I mean, he was always like -- he would
17 say stuff but never physical.  He always would just
18 say -- he was similar to Mike.  He was very -- you
19 know, his tongue was very reckless, but it was the
20 time that he touched me that bothered me.
21     Q.   Well, what would he say?
22     A.   I had a nice body.  He would always try
23 to hug me, stuff like that.
24     Q.   Okay.  Anything else?

Page 108

1      A.   Not that I can recall right now.
2      Q.   And, again, Gabe was not a manager;
3  right?
4      A.   I don't think so.
5      Q.   Okay.  So the time you complained to
6  Lola, was that the time we already talked about?
7      A.   What do you mean?
8      Q.   We talked about -- earlier, before the
9  break, we talked that you complained to Lola about
10 this customer that grabbed your butt.
11     A.   Mm-hmm.
12     Q.   Do you remember that?
13     A.   Yes, uh-huh.
14     Q.   Okay.  Is that -- you said that you
15 talked to Emma, Lola, and Mia --
16     A.   Uh-huh.
17     Q.   -- about sexual harassment.
18     A.   Uh-huh.
19     Q.   Is that what you talked to Lola about,
20 that one --
21     A.   She knew about the Gabe thing, yeah.
22 She knew.  But I was --
23     Q.   No.  No, no, no.  The customer grabbing
24 your butt --

Page 109

1      A.   Uh-huh.
2      Q.   -- is that what you complained to Lola
3  about?
4      A.   Yes.  Lola about the customer, the
5  patron, yes.
6      Q.   Okay.  Any other time that you
7  complained to Lola about?
8      A.   Yes, there were other times, but that
9  was the most recent one I can remember.
10     Q.   Okay.  How many times did you complain
11 to Lola?
12     A.   Maybe -- over three.
13     Q.   Over three?
14     A.   Over three.
15     Q.   And what did you complain to her about
16 on the other occasions other than the customer
17 touching your butt?
18     A.   I was uncomfortable being the host.
19     Q.   That's what you told her?
20     A.   Yes.
21     Q.   Did you explain any further than that?
22     A.   Yeah.  I explained about my clothes, I
23 don't want to wear those clothes anymore.  I
24 explained the customers.  I mean, she was a host



Page 110

1  before so she knew how it was there.
2      Q.  Okay.  Did you complain to Lola at all
3  about anything else?
4      A.  Not I can think of off the top of my
5  head.  I'm sure I did, but I can't think of right
6  now.
7      Q.  Did you complain to Lola about any
8  employee harassing you or making inappropriate
9  comments?
10     A.  Yeah.  I told her about Mike.  I told
11 her about Matty.  She knew about me and Simon's
12 bickering all the time.
13     Q.  Well, bickering is not the same as
14 sexual harassment; correct?
15     A.  I mean, it all depends what you define
16 as sexual harassment.
17     Q.  Is bickering -- you would say that
18 bickering is sexual harassment?
19     A.  If somebody's talking about your body,
20 you tell me.
21     Q.  Is bickering -- you mentioned the word
22 "bickering."
23     A.  Mm-hmm.
24     Q.  To me, bickering does not mean sexual

Page 111

1  harassment.
2      A.  Okay.
3      Q.  Bickering is an argument --
4      A.  Okay.
5      Q.  -- right?
6      A.  That's what you said, yeah.
7      Q.  Would you agree with that?
8      A.  I disagree.
9      Q.  You don't think bickering is an
10 argument?
11     A.  I think I used the word I wanted to use,
12 so no, I don't think it's the same.  I mean, I think
13 it's the same as -- I think bickering is the same --
14 our bickerings was due to unfair treatment, and he
15 would just say nasty stuff.  He just played a lot.
16 He said nasty stuff all the time.
17     Q.  Who?
18     A.  Simon.
19     Q.  Simon?
20     A.  Yeah.
21     Q.  Okay.
22     A.  He never touched me, but he always said
23 nasty stuff.
24     Q.  Like what?

Page 112

1      A.  About my body.
2      Q.  Like what?  What words did he use?
3      A.  I had a nice body.
4      Q.  What else?
5      A.  What do you mean "what else?"
6      Q.  What were his other words?
7      A.  You have a nice butt.  Johanna, you have
8  nice breasts.  I mean, he --
9      Q.  What else?  What other words did he use?
10     A.  That's all I can think of right now.
11     Q.  Okay.  And Simon never touched you --
12     A.  No.
13     Q.  -- right?
14     A.  Uh-uh, no.
15     Q.  And Gabe touched you on the butt one
16 time; right?
17     A.  From my understanding, yes.
18     Q.  Any other things that you complained to
19 Lola about?
20     A.  It was just overall just being a woman
21 at Mott was hard.  That was all.  So she was just
22 trying to help me to get out of being a host.
23     Q.  And you wanted to be what?
24     A.  Anything but a host.

Page 113

1      Q.  A server?
2      A.  A server, even -- I didn't even clean
3  dishes, but I was willing to be a dishwasher.
4  Anything just to get out of being a host.
5      Q.  Okay.  And did you complain to Mia too?
6      A.  Yeah, Mia knew.
7      Q.  What did you complain to Mia about?
8      A.  The same, about being uncomfortable.
9      Q.  Anything else you recall complaining to
10 Mia about?
11     A.  Uh-uh.  Just mainly being uncomfortable
12 and I wanted to change positions.
13     Q.  What do you -- do you remember Mia's
14 last name?
15     A.  I do not.
16     Q.  Okay.  Any other people that you
17 complained about any kind of inappropriate behavior
18 from either a customer or an employee?
19     A.  You mean like a manager?  Any other
20 manager or any other employee?
21     Q.  I used the word employee.
22     A.  Oh, yeah.
23     Q.  That includes managers too.
24     A.  I told Katie.  Katie knew, Emma knew.



Page 114

1    Q.   No, no.  I'm talking about when -- you
2  named Emma, Lola, and Mia --
3    A.   Managers.
4    Q.   -- as the people you talked to about
5  this stuff that you thought was -- made you feel
6  uncomfortable.  Okay?
7         My question is did you complain to
8  anybody else, did you notify anybody else of this
9  inappropriate behavior by either a customer or an
10 employee?
11   A.   That's my mistake.  I thought you just
12 meant managers.
13        So if you're talking about employees
14 period, Johanna, Hatha, Emma, Lola --
15   Q.   Hold on.
16   A.   -- Mia.
17   Q.   Now, I don't know what you mean by your
18 answer.
19        Are you talking you talked to these
20 other employees who are not managers?
21   A.   Yes.
22   Q.   Okay.  Now you're -- you're not hearing
23 my question correctly here.
24        I asked you whether you talked to any

Page 115

1  other manager, manager, about inappropriate behavior
2  by either a customer or an employee.
3    A.   Yes.  And you can add Nate on there.
4    Q.   You talked to Nate?
5    A.   Yes.
6    Q.   Okay.
7    A.   I brought my butt grab from the patron
8  to him, so he was aware.
9    Q.   All right.  And that's the only incident
10 you brought to his attention?
11   A.   That I can think of.
12   Q.   Any other managers that you complained
13 to about either an employee or a customer engaging
14 in inappropriate behavior toward you?
15   A.   Any other manager, no.  I can't think of
16 any other manager.
17   Q.   Okay.  What are the other incidents,
18 then, of inappropriate behavior either by a customer
19 or an employee that we haven't talked about yet?
20   A.   Could you dissect that a little bit
21 more?  What are you saying?
22   Q.   Well, you're the one that brought up
23 these few issues about Gabe touching your butt,
24 customers touching your butt.  You talked to Lola

Page 116

1  and Mia about feeling uncomfortable in general about
2  being a host.
3    A.   Mm-hmm.
4    Q.   Other than those things, are there any
5  other events or any other actions by either an
6  employee or a customer that you talked to either a
7  manager or an employee that was not a manager?
8    A.   Maybe about Mike.  He used to call me
9  like a bitch sometimes.
10   Q.   Mike called you a bitch?
11   A.   Mike.  Yeah, Mike.  Simon called me a
12 bitch before.  Yeah.
13        (Indiscernible.) -- called me a bitch
14 before.
15        THE REPORTER:  Who?
16        THE WITNESS:  Eller.  Eller.  That was his
17 name, Eller.  That's what we called him.  I don't
18 know his real name, but we called him that.
19 BY MR. LA POINTE:
20   Q.   Okay.  Any other inappropriate behavior
21 that you experienced either from a customer or an
22 employee while you worked at Mott Street that we
23 haven't talked about yet?
24   A.   Besides from customers, none that I can

Page 117

1  think of right now.
2    Q.   Okay.  Any other -- other than Emma,
3  Lola, Mia, and Nate, are there any other managers
4  that you complained about about inappropriate
5  behavior by a customer or an employee?
6    A.   Not that I can think of.  I don't know.
7    Q.   You don't know or --
8    A.   I mean, those are the four on top of my
9  head.  I haven't been there in five years.  I don't
10 know.
11   Q.   Count II on page 5, sexual
12 discrimination, this seems to be also based on
13 inappropriate comments --
14   A.   Mm-hmm.
15   Q.   -- that were made to you and other
16 women?
17   A.   Mm-hmm.
18   Q.   Okay?
19        It's inappropriate comments which were
20 not directed at male counterparts.
21   A.   Mm-hmm.
22   Q.   Okay?
23        So is this -- Count II, is that the
24 same, kind of identical to Count I, sexual



Page 118

1  harassment; or is it based on anything else?
2      A.   I think it's different.  Women weren't
3  treated right at Mott Street, so that's sexual
4  discrimination, I believe.  It's like a gender
5  thing.
6      Q.   How so?  How were they not treated
7  right?
8      A.   Like I just said earlier, Simon was
9  like, he could do no wrong.  He could come in late,
10 he could -- he could do no wrong.
11         But if any of us were late or any of
12 us -- we were -- we were in trouble, so to speak.
13     Q.   Simon was what, a server?
14     A.   A server, uh-huh.
15     Q.   Okay.  Different position than yours;
16 right?
17     A.   Correct.
18     Q.   Okay.  You were a host, he was a server?
19     A.   Correct.
20     Q.   Okay.  And how do you know that
21 management didn't talk to him about --
22     A.   Because he still worked there.
23     Q.   How do you know that management didn't
24 talk to him about him coming in late?

Page 119

1      A.   Because he still worked there.
2      Q.   Do you know whether they talked to him
3  about him coming in late?
4      A.   I mean, if you're late 35 times, you
5  would've been fired by then; right?
6      Q.   And how do you know that he came in late
7  35 times?  Were you keeping track of his --
8      A.   Yes, I was actually.
9      Q.   You were?
10     A.   Yeah.
11     Q.   Did you keep a diary or something?
12     A.   No, I didn't keep a diary.  I just saw
13 it every time he came in late.
14     Q.   Okay.  And how late are we talking
15 about?  A couple --
16     A.   Late is late.
17     Q.   -- minutes?
18     A.   Late is late.  I'd just be tardy if
19 you're one minute late.
20     Q.   How late -- how late is late?
21     A.   I don't recall.  I know it was late.
22     Q.   A couple minutes?  Three minutes?
23     A.   Possibly.
24     Q.   Four minutes?

Page 120

1      A.   Possibly.
2      Q.   Five?
3      A.   Possibly.
4      Q.   Okay.  Not 20?
5      A.   I don't know.  I don't remember.
6      Q.   Okay.
7      A.   I just know late.
8      Q.   So he could've come in just a little bit
9  late -- right? -- is what you're saying?
10     A.   I just know he was tardy a lot.
11     Q.   Okay.  Did you ever come in late?
12     A.   They expected me to come in late.  I had
13 another job.
14     Q.   So the answer is yes, you did come in
15 late?
16     A.   No.  My schedule was different from
17 everybody else's.
18     Q.   Well, you just said they expected you to
19 come in late.
20     A.   So when I had the first job -- if you
21 want me to elaborate.  The first year when I had my
22 law firm job, I came in -- like I said earlier, I
23 came in like around like 6:00.  When I started to
24 work there more at Mott, that's when I would see the

Page 121

1  discrepancies.  So when I was there more full-time,
2  I would see the discrepancies of time --
3      Q.   Okay.
4      A.   -- and the favoritism.
5      Q.   So any other ways that males were
6  treated better than females or than you?
7      A.   No.  I just always saw that when we
8  brought something to Nate, he would minimize it; but
9  if Simon or -- I'm just using Simon.  I don't have
10 no problem with him; but when he would -- he would
11 bring a problem, he would -- it would be acted on.
12 They would -- they would act on what he said.
13     Q.   Who is it?
14     A.   Nate.  Nate would act on it.
15     Q.   Nate would act on whose complaint?
16     A.   Simon's.  If he had a complaint, he
17 would act on Simon's complaint.
18     Q.   Okay.  Any other ways that males were
19 treated better?
20     A.   I mean, they didn't get rude comments
21 like "Are you on your period?" and stuff like that.
22 They didn't get those type of comments like we got.
23     Q.   Well, there was a jar of ibuprofen that
24 was at the front desk or around that area; right?



Case: 1:20-cv-07721 Document #: 68-2 Filed: 05/05/23 Page 33 of 45 PageID #:874

Case: 23-2765    Document: 18    Filed: 02/05/2024    Pages: 278
Anderson vs Mott Street
Nikkolai Anderson - 12/30/2022                                          Pages 122..125

Page 122

1    A.   I don't know.
2    Q.   The people, if they had pain, then it
3 was their pain relief to take the ibuprofen;
4 correct?
5    A.   I don't know that.
6    Q.   You don't know that?
7    A.   No.
8    Q.   Okay.  Any other ways that males were
9 treated better than females?
10   A.   Not that I can think of right now.
11   Q.   Do you believe you were terminated
12 because of your gender?
13   A.   Yeah.
14   Q.   What do you have to base that on?
15   A.   As I just said, I'm the only one that
16 spoke up, so in my perspective --
17   Q.   No, no, no.  I'm asking you what -- what
18 facts do you have to support your opinion that you
19 were terminated because of your sex?
20   A.   I just said it.
21   Q.   You didn't say anything.
22   A.   I was talking.  You said no.
23   Q.   Because you're going off on a tangent.
24   A.   Okay.  So what's your question?

Page 123

1    Q.   My question is this:  What facts do you
2 have to support your opinion, your belief that you
3 were terminated because you're a woman?
4    A.   Because I never got a write-up, I never
5 got anything done to me, I was never -- I was rarely
6 late.  So with all that said and I saw my male
7 counterparts do it all the time, that is a
8 discrepancy.  So I'm looking at myself and seeing
9 what's the differences are.  One difference was I
10 was Black, one difference was I was a woman, and I
11 saw my male counterparts come in and do whatever
12 they wanted to do and say whatever they wanted to
13 say.
14   Q.   Well, you're not -- you're not raising
15 the issue of race discrimination in this case;
16 right?
17   A.   I just -- I said race and I said gender.
18 I said my male counterparts.
19   Q.   But you're not claiming race
20 discrimination --
21   A.   I know.
22   Q.   -- in this case.
23   A.   I'm -- I said -- what I said --
24   Q.   Ma'am, let me -- answer my question,

Page 124

1 please.
2         You're not claiming race discrimination
3 in this case, are you?
4    A.   No.
5    Q.   So what other facts -- I mean, you're
6 saying you didn't come in late and your male
7 counterparts did.  But what about other issues?
8 That's the only factor that you're pointing to.
9 What about, you know, the complaints about your --
10 from customers on Yelp?  What about the
11 insubordination we've gone through?
12   A.   Where is the write-up?
13   Q.   That's your opinion --
14   A.   Okay.
15   Q.   -- there should have been a write-up?
16   A.   Okay.  No, that's the policy.
17   Q.   All I'm saying is that those issues did
18 occur?
19   A.   To you.
20   Q.   According to management, that's --
21 those --
22   A.   Okay.
23   Q.   -- issues did occur?
24   A.   Sure.

Page 125

1    Q.   So -- all right.  What other facts do
2 you have to support your belief that you were
3 terminated because of being a woman?
4    A.   I'll just say this.  Women quit.  All
5 the time women that were there quit.  So with that
6 said, all the men stayed.  You can look -- dissect
7 that however you want to dissect it.  There's a
8 pattern.  I just was the one that spoke up.  That's
9 the difference.
10   Q.   What other facts do you have to support
11 your belief that you were terminated because you're
12 a woman?
13   A.   I'll come back to that.
14   Q.   No, no, no.  That's -- there's no coming
15 back to that.  My question is this.
16   A.   I answered it.
17   Q.   Do you have any other facts to support
18 your belief --
19   A.   Not right now.
20   Q.   All right.  Do you have any other facts
21 to support your belief that you were terminated
22 because of being a woman?
23   A.   Besides the fact that I was treated
24 differently, no.



Page 126

1    Q.  Can you point to any males that had the
2  complaints that you had about your performance from
3  customers --
4    A.  I just --
5    Q.  -- and had these other issues -- I know
6  you dispute that, but can you point to any other
7  males or any males that had the same track record as
8  you and were not terminated?
9    A.  I don't know who had a track record like
10  me.
11    Q.  What's that?
12    A.  I don't know who had a track record like
13  me.
14    Q.  Can you point to any males that were
15  comparable to you that were not terminated?
16    A.  That had a track record like me?
17    Q.  That should have been terminated in your
18  opinion.
19    A.  Oh.  Simon, Mike.  Mainly Simon and
20  Mike, they should've been fired.
21    Q.  Because of what?
22    A.  They -- they said derogatory things to
23  people, they played too much, they -- they didn't
24  know their microaggressions were affecting people.

Page 127

1    Q.  Microaggressions, what does that mean?
2    A.  I can't explain that.
3    Q.  You're the one that used that term.
4    A.  I mean, a microaggression --
5    Q.  What does it mean to you?
6    A.  It's a subtle way of when someone
7  doesn't know what they're inflicting on you.  It's a
8  subtle way of impacting someone and disrespecting
9  them without them knowing.  It's a subtle.  It's a
10  subtle thing.
11    Q.  So somehow you believe that they should
12  have been terminated because of a microaggression?
13    A.  I don't believe anything.  I said that
14  they should've been terminated because of the
15  policies.  They were late, they should've been
16  fired.
17    Q.  Because they were late --
18    A.  That's one of the factors, one of them.
19    Q.  Yeah.  Because they were late a few
20  minutes?
21    A.  And they got rude comments as well.
22  They got rude -- if I got rude --
23    Q.  How do you know that?  How do you know
24  that?

Page 128

1    A.  I said to you earlier they brought it to
2  the host stand.  They brought it to the host stand.
3  I would bring it to a manager.  Nothing ever
4  happened.  I did my part.  I went through the proper
5  protocol and --
6    Q.  How do you know nothing happened?
7    A.  Because he was still working there.
8    Q.  How do you know management didn't talk
9  to him?
10    A.  Because he was still working there.
11    Q.  Ma'am, are you listening to me?
12    A.  I'm listening.
13    Q.  Are you listening?
14    A.  I hear you.
15    Q.  Because you're not answering my
16  question.
17      How do you know that management didn't
18  talk to him?
19    A.  Because if management talked to him, by
20  the time I was there for two years, he would've been
21  fired by then.
22    Q.  Okay.
23    MR. BROWN:  Now's a good time to bring this
24  to a close.

Page 129

1    MR. LA POINTE:  Okay.  All right.  We're
2  done.
3    THE VIDEOGRAPHER:  We're going off the record
4  at 1:17 p.m.  That concludes today's testimony of
5  Ms. Anderson.
6      (Discussion off the record.)
7    THE REPORTER:  I'm assuming you're ordering
8  the first part?  Do you want it?
9    MR. LA POINTE:  Yeah, I guess.
10      (Whereupon the proceedings
11      concluded at 1:18 p.m.)
12      *   *   *   *   *
13
14
15
16
17
18
19
20
21
22
23
24



Page 130

```
1    STATE OF ILLINOIS     )
                           )  SS.
2    COUNTY OF K A N E     )
3         I, Amy K. Bateman, CSR No. 84-003803, RPR,
4    CRR, CRC, do hereby certify that NIKKOLAI ANDERSON
5    was first duly sworn by me to testify the truth;
6    that the foregoing deposition, Pages 1 through 131,
7    was recorded stenographically by me and
8    computer-transcribed under my personal direction;
9    and that the said deposition constitutes a full,
10   true, and correct record of the testimony given by
11   the deponent as heard via remote videoconference.
12
13        I further certify that the said deposition was
14   taken at the time and place specified and that the
15   taking of said deposition commenced on the 30th day
16   of December, 2022, at 10:32 a.m.
17
18        I further certify that the reading and
19   signing of the deposition was not requested by the
20   deponent or a party pursuant to Rule 30(e) of the
21   Federal Rules of Procedure.
22
23
24
```

Page 131

```
1         I further certify that I am not counsel for
2    nor in any way related to any of the parties to this
3    suit, nor am I in any way, directly or indirectly,
4    interested in the outcome thereof.
5
6         This certification applies only to those
7    transcripts, original and copies, produced under my
8    direction and control; and I assume no
9    responsibility for the accuracy of any copies which
10   are not so produced.
11
12        IN WITNESS WHEREOF I have hereunto set my
13   hand this 10th day of January, 2023.
14
15
16
17        AMY K. BATEMAN, CSR, RPR, CRR, CRC
          180 North LaSalle Street
18        Suite 2800
          Chicago, Illinois 60601
19        Phone:  (312) 236-6936
20
     CSR No. 084-003803
21
22
23
24
```



60:24

**Exhibits**

**Anderson_
Exhibit_No._2**
18:15,17

**Anderson_
Exhibit_No._3**
19:19,21

**Anderson_
Exhibit_No._4**
51:11,14 59:3

**Anderson_
Exhibit_No._5**
60:1,3

**Anderson_
Exhibit_No._6**
66:24 67:2

**Anderson_
Exhibit_No._7**
76:4,6 77:11 83:2
85:5 87:10,21 88:1
89:21 99:2

**Anderson_
Exhibit_No._8**
84:1 86:15 89:24
92:21 95:6

**Anderson_
Exhibit_No._9**
84:3,15,17 85:18

**Anderson_
Exhibit_No._1**
18:15 19:19,21
51:11 60:1 66:24
76:4 84:1,15 86:15
102:7

**1**

**1** 18:15,17 77:11
102:15

**1,000** 99:3,4

**10** 42:12,18

**10:32** 4:4,12

**10:47** 4:15

**11** 14:20 53:3 87:8

**11/13/2016** 53:24

**11/6/2016** 52:1
53:3

**11:00** 68:11,12

**1200** 4:7,17

**12:15** 102:3

**12:51** 102:6

**15th** 15:16,17 60:8

**1990** 14:20

**1:17** 129:4

**1:18** 129:11

**2**

**2** 19:19,21

**20** 120:4

**20-cv-07721** 4:6

**2015** 15:17,23 16:3
17:16

**2016** 45:11 49:20
60:8 65:23 105:3,
5,9,16

**2017** 15:18 51:2
65:22 67:5 71:16
76:16 79:22 85:10,
20 86:7 87:2,5
91:8 96:4 97:10,18
105:8

**2021** 19:14

**2022** 4:3

**20th** 19:14

**22** 15:18 71:16
79:21 85:20

**22nd** 76:16 85:9
86:7,23 87:5 95:7,
20 96:3 97:10

**2323** 6:3

**24th** 86:20 95:8

**26** 97:18

**26th** 51:2 67:5

**28,000** 10:7 11:15

**29** 11:15

**29,000** 11:15

**3**

**3** 51:11,14 59:3

**30,000** 10:7

**30-minute** 56:6

**30th** 4:3

**35** 119:4,7

**3:00** 72:12,14,19

**3:56** 87:5,8 90:23
93:2 94:1

**4**

**4** 60:1,3 102:16

**4/12/2017** 55:7

**4/24/2017** 56:3

**4:00** 29:24 72:14,
20

**4:30** 72:20

**5**

**5** 66:24 67:2
102:18 117:11

**5:00** 72:22 73:3,4
93:7,16,17 94:10

**5:30** 72:1,2 73:3,4,
9

**6**

**6** 76:4,6 77:11 83:2
85:5 87:10,21 88:1
89:21 99:2

**6/27/17** 57:7

**6:00** 28:24 29:1
72:22 120:23

**7**

**7** 84:1,4,14 86:14,
15 89:24 92:21
95:6

**8**

**8** 84:3,6,15,17
85:18

**8/12/2017** 57:12

**80** 31:11,16,17

**9**

**9** 102:7,9

**9/22** 97:8

**9/23** 97:8

**A**

**A-N-D-E-R-S-O-N**
6:1

**a.m.** 4:4,12,15

**accommodating**
57:7

**accused** 13:3

**acknowledged**
52:2

**act** 121:12,14,15,
17

**acted** 121:11

**actions** 116:5

**add** 115:3

**address** 6:2 85:21

**admit** 54:4

**affecting** 126:24

**aggressively**
41:9,10

**agree** 26:17 89:13
111:7

**ahead** 48:11,13,20
65:7

**allegation** 65:11

**allegations** 103:5

**allegedly** 62:19

**altered** 91:24
92:2,6

**Amy** 5:8

**anderson** 4:2,6,
23 5:13,20 18:15,
18 19:19,22 51:11
55:24 60:1 66:24
76:4 84:1,15 86:15
102:7 129:5

**Angela** 84:21

**anger** 78:3,7

**angry** 70:20,21,23
71:4,5 78:7 85:14

**answering** 63:8
128:15

**answers** 7:19

**anymore** 79:2
82:13,17 109:23

**apartment** 69:3

**apologize** 49:7

**apologized** 49:6,
11

**apparently** 68:5
87:13

**applying** 56:14

**approach** 28:14
56:9

**area** 121:24

**argument** 111:3,
10

**argumentative**
47:5 92:15 97:3

**arrived** 94:9

**ass** 81:3

**assistant** 74:10
78:2,11

**associate's** 14:1,
8

**assume** 7:16 27:5
63:22 64:1,2

**assumed** 65:23

**assuming** 52:17
62:18,21,22 63:11
96:7 97:11 129:7

**attached** 86:6



**attention** 13:17
86:1 115:10

**attorney** 4:22 6:24
10:24 11:1 49:18
84:21 87:13,18
91:6

**attorney's** 87:14

**August** 51:2 67:5
83:23 97:18

**aware** 12:12,13
26:24 88:21,22
115:8

**B**

**baby** 56:11

**bach-** 14:8

**back** 4:14 10:11
48:23 49:6 74:20
77:19 78:10 84:9,
14 102:5 125:13,
15

**bad** 23:5,10 25:4
26:14 27:9,15

**banned** 13:16

**barely** 37:17 49:2
52:2 71:15

**bartender** 60:11,
14,15

**base** 122:14

**based** 9:15,23
103:5 117:12
118:1

**basically** 106:5,16

**Bateman** 5:8

**bathroom** 57:2

**beautiful** 39:9,23

**beginning** 104:24
105:13

**behalf** 4:23,24 5:2

**behavior** 41:8,16
63:12 113:17
114:9 115:1,14,18
116:20 117:5

**belief** 123:2 125:2,

11,18,21

**bet** 38:23

**bickering** 110:12,
13,17,18,21,22,24
111:3,9,13

**bickerings**
111:14

**birth** 14:18

**bit** 35:3 55:16 56:5
81:16 115:20
120:8

**bitch** 116:9,10,12,
13

**black** 34:19 37:23,
24 38:6 123:10

**body** 43:7 80:17
107:22 110:19
112:1,3

**bothered** 107:20

**bothering** 105:23

**bottom** 68:24
85:19

**brash** 54:5

**break** 101:20
108:9

**breasts** 112:8

**bring** 23:20 25:8
121:11 128:3,23

**bringing** 86:1

**brought** 13:17
49:6 101:20 115:7,
10,22 121:8 128:1,
2

**Brown** 4:10,22
11:2,4 27:18 35:22
36:3 47:4 48:13
55:21 58:12 63:2
64:12 65:1 66:21
92:12,15 96:24
97:3,8 98:19 99:6
100:9,17,23 101:3,
10,22 128:23

**browsing** 51:3

**brush** 106:24

**brushed** 106:19

**businesses** 27:3

**butt** 36:24 37:1
38:17 41:3 80:23
106:15,20 107:15
108:10,24 109:17
112:7,15 115:7,23,
24

**buttocks** 81:1

**C**

**call** 116:8

**called** 5:14 10:13
49:5 72:7 78:11,14
94:12,17,21 95:1
116:10,11,13,17,
18

**calls** 57:15

**caption** 4:5

**care** 99:9

**case** 4:5,6 8:4
10:16,21 12:6,16,
19 92:1 123:15,22
124:3

**cases** 12:5

**celibate** 39:24

**cell** 4:9 46:4 47:8,
12,19,20,21,22
63:14

**chair** 106:21,23

**change** 29:20
113:12

**charge** 8:5 9:2,10,
11,12,13,23 10:2

**charges** 11:23

**chef** 42:20

**chest** 82:9,10

**Chicago** 6:4

**children** 15:1

**choosed** 21:6,7

**Chung** 16:8 60:18
86:20

**claim** 8:22,24
13:11 62:17

**claimed** 13:14

**claiming** 123:19
124:2

**claims** 102:15

**clashed** 33:19,21,
22

**clashing** 34:3

**clean** 113:2

**clear** 75:20 96:1

**client** 85:20

**clock** 51:8

**close** 128:24

**cloth** 79:8

**clothes** 78:2
82:13 109:22,23

**clothing** 82:17,18,
19,23

**clue** 65:10

**cold** 105:18

**college** 14:2

**comment** 56:13

**comments** 55:23
62:5,19 100:5
110:9 117:13,19
121:20,22 127:21

**communicating**
61:8,11

**companies** 29:9

**company** 5:6 12:1
24:6,14 27:9 28:3
63:17 64:4 81:11
103:7,12

**company's** 62:24
63:17

**comparable**
126:15

**complain** 34:14,
17 82:3 103:7,12
105:19 109:10,15
110:2,7 113:5,7
114:7

**complained**
13:18 23:15 43:16
81:11,23 82:2

103:8,24 104:13
108:5,9 109:2,7
112:18 113:17
115:12 117:4

**complaining** 96:3
113:9

**complaint** 19:1
23:22 26:18 37:9
40:18 102:9,15
103:6 121:15,16,
17

**complaints** 11:23
26:11 69:21 78:19
124:9 126:2

**concerned** 31:10

**concluded**
129:11

**concludes** 129:4

**conduct** 57:23
75:13 92:3

**confused** 37:13

**connect** 93:9

**considers** 28:5

**contact** 56:8

**Continuing** 46:17
50:21

**contribute** 35:1

**conversation**
93:11

**convicted** 8:2

**correct** 7:1 11:11
18:4,9 20:14
21:10,14,24 22:23
23:1 25:3 27:16
34:6,8 44:6 45:4,
17 46:6,7 47:23
52:11 63:1,18
64:5,8 69:17 70:4,
8,13,17 76:18
77:14 87:2 94:7
96:6,11 97:16
110:14 118:17,19
122:4

**correctly** 77:5
114:23

**could've** 52:6
57:2 100:13 120:8



counsel 4:20
44:16,18,19

counseled 44:13

count 102:15,18,
21,24 103:4
117:11,23,24

counterparts
117:20 123:7,11,
18 124:7

couple 84:20
86:19 119:15,22

court 5:7 7:3,23
12:15 19:1

crime 8:2

criminal 7:8

crop 82:16

crotch 32:13,14
33:1 35:8 36:22
38:15 62:8,23
63:13 64:11,18
65:9

current 99:18

customer 26:18
57:14 75:3 79:13
80:5,8,17 81:12,23
103:9 108:10,23
109:4,16 113:18
114:9 115:2,13,18
116:6,21 117:5

customers 23:14
24:15 25:2,5 27:1
62:16 63:16
109:24 115:24
116:24 124:10
126:3

cut 57:16

**D**

D-O-M-A-C-H
31:4

date 4:3 14:18
45:6 88:12 92:20
104:23

dated 67:5

dates 58:21,22

day 16:17 28:21

49:6 58:22,23 59:2
68:16 71:24 76:13
77:17,18,19,23
78:6 79:14 82:18
95:19

days 59:2 77:23
78:6

debate 46:21

debating 48:9

December 4:3

decent 55:8

deeper 98:2

defendant 5:1,3
12:6

defiantly 50:1

define 110:15

degree 14:1,4,9

delete 89:16

depends 21:4
110:15

deposition 4:2,7,
16 6:18,21 7:2
12:19 18:17 19:21
51:14 76:6

depositions
12:23

derogatory
126:22

desk 47:24 121:24

Deutsch 8:21

diary 119:11,12

difference 66:20
123:9,10 125:9

differences 123:9

differently 125:24

difficult 99:24

diffuse 35:4

dinner 72:17

DIRECT 5:16

directed 55:23,24
117:20

disagree 111:8

discharge- 17:7

discharged 15:4
17:3,6

discount 74:3,4

discovery 51:18
60:7

discrepancies
121:1,2

discrepancy
123:8

discrimination
8:6 9:13,18 13:4,
19 70:7,16 96:4
102:19 117:12
118:4 123:15,20
124:2

discussion 4:13
61:14 129:6

dishes 113:3

dishwasher
113:3

dispute 126:6

disrespectful
70:9

disrespecting
127:8

dissect 115:20
125:6,7

distress 103:1

document 18:20
19:5,6,8 55:22
59:3 60:4,6 84:18
87:17 91:24

documents 51:17

Domach 31:2
60:18

doubt 39:11

dropped 14:5

due 111:14

Dufour 32:2

duly 5:14

dumbest 100:1

**E**

e-mail 60:7,17
61:2 67:2,10 68:2,
9,15 69:22 70:6,
14,18 76:12,20
77:11,16 78:7
83:6,13,14,16,18
85:4,9,22 86:5,10,
22 87:4,12,14,18
88:16,24 89:20
90:21 92:22 94:1,7
95:6,7,20 96:3,8,
11 97:6,8,11,16,
19,22,23,24 98:2,
5,24

e-mailed 77:24
90:22,24 91:2

e-mails 65:23
86:19

earlier 29:23
72:19 108:8 118:8
120:22 128:1

early 45:8,9 72:13
94:13,18,21 95:1

Earth 100:1

easier 48:19
101:21

easily 99:23

eat 74:21

education 13:24

EEOC 9:3,4,12
10:14

elaborate 77:18
120:21

Eller 116:16,17

else's 120:17

embarrassed
81:21

Emma 30:23,24
31:12 59:23 60:18
82:1,2,12 104:1,8,
13 105:2,3,19
108:15 113:24
114:2,14 117:2

Emma's 31:1

emotional 34:21
35:18 103:1

emphasis 20:12

emphasize 20:15,
19,20,22 21:2,8

emphasizing
22:17

employed 15:15,
24

employee 110:8
113:18,20,21
114:10 115:2,13,
19 116:6,7,22
117:5

employees 20:16
21:3,18 24:13
114:13,20

employer 8:6
13:4,19 37:16,20

employment
29:5,13 33:3 45:7,
10 49:14 71:13,20
72:24 103:9 105:1

end 10:1,16 33:3
45:7 103:8 105:1,
13,16

ends 69:7

enforce 21:9,19,
22 24:7,14

engage 41:15

engaged 63:12

engaging 115:13

Engel 8:21

environment
98:1

environment's
70:10

events 37:13
116:5

exact 75:4

EXAMINATION
5:16

examined 5:15

exhibit 18:15,17
19:19,21 51:11,14



59:3 60:1,3 66:24
67:2 76:4,6 77:11
83:2 84:1,3,15,17
85:5,18 86:15
87:10,21 88:1
89:21,24 92:21
95:6 99:2 102:7,9

**expectations**
61:12 63:1,18

**expected** 120:12,
18

**experience** 20:13,
20 22:18 52:7

**experienced**
116:21

**expert** 99:5

**explain** 48:3,4,5
74:22 80:6,16 90:5
109:21 127:2

**explained** 74:24
75:2,4 80:11
109:22,24

**explaining** 106:16

**explanation**
55:11 91:14 92:9

**extent** 96:2

**extremely** 70:10

**eye** 56:8

---
F
---

**face** 28:6,8 45:23

**fact** 52:23 65:9
68:15 77:12 95:19
125:23

**factor** 124:8

**factors** 127:18

**facts** 122:18 123:1
124:5 125:1,10,17,
20

**fall** 16:4

**familiar** 11:7

**family** 29:2 72:7
74:5 93:6,8,14,15,
16 94:9,10

**faults** 49:10

**favorable** 34:4

**favoritism** 33:24
121:4

**feedback** 34:1

**feel** 114:5

**feeling** 116:1

**felt** 39:5

**females** 121:6
122:9

**figure** 57:17

**figured** 99:23

**file** 8:22

**filed** 8:5 9:7 10:20
11:10,24 19:1,10,
13,14 102:9

**final** 102:24

**find** 95:15 101:24

**finger** 45:22

**finish** 24:9 29:18
43:21 50:20 93:21,
22

**fire** 65:10

**fired** 65:14 119:5
126:20 127:16
128:21

**Firehouse** 13:8,9

**firm** 8:18,20 13:2
16:22,23 17:1,4,
11,13,21,24 18:3
28:23 29:1,4,21
84:22 120:22

**flaws** 31:19,20,22,
24

**flexible** 34:20

**flirty** 43:11,12
106:17,18

**folds** 79:6

**follow** 20:17

**food** 55:8

**for-** 87:23

**form** 97:3

**forward** 88:24

**forwarded** 86:21
87:18,21 88:3
91:3,4,6

**forwards** 88:15
95:8

**found** 56:4,8

**foundation** 55:22
58:12

**fourth** 56:11

**frazzled** 55:9

**Freeman** 40:24

**Friday** 79:4,5

**friendly** 20:13,20,
24 22:2,20 24:15
25:2 28:13 53:4
61:23

**Fringe** 8:9,10
10:11 12:16 13:2
15:7,8 18:23 19:2

**front** 19:24 81:20
121:24

**full-time** 18:1,3
29:15 121:1

**fully** 65:4

**funny** 35:6 89:20
90:14

---
G
---

**Gabe** 40:24 41:17
42:10 43:6,15 62:6
104:14,17,19,20
105:21 106:3,6
107:11,14 108:2,
21 112:15 115:23

**Gabe's** 42:19

**gather** 66:6

**gave** 43:24 74:9,
19 78:1 79:3,8,10

**gender** 96:5 118:4
122:12 123:17

**general** 116:1

**get along** 31:5

**Gill** 5:2

**God** 99:9

**good** 31:7,12
52:12 128:23

**Google** 59:21

**Gotcha** 101:22

**grab** 32:12 115:7

**grabbed** 32:24
36:20 41:3 59:14,
16 108:10

**grabbing** 38:15
62:7,23 63:13
64:10,17 108:23

**graciously** 54:2

**graduate** 14:11

**Great** 55:8 90:16,
19

**greet** 28:12

**grope** 107:1

**grounds** 64:8,11,
18 65:10

**group** 40:23

**guess** 16:5,16
27:22 30:18,24
35:19 37:10,11
38:19 42:12,13
53:15 58:21,23
69:19 81:19 87:22
100:1 102:11
103:18,20 129:9

**guessing** 37:8
77:7

**guest** 20:12,20
22:18

**guests** 20:13,24
22:20 23:2 28:13,
14 49:22 61:8,11,
15,23 62:20

**guy** 64:10,18

**guys** 62:23 63:13

---
H
---

**half** 29:10

**hand** 5:11 41:3

**handbook** 20:1,
12,19,21,22 21:1
65:16

**handle** 39:5 80:14

**happen** 25:11
33:5

**happened** 10:11,
15 16:16 24:22,23
48:3,7,11 49:8,16
50:7 78:5 80:6
104:14,17 128:4,6

**harassed** 96:5

**harassing** 110:8

**harassment** 13:5,
15,19 70:7,13
102:16 103:4,12
108:17 110:14,16,
18 111:1 118:1

**hard** 112:21

**Harold** 14:10

**Hatha** 79:1 80:10
114:14

**head** 7:22 15:8,10
110:5 117:9

**header** 19:11

**hear** 63:6 128:14

**hearing** 114:22

**held** 4:7,16

**highest** 13:24

**hire** 16:12

**hired** 16:6

**Hold** 114:15

**home** 46:1 50:6,8,
12 68:5,16 69:7
70:2 73:15,17,18

**honest** 16:1 21:4
31:9,15

**honesty** 31:23

**Hoog** 4:18

**horrible** 52:7

**host** 23:20 25:8
28:4,6 49:21 50:22
54:1,14 61:3 62:12



63:14 65:22 69:4
74:2 78:1,9,18
109:18,24 112:22,
24 113:4 116:2
118:18 128:2

**hostess** 52:2
53:4,6 55:8 56:4
57:7,13

**hostile** 70:11 98:2

**hosting** 78:3 79:2

**hosts** 52:16 53:9,
10 55:1 58:23
61:9,17,21,23

**house** 19:24 75:6

**hug** 35:19 41:24
42:2,6,8,9 74:20
107:23

**human** 7:20

---

**I**

**ibuprofen** 121:23
122:3

**idea** 14:14 26:1
76:1

**identical** 117:24

**identify** 4:21

**II** 102:18 117:11,23

**III** 102:21

**Illinois** 4:17

**imagine** 38:14
40:18 43:17 89:14

**impacting** 127:8

**impatient** 57:14

**implement** 65:17

**Impossible** 32:23

**inappropriate**
38:12,17 110:8
113:17 114:9
115:1,14,18
116:20 117:4,13,
19

**Inaudible** 63:5

**incident** 50:14
71:8 107:13 115:9

**incidents** 59:3
115:17

**included** 103:5

**includes** 113:23

**including** 53:12
62:22

**incredibly** 57:14

**Indicating** 107:1

**indication** 55:23

**Indiscernible**
116:13

**inflicting** 127:7

**infliction** 103:1

**information**
43:24

**instance** 22:4

**instances** 25:1

**instruct** 54:15

**Insubordinate**
75:13

**insubordination**
75:8 124:11

**intelligence**
100:7

**intentional** 103:1

**intentionally**
106:20

**Internet** 27:13
51:4

**interruption** 4:9

**interview** 16:10

**interviewed**
16:13

**interviewing**
16:15

**interviews** 62:7

**ipad** 51:3,6,7
62:14,15 63:15
68:18 69:1,9,16
71:8

**issue** 90:17 93:9
105:24 123:15

**issues** 61:11
62:18 85:21
107:11 115:23
124:7,17,23 126:5

**items** 49:21 50:18,
22 62:12,20

**IV** 102:24

---

**J**

**January** 19:14

**jar** 121:23

**job** 15:4 17:13
18:1,8 31:24 32:1
35:5 49:4 99:18
120:13,20,22

**jobs** 17:23

**Johanna** 32:21
80:11 106:6,22
107:5,6 112:7
114:14

**jokes** 34:21

**joking** 100:6,12

---

**K**

**Karina** 69:2,3

**Katie** 113:24

**keeping** 119:7

**kicked** 45:15,16
49:5

**Kim** 5:5

**kind** 7:20 13:5
66:6 69:20 113:17
117:24

**kinds** 21:11 31:22

**Kiran** 5:2

**knew** 33:16 34:10
39:17 78:5 91:21
96:6 97:18 108:21,
22 110:1,11 113:6,
24

**knowing** 127:9

**Kristen** 23:4 24:8,
16,17,18,23 25:11
26:15

---

**L**

**LA** 4:24 5:5,17
11:6,8 18:16 19:20
27:20 36:1,4 47:6
48:14 51:13 56:1
58:13 60:2 63:10
64:13 65:2 66:23
67:1 76:5 84:2,5,8,
11,13,16 86:14,17
92:18 97:5,9
98:20,22 99:7
100:10,18 101:5,
11,19,23 102:8
116:19 129:1,9

**laid** 17:8,9,10,20

**Lam** 84:21

**Lapointe** 4:24

**late** 29:2 105:9
118:9,11,24 119:3,
4,6,13,14,16,18,
19,20,21 120:7,9,
11,12,15,19 123:6
124:6 127:15,17,
19

**law** 7:3 8:18,20
13:2 16:22,23
17:1,3,11,13,21,24
18:3 28:23 29:1,4,
21 120:22

**lawsuit** 9:4,5,6,7,
10,22 10:18,20
11:4,5,10 18:22
102:10

**lawsuits** 11:24

**lawyer** 86:9

**lead** 28:4 54:14
65:21,22

**leading** 77:23
78:6

**leave** 49:20

**leaving** 50:18,21
63:14

**left** 14:6 74:21
105:2,3

**legal** 4:18

**letter** 84:21

**letting** 75:7

**level** 13:24

**Levy** 8:21

**Lexitas-chicago**
4:19

**lie** 7:6 33:11,13,18
36:6,8,9,10 37:6
39:24 40:16 42:7
43:15

**lied** 36:7

**life** 39:19,20,21
40:1

**lines** 56:3

**listening** 128:11,
12,13

**literally** 34:21
52:4

**Lola** 30:6,22,24
31:5 34:12,16
35:1,2 49:20 50:17
59:14,16 60:17
62:11 67:3,10
76:17 78:23 79:1,
12 80:5,6,11,12
82:20,23 85:12
86:20,23 92:24
95:6,21 96:3 97:17
103:8 104:1 108:6,
9,15,19 109:2,4,7,
11 110:2,7 112:19
114:2,14 115:24
117:3

**long** 29:8 57:17
80:2

**longer** 79:4

**looked** 22:15
58:21

**loose** 82:18

**lose** 101:12

**lot** 20:10,12,15
23:3 29:2 33:19
34:2 35:4,5 48:19
65:20 81:17 93:22
111:15 120:10

**love** 65:18

**Lucky** 32:20



lunch 101:20

lying 33:9 44:1

---

**M**

made 56:13 62:19
114:5 117:15

main 17:24 105:24

make 37:12 56:8
84:6 96:20 101:20

makes 35:15

making 37:12
69:20 100:5,6
110:8

male 117:20
123:6,11,18 124:6

males 121:5,18
122:8 126:1,7,14

management
34:7,9 38:20 39:2,
14,15,16,17 81:23
97:16 118:21,23
124:20 128:8,17,
19

manager 30:2,4,
19,23 31:7,13
60:12,15 82:1
104:6,8 108:2
113:19,20 115:1,
15,16 116:7 128:3

managers 43:2
113:23 114:3,12,
20 115:12 117:3

manners 61:12

marked 18:15
19:19 51:11 60:1
66:24 76:4 84:1,15
86:15 102:7

married 14:21,23

Martin 4:24

Matt 35:7,8 36:16
37:15,17,18,22
39:18 40:15 42:21
62:6

matter 99:10

Matthew 35:23

Matty 35:24
110:11

meal 29:2 72:7
93:6,8,14,15 94:9,
10

meal's 93:16

meaning 10:22
21:9 22:12 31:19
47:24 106:16

means 7:6 65:23
73:24

meant 95:24
114:12

meet 94:13

meeting 63:17
72:23 75:17,21

meetings 34:12,
13

Melazzo 60:8,9
61:14

memory 71:7 93:3
94:2

men 38:15 42:6
70:11 78:20,21
96:5 125:6

mention 96:4

mentioned 13:3
62:21 110:21

menu 56:15

message 87:21
88:3,15,16 91:4

messes 90:8,11

met 71:19

Mia 104:1,2 108:15
113:5,6,7,10
114:2,16 116:1
117:3

Mia's 104:4
113:13

microaggression
127:4,12

microaggression
s 126:24 127:1

mid 45:9

middle 105:1

might've 68:7

Mike 60:8,9 61:14
107:18 110:10
116:8,10,11
126:19,20

mind 61:11

mine 30:18 34:14
39:17

minimize 121:8

minute 119:19

minutes 119:17,
22,24 127:20

missed 29:2

mistake 114:11

mm-hmm 6:5
7:11 66:13 67:22,
24 76:11 79:23
81:7 103:10,22
104:3 107:7
108:11 110:23
116:3 117:14,17,
21

months 29:12

Mott 4:6 8:4 13:2
15:3,15 17:22
18:5,10 20:1,15,18
21:19,21 28:5
29:6,13 30:2 40:5
41:20 70:11 71:13
82:14 101:14
112:21 116:22
118:3 120:24

mouth 47:1,2

Move 98:19

moving 69:4

---

**N**

N-I-K-K-O-L-A-I
5:22

named 114:2

nasty 111:15,16,
23

Nate 16:7,8 30:22
34:13,16,24 45:2,

13 47:10 48:24
51:2,9 60:18 62:9
68:16 69:4 70:2
71:21,23 72:24
73:13 76:20 78:17,
23,24 79:1 80:13,
14 82:11,22 86:20,
22 94:13 95:1,8,13
115:3,4 117:3
121:8,14,15

nature 7:20

necessarily 21:22
93:9

needed 54:19

negative 34:1
51:19 52:11,19,20
53:5

nice 73:14 107:22
112:3,7,8

Nicole 4:23

nigger 10:13

night 68:4 90:15

Nikka 74:12 80:14

Nikkolai 4:2,5
5:13,20

nod 7:20,21

nodding 6:15

nonchalant
101:18

Northbrook 4:17

nose 52:5

nostrils 52:4

notes 61:10

notice 88:11

noticed 56:4,10

notify 114:8

November 60:8

Now's 128:23

---

**O**

O-L-A-T-E-G
30:12

O-L-A-T-E-J-U
30:12

oath 7:3 14:17
44:5 91:22 98:23
99:1

object 27:18 47:4
64:12 66:21 96:24

objection 55:21
58:12 63:2 65:1
92:12 98:19 99:6
100:9,17,23 101:3,
10

observed 51:3

occasion 46:10
51:9 56:23 94:15

occasions 32:12
109:16

occur 96:13,15
124:18,23

occurred 86:10
96:8

odd 56:8

offense 7:8

offensive 81:19

office 23:7 106:22
107:2,3

Olateju 30:16

online 27:1,8

open 55:10 106:3

opens 72:21

Opentable 51:19

opinion 31:7
122:18 123:2
124:13 126:18

order 84:12

ordering 56:14
129:7

organization
21:18 27:16 28:6

outdoor 56:5

overlook 34:14

overlooked 22:9

overreact 46:15,
16

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com

A- 80

LEXITAS

Case: 1:20-cv-07721 Document #: 68-2 Filed: 05/05/23 Page 42 of 45 PageID #:883
Case: 23-2765    Document: 18    Filed: 02/05/2024    Pages: 278
Anderson vs Mott Street
Nikkolai Anderson - 12/30/2022

7

**overreacted** 47:21 49:3

**overreacting** 49:8

**owners** 85:21

**P**

**p.m.** 87:5 93:2 94:1 102:3,6 129:4,11

**pages** 84:20 86:19

**pain** 122:2,3

**paragraph** 85:19

**part** 31:8,14 36:14 40:22 73:20,21 75:5,19 80:16 93:11 128:4 129:8

**pass** 95:14

**past** 68:12

**patio** 56:5,7

**patron** 13:12 81:5, 6 82:4 109:5 115:7

**patrons** 78:24

**pattern** 125:8

**penalty** 44:7

**people** 21:13 32:5 37:13,14 42:5 43:16,19,23 54:15, 18,23 56:14 57:4 59:22 69:21 113:16 114:4 122:2 126:23,24

**percent** 31:11,16, 17 99:3,4

**perception** 53:15

**performance** 63:18 126:2

**performing** 62:24

**period** 26:4,11 29:4,8 114:14 121:21

**perjury** 7:6 44:7

**Pershing** 6:3

**person** 21:4 31:9, 15 35:19 43:12 56:11 70:22,23 71:5,19 90:15 99:20 100:1 106:18

**personal** 47:8 49:21 50:18,22 51:4 62:12,15 63:15 69:9,16

**perspective** 122:16

**phat** 81:3

**phone** 4:9 44:14 45:3 46:4 47:8,13, 19,20,21,22 48:22 49:2,3 57:13,16 62:9,10 63:14 65:13

**phonetic** 16:14

**physical** 107:17

**picked** 21:6,7

**place** 72:24

**placing** 54:2

**played** 111:15 126:23

**point** 126:1,6,14

**POINTE** 4:24 5:5, 17 11:6,8 18:16 19:20 27:20 36:1,4 47:6 48:14 51:13 56:1 58:13 60:2 63:10 64:13 65:2 66:23 67:1 76:5 84:2,5,8,11,13,16 86:14,17 92:18 97:5,9 98:20,22 99:7 100:10,18 101:5,11,19,23 102:8 116:19 129:1,9

**pointed** 54:3,16

**pointing** 124:8

**policies** 18:12 21:11,19,23 24:14 65:17 127:15

**policy** 46:4 64:4 124:16

**POS** 48:21,23

**position** 28:2 32:8 42:19 78:16 118:15

**positions** 113:12

**positive** 56:21

**Possibly** 27:17,21 84:19 102:13 119:23 120:1,3

**preparing** 67:9

**present** 5:5

**press** 43:6

**presume** 95:18

**presumptions** 95:22

**pretty** 26:19 27:15 52:10,19 54:4 70:20 99:23

**previous** 37:16,20 56:11,12 83:18

**problem** 39:15 121:10,11

**procedures** 18:11

**proceeded** 48:24

**proceedings** 129:10

**produced** 51:17 60:7

**promoted** 65:21

**promotion** 78:18

**pronounce** 30:11

**proof** 58:10,14,19, 24

**proper** 128:4

**properly** 61:15

**protect** 32:1

**protocol** 128:5

**provided** 87:13,18 89:21

**publicized** 26:18

**Purdue** 14:5

**purpose** 6:20

**pursue** 9:22

**pushed** 48:23

**put** 41:3 46:24 47:2 78:16 79:9

**putting** 45:22

**Q**

**question** 7:13,15, 17 20:18 23:9 24:10 43:21 45:19 50:10,20 53:17 58:6 59:11 63:9 64:15 66:2 81:17 91:9 93:18,21,22 94:23 96:23 97:4 98:11,12,17 114:7, 23 122:24 123:1, 24 125:15 128:16

**questioning** 66:22 101:4

**questions** 29:18 48:18 49:17 67:17 98:8

**quicker** 101:23

**quit** 107:12 125:4, 5

**R**

**race** 9:16,17,18 123:15,17,19 124:2

**Raffy** 79:4

**raise** 5:10 45:21

**raising** 123:14

**rape** 77:20,22

**raped** 77:22 78:4,8

**rarely** 54:24 55:2, 3,6 57:5 123:5

**read** 20:6 67:12, 15,16

**reading** 103:4

**real** 116:18

**realize** 91:22,23, 24 92:5

**realized** 49:10

**reason** 33:12,14, 15,18 36:5 37:6 39:11 40:15 43:15 46:14

**reasons** 51:4 69:10,16

**recall** 9:16 12:4 15:12 16:1 23:23 24:1,5 25:16,20,24 26:9,13 44:13 45:6 71:12 75:16,21 77:5 81:22 94:12, 16 103:15,16,17 104:23 105:17 108:1 113:9 119:21

**receipts** 79:9

**receive** 18:10

**recent** 11:20 79:20 109:9

**recently** 11:21,22 36:19 41:2

**receptionist** 17:14

**recess** 102:4

**reckless** 107:19

**recognize** 18:18, 20 19:5,6 76:7 102:10

**recognizing** 18:19

**record** 4:1,11,13, 14 5:19 102:2,5 126:7,9,12,16 129:3,6

**record's** 75:20

**records** 56:22 86:12

**references** 60:22

**reflected** 59:2

**refresh** 71:7 93:2, 18,20 94:1,4

**refund** 52:6



**refused** 56:8

**relationship** 106:3,6,9,14,18

**relevance** 58:12

**relief** 122:3

**remem-** 72:10

**remember** 10:8, 10 11:18,20 14:12, 13,15,17 15:7,14, 19,22 28:24 29:22 30:1 40:24 42:17 44:16 49:23,24 50:4,6,12,13,15, 16,19,23,24 51:4, 5,6,7,8,10 56:16 61:13,22 62:2,10 67:9,15 68:1,16,20 69:13 71:9,10,17 72:6,15 73:2,4,5,7, 8,10,11,12 76:22 77:8,9 79:14 83:4, 5,21 84:19 94:11, 19,22,24 95:4 103:24 104:5,12 105:2,10 108:12 109:9 113:13 120:5

**remove** 90:4,20 98:24

**removed** 90:3

**repercussion** 37:9,10

**repercussions** 34:2

**rephrase** 7:13

**reporter** 5:7,10 7:23 63:6 84:4,7,9, 12 116:15 129:7

**represent** 4:21

**respect** 55:22

**respond** 6:8 99:8

**responding** 49:24

**response** 6:11

**responsive** 7:17

**restaurant** 27:10 28:8 45:15,16 72:18,21

**result** 10:1,2,16

**retali-** 96:16

**retaliation** 9:21 40:19 83:16,18 94:7 96:10,18 97:15 102:22

**revealing** 82:16

**revelation** 35:20

**review** 27:8 52:11, 20 53:5 67:23

**reviews** 23:6,10 25:4 26:14 27:1 51:19,20 59:21,22 60:23 62:16 63:16 75:1,3

**Road** 4:8,17 6:3

**routinely** 39:19

**rude** 52:2 53:9,10, 13,14,21,22,23 55:9 56:4 57:7,14, 15 62:16,19 63:15 65:21,24 66:16,18 121:20 127:21,22

**rudely** 49:24

**rudeness** 54:5

---

**S**

**S-E-A-N** 4:22

**SA** 74:9 78:14,15 79:11

**Salon** 8:10 10:11 12:17

**sanctionable** 92:3

**sarcasm** 66:19

**sarcastic** 66:5,8, 11,18 100:5

**sat** 23:7 34:13 57:4 82:12

**Saturday** 77:22 79:5

**schedule** 69:21 78:1 120:16

**screen** 4:4

**Sean** 4:22 11:2

**seat** 54:15 57:1

**seated** 54:18,22

**seating** 55:11

**seconds** 87:8

**send** 68:8 76:19

**sending** 69:7 70:2

**sense** 35:15 37:12 96:20

**sensitive** 34:22 35:18

**September** 15:16, 17,18,23 17:16 71:16,18 76:16 79:21 83:23 85:9, 20 86:7,20,24 87:5 95:8 96:3 97:10

**server** 32:9,10 42:22,24 55:8 57:3 78:10,11 113:1,2 118:13,14,18

**servers** 57:1

**serving** 74:9 78:2

**setting** 61:12

**settle** 10:3,4,6,17 11:16

**settled** 11:9 12:23

**settlement** 11:14

**sex** 37:22 38:6 39:19,20,21 40:1, 20 122:19

**sexual** 13:14 41:9, 10,15 70:13 102:16,19 103:4, 12 108:17 110:14, 16,18,24 117:11, 24 118:3

**sexually** 96:5

**shake** 7:21

**Shermer** 4:7,17

**shift** 28:18,20 29:20 72:11

**shock** 54:5

**short** 42:10 82:15

**shorter** 42:17

**shortly** 79:15,17 85:24

**shorts** 82:15

**should've** 126:20 127:14,15

**shoulder** 82:6

**show** 54:12 56:22 58:2

**showed** 69:1 90:18 99:20

**side** 93:8

**similar** 107:18

**Simon** 22:4,24 23:3,5,9,15,24 26:8 32:2,13,20 33:15,19 35:5,7 36:5,7 42:23 62:6 111:18,19 112:11 116:11 118:8,13 121:9 126:19

**Simon's** 34:21 43:20 110:11 121:16,17

**simple** 90:18

**simply** 93:19

**single** 48:10

**sitting** 56:9 68:10, 13 106:21,23

**situation** 35:4 49:15 50:5 51:6,7 68:18 98:4

**situations** 56:12

**six-tops** 55:10

**skip** 56:13

**skipped** 84:13

**smart** 66:8,12

**smoother** 93:22

**snarky** 56:13

**snobby** 52:2,24 53:2 66:1

**somebody's** 110:19

**someone's** 45:23

**sound** 15:21 30:14,16 42:16

**Spa** 8:12

**speak** 35:5 118:12

**specialist** 4:19

**specific** 70:12

**speculation** 27:19 63:2 99:6

**spell** 5:21 30:10 31:3

**spent** 61:9

**spoke** 61:20 122:16 125:8

**spoken** 33:15

**spot** 16:12

**stahj** 16:14

**stamp** 88:12,18 89:6,22,24 90:3,20 91:10 93:24 98:24

**stand** 23:20 25:9 49:21 50:22 62:12 63:14 69:4 128:2

**standing** 55:21 106:24

**start** 28:19,20,22 29:23 79:7,10 82:19

**started** 18:5,11 28:23 29:1,2 120:23

**starts** 72:18

**state** 5:18

**stature** 42:11

**stay** 68:12 89:6

**stayed** 79:3,5 125:6

**Stephan** 4:18

**stoic** 35:14,18

**stop** 29:5 100:16, 19

**stopped** 29:21





**Street** 4:6 8:5 13:2 15:3,16 17:22 18:6,10 20:1,15,18 21:19,22 28:5 29:6,13 30:3 40:5 41:20 70:11 71:14 82:14 101:14 116:22 118:3

**stuff** 20:11 22:5,8, 10 34:14,22 36:6 40:16 61:3 65:9 78:5 79:6,9 105:23 107:17,23 111:15, 16,23 114:5 121:21

**subtle** 127:6,8,9, 10

**sued** 12:8,9

**suffice** 70:19

**sugarcoating** 75:6

**suing** 37:15,18

**supervised** 30:5

**support** 122:18 123:2 125:2,10,17, 21

**supposed** 28:12 79:7

**surprised** 106:2

**swear** 5:9

**sworn** 5:12,15

**system** 48:21,23

**T**

**table** 57:15

**tables** 55:12

**tad** 95:15

**talk** 37:15,18 40:1 44:20 46:17,19,20 47:3,15 62:1 75:1, 8 79:12 118:21,24 128:8,18

**talk-** 40:17

**talked** 6:23 13:20 17:1 36:17 37:17

39:19 40:20 43:24 44:21,22 47:10 62:8,15 75:6 79:1 90:14 93:6 104:19 108:6,8,9,15,19 114:4,19,24 115:4, 19,24 116:6,23 119:2 128:19

**talking** 22:17,18, 22 24:22 31:23 32:21,22 59:22 61:22 62:11 73:15, 16,17 74:15 88:22 95:18 98:1 110:19 114:1,13,19 119:14 122:22

**talks** 61:10 68:15

**tangent** 122:23

**tardy** 119:18 120:10

**Taylor** 35:7 36:2, 16

**tech-savvy** 89:17 90:13 99:16

**Technology** 90:8, 11

**telling** 37:11 39:15 44:3

**temper** 100:21,22 101:6,7,8,12

**term** 127:3

**terminate** 71:20

**terminated** 71:13 72:24 74:23 76:13 77:13 83:3,12,13, 14,15,18 85:24 95:19 96:9 122:11, 19 123:3 125:3,11, 21 126:8,15,17 127:12,14

**termination** 64:8, 11,18 76:20 83:7, 20 86:10 93:4 94:3,5,6 96:10,18 97:7,12,15

**terrible** 55:8

**testified** 5:15

**testify** 99:5

**testimony** 77:4 129:4

**thing** 26:8 48:23 62:13 104:14,17, 20 105:22 108:21 118:5 127:10

**things** 19:13 34:19 62:22 63:11, 14,24 64:2,3,6 96:6 112:18 116:4 126:22

**thought** 45:21 73:3 114:5,11

**Thursday** 79:4

**tight** 82:17,19,23

**time** 4:3,20 13:18 16:18 17:16,19 22:5,8,11 28:21 29:4,8,23 30:21 39:23 47:8 50:9 56:22 57:17 67:12, 23 71:24 72:7,19 73:1 75:21 77:15 81:8 82:14 88:11, 12,18 89:6,22,24 90:3,8,11,12,20 91:10 92:21 93:24 94:8 98:24 103:8, 11 107:14,20 108:5,6 109:6 110:12 111:16 112:16 119:13 121:2 123:7 125:5 128:20,23

**time-stamped** 87:4

**times** 22:24 23:21 24:4 25:10,15 35:4 54:18,20,22 59:9 81:14,22 103:16 109:8,10 119:4,7

**timing** 95:16

**today** 5:7 6:8,17, 21 55:12 57:13 68:22,24 73:15 95:14

**today's** 4:3 129:4

**told** 32:19,24 35:7, 8,17 38:3,19,21 39:8,15,18 41:2,8,

24 42:14 50:17 51:24 56:5 59:15, 16,20 62:6,8,14 65:8 68:15 78:15, 23,24 80:5 82:18, 19,23 101:17 109:19 110:10 113:24

**tongue** 107:19

**top** 15:8,10 19:10, 11 57:6 87:14 88:7 110:4 117:8

**topic** 101:2

**tops** 82:16

**touch** 37:13,14 82:6

**touched** 13:12,13 35:6,8 37:7,11 47:20,22 48:24 49:3 80:5,8,17,18 82:4 103:9 104:21 105:21 106:14,22 107:14,20 111:22 112:11,15

**toucher** 35:15

**touching** 78:20, 21,24 79:13 81:12, 23 109:17 115:23, 24

**touchy** 35:19 101:2

**track** 119:7 126:7, 9,12,16

**training** 18:11 79:10

**transparent** 36:15

**treated** 118:3,6 121:6,19 122:9 125:23

**treating** 61:14,23

**treatment** 21:12 34:5 111:14

**trouble** 118:12

**true** 19:4 37:3 41:4,13,14 42:1 43:9,13 59:7 62:22 63:11,24 64:3

69:15 86:11

**truth** 44:3

**turn** 84:24

**turned** 52:5

**turns** 76:13

**two-year** 14:2,8 26:3,11

**type** 58:24 121:22

**typically** 68:8 88:19 89:9

**U**

**uh-huh** 6:13 8:11, 13 9:14,19 10:5 12:18,24 13:10 14:3 16:9,20,24 17:2,24 18:7 19:17 20:2 23:18 27:7, 11,14 29:17 31:21 32:7,11 44:2 47:17 52:9 55:4 59:18 67:4 69:23 76:15 78:12 80:3 85:13, 16,23 87:11,20 88:17 89:1,3 95:10 97:13 98:14 99:3 102:17 108:13,16, 18 109:1 118:14

**uh-uh** 12:4 51:1 52:24 55:20 57:11 66:17 70:24 71:2 75:22 83:10,12 112:14 113:11

**Unaware** 27:2

**uncomfortable** 70:10 109:18 113:8,11 114:6 116:1

**underlined** 54:1

**understand** 7:4, 10,12,16,21 35:3 44:5,9

**understanding** 112:17

**unfair** 111:14

**unfriendly** 56:10



**uniform** 74:9

**untrue** 35:12,13
63:21

**upset** 70:3

---

**V**

**vacancy** 56:5

**validate** 59:6

**venture** 17:22

**verbal** 7:19,22

**versus** 4:6

**Victoria** 5:5

**video** 4:2,4,19
102:2

**view** 49:21

**violation** 46:3
49:14

**violations** 64:4

**voice** 45:22

**voiced** 37:7

---

**W**

**wait** 56:6 57:17

**Waiters** 53:4

**waiting** 56:7 68:10

**walked** 74:19

**wanted** 10:3,4,17
16:17 21:8 31:24
95:14 111:11
112:23 113:12
123:12

**warm** 28:13

**Washington**
14:10

**ways** 43:7 62:23
63:16 73:20,22
121:5,18 122:8

**wear** 82:13,17
109:23

**wearing** 82:14,19

**week** 79:3,7,17,18,

19,21

**weekend** 61:9
80:1

**weeks** 79:19,21
80:1

**weird** 43:7 54:4

**West** 6:3

**white** 34:20

**window** 48:22

**winter** 105:3,5,11

**woman** 37:23,24
38:6 112:20 123:3,
10 125:3,12,22

**women** 42:8,9
117:16 118:2
125:4,5

**word** 46:19 48:10
52:12 110:21
111:11 113:21

**words** 47:1,2
68:22 69:12 75:5
80:15 112:2,6,9

**work** 8:18 16:17
29:9 33:20 39:21,
22 40:8,9,12 61:3
70:10 98:1 101:12
120:24

**work-related**
69:10

**worked** 13:4
17:21 25:18,22
28:23 29:1,4 32:3,
6 58:22,23 116:22
118:22 119:1

**workers** 69:22

**working** 16:15,18,
21 17:23 18:2
29:5,14,21 33:17
44:14 46:4 56:23
59:1,9 68:9 74:5,
12 128:7,10

**worry** 76:7

**would've** 38:19
59:14,20 65:20
66:1 119:5 128:20

**writ** 74:14

**write-up** 65:15,18,
19 123:4 124:12,
15

**wrong** 22:5,8,10
34:10 49:7,15
118:9,10

---

**Y**

**year** 29:10 105:13,
14 120:21

**years** 25:22 33:15
117:9 128:20

**yell** 45:20 47:15
48:24 49:19

**yelled** 44:21,23
45:1,13,18 48:12,
15

**yelling** 45:21,23,
24

**Yelp** 23:6,12,13
26:14,18,20,22,23
27:6,24 51:18
59:20 60:23 62:16
63:16 124:10



```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   NIKKOLAI ANDERSON,                )
                                       )
 4                      Plaintiff,     )
                                       )
 5     vs.                             )   No. 1:20-cv-07721
                                       )
 6   MOTT STREET,                      )
                                       )
 7                      Defendant.     )

 8                      Videotaped continued deposition of

 9   NIKKOLAI ANDERSON, called as a witness herein, taken

10   by remote video conferencing pursuant to the

11   applicable provisions of the Federal Rules of

12   Procedure governing the taking of depositions, taken

13   before Kathleen M. Grove CSR No. 84-002197, RPR, CRR,

14   on Thursday, January 12, 2023, at 10:22 a.m.

15

16

17

18

19

20

21

22

23

24
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 133

```
1    PRESENT:

2        THE LAW OFFICE OF SEAN BROWN
         MR. SEAN BROWN,
3        111 West Jackson Boulevard, Suite 1700
         Chicago, Illinois 60604
4        (708) 858-1402
          attorneyseanbrown@gmail.com
5           Appeared via video conference on behalf of
            Plaintiff;
6
                      and
7
         LA POINTE LAW, PC, by
8        MR. MARTIN K. LA POINTE,
         MS. KIRAN K. GILL, and
9        MS. ABIGAIL CABANIN,
         1200 Shermer Road, Suite 425
10       Northbrook, Illinois  60062-4500
         (847) 786-2501
11       mlapointe@lapointelaw.com
         kgill@lapointelaw.com
12       acabanin@lapointelaw.com
            Appeared via video conference on behalf of
13          Defendant.

14   ALSO PRESENT VIA VIDEO CONFERENCE:

15       MR. MICHAEL NEWELL, Video Technician Specialist;
         MR. NATHANIEL CHUNG.
16

17                      - - -

18

19

20

21

22

23

24
```



```
 1                    I N D E X

 2   WITNESS

 3   NIKKOLAI ANDERSON

 4   EXAMINATION BY:                        Page      Line

 5   MR. LA POINTE......................... 136         1
     MR. BROWN............................. 218        20
 6   MR. LA POINTE......................... 228         5

 7

     EXHIBITS:
 8
     DEFENDANT'S
 9
     No. 10    Defendant's First Set of
10             Interrogatories to Plaintiff.. 185      22
     No. 11    Charge of Discrimination Re
11             Jaelen Wylie.................. 209       10
     No. 12    Sexual Assault Incident
12             Notice....................... 211       22

13   ANDERSON

14   No. 5     Email dated August 29, 2017   158        3

15

16

17

18

19

20

21

22

23

24
```



```
 1              THE VIDEOGRAPHER:  This is Michael Newell

 2    with Lexitas.  I am the operator of this camera.

 3    We're on the record on January 12th, 2023, and the

 4    time is 10:22 a.m. as indicated on the screen.  This

 5    deposition is being recorded remotely.

 6                      This is the video deposition of

 7    Nikkolai Anderson, Volume 2.  The case is captioned

 8    Anderson versus Street, Case No. 1:20-cv-07721.

 9                      Will the attorneys please identify

10    themselves for the video record.

11           MR. LA POINTE:  Martin --

12           MR. BROWN:  My name is Sean Brown, S-e-a-n,

13    on behalf of the plaintiff, Nikkolai Anderson.

14           MR. LA POINTE:  And Martin LaPointe and Kiran

15    Gill on behalf of the defendant.

16           THE VIDEOGRAPHER:  The court reporter today

17    is Kathleen Grove with Lexitas.

18                      Will you please swear in the

19    witness.

20                          (Witness sworn.)

21                      NIKKOLAI ANDERSON

22    called as a witness herein, having been first duly

23    sworn, was examined and testified as follows:

24    ///
```



 1              DIRECT EXAMINATION (Cont'd.)

 2                  BY MR. LA POINTE:

 3         Q.   Okay.  Ms. Anderson, again, you've been

 4    sworn in to tell the truth under penalty of perjury.

 5                  You understand that; right?

 6         A.   Yes, sir.

 7         Q.   Okay.  And you recall your last

 8    deposition that we took on December 30th; correct?

 9         A.   Yes.

10         Q.   Okay.  I'm just going to summarize a

11    little bit of what you said toward the end of your

12    deposition when I asked you to let me know what

13    comprised your claim for sexual harassment, the

14    events that comprised your claim for sexual

15    harassment.

16                  You mentioned Gabe -- what was his

17    last name, again?  Freeman; is that right?

18         A.    I don't know his last name.  I don't

19    know.

20         Q.   Okay.  Gabe Freeman.

21         THE REPORTER:  Excuse me, Marty, before you

22    go any further.

23         MR. LA POINTE:  Yes.

24         THE REPORTER:  Mr. Brown, can you get the



 1   witness closer to the computer or closer to the

 2   microphone on the computer or the computer closer to

 3   her?

 4          MR. LA POINTE:  Or turn up the volume, maybe.

 5          THE REPORTER:  And if you could just keep

 6   your voice up, Ma'am.

 7          THE WITNESS:  I have a raspy voice.  I'm

 8   sorry.

 9          MR. LA POINTE:  Okay.  Do you think that's

10   better, Kathie?

11          THE REPORTER:  We'll just keep going.

12          MR. LA POINTE:  Okay.  All right.

13   BY MR. LA POINTE:

14          Q.   So, again, you recall your last

15   deposition on December 30th; correct?

16          A.   Correct.

17          Q.   Or when I say last deposition, the first

18   day of your deposition.  We had to cut it short

19   because your attorney was going out of town.  But I

20   was asking you questions about the events which

21   comprised your sexual harassment complaint, and let

22   me just list them off to make sure that those are

23   correct, what you said before.

24                    You mentioned Gabe grabbing your



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                          Page 138

```
 1   butt.  That's one; correct?

 2        A.   Correct.

 3        Q.   And that was in the winter of 2016-2017;

 4   correct?

 5        A.   Don't recall, but -- don't recall.  I

 6   don't recall the time frame.

 7        Q.   Okay.  Does that sound about right?

 8        A.   It -- it was winter, I'm sure, probably

 9   was winter.

10        Q.   Okay.  And then the next event was about

11   two weeks before your termination where a customer

12   had touched your butt; is that right?

13        A.   Customer touched my butt.  I don't know

14   the time frame.

15        Q.   You think that's about right, or you

16   don't know the time frame at all?

17        A.   I don't recall.  I just know it was

18   recent from when I was terminated.

19        Q.   Close in time to when you were

20   terminated?

21        A.   Close in time when I was terminated.

22        Q.   And you complained to Lola about that;

23   right?

24        A.   About the customer?  Yes.
```



```
 1          Q.   Okay.  Did you complain to Lola about
 2    Gabe also touching you?
 3          A.   It was either Lola or Emma, one of
 4    those.
 5          Q.   Okay.
 6          A.   I don't recall.
 7          Q.   Okay.  And then you also mentioned
 8    bickering with Simon?
 9          A.   Uh-huh.
10          Q.   And I think --
11          A.   Yes.
12          Q.   And I think what you -- you clarified
13    bickering as Simon saying things to you like "nice
14    body, nice butt"?
15          A.   Uh-huh, correct.
16          Q.   Is that correct?
17          A.   Yes.
18          Q.   Okay.  Is there anything else he said,
19    Simon said, other than those two things to you?
20          A.   It was just a -- well, like most of
21    them, most of the guys -- but, yes, he was a -- he
22    was huggy person.  Like they liked to hug there.  He
23    was a huggy type of person, liked to touch you and
24    stuff.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                              Page 140

```
 1          Q.   So he liked to hug you?

 2          A.   Liked to hug, yeah.

 3          Q.   And he hugged other people too?

 4          A.   I don't recall who he hugged.  I know he

 5    hugged me.

 6          Q.   Well, you said he was a huggy person.

 7    That's suggest it --

 8          A.   Huggy person.

 9          Q.   -- applies to other people too; right?

10          A.   That could mean a lot of things.  I

11    mean, he hugged me.

12          Q.   Okay.  But I'm just using, you know,

13    what you just told me when you said he's a huggy

14    person.

15               That suggests he hugs a lot of

16    people, not just you?

17          A.   Well, I'm clarifying.  He hugged me.

18          Q.   Okay.  Did he hug other people, that's

19    the question?

20          A.   I don't recall who he hugged.  I just

21    know he hugged me.

22          Q.   Okay.  Because you -- one of the things

23    you said to me or said in your deposition earlier

24    was that Simon never touched you.  That's --
```



```
 1         A.   No --

 2         Q.   (Inaudible due to simultaneous

 3    speaking.)

 4         A.   -- I'm not saying he touched me

 5    inappropriately.  I'm saying he was a huggy person.

 6         Q.   Okay.  And then the other thing that you

 7    mentioned that comprised your sexual harassment

 8    claim is that you felt uncomfortable working as a

 9    host.

10         A.   Yes.

11         Q.   Okay.  And then you also mentioned that

12    Mike -- what's Mike's last name?

13         A.   I think Melazzo or something.

14         Q.   Melazzo?

15         A.   I think so.

16         Q.   That he called you a bitch?

17         A.   Yes, uh-huh.

18         Q.   Okay.  All right.  So that's -- those

19    are the things you listed as the things that you

20    believe comprised your sexual harassment complaint;

21    correct?

22         A.   For the -- some of them, yeah.

23         Q.   Okay.  Is there anything else?

24         A.   I just remember not wanting to put my
```



```
 1   stuff in the back because I didn't like to be

 2   touched.  So I remember -- that's all I really

 3   remember besides the customer, Gabe's stuff, Matty's

 4   stuff.

 5                    Yeah.  That's about it from what I

 6   can recall right now, from what I can recollect

 7   right now.

 8        Q.   Okay.  So as far as touching you, you

 9   mentioned Simon would hug you, but you didn't

10   consider that to be sexual; correct?

11        A.   No, no, I just thought it was

12   unprofessional.

13        Q.   Okay.  Other than that, the only other

14   instances of touching was a customer touching you on

15   the butt once and Gabe touching you on the butt

16   once; correct?

17        A.   So Gabe grabbed my butt that one time,

18   but Gabe used to always caress and -- like when he

19   would hug, he would like -- you know, like glide his

20   hand over my butt.  But, no, that time we're talking

21   about when he grabbed my butt, my behind.

22        Q.   Okay.  So Gabe would also hug you?

23        A.   Yes.  I think I told you -- I think the

24   last deposition I told you that it was -- it
```

**LEXITAS**

```
 1   wasn't -- I think I said three times or something,

 2   two or three times, I think I said.  I just don't

 3   remember all of the --

 4         Q.   Did Gabe hug you about three times, two

 5   or three times?

 6         A.   Yeah, about two, three, something like

 7   that.

 8         Q.   Okay.  Do you know when that was?

 9         A.   I don't recall.

10         Q.   And you say when he hugged you -- can

11   you describe it a little bit more?

12         A.   He would hug underneath, you know, at

13   the waist, you know, and then he would let go, and

14   it would like glide on my behind.

15         Q.   Okay.  But he wouldn't grab your

16   butt --

17         A.   No.  The one time he grabbed my butt was

18   that time.

19         Q.   He would?

20         A.   Yeah, uh-huh.  The one time he grabbed

21   my butt was the time I'm talking about.

22         Q.   Right  Okay.  So other than that, the

23   other times he hugged you, he wouldn't grab your

24   butt; correct?
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                         Page 144

```
 1        A.    No, he would just glide it -- whatever

 2   the word is; glaze it, glide it, slide it, slope it,

 3   whatever.

 4        Q.    Okay.  All right.

 5        A.    My butt was in his hands, in a sense.

 6        Q.    Did you have an -- did you have an

 7   intimate relationship with anybody at work, at Mott

 8   Street?

 9        A.    Intimate?  No, no.

10        Q.    No?  No sexual relationship at all?

11        A.    No.

12        Q.    No dating at all?

13        A.    Dating, no.

14        MR. BROWN:  Sorry.  If I can have -- If I can

15   have a brief break just a minute.  Sorry.

16        THE VIDEOGRAPHER:  We're going off the record

17   at 10:31.

18                  (Recess taken.)

19        THE VIDEOGRAPHER:  We are back on the record

20   at 10:45.

21   BY MR. LA POINTE:

22        Q.    Okay.  Ms. Anderson, you also mentioned

23   Mike Melazzo calling you a bitch.

24                  How many times would you say he
```



```
 1   called you a bitch?

 2        A.   I just recall the one.

 3        Q.   Just one.  And was it to your face or

 4   directly to you, or was he saying that to somebody

 5   else about you?

 6        A.   To me.

 7        Q.   To you.  Okay.

 8             Were you having a disagreement with

 9   him at the time?

10        A.   I wouldn't say that, no.

11        Q.   There was no disagreement at all?

12        A.   I mean, not -- not from my end, no.

13        Q.   Apparently from his end?

14        A.   Maybe from his end.  I don't -- I don't

15   know.

16        Q.   Okay.  All right.  Other than those

17   things that we just went through, any other facts or

18   events that make up your sexual harassment

19   complaint?

20        A.   When Nate told me that I shouldn't wear

21   loose clothing.

22        Q.   Okay.  And who told you that?

23        A.   Nate.

24        Q.   Okay.  And if you wore loose clothing,
```



```
1    is it possible you could, you know, like move your

2    arm -- if you had loose clothing on you could move

3    your arm and, you know, run into wine glasses or

4    something like that on the table?  Is that possible?

5            A.   I don't think so.

6            Q.   Okay.  Did Nate explain to you why he

7    said that?

8            A.   He said that I looked better in

9    form-fitting clothing.

10           Q.   Okay.  Did he also -- did Nate on

11   occasion also tell you to dress appropriately; not

12   to dress provocatively or something to that effect?

13           A.   To dress provocatively?

14           Q.   To not dress provocatively or something

15   to that effect?

16           A.   I came -- I came from work from a law

17   firm.  So, I mean, I wore my law firm clothes to the

18   job.

19           Q.   Okay.  But my question is, did Nate ever

20   talk to you about not dressing -- to dress

21   appropriately, to not dress provocatively?

22           A.   No.

23           Q.   You don't recall that?

24           A.   No.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                   Page 147

```
 1           Q.   Okay.  All right.  Anything else that
 2   comprises your sexual harassment claim here?
 3           A.   Not that I can recall right now.
 4           Q.   Okay.  And then turning to your
 5   sexual -- sex discrimination claim, as far as the
 6   facts to support your claim that you were terminated
 7   based on your gender or sex, you mentioned last time
 8   that -- that you were not written up prior to your
 9   termination --
10           A.   Correct.
11           Q.   -- right?
12                     Are you aware of other employees
13   who were not written up but yet were terminated
14   anyways?
15           A.   No, I don't recall.
16           Q.   You don't know -- you wouldn't know
17   that; right?
18           A.   I probably would, I just don't recall.
19           Q.   You probably would?
20           A.   I probably would, I just don't recall.
21           Q.   How would you know whether other employees
22   were written up or not?
23           A.   Because we all talked.
24           Q.   Okay.  And they could or -- it's
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                                    Page 148

 1   possible they didn't tell you about those things;

 2   correct?

 3           A.   No.  We were pretty open with each

 4   other.

 5           Q.   Okay.  But it's possible they were

 6   written up or not written up and they wouldn't even

 7   tell you about it; right?

 8           A.   I don't see why not.  Anything's

 9   possible.

10           Q.   Okay.  Were other people -- other

11   employees terminated during your employment?

12           A.   I don't recall.  I don't know.  I don't

13   recall.

14           Q.   All right.  And then the other issue you

15   mentioned in addition to not being written up prior

16   to your termination is that other employees were not

17   terminated because they were late.  They were late

18   repeatedly, and you thought they should have been

19   terminated, they should have been fired; right?

20           A.   Yes.

21           Q.   Okay.  But you were not terminated for

22   being -- for being late, for being tardy; right?

23           A.   No.

24           Q.   Okay.  So anything that happened with



```
1   other employees who were late or tardy, that would

2   not be comparable to your situation; correct?

3           A.   I disagree.

4           Q.   Well, you were not terminated for being

5   tardy; correct?

6           A.   Correct.

7           Q.   Okay.  So your circumstances for your

8   termination were different than these other people

9   who were tardy; correct?

10          A.   I disagree.

11          Q.   So how were they -- how were they the

12  same?

13          A.   There was a policy, and if the policy

14  was abided by, then those rules would have

15  implemented something for either a person being

16  written up or fired.  So -- It's their policy.

17          Q.   But you weren't -- you were not a

18  manager; right?

19          A.   Correct.

20          Q.   Okay.  And you were not involved in

21  enforcing the policies of the company, correct,

22  because you're not a manager?

23          A.   I wasn't involved with enforcing?

24          Q.   Enforcing the policies because you're
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                        Page 150

```
1    not a manager; correct?

2          A.    Correct.

3          Q.    Okay.  And then the other item you

4    mentioned was -- to support your claim that you were

5    terminated because you're a woman is because women

6    quit, women resigned from Mott Street?

7          A.    Correct.

8          Q.    Okay.  And how does that -- how does

9    that support your claim that you were terminated

10   because of your gender?

11         A.    Because it was a -- it was a very

12   unsafe, hostile work environment for women.  There

13   was no protection for women; therefore, women would

14   quit.

15         Q.    Okay.  Did other people, other female

16   employees, complain about a hostile work environment?

17         A.    Yes.

18         Q.    Who?

19         A.    Emma, Lola, me, Jaelen, Johanna, Mya

20   Emily.

21         Q.    Did they complain to management?

22         A.    Lola was a manager.

23         Q.    And did she complain to her manager?

24         A.    Yes, I'm sure she did.  Emma, too.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 151

```
 1              Q.   No, no, no.  I'm not asking you whether

 2    you're sure she did --

 3              A.   I'm sure they did.

 4              Q.   -- I'm asking you whether you know she

 5    did.

 6                   Do you know that she -- that Lola

 7    complained to her manager about the work environment?

 8              A.   From my knowledge, yes.

 9              Q.   Did she tell you that?

10              A.   I sat with her and Nate and discussed my

11    work environment, Lola and Nate.  He was very aware

12    of my work environment, hence why I asked to be a

13    serving assistant.

14              Q.   And what was that -- when was that

15    meeting that you just mentioned?

16              A.   After my first email.

17              Q.   After your first email?

18              A.   My first email.

19              Q.   And that was in August of 2017?

20              A.   I don't recall the date, but that email

21    that I sent, we sat down on the patio and talked,

22    and he apologized.

23              Q.   Okay.  All right.  And that was -- was

24    that about the iPad situation?
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 152

```
 1          A.   I don't -- I still don't remember that

 2   story, but okay.

 3          Q.   Well, I mean, we went over an email that

 4   you sent about the iPad situation.

 5          A.   I've been to therapy.  I've suppressed

 6   so much of this stuff.  I don't recall.

 7          Q.   Yeah.  Okay.

 8               So anything else that supports your

 9   claim other than those three things that I just

10   mentioned:  Never being written up, other employees

11   not being terminated because they were tardy or

12   late, and women quitting?

13               Other than those three things,

14   anything else that supports your claim that you were

15   terminated because of your gender or sex?

16          A.   Not that I can recall right now at this

17   moment.

18          Q.   Okay.  So who discriminated against you

19   because of your sex, then, in terminating your

20   employment?

21          A.   What do you mean?

22          Q.   Who at the company discriminated -- you

23   understand a company is inanimate.  In other words,

24   it cannot discriminate against someone because it's
```



1  a company, and it's an inanimate object; right?

2  It's made up of managers and owners.

3         A.   Right.

4         Q.   So who exactly at the company

5  discriminated against you because of your sex in

6  terminating your employment?

7         A.   If I'm being honest, I thought it was

8  Vicki, but Lola told me it was Nate.

9         Q.   Is that speculation?

10        A.   That's what she told me.

11        Q.   Who -- Lola said it was Vicki?

12        A.   No, I thought it was Vicki.  I didn't

13 think it was Nate because -- I didn't think it was

14 Nate.  And then she told me that it was Nate.

15        Q.   Wait a minute.  What did she tell you

16 exactly?  What words did she use?

17        A.   She said, "For some reason, Nate picked

18 on you," and she thought it was because I was a

19 vocal.  And she thought he was very passive-

20 aggressive about it, and she thought it was unfair.

21        Q.   Okay.  So that's not the same thing as

22 sex discrimination.  What you just mentioned is not

23 sex discrimination.

24                  You understand that; right?



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 154

```
1          A.   What's your question?

2          Q.   Do you understand what I just asked

3    you -- I just asked you a question --

4          MR. BROWN:  Objection (Inaudible) --

5    BY MR. LA POINTE:

6          Q.   You just mentioned about picking on you

7    because you're a vocal and speaking out.

8               That's not the same thing as sex

9    discrimination; correct?

10         MR. BROWN:  I'm going to object.  It calls

11   for a legal conclusion.

12   BY MR. LA POINTE:

13         Q.   Go ahead.  You can answer.

14         A.   Oh.  I still think so, because when

15   you're vocal about something like that and then

16   you're being forced to do something or work in an

17   environment that you don't want to work in or wear

18   clothes that you don't want to wear or be around

19   people that make you uncomfortable or being around

20   patrons that make you uncomfortable, then yes, yes,

21   I do think that.

22         Q.   But that's just speculation on your

23   part; correct?

24         A.   To you, to you; not to me.
```



Anderson vs Mott Street

Nikkolai Anderson, Vol II - 01/12/2023                                    Page 155

```
 1          Q.   Well, what facts do you have to support

 2    your assertion that Nate discriminated against you

 3    because of your sex in terminating your employment?

 4          A.   Because he would have protected me.

 5    When that -- when we brought it to his attention

 6    that day when that patient touched my behind, he

 7    should have either kicked him out or removed me from

 8    the host stand away from that man, but he did not.

 9    He had me stand there with that man still and be

10    uncomfortable until he ate his food and left.

11          Q.   Okay.  Anything else?  Any other facts

12    to support your assertion that Nate discriminated to

13    you because of your sex in terminating your

14    employment?

15          A.   Not that I can recall right now.

16          Q.   Okay.  Turning to your retaliation

17    claim, is -- are you saying that you were terminated

18    in retaliation for your complaints?

19          A.   Correct.

20          Q.   And what were your complaints?  What do

21    you believe were the complaints that resulted in

22    your -- in retaliation by the company in terminating

23    your employment?  What were the underlying

24    complaints that you made?
```



```
 1          A.   I just think it was complaints in

 2   general.

 3               I believe that -- I don't believe,

 4   I know that because I sent the -- the email that I

 5   first sent I guess went to everybody.  I thought it

 6   just went to Lola.  It went to everybody.

 7               So I think because of that, I was

 8   just singled out and almost like a -- I'm bringing

 9   something to people's attention that -- Nate was

10   our -- Nate was our manager, so I think when I spoke

11   up, it brought light to things that the other

12   partners weren't aware of, and I don't think he

13   liked that.

14          MR. LA POINTE:  Okay.  Madam Court Reporter,

15   do you have Exhibit 5 that we can display?

16          THE REPORTER:  I do not have the exhibits

17   downloaded.  I didn't know I would be displaying

18   them, Marty.

19          MR. LA POINTE:  Okay.  Well --

20          THE REPORTER:  If you want to give me a few

21   minutes, I can go to the repository, grab them,

22   and --

23          MR. LA POINTE:  Let me just ask, Sean, do you

24   have the exhibits there?
```



 1          MR. BROWN:  I do not.

 2                    Which exhibit?

 3          MR. LA POINTE:  5.

 4                    I can give you our Bates number, if

 5    you need that.

 6          MR. BROWN:  Yeah, what's the Bates number?

 7          MR. LA POINTE:  Mott 000073 and 74.

 8                    If you -- Sean, if you can just

 9    show the witness, show your client the document,

10    there is no need to display it, because I have a

11    copy here.

12          MR. BROWN:  Oh, give me one second.

13          MR. LA POINTE:  Yeah.

14                    Kathie, do you have access to the

15    exhibits or --

16          THE REPORTER:  Were you talking about

17    Exhibit 5?

18          MR. LA POINTE:  Yeah.

19          THE REPORTER:  I -- hang on.  Let me --

20          MR. LA POINTE:  I'm just trying to move this

21    along.

22          THE REPORTER:  Yeah, I just --

23          MR. BROWN:  It's 73 and 74, right?  Okay.

24          MR. LA POINTE:  Yeah, we've got it now.



```
 1          MR. BROWN:  Perfect.

 2          THE REPORTER:  Okay.

 3                    (Anderson Exhibit No. 5

 4                     referenced.)

 5  BY MR. LA POINTE:

 6          Q.   Okay.  What's on the screen, Ms. Anderson,

 7  is Exhibit 5 to your deposition.  And you remember

 8  going through this email; correct?

 9                    Exhibit 5, do you recall going

10  through this document, Ms. Anderson?

11          A.   Somewhat.

12                    Do you want me to read it?

13          Q.   Are you -- I'm sorry, what did you say?

14          A.   Do you want me to read it?

15          Q.   No, no, no.  You've already read it.

16                    But you recall going through this?

17  That's all -- that's the only question I have.

18          A.   Oh.  Vaguely.  Yes, vaguely.  I didn't

19  read it all, but vaguely.

20          MR. LA POINTE:  Okay.  Can you go to page 2,

21  Kathie.

22          THE REPORTER:  Sure.

23          MR. LA POINTE:  Just -- yeah.  All right.

24
```



```
1    BY MR. LA POINTE:
2         Q.   Is this the email you're talking about
3    as far as the email to Lola where you brought your
4    concerns -- scheduling and general concerns to the
5    attention of Lola?
6         A.   I believe so.  I'm not sure.  I believe
7    so.
8         Q.   Okay.
9         A.   I'm not a hundred percent sure.
10        Q.   Okay.  And then I think you mentioned
11   that Nate ended up apologizing to you out on the
12   patio --
13        A.   Right.
14        Q.   -- and was it after you sent this email?
15        A.   Yes.
16        Q.   Okay.  And did he address your concerns
17   as set forth in this email, Exhibit 5?
18        A.   Not necessarily, no.
19        Q.   Okay.  When he apologize to you, was
20   there a context?  What else did he say?
21        A.   Oh, it was -- it was about how he, you
22   know -- Nate, he's animated when he's upset.  So it
23   was how he talked to me.  That was what he was
24   apologizing for.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 160

```
 1          Q.   Okay.  All right.  And were you

 2   satisfied with his apology?

 3          A.   It wasn't his first time apologizing, so

 4   it was the norm.  He apologizes.

 5          Q.   And were you satisfied with his apology?

 6          A.   No, because there was no action behind

 7   it.

 8          Q.   Okay.  What action did you expect on

 9   this email?

10          A.   For change to -- to occur.

11          Q.   Like what change?

12          A.   I wanted to not be a serving assistant.

13   I wanted to -- to -- I mean, I wanted to be a

14   serving assistant.  I didn't want to be hosting

15   anymore.  That was the main goal of the whole thing.

16               I wanted to be treated fairly; I

17   wanted -- I even asked him and Lola if we could do

18   like a training or something to like teach us about

19   stuff and learn about (inaudible) --

20          Q.   And you --

21          A.   -- yeah.

22          Q.   And I think you testified last time

23   after this email was sent on August 26, 2017, that

24   Mott Street did, in fact, start to transition you
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 161

```
 1    from host -- host to serving assistant; correct?

 2         A.    Yes, they gave me the apron.

 3         Q.    Okay.  So they were addressing your

 4    concerns by doing that; correct?

 5         A.    That was a step, but they did not

 6    address anything.  That was a step in the direction

 7    I asked for; but, no, ultimately I got fired.

 8               So, no, it wasn't -- it was a step,

 9    but they took 10 steps back.  They gave me an apron

10    on one day, and then the next day -- not the next

11    day, but the next -- the following week they fired

12    me.  So I didn't understand the concept.

13         Q.    Okay.  All right.  So what facts do you

14    have to support your claim that you were terminated

15    in retaliation for your complaint, Exhibit 5, the

16    email that you sent to Lola, your concerns that you

17    made then?  What facts do you have to support your

18    claim that you were retaliated against in being

19    terminated?

20         A.    The only fact is the time frame.  So

21    alls I can go by is the time frame.  I made a

22    complaint, and after I made those complaints, I got

23    in trouble for making complaints.

24               I should have just sucked it up and
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 162

```
 1   dealt with it, and then I probably would have been

 2   fine.  But when I spoke up, I do believe that that's

 3   the reason why.

 4        Q.   Okay.  So just the proximity in time?

 5        A.   Time frame, uh-huh.

 6             And then just Lola, Lola told me.

 7        Q.   Lola told you what?

 8        A.   Lola told me the email bothered Nate.

 9        Q.   Well, and Nate ended up apologizing to

10   you for the email after the email; correct?

11        A.   He apologized for his reaction to the

12   incident that I was -- that he yelled at me about.

13   He apologized for that.

14        Q.   Right.

15        A.   He didn't say I'm sorry for mistreating

16   you and not hearing your cries, and I'm going to

17   start pushing you toward being a serving assistant.

18   He didn't say that; Lola said that.  He didn't say

19   that.

20        Q.   But those are the things that the

21   company did.  Nate apologized for the way -- what

22   you say yelled at you, and the company also started

23   transitioning you to a serving assistant position;

24   correct?
```



```
 1              A.   I wouldn't say transitioning.  Maybe

 2    we're defining transitioning different.

 3                        They gave me a apron.  That's not

 4    transitioning; that's a step.

 5              Q.   The company was going to transition you

 6    to a serving assistant position; correct?

 7              A.   No, they transitioned me to a

 8    termination.  That's what they transitioned me to.

 9              Q.   Ma'am, let's not be cute here.  Do you

10    want to answer my question, or do you want to just,

11    you know, play this game of you not answering my

12    question and coming up with something totally

13    irrelevant?

14                        My question is this:  The

15    company -- you said in your last deposition that the

16    company was transitioning you to a serving assistant

17    position; correct?

18              A.   No, no.

19              Q.   Before your termination, the company was

20    transitioning you to a serving assistant position;

21    correct?  Right?

22              A.   I -- no, not correct.  I wouldn't say

23    transition.

24              Q.   What -- what position did you hold prior
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 164

```
 1   to your termination?

 2          A.   Host.

 3          Q.   You were still in the host position?

 4          A.   Yes.

 5          Q.   And they gave you an apron to -- as a

 6   step toward moving into the serving assistant

 7   position; correct?

 8          A.   Step.  Yes, a step, uh-huh.

 9          Q.   Okay.  So all that's true; right?

10          A.   A step, yes.  They took a step in that

11   direction, yes.

12          Q.   Okay.  All right.  So the company was,

13   in fact, addressing your concern about moving from a

14   host to a serving assistant position; correct?

15          A.   No, no.

16          Q.   Okay.  We'll move on.  You don't want to

17   answer my question.  That's fine.

18          A.   Okay.

19          Q.   Anything else -- any other facts that

20   support your assertion that your termination was in

21   retaliation for your email to Lola, Exhibit 5?

22          A.   Not that I can recall right now.

23          Q.   Okay.  So is it just based on speculation

24   that you were terminated for retaliation?
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 165

```
 1              A.    No.

 2              Q.    Well, the only thing you have to show

 3    for it is the timing, is what you said; right?

 4              A.    Timing and a witness, so ...

 5              Q.    Timing and a witness.  What does that

 6    mean?

 7              A.    Lola was my witness.

 8              Q.    Witness to what?

 9              A.    She told me that it was -- it was personal,

10    she told me.

11              Q.    She told you that that email bothered

12    Nate; is that --

13              A.    Yes, yes, she told me.  She was a

14    manager.

15              Q.    All right.  Anything else that supports

16    your claim that you were terminated in retaliation

17    for that email?

18              A.    Not that I can recall right now.

19              THE REPORTER:  Would you like me to take the

20    exhibit down?

21              MR. LA POINTE:  Yes.

22    BY MR. LA POINTE:

23              Q.    Were there other employees who were not

24    terminated in circumstances like yours who did not
```



```
 1   speak up and send emails like this about their

 2   concerns?

 3          A.   I -- I wouldn't know.  I don't recall.

 4          Q.   So you're not aware of any other

 5   similarly situated employees like you who were not

 6   terminated; right?

 7          A.   I don't recall.  I just know if you

 8   speak up -- on the iPad situation, I just know that

 9   Annabel was on the iPad -- on the iPad all the time.

10   So I do remember her being on the iPad all the time.

11   But that's one thing I remember that was different

12   between me and her.

13          Q.   What was Annabel's position?

14          A.   She's a host.

15          Q.   Okay.

16          A.   She wasn't sent home, so.

17          Q.   When she was on the iPad, was she doing

18   work-related --

19          A.   Absolutely not.

20          Q.   And how do you know that?

21          A.   I stood next to her.  I was the lead

22   host.

23          Q.   And do you know if management knew that

24   she was working on personal items on the iPad?
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023

```
 1          A.    Yes.

 2          Q.    How do you know that?

 3          A.    Because Lola would talk to her.

 4          Q.    About what?

 5          A.    The iPad.

 6          Q.    What did she -- what did Lola say, to

 7   put it away?

 8          A.    "Get off of that."

 9          Q.    "Get off of that"?

10          A.    Uh-huh.  "You shouldn't be looking at

11   that; you shouldn't be on your phone," stuff like

12   that.

13          Q.    So Lola as a manager was enforcing the

14   rules in telling Annabel not to be on the iPad or

15   her cell phone; correct?

16          A.    Yes.

17                And then there were a few times

18   when Nate --

19          Q.    Yes?  Is that a yes?

20          A.    I'm sorry.  What?

21          Q.    Is that a yes?

22          A.    Could you ask the question again.

23          Q.    Lola was enforcing the rules of the

24   company by telling Annabel not to be on her cell
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 168

```
 1    phone or iPad to do personal items; correct?

 2         A.   If that was the policy, sure.

 3         Q.   No.  Was Lola doing that?  She was

 4    enforcing the policies of the company in telling

 5    Annabel not to be on her cell phone or iPad to do

 6    personal items?

 7         A.   I don't know if that's the policy.  I

 8    just know she said those things.

 9         Q.   Said what things?

10         A.   Said to her to get off the iPad, as well

11    get off her phone.  I know that for a fact, but I

12    don't know if that's the policy.

13         Q.   Again, we're kind of going on tangents

14    here because you want to inject your own personal

15    views on things.  So if you just answer my question,

16    it would go a lot quicker.

17         A.   Okay.

18         Q.   You'll get out of here a lot sooner.

19    Okay?

20              Your last claim is intentional

21    infliction of emotional distress?

22         A.   Uh-huh.

23         Q.   In paragraph 32 of the complaint, the

24    complaint says that "The company intended to cause
```



```
 1    severe emotional distress in the plaintiff."

 2                      So what facts do you have to

 3    support that allegation that the company or its

 4    owners or managers intended to cause severe

 5    emotional distress for you?

 6         A.   I don't understand the question.

 7         Q.   That's your complaint.  I'm quoting from

 8    your complaint.

 9                      I'm asking you, what facts do you

10    have to support that allegation that the company

11    intended to cause severe emotional distress in the

12    plaintiff?  That's you.

13         A.   Okay.

14         Q.   What facts do you have to support that

15    allegation?

16         A.   Well, I went to therapy for a very long

17    time --

18         Q.   No, no, no, no.  I'm not asking that.  I

19    haven't got to that question yet.

20                      My question is, what facts do you

21    have to support that any owner or manager of the

22    company of Mott Street intended to cause severe

23    emotional distress in you?

24         A.   I don't get the question.
```



```
 1          Q.   Do you have any facts that support that

 2   allegation?

 3          A.   I don't get your question.

 4          Q.   Yes or no?

 5          A.   I don't get your question.

 6          MR. BROWN:  He's asking how do you know they

 7   intended to cause stress to you?  What did they do?

 8          THE WITNESS:  What do you mean?

 9          MR. BROWN:  Like how do you know that they

10   intended to cause you emotional distress?  That's

11   what he's saying.

12                  Like what actions did they take

13   that were intentional to cause you emotional

14   distress?

15          THE WITNESS:  Oh, oh, firing me was --

16   that --

17   BY MR. LA POINTE:

18          Q.   No, no, no, no.  Now your lawyer is

19   changing my question here.

20                  My question is this:  What -- what

21   did the company do?  What facts do you have to

22   support your allegation?

23                  This is in your complaint.  I'm not

24   making this up.  This is in your complaint, not
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                                          Page 171

 1   mine, yours.

 2          A.   Can you word it differently or

 3   something, because I'm not understanding your

 4   question.

 5          Q.   Your complaint says that the

 6   company's -- the company, which, of course, is

 7   represented by its owners and managers, this is a

 8   quote, "intended to cause severe emotional distress

 9   in the plaintiff," closed quote.

10                   What facts do you have to show that

11   the managers or the owners of the company intended

12   to cause severe emotional distress in you?

13          A.   I don't know.

14          Q.   That they intentionally tried to cause

15   severe emotional distress, that's the question.

16                   Do you have any facts at all?

17          A.   I don't know.

18          Q.   You don't have any; right?

19          A.   I said I don't know.

20          Q.   You don't know of any facts?

21          A.   I don't know.  I don't -- I don't know.

22          Q.   Okay.  Next question, paragraph 33 for

23   your intentional infliction of emotional distress

24   claim says, "The conduct was extreme, outrageous,



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                                    Page 172

```
 1   and beyond the bounds of moral decency.  The conduct

 2   was so outrageous that no reasonable person could be

 3   expected to endure it."

 4                  What conduct is that referring to?

 5         A.    Being violated.

 6         Q.    "Being violated," what does that mean?

 7         A.    Having your body parts touched unwanted.

 8         Q.    So the same events that make up your

 9   sexual harassment claim?

10         A.    I -- I suppose that's one of them -- one

11   of the variables that did.

12         Q.    Okay.  So the facts that support your

13   intentional infliction claim as far as the conduct

14   is concerned was the same facts that make up your

15   sexual harassment complaint; correct?

16         A.    All of it, all of my -- all of it.  All

17   of it makes up that.

18                  My -- when I went to the EEOC, I

19   did for race, I did for sex, I did it for gender, I

20   did it for -- I did it for all of it.  I did it for

21   retaliation.  All of it makes up the whole compass

22   of that.

23         Q.    We're not -- we're not talking about the

24   EEOC here.  We're talking about your lawsuit now.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 173

 1           A.    Okay.

 2           Q.    It's a different proceeding than this.

 3           A.    Okay.

 4           Q.    What I'm asking you is, what specific

 5   conduct are you referring to that was so outrageous

 6   that no reasonable person would be expected to

 7   endure it?

 8           A.    The sexual harassment, the retaliation,

 9   and the discrimination against my sex.

10           Q.    So the same events that we've already

11   talked about; correct?

12           A.    Yes.

13           Q.    Yes?

14           A.    Yes, for the most part.

15           Q.    Well, is there anything else?

16           A.    Not that I can recall right now.

17           Q.    And then paragraph 34 says, "As a result

18   of the conduct, plaintiff suffered severe emotional

19   distress."  Is that correct?

20           A.    Correct.

21           Q.    And how so?  Describe your symptoms?

22   What emotional distress did you suffer as a result

23   of these things that happened to you at Mott Street?

24           A.    I was depressed; I was suicidal; I was



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                          Page 174

```
1   afraid; I was fearful; I was -- I had anxiety; I --

2   yeah, it was a sad time.

3           Q.   When?  When was the time?

4           A.   2017.  Sad time.  2017, 2018, 2019.

5                     I would just say about this year I

6   started to feel somewhat whole again.

7           Q.   This year meaning 2022?

8           A.   2022.  Sorry, yes, 2023, 2022.

9           Q.   And did you see a psychiatrist or

10  psychologist --

11          A.   I did.

12          Q.   -- or other mental health care

13  professional?

14          A.   I did.

15          Q.   Who was that?

16          A.   Her name is Veronica.

17          Q.   Veronica?  And what is her last name?

18          A.   I -- I don't know.

19          Q.   And what kind of professional is she?

20          A.   A doctor, from my knowledge as to -- I

21  don't know.  I didn't ask that.  A doctor.

22          Q.   Medical doctor or --

23          A.   I don't know.  I don't know.  I just

24  know she -- I talked to her on my problems.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                      Page 175

```
 1          Q.   Was she a therapist?

 2          A.   I would assume.  I don't know.

 3                    That's where they sent me.

 4          Q.   And what -- you don't know her last

 5   name?

 6          A.   I'm not sure.

 7          Q.   Was she in a practice or by herself?

 8          A.   A practice.

 9          Q.   Do you know the name of the practice?

10          A.   Heartland, I think.  Heartland.

11          Q.   Heartland?

12          A.   I think so.

13          Q.   And where are they located?

14          A.   Up north.

15          Q.   Up north where?

16          A.   I'm not sure.

17          Q.   In the city or --

18          A.   In the city, uh-huh, in Chicago.

19          Q.   Okay.  Any other mental health

20   professional that you consulted with?

21          A.   Dr. Bell, but that was before she

22   referred me to Veronica.

23          Q.   Okay.  And what -- what other things

24   that you talked about, other than working at Mott
```



1   Street, did you talk with Veronica about?

2          A.   For the most part of Mott Street.  I

3   don't recall -- oh, it was mainly about Mott

4   Street -- it was in conjunction with the rape and

5   Mott Street.  So that's why it was so hard.  So it

6   was mainly about that.

7          Q.   So there were two things that you talked

8   to Veronica about:  One is what happened at Mott

9   Street, and the other is the fact that you were

10  raped?

11         A.   Correct.

12         Q.   And that was right around the same

13  time -- right before you were terminated, I believe;

14  right?

15         A.   Days before.  Days before.

16         Q.   Okay.  So would you say that being raped

17  was the more stressful issue that you were dealing

18  with at that time?

19         A.   No.  Actually, Mott hurt me the most

20  because it was -- it was personal.  I thought they

21  were like family.

22         Q.   And the two other times you sued your

23  employers, you thought those were personal too?

24         A.   No, this was -- this was the most



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 177

 1   personal.
 2         Q.   Okay.  Did you claim emotional distress
 3   when you were terminated at the two other employers?
 4         A.   It never got that far.
 5         Q.   Was it in your complaint, though?
 6         A.   Sorry?
 7         Q.   It was in your complaint; right?  I've
 8   got your complaint against the salon.
 9         A.   Oh, Fringe?  Oh, yeah, I was called -- I
10   was called a nigger, yeah.  So, yeah.
11         Q.   Okay.  And that was -- emotional
12   distress is part of your complaint there too; right?
13         A.   I suppose.
14         Q.   Yeah.  Did you consult a psychiatrist or
15   psychologist or mental health professional --
16         A.   Veronica was around --
17         Q.   -- when you were terminated from Fringe?
18         A.   Veronica was around for that time.
19         Q.   I'm sorry?
20         A.   Veronica was around for that time.  I
21   just stopped seeing Veronica like six months ago.
22         Q.   Okay.  How many times did you see her?
23         A.   A lot.  A lot.  I don't -- I can't
24   count.  A lot.



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                              Page 178

```
 1           Q.    Okay.
 2           A.    She was the one helping me to get
 3   through -- to get jobs.
 4           Q.    She was helping you to get jobs?
 5           A.    She was like helping me to like, you
 6   know, put my foot back out there, because I wasn't
 7   work -- I was too afraid to work.  She was the one
 8   that was like helping me to like motivate me to go
 9   back to work.
10           Q.    Okay.  Do you have her address?
11           A.    Have her address?
12           Q.    Do you have her address?
13           A.    No, not off the top of my head, no.
14           Q.    Well, can you give that to your
15   attorney, because I don't think you've produced any
16   documents -- unless I'm mistaken, I don't believe
17   you've produced any documents related to your
18   therapy sessions there.
19           A.    Okay.  I can.
20           Q.    Do you have any documentation that shows
21   your therapy sessions with them?
22           A.    I'm sure -- I'm sure she does.
23           Q.    Okay.  All right.  Have you taken any
24   medication related to your emotional distress?
```



```
1          A.   No.  She told me that I take Advil too

2     much.  I have a lot of headaches.

3          Q.   Advil?

4          A.   She told me I take Advils too much.

5          Q.   Okay.  Other than Advil, have you taken

6     any medication for treatment of your emotional

7     distress?

8          A.   No.

9          Q.   Okay.  Have you received any diagnosis

10    from Veronica or any other mental health care

11    professional?

12         A.   No.  She simply said I'm just depressed.

13    That's all she kept saying, I was depressed.

14         Q.   Okay.  But no diagnosis was made; correct?

15         A.   Not that I know of.  I probably -- she

16    probably did; I just didn't hear her.  I wasn't a

17    listener back then.  So she probably did.  I don't

18    know.

19         Q.   When did you start seeing her?

20         A.   That was September.  So maybe December.

21         Q.   What year?

22         A.   2017.  So maybe like December, November,

23    something like that.

24         Q.   Up until what?
```



```
 1            A.    Up until like six or seven months ago.

 2            Q.    Okay.  Prior to consulting with

 3    Veronica, have you ever been treated for emotional

 4    distress in your life?

 5            A.    I don't think so.  I don't know.  I

 6    don't recall.

 7            Q.    You never went to another mental health

 8    professional?

 9            A.    Like I said, I was with Dr. Bell first,

10    so she helped me -- I always went to therapy for

11    like just -- to just check in, but nothing -- I

12    don't think.  I don't -- I don't recall.

13            Q.    Well, would you say -- who is it that

14    you just mentioned, Dr. Bell?

15            A.    Dr. Bell.

16            Q.    And who is Dr. Bell?

17            A.    She's my doctor.

18            Q.    A medical doctor?

19            A.    I don't -- I don't know what position.

20    I just know she's a doctor.

21            Q.    And how long have you been consulting

22    with her?

23            A.    I started with her maybe 2015 or 2016,

24    maybe.
```



```
 1          Q.   All right.  And what did you consult

 2   with her about?

 3          A.   I guess life, I guess, just life stuff.

 4          Q.   So she was like a mental health therapist?

 5          A.   I don't recall.  I just know she

 6   referred me to Veronica when I got depressed.

 7          Q.   Okay.  Any other times that you've

 8   consulted a doctor in your life about mental health

 9   issues?

10          A.   Not that I can recall.

11          Q.   Have you ever been prescribed medication

12   for mental health issues?

13          A.   Not that I can recall.

14          Q.   In this lawsuit, are you seeking your

15   job back with Mott Street?

16          A.   No.  I -- no.

17          Q.   Okay.  So I want to go through the jobs

18   you had before Mott Street.

19          A.   Okay.

20          Q.   First of all, what was your -- what's

21   your highest level of education?

22          A.   Associate's, I think.

23          Q.   Associate's degree?  I think -- I think

24   we covered that.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 182

```
 1          A.    We did.

 2          Q.    And so when did you graduate high

 3   school?

 4          A.    I don't remember.

 5          Q.    When was your first job after high school?

 6          A.    My first job was during high school.  It

 7   was -- yeah, my first job was during high school.  I

 8   don't remember when that was, though.  I don't

 9   remember.

10          Q.    Okay.  Let's talk about after high

11   school.

12                Do you know -- remember what your

13   first job was after high school?

14          A.    After high school was the same job, and

15   then I went to the law firm after that.

16          Q.    Okay.  What was the name of the law firm

17   again?

18          A.    Deutsch, Levy & Engel.

19          Q.    Can you spell it?

20          A.    I don't -- I don't know.

21          Q.    What was the name again?

22          A.    Deutsch, Levy & Engel.

23          Q.    Okay.  And what years did you work with

24   them?
```



```
 1          A.    I don't remember.

 2          Q.    How many years did you work with them?

 3          A.    Maybe two to three.

 4          Q.    And that was the same law firm you were

 5   working at during your employment at Mott Street?

 6          A.    Correct.

 7          Q.    And you brought a claim against them

 8   related to your termination; correct?

 9          A.    Correct.

10          Q.    And you settled that claim; right?

11          A.    Correct.

12          Q.    Was Sean your attorney as well, Sean

13   Brown?

14          A.    Nope, just me.

15          Q.    Okay.  And when did you first retain

16   Sean Brown as your attorney in this case?

17          A.    For -- I think December.

18          Q.    I'm sorry?

19          A.    December.

20          Q.    December?

21          A.    Uh-huh.

22          Q.    December of what year?

23          A.    Of last year, I think.

24          Q.    Of 20 --
```



```
 1              MR. BROWN:   2021.

 2    BY MR. LA POINTE:

 3         Q.   And how did you -- how did you know Sean

 4    Brown?  Did you know him before this, before you

 5    retained him?

 6         A.   Nope.

 7         Q.   How did you find him?

 8         A.   Word of mouth.

 9         Q.   Okay.  And Sean Brown represented you in

10    the Fringe Salon case too; right?

11         A.   Right, correct.

12         Q.   All right.  So what was the -- so you

13    worked at the law firm.

14              I believe -- you were terminated by

15    the law firm; is that right?

16         A.   Laid off.

17         Q.   Laid off.  And why did they say they

18    were laying you off?

19         A.   They were downsizing.

20         Q.   And why did you bring a claim against

21    them if they were laying you off because of

22    downsizing?

23         A.   Because my manager slapped me.  And I

24    had a police report, and they didn't fire her, but
```



```
 1   they fired me.  But they said in the settlement that

 2   it was -- it was a layoff, and I disagreed.

 3          Q.   So a female manager slapped you?

 4          A.   Correct.

 5          MR. BROWN:  This will be the last brief

 6   break.

 7          THE VIDEOGRAPHER:  We're going off the record

 8   at 11:36.

 9                  (Recess taken.)

10          THE VIDEOGRAPHER:  We are back on the record

11   at 11:50 a.m.

12   BY MR. LA POINTE:

13          Q.   Okay.  All right.  Let me go back to

14   your answers about the therapist that you consulted

15   with.

16          MR. LA POINTE:  Can you -- Kathie, can you

17   display Exhibit 10 that we've marked for the

18   deposition here today.

19          THE REPORTER:  Sure.

20          MR. LA POINTE:  Can you go to page 8.

21                  (Defendant's Exhibit No. 10

22                   identified.)

23   BY MR. LA POINTE:

24          Q.   Ms. Anderson, these are your attorney's
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                     Page 186

```
 1    and yours, in fact, too, answers to our

 2    interrogatories that we served on your lawyer.

 3                    And if you look on page 8, which is

 4    displayed here on the screen, it reflects -- the

 5    answer reflects to No. 8, question 8, the therapist

 6    that you saw, and that was Margo Bell?

 7         A.    Okay.

 8         Q.    Veronica Speedwell; is that correct?

 9         A.    I would think.

10         Q.    Okay.  Well, I mean, you signed the

11    verification for those interrogatories.  Are those

12    answers correct?

13         A.    It should be, yeah.

14         Q.    Okay.  And this -- this answer says that

15    you consulted with Margo Bell from 2015 to 2017.  Do

16    you see that?

17         A.    Uh-huh.

18         Q.    And then this answer also says that you

19    consulted with Dr. Veronica Speedwell from 2019 to

20    the present.  Do you see that?

21         A.    Okay.

22         Q.    Is this correct, 2019 to the present?

23         A.    No, I started seeing Veronica -- well, I

24    started seeing Veronica around 2017 or 20 -- I don't
```



1    remember.  I don't know.

2            Q.   Well, that's not what this says.

3            A.   Okay.

4            Q.   Which is correct, 2019 or --

5            A.   I'm not sure.  I'm not sure.  I'm not

6    sure.  I have to look at my own paperwork.  I'm not

7    sure.

8            Q.   So this is -- I mean, if you look on the

9    last page to this exhibit, which is the verification

10   or certificate of -- I'm sorry.  Where is the

11   verification?

12           MR. LA POINTE:  Sean, is there a verification

13   for this?

14           MR. BROWN:  Yeah, it was sent separately.

15           MR. LA POINTE:  Separate.  Well, I don't

16   think I have it as an exhibit, then.

17   BY MR. LA POINTE:

18           Q.   Do you recall signing a verification

19   that these interrogatories answers were true and

20   correct?

21           A.   Sure, I guess, yes.  I don't know.  I

22   don't remember.  I don't remember.

23           Q.   So my question is, is that correct, that

24   you consulted with Veronica Speedwell from 2019 to



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 188

```
 1   the present?

 2          A.   It wouldn't be present, so.

 3          Q.   What about the start date, 2019?  Is

 4   that --

 5          A.   I would have -- I would have to look in

 6   my paperwork.

 7          Q.   You're not sure?

 8          A.   No, not sure.

 9          Q.   Okay.

10          A.   Mistakes happen.

11          Q.   Right.  What was your next job after the

12   law firm and after -- well, you left the law firm

13   before -- before your employment ended with Mott

14   Street; correct?

15          A.   Yeah, I think -- yeah, yeah, uh-huh.

16          Q.   Okay.  What was your first job after

17   Mott Street?

18          A.   I want to say -- I want to say maybe

19   Barneys.  I'm not sure.  Maybe Barneys.  I'm not

20   sure.

21          Q.   Barneys?

22               Okay.  Before we continue, when you

23   were with the law firm, were there any complaints

24   about your employment while you were working there?
```



```
 1            A.   I wouldn't know.  I don't know.

 2            Q.   Were you written up at all?

 3            A.   No, I wouldn't know.  I don't know.  I

 4    don't remember.

 5            Q.   Were you disciplined at all by your law

 6    firm, the law firm?

 7            A.   I don't remember.

 8            Q.   Were there any complaints about your

 9    performance or conduct at the law firm?

10            A.   I don't remember.

11            Q.   So when you left Mott Street, what did

12    you -- what did you do to find a job?

13            A.   What did I do?

14            Q.   What efforts did you make to find

15    another job?

16            A.   I did nothing for a while, and then I

17    started to apply through Craigslist and Indeed and

18    stuff, I think.

19            Q.   Okay.  When you said you did nothing for

20    a while, how long was that time frame?

21            A.   I -- I don't remember.

22            Q.   Well, how -- can you approximate how

23    long that was?

24            A.   I really can't.  It's all a blur.  I
```



```
 1   can't remember.  I don't remember.
 2         Q.   Was it months, or was it years?
 3         A.   I'm sure it was months -- I don't know.
 4   Maybe months.  I'm not sure.  I'm not sure.
 5         Q.   When did you first start looking for a
 6   job?
 7         A.   I don't recall.
 8         Q.   No idea?
 9         A.   Not the top of my head, no.
10         Q.   And you didn't keep any records about
11   that?
12         A.   I'm sure -- I'm sure I have.  I'm sure I
13   have records, yeah.
14         Q.   Well, your attorney produced a bunch of
15   records to us, but I don't really see any -- any
16   records in there about your job search.
17         A.   Okay.
18         Q.   Did you keep any records regarding your
19   job search, that's my question?
20         A.   I would hope.  I don't remember, I don't
21   know.  I would have to look.
22         Q.   Well, it's not a matter of whether you
23   hoped you would, it's a --
24         A.   I don't remember.
```



1          Q.    -- matter of whether you did or not?

2          A.    I don't remember.

3          Q.    So the answer is no, you didn't keep any

4     records about your --

5          A.    The answer isn't no.  The answer is I

6     don't remember.  I would have to look.

7          Q.    Well, you have an obligation.  We asked

8     for those records in our request for documents.

9          A.    Okay.

10          Q.    Are you saying you have other documents

11     that you haven't produced?

12          A.    I'm not sure --

13          MR. BROWN:  That should be -- there should

14     be -- let me see which Bates number it is.

15          MR. LA POINTE:  Well, I see Anderson Bates

16     No. 4 regarding --

17          MR. BROWN:  Let me see.  There's like 56

18     pages that I sent.  The job searches were mainly

19     like over the Internet, so it's going to be like --

20     it will be like Internet screenshots.

21          MR. LA POINTE:  All right.  Well, let's --

22          MR. BROWN:  It will be like from 46 to -- I

23     think 46 to 52.

24          MR. LA POINTE:  Oh, the Google mail?



```
1          MR. BROWN:  Yep.

2          MR. LA POINTE:  Okay.  Is that it, Sean?  Is

3   that all the documents related to looking for

4   another job?

5          MR. BROWN:  Yes.

6          MR. LA POINTE:  Okay.

7   BY MR. LA POINTE:

8          Q.  So what efforts did you make to find

9   another job after you left Mott Street?

10         A.  I applied for jobs.

11              I had got evicted after that so,

12  like I said, life was a blur.  I don't remember.

13         Q.  You don't remember applying for jobs?

14         A.  Oh, I'm sure I have.  I'm sure I need to

15  do something to pay rent, but ...

16         Q.  Were you living on your own?

17         A.  Yeah.

18         Q.  By yourself or with somebody else?

19         A.  No, I had a roommate.

20         Q.  A roommate?  A male or female roommate?

21         A.  Female.

22         Q.  Okay.  So when -- when did you start

23  applying for another job?

24         A.  I don't recall.
```



 1         Q.    And when was your next job after Mott

 2   Street?

 3         A.    I think it was Barneys, but I don't -- I

 4   don't remember.  I think it was Barneys, but I think

 5   there was another job before that.  I don't

 6   remember.  I don't remember.  I think there was

 7   another job before that, though.  I don't remember.

 8         Q.    Can you turn back to Exhibit 10.

 9         MR. LA POINTE:  Kathie, can you display it?

10         THE REPORTER:  Sure.

11         MR. LA POINTE:  Can you go to page 7, Kathie.

12         THE REPORTER:  Sure.

13   BY MR. LA POINTE:

14         Q.    Okay.  This is page 7 of the answers to

15   our interrogatories prepared by your lawyer.

16         A.    Yep.

17         Q.    Down at the bottom in response to No. 7,

18   it has "Firehouse, July 2018 through February 2019."

19         A.    Yep.

20         Q.    Is that the time --

21         A.    Yes.

22         Q.    -- you worked for Firehouse?

23         A.    Yeah, I think so.  That should be.

24         Q.    And Firehouse is what?  Is that a sub --



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                          Page 194

```
 1          A.    A sub?

 2          Q.    Sub sandwiches?

 3          A.    It's a restaurant.

 4          Q.    Fast food or sit-down?

 5          A.    I guess sit-down, I guess.

 6          Q.    Okay.  Where are they located?  Do you

 7    know where they're located?

 8          A.    Oh, downtown.

 9          Q.    Downtown?

10          A.    Yeah.

11          Q.    And what did you do for them?

12          A.    Host.

13          Q.    Okay.  So when did you apply to Firehouse?

14          A.    I don't -- I don't remember.

15          Q.    Was that your first application for a

16    job after you left Mott Street?

17          A.    I don't know.  I would hope not.  I

18    don't know.  I don't know.

19          Q.    You said you made 20,000 with Firehouse;

20    right?

21          A.    Here and there, sure.  I'm not sure.

22          Q.    So I would presume you got a W-2 at the

23    end of the year for both 2018 and 2019; correct?

24          A.    Yeah, I would -- but I was homeless, so
```



```
 1   it wouldn't have -- I wouldn't have gotten it.

 2        Q.   Well --

 3        A.   I didn't have a home.  So I never got

 4   that -- I actually never filed those taxes for that,

 5   actually.

 6        Q.   Well, but you still got a W-2 even if

 7   they -- you were homeless, they would have had an

 8   obligation to give you a copy of your W-2; correct?

 9        A.   I would hope, yeah.

10        Q.   Okay.  Well, we don't have any W-2s in

11   the documents your attorney produced, then.

12        A.   Well, I don't have -- I don't have any

13   W-2s.  I need -- I need to file that.

14        Q.   Well, it's your obligation to provide us

15   information on your wages, and you haven't provided

16   W-2s for any of these employers.

17        A.   Okay.  I don't -- because I don't have

18   W-2s.  I was homeless.

19             I always expect W-2s to come to

20   your home at the end of the year, so.

21        Q.   If they didn't have an address to send

22   those to, they would have had to have given you the

23   W-2 in person.

24        A.   Okay.  I never got it.
```



```
 1          Q.   You're saying none of these employers
 2     gave you W-2s?
 3          A.   I'm not saying none of them.  I'm
 4     speaking about Firehouse.  I never got that.
 5               Barneys, I don't know.  Maybe it's
 6     in storage.
 7               Fringe, don't know.
 8               Uber, I filed those, so -- yeah.
 9          Q.   Okay.  Uber, you filed those?
10          A.   I filed taxes for those.
11          Q.   So you must have a W-2 for Uber?
12          A.   Yeah, I should have one of those, yeah.
13          Q.   Okay.  Well, I mean, you have an obligation
14     to produce that information to us --
15          A.   Okay.
16          Q.   -- that documentation?
17          A.   I can, no problem.
18          Q.   Okay.  So you worked for Firehouse from
19     July '18 through February '19?
20          A.   I -- I guess so.
21          Q.   Well, that's -- well, I mean, this is
22     your answer, ma'am.
23          A.   I mean, yes, it's here or there.  I
24     don't -- I have -- I was homeless.  I have no -- I
```



```
 1   have no -- it's all just off of memory.  I don't

 2   know.  I don't know.  I don't know.

 3           Q.   I understand you may have been homeless,

 4   but my question is not about that, it's about your

 5   working during this time.

 6           A.   I'm -- what I'm saying is -- I'm under

 7   oath, so I'm just giving -- I'm saying that's a

 8   possibility, sure, yes.

 9                I don't want to quote that, because

10   I'm not sure.  I'm not one thousand percent sure

11   that's completely accurate.  Just here or there.

12           Q.   Well, your interrogatory answer was

13   under oath too.  You signed the certification --

14           A.   Oh, I was unaware of that, I (inaudible)--

15           Q.   Right.  So why did you leave Firehouse?

16           A.   It was a restaurant.  So I tried my go

17   at it again, but it was similar.  The restaurant

18   industry was similar.  It was -- it's just not a

19   good environment for women, I think.

20           Q.   So you worked at Firehouse.  You didn't

21   like it; is that what you're saying?

22           A.   I didn't like it.

23           Q.   Okay.  And so you left because you

24   didn't like it?
```



1          A.   From what I remember.  I don't remember.

2    I don't remember.

3          Q.   Were you fired?

4          A.   I don't -- I don't remember.

5                    (Simultaneous speaking.)

6    BY THE WITNESS:

7          A.    I might have -- I might have been

8    called a no-show or something.  I don't know.  I

9    don't know.

10         Q.   Okay.  So you would have been fired from

11   Firehouse?

12         A.   Could have been.  Didn't care about the

13   job, so I don't know.

14         Q.   Okay.  Did you have problems at Firehouse

15   too?

16         A.   Yeah, the patrons -- the patrons were

17   touchy there too.

18         Q.   And were you disciplined at all at

19   Firehouse?

20         A.   Got written up?

21         Q.   Yep.

22         A.   I don't remember.  I don't -- I don't

23   know.

24         Q.   By the way, when you left Mott Street,



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                                    Page 199

```
 1    did you apply for unemployment benefits?

 2          A.    I don't think so.  I don't know.  I

 3    don't think so.

 4          Q.    And then your next job appears to have

 5    been Barneys New York?

 6          A.    Yep.

 7          Q.    Is that right?

 8          A.    Yes.

 9          Q.    And what is Barneys?

10          A.    The retail store.

11          Q.    Where are they located?

12          A.    They were located in the Gold Coast.

13          Q.    Okay.  And what did you do for them?

14          A.    Well, I guess front desk type of -- host

15    type of thing.

16          Q.    Okay.  The Firehouse restaurant, do you

17    know where that was -- I know you said it was

18    downtown Chicago.

19                Do you have the cross streets or

20    what street it was on?

21          A.    I don't remember that.

22          Q.    But it was in downtown?

23          A.    Downtown, yeah.

24          Q.    And Barneys New York was on the Gold
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 200

```
 1   Coast.
 2              Do you know what street it was on?
 3        A.   It was right by -- it was right by the
 4   Water Tower, kind of.
 5        Q.   Okay.  You worked there from April 2019
 6   through July 2019?
 7        A.   Correct.
 8        Q.   And so that was about, what, four
 9   months?
10        A.   Uh-huh.
11        Q.   Three months?
12        A.   Correct, something like that.
13        THE REPORTER:  Can I --
14   BY MR. LA POINTE:
15        Q.   And why did you leave?
16        THE WITNESS:  Go ahead.  She was speaking.
17        THE REPORTER:  I was just going to ask you to
18   take your hand away from your face.
19        THE WITNESS:  Oh, I'm so sorry.  I'm so
20   sorry.  I'm so sorry.
21   BY MR. LA POINTE:
22        Q.   Yeah, why did you leave Barneys New York?
23        A.   They foreclosed.
24        Q.   They foreclosed.  So they closed their
```



1   store?

2        A.   All of their -- I think they got one or

3   two stores left.  All of their stores -- I mean, I'm

4   sorry, they filed bankruptcy.  Bankruptcy, that's

5   what it was, bankruptcy.

6        Q.   Okay.  And then you worked at Fringe

7   after that?

8        A.   Well, in -- in between it.  I was

9   working at both at one point.

10       Q.   By the way, what was your job at

11  Barneys?

12       A.   As I said, I think it's like the front

13  desk hostess type of -- something like that.

14       Q.   Okay.  Right.  I think I asked you that

15  question already.

16            Fringe, that was a salon; right?

17       A.   Right, uh-huh.

18       Q.   So haircuts, beauty salon?

19       A.   Yeah, nails, stuff like that.

20       Q.   Okay.  And what was your job there?

21       A.   Front desk.

22       Q.   And what -- what was their -- where do

23  they have their salon?

24       A.   In Wicker.



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 202

```
1          Q.   Wicker Park?

2          A.   Uh-huh.

3          Q.   Do you know what street?

4          A.   Maybe Milwaukee, maybe.  Don't quote me

5     on it.

6          Q.   And what was your job there?

7          A.   Front desk.

8          Q.   And why did you leave there?

9          A.   I was called a nigger, and then I

10    complained to the manager.  She didn't like it.

11               And then I -- they were doing an

12    investigation, and at the end of the investigation,

13    she fired me.

14         Q.   Fired you for what?

15         A.   I don't know.  We still don't know.

16         Q.   What did they accuse you of doing?

17         A.   She didn't say.  Just got fired.  She

18    didn't say.

19         Q.   And that's the company that you sued;

20    right?

21         A.   Yes.

22         Q.   Okay.  And you made -- you worked there

23    from July 2019 through October 2019?

24         A.   I believe so, yes.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 203

```
 1          Q.   And you made -- you made about 10,000

 2    there?

 3          A.   I believe so.

 4          Q.   And you made about 10,000 at Barneys

 5    New York; correct?

 6          A.   I believe so.

 7          Q.   What was your wage -- let's start with

 8    Firehouse.  What was your rate of pay?

 9          A.   I don't remember.

10          Q.   How about Barneys?

11          A.   I don't remember.

12          Q.   Fringe?

13          A.   Don't remember.

14          Q.   And then your next job was -- after

15    Fringe was Uber?

16          A.   Yes.

17          Q.   Yes?

18          A.   Yes, sir.

19          Q.   And what was your rate of pay there?

20          A.   I think 19 -- don't quote me.  I think

21    19, 18, something like that.

22          Q.   And you worked from January of 2000 to

23    June of 2000 -- or, I'm sorry.  June of 20 --

24    January of 2020 through June of 2020; right?
```



```
 1            A.   Right, uh-huh.

 2            Q.   And you made roughly 18,000?

 3            A.   Possibly, yes.

 4            Q.   Okay.  Now, during this time from July

 5    of '18 through June of 2020, did you apply for other

 6    jobs during that time?

 7            A.   I don't recall.

 8            Q.   Other than, of course, applying for each

 9    one of these jobs that you ended up with -- I assume

10    you did apply for each one of these; correct?

11            A.   For -- I believe so.  I think so.

12            Q.   Okay.

13            A.   I -- (inaudible) I guess, yeah.  I

14    guess.

15            Q.   And after you left Uber -- what was the

16    reason why you left Uber?

17            A.   The Pandemic.

18            Q.   Okay.  And did you bring a claim against

19    Uber?

20            A.   No.

21            Q.   Okay.  And did you apply -- it looks

22    like you applied for unemployment after you left

23    Uber?

24            A.   Correct.
```



```
 1          Q.   And you got unemployment from June of

 2   2020 through November of 2022?

 3          A.   I think -- November of 2022?

 4               Oh, yeah, when was -- I wouldn't

 5   say -- I don't know if it's November 2022.  I think

 6   it was more so -- I don't remember.  I don't

 7   remember.

 8          Q.   That's what it says here.

 9          A.   I see what it says.  I don't ...

10          Q.   What was your unemployment that you were

11   receiving?  How much were you receiving?

12          A.   I don't recall.

13          Q.   Was that because of the Pandemic relief

14   by Congress you were getting increased benefits for

15   unemployment?

16          A.   I think so.  I don't know.  I didn't ask

17   (inaudible).

18          THE REPORTER:  "I didn't" what?

19          THE WITNESS:  I didn't ask questions.

20   BY MR. LA POINTE:

21          Q.   Did you look for a job after you left

22   Uber up until November of 2022?

23          A.   I don't recall.

24          Q.   Are you employed today?
```



```
 1            A.   I am.

 2            Q.   And when -- with who?

 3            A.   A dental office.

 4            Q.   What's the name of it?

 5            A.   Endo and Perio.

 6            Q.   Endo and Perio?

 7            A.   Yes.

 8            Q.   And when did you start working there?

 9            A.   November of this -- not this year.  2022.

10            Q.   November of 2022?

11            A.   Right.

12            Q.   To the present?

13            A.   Correct.

14            Q.   Okay.  And other than -- so -- well, let

15    me strike that.

16                 Between Uber and this dental

17    office, Endo and Perio, did you work for any other

18    companies?

19            A.   No.

20            Q.   Okay.  And how much do you make at this

21    dental office?

22            A.   I think 19.

23            Q.   19 an hour?

24            A.   I believe so.
```



```
1          Q.   Is that full-time?

2          A.   Yes.

3          Q.   And what's your job there?

4          A.   Front desk.

5          Q.   Do you have records for your unemployment

6    payments?

7          A.   I should.  I should.

8          Q.   Okay.  Again, you're required to produce

9    those records as well to us.

10         A.   No problem.

11         Q.   And how much have you made at the dental

12   office since you started there to the present, do

13   you know?

14         A.   I don't know.

15         Q.   What's their location?  What's their

16   address?

17         A.   I work in Orland, so I don't know.

18         Q.   You work in where?

19         A.   I work in Orland.  It's by the mall.

20         Q.   Orland Park?

21         A.   Yeah, uh-huh.

22         Q.   All right.  Other than these jobs that

23   we've gone through, which obviously you would have

24   applied for those jobs, can you recall any other
```



1    application for employment since you left Mott Street?

2         A.   I don't recall.

3         Q.   And do you recall any other efforts that

4    you made other than applying online as referenced by

5    your Google mail documents, which I guess are

6    Anderson 46 through 52?

7         MR. LA POINTE:  Is that right, Sean?

8         MR. BROWN:  Yes.

9    BY MR. LA POINTE:

10        Q.   Any other times that you've applied for

11   jobs other than what's in those documents and these

12   employers that we've gone through now?

13        A.   I'm not -- that should be it.

14             But, I mean, if I find more, I'll

15   gladly send it over.

16        Q.   Have you -- at the dental office, have

17   you had any performance or conduct issues that

18   you -- that your employer has addressed with you?

19        A.   No.

20        Q.   No?

21        A.   No.

22        Q.   And other than -- well, of these

23   employers that we've talked about, it sounds like

24   you were laid off from the law office, terminated by



```
 1   Mott Street, and also Fringe Salon terminated your

 2   employment; correct?

 3          A.   Correct.

 4          Q.   Other than those, any other employers

 5   that you've been involuntarily terminated from?

 6          A.   Not that I recall, no.

 7          MR. LA POINTE:  Kathie, can you display

 8   Exhibit 11.

 9                    (Defendant's Exhibit No. 11

10                     Identified.)

11   BY MR. LA POINTE:

12          Q.   What's been marked as Exhibit No. 11,

13   Ms. Anderson, is a document that your attorney

14   produced to us, Anderson 002, Bates 002.

15          A.   Okay.

16          Q.   You -- your attorney produced this as

17   part of the support for your case.

18                    What is -- what is this document?

19          A.   I'm really not sure.

20          Q.   Well, it appears to be a charge of

21   discrimination by Jaelen Wylie?

22          A.   Correct.

23          Q.   Do you see that?

24          A.   I see it.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                           Page 210

```
 1          Q.   Against Soho House Chicago?

 2          A.   Okay.

 3          Q.   Is that right?

 4          A.   I guess.  I see it.

 5          Q.   Is this a document that you had in your

 6   possession?

 7          A.   I don't know if I -- I don't recall the

 8   reason why I sent it to Sean.  I probably sent it to

 9   Sean -- I don't -- it was a principle there, I just

10   don't remember the principle at this moment.  It

11   probably was -- I don't remember.

12          Q.   Well, how does this support your case

13   against Mott Street?

14          A.   I -- I'm not sure.  It was for a reason

15   that I sent it.  I asked her for a reason, but I

16   don't remember that.

17          Q.   Who is Jaelen Wylie?

18          A.   She used to work at Mott Street.

19          Q.   And she left there?

20          A.   She quit, yeah.

21          Q.   So this charge is dated April 4, 2018.

22               Is that -- well, that was after

23   your employment ended at Mott Street; right?

24          A.   Correct.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 211

```
 1          Q.   Was -- did Jaelen Wylie work for Soho

 2   House after she left Mott Street?

 3          A.   I -- I don't remember -- yeah, yeah she

 4   did.  I think she did work at Soho then.

 5          Q.   Okay.  So you're not sure what relevance

 6   this has to your case?

 7          A.   I don't remember why I sent -- I

 8   don't -- it was a reason.  I don't remember.  There

 9   was a reason, I just don't remember.

10                Oh, maybe because the outcome was

11   different for her.  The outcome, they rectified it.

12   So she's -- she was still employed there, and it all

13   was good.

14                That was a good example of when you

15   complain and then someone fixes it; versus me, when

16   I complained, I was terminated.  I think that's

17   probably what the issue was -- that's probably what

18   I was trying to say.  I don't know.

19          MR. LA POINTE:  Kathie, can you display

20   Exhibit 12.

21                    (Defendant's Exhibit No. 12

22                     Identified.)

23   BY MR. LA POINTE:

24          Q.   Okay.  Exhibit 12 is two pages from
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                          Page 212

```
 1   your -- again, your attorney's production of
 2   documents.  It's Anderson 001, Bates 001, and then
 3   Anderson 003.
 4        MR. LA POINTE:  Can you just page down to the
 5   second page, Kathie.
 6   BY MR. LA POINTE:
 7        Q.  So what is this document, these two
 8   pages, Ms. Anderson?
 9        A.  A Sexual Assault Incident Notice.
10        Q.  Is it related to -- the name at the top,
11   name of the victim appears to be Jaelen?
12        A.  Oh, I can't see it.
13        Q.  Jaelen Wylie?
14        A.  His computer, he's trying to fix it.  I
15   can't see it.  I can't see it.
16        Q.  On the top of the page --
17        A.  He's trying -- he's trying to like make
18   it bigger.  I can't see it.
19        MR. BROWN:  Give me one second.
20        THE REPORTER:  I just made it bigger.
21        THE WITNESS:  Oh, okay.
22   BY MR. LA POINTE:
23        Q.  Do you see that at the top, name of the
24   victim?
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                              Page 213

 1          A.    Oh, I see it here, uh-huh.

 2          Q.    Jaelen Wylie, the same person we were

 3   just talking about?

 4          A.    Correct.

 5          Q.    Is this a complaint about her sexual

 6   assault?

 7          A.    I don't think -- this says theft.  It

 8   probably was just a mis-scan or something.  This is

 9   a theft.

10                I just asked her to send me her

11   documents over.  So I probably just mis-scanned this

12   or something.

13          MR. LA POINTE:  All right.  Let's go back to

14   the first page, Kathie, of this -- of this exhibit.

15   BY MR. LA POINTE:

16          Q.    So is this something different?

17          A.    No, this is mine.  This is my -- this is

18   my rape.

19          Q.    And it's dated the 17th of September,

20   2017; right?

21          A.    It is, yeah.  Unfortunately, yeah.

22          Q.    Okay.  So this is related to your

23   reporting to the police about your rape; right?

24          A.    Unfortunately, yes.



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                           Page 214

```
 1           Q.   Right?

 2           A.   Yeah.

 3           Q.   Yeah.  Okay.  And so how does this

 4   relate to your -- to your lawsuit now against Mott

 5   Street?

 6           A.   I was raped -- well, I asked to come

 7   in -- so serving assistants come in early -- I'm not

 8   blaming them.  Don't get me wrong, I'm not blaming

 9   them for the rape.

10                Serving assistants come in early so

11   they can prep, and then serving assistants do the

12   closing as well.  I had asked to come in earlier

13   versus stay later.  I was told I had to stay later

14   to be with Raffy.  And once I stayed later that

15   night, when I left with Johanna and Simon, the Uber

16   driver raped me.

17                So I was -- I had told Lola.  She

18   said she told Nate.  And it was like a wedding or

19   something, I think Liv's wedding that Sunday or

20   something.  I still came and everything like that.

21                And I -- I -- I associate it with

22   that because I was already having like sexual

23   advances and stuff like that before about the

24   clothing and all of that stuff, and then I was
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com

A- 167

LEXITAS

 1  raped.  He was saying the same thing, like it was

 2  about what you were wearing.  And I was like I was

 3  just telling them I went to change my clothes and

 4  all of that stuff, and all of my cries weren't

 5  heard, which led to that.  And that was his biggest

 6  takeaway, was that because of the clothing that I

 7  wore, that's why he did what he did.

 8                    And I put fault into Mott because

 9  had I wore what I wanted to wear or they heard

10  anything I said, I don't think that day would have

11  happened the way it happened.

12          Q.   Do you know for a fact that Nate knew

13  about you being raped?

14          A.   Lola told me she told him.

15          Q.   That's all you know; right?

16          A.   That's all -- that's all -- I mean, the

17  day of the wedding he hugged me and said, "Sorry."

18          Q.   When was the wedding?

19          A.   Oh, that Sunday.

20          Q.   Sunday, what date?

21          A.   If that was the 17th, whatever date the

22  Sunday was, that Sunday -- or Monday.  Like a Sunday

23  or Monday.  We were off that day.

24                    I don't remember.  It was a Sunday



1   or Monday.  It was, I think, Liv's wedding or

2   Kristen's -- somebody's -- somebody's wedding.

3        Q.  All right.  Let me just get a 2017

4   calendar just so I can see what days we're talking

5   about here.

6                  All right.  So September 17th,

7   the 17th was, in fact, a Sunday.

8        A.  Yeah.

9        Q.  So when was the -- when was the wedding

10  that you were referring to?

11       MR. BROWN:  Hold on.  We need a break.

12       MR. LA POINTE:  Okay.

13       THE VIDEOGRAPHER:  Going off the record at

14  12:28.

15       MR. LA POINTE:  Let's take like a five- or

16  ten-minute break.

17                  (Recess taken.)

18       THE VIDEOGRAPHER:  We're back on the record

19  at 12:37.

20  BY MR. LA POINTE:

21       Q.  Okay.  The incident that you described

22  about a customer touching your butt, do you know

23  whether Nate Chung knew about that incident?

24       A.  Yes.  Yes.



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 217

```
 1          Q.   And how do you know that?
 2          A.   We went to him.  Lola and I went to him
 3   and told him.
 4          Q.   I'm sorry?
 5          A.   Lola and I went to him and told him.
 6          Q.   You and Lola together went to Nate and
 7   told him about this?
 8          A.   Yes.
 9          Q.   And when was that?
10          A.   What day?
11          Q.   When was that?
12          A.   The day of -- when the incident happened,
13   we went to tell him.
14          Q.   And when in comparison -- in your
15   employment, when did it happen?
16          A.   Close -- close in proximity to that
17   email I sent.
18          Q.   The August 2017 email?
19          A.   I believe so.
20          Q.   I'm sorry?
21          A.   I believe so.
22          Q.   Okay.  So you're saying it was a meeting
23   that you had with Lola and Nate --
24          A.   No.
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 218

```
 1           Q.    -- where you told Nate about that?

 2           A.    It wasn't a meeting.  We left the host

 3    stand and went to him and told him.

 4           Q.    Okay.  I call that a meeting.  To me

 5    that's a meeting.

 6                      You met with Nate and Lola, and the

 7    two of you told Nate about that?

 8           A.    Uh-huh, correct.

 9           Q.    Okay.  And what was Nate's response?

10           A.    You know -- you know Nikka's strong, she

11    can handle it, or something like that.

12           Q.    Okay.  All right.  Do you know whether

13    Nate knew about Gabe touching your butt?

14           A.    I -- I'm not aware.  I just know Emma

15    and Lola knew.  I'm not aware if they told him or --

16    I'm not aware.

17           MR. LA POINTE:  Okay.  All right.  I don't

18    have any other questions, Sean.

19           MR. BROWN:  Just a few follow-up questions.

20                      CROSS-EXAMINATION

21                      BY MR. BROWN:

22           Q.    With respect to your claim for sexual

23    discrimination, can you explain to us how do you

24    feel you were discriminated against based on
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 219

```
 1   being -- you being a female?

 2          A.   What --

 3          MR. LA POINTE:  Objection; asked and

 4   answered.

 5   BY MR. BROWN:

 6          Q.   So I guess my question is, how did

 7   you -- how did they treat you differently for being

 8   a female as opposed to other employees?

 9          MR. LA POINTE:  Same objection; asked and

10   answered.

11   BY MR. BROWN:

12          Q.   You can answer.

13          A.   I was treated differently -- of gender,

14   you mean?

15          Q.   Yes.

16          A.   Simply because I knew people were

17   doing -- who were men, in particular, were doing

18   wrong things, unprofessional things, things that

19   were in policy, and they weren't -- and let's say if

20   you're late six times, that is equivalent to a

21   write-up; and then you're late six more times,

22   that's equivalent to your second and the next, so

23   forth and so forth and so forth.  Eventually you'd

24   be fired.  And the men were not fired when they'd do
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                   Page 220

```
 1    the same thing other women would do.
 2         Q.    So is that the only distinction, the
 3    policy for tardiness where men would be able to be
 4    tardy without punishment but women would be
 5    punished?
 6         A.    I don't -- no, because I know in
 7    particular, like, for instance, Emily, I think she
 8    was drinking on the job or something, and I think
 9    she was fired or something like that.  And, you
10    know, I know for a fact men was at the job drinking
11    too.
12         Q.    Okay.  Do you know which men in
13    particular were drinking on the job?
14         A.    I don't remember their names.
15         Q.    Do you know what they -- what positions
16    they worked as?
17         A.    Servers, bartenders.
18               She was a bartender.
19         Q.    And Emily was a bartender?
20         A.    (Indicating.)
21         Q.    So Emily was fired for drinking on the
22    job --
23         A.    Something like that she told us.  She
24    told us that she was -- that was the reason that
```



```
 1   they fired her, because something about drinking on

 2   the job.

 3           Q.   But men were not fired for drinking on

 4   the job?

 5           A.   No, they were not.

 6           Q.   Okay.  Now, is there a particular

 7   instance where you did something but a male

 8   counterpart was treated differently?

 9           A.   (Inaudible.)

10           THE REPORTER:  I'm sorry.  I didn't hear your

11   answer.

12           THE WITNESS:  I said, "What do you mean,

13   Sean?"  I'm sorry.

14   BY MR. BROWN:

15           Q.   Is there a specific instance where you

16   engaged in a course of conduct and were either

17   talked to or reprimanded for it when your male -- a

18   male employ -- a male counterpart, a male coworker,

19   did the same conduct but was not reprimanded or

20   talked to about it?

21           A.   I think the main one was the phones.

22                So I've mentioned Simon before.

23   Simon was always on his phone, but -- and this was

24   what me and Nate talked about, is that Simon could
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 222

```
 1   do it, but when I -- when I touched it one time in

 2   the lights out, I get sent home.  But when he

 3   touches it, it's all the time in your face, you just

 4   let it slide.  But when I do it, it's like this

 5   World War III situation.

 6        Q.   Okay.

 7        A.   Basically I lose money.  I get -- I have

 8   to go home and lose money.  He gets to stay home --

 9   stay at the job and still work and profit.

10        Q.   Now, with respect to the claim for

11   intentional infliction of emotional distress, during

12   Mr. LaPointe's questioning, you indicated you didn't

13   know in response to his question about what -- how

14   did you know they intended to cause you emotional

15   distress.  So I'm going to reword that question so

16   that you may have a better understanding of how to

17   respond to that.

18             So essentially can you -- are you

19   able to tell us what conduct gave you reason to

20   believe they intended to cause you emotional

21   distress?

22        A.   I guess -- I guess knowing of my rape

23   and then knowing I was moving, knowing all of those

24   things, and knowing that a person without a job
```

LEXITAS

Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                              Page 223

1   couldn't afford rent and then just got raped, so

2   their whole mental -- their whole mental state is

3   off, and then firing them for no reason led to a

4   downward spiral, to be honest.

5            Q.   When you say "firing them for no

6   reason," what do you mean by that?

7            A.   I was -- I mean, they didn't give me a

8   reason for what my termination was.  I had no

9   write-ups, no paperwork, no -- anything saying that

10  I was -- I did something wrong; that I should fix

11  this; therefore, if I don't fix this, I will be

12  terminated.  Nothing of that sort ever came my way.

13           Q.   Why do you believe you were terminated?

14           A.   I think it was just personal.  I think

15  because I spoke up.  I do believe it's retaliation,

16  for the most part.  I think because I spoke up on

17  the conditions, that's why -- that's why we're here

18  today.

19           Q.   Now, the -- when you say you spoke up on

20  the conditions, did you speak up on the conditions

21  of the work -- the working conditions after the

22  sexual assault incident occurred?

23           A.   No.  Jaelen was -- she didn't like it.

24  She hated it.  That's why she quit.  She didn't like

LEXITAS

 1   being touched, either.  She was touched.  She was --
 2   she hated the hugging that they would do.
 3               But I wasn't there often.  So I
 4   would bring it to Emma, I would bring it to Lola,
 5   but it was nothing that anybody could do,
 6   essentially.  It was nothing that anybody could do.
 7   Because Lola and Emma, that's why they both quit,
 8   because it's nothing -- they had no -- they had no
 9   say to change from occurring in that environment.
10        Q.   Okay.  Now, you had sent an email in
11   August informing management about the working
12   conditions and the concerns that you had with those.
13   What do you think -- but you weren't fired
14   immediately after that August email.
15               What do you think happened between
16   August 26 and the day that you were terminated on
17   September 23rd, I believe?
18        A.   I -- I really -- I know Nate was --
19   during that time he was more passive-aggressive with
20   me.  So we weren't really seeing eye to eye at that
21   time.  I do recall that.
22               But I really -- when -- I tell
23   y'all I was stunned when he said those words.  I
24   didn't even understand the reason for the



```
 1   termination.
 2                  So all I could correlate it to was
 3   what Lola had said, was she didn't like the fact --
 4   he didn't like the fact that I emailed him.  He
 5   didn't like that.  So I was like, oh, the emails
 6   bother him that much to get to -- took us to this
 7   point.
 8        Q.   And what -- do you remember, what was
 9   the date of the last email you sent him prior to
10   being terminated?
11        A.   I don't remember the date.
12        Q.   Do you remember how long after you sent
13   an email to management that you were terminated?
14        A.   It had to be like a month.
15        Q.   Okay.
16        A.   As far as email, the sent email.
17                  The second email I sent with the --
18   apparently the same day, and then I was terminated.
19                  So I don't know.  I don't know.
20        Q.   So you sent an email the same day of
21   your termination?
22        A.   Correct.
23        Q.   Now, prior to bringing this lawsuit
24   against Mott Street, did you approach them seeking a
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 226

 1   remedy for your concerns?

 2        A.   I did.  I emailed them after I was

 3   fired.  In particular, I talked with Thalia and

 4   Lola, and they both advised me to talk to Ed and

 5   Ginny.

 6                   So I emailed both of them trying to

 7   get some type of remedy, some type of positive

 8   outcomes.  I didn't want to -- I didn't want to -- I

 9   needed -- I actually needed the job, because I felt

10   like the rape just happened, so I just needed to

11   like be somewhere and not home.  So, I mean, I need

12   to get this job back.  So I -- I guess begged, I

13   guess you could say, and put my pride aside and

14   asked for it back, and then they emailed me some

15   generic message.

16                   And then that's when -- I even told

17   the EEOC, I said, "I'm not looking for monetary.  I

18   just really want an apology, like just some type of

19   apology."  And, unfortunately, that's not what

20   happened.

21        Q.   And there was another question

22   concerning you seeing Dr. Veronica Speedwell.  There

23   was some issues concerning the dates of treatment.

24                   Do you recall the last time you saw



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                        Page 227

```
 1   Dr. Speedwell?

 2          A.    The last --

 3          Q.    What year or what --

 4          A.    It was 2022.  The last time I saw her,

 5   let's just say the summer or spring, something like

 6   that.

 7          Q.    Okay.  So summer or spring of 2022?

 8          A.    Uh-huh.  If I can look in my phone, I

 9   can tell you the last time I text.  She text me to

10   come -- when she comes to the office.

11          Q.    Oh, sure, if you can do that.

12          A.    8/26.

13          Q.    Okay.  So August of 2022?

14          A.    Uh-huh.

15          Q.    Now, your relationship with Dr. Speedwell,

16   was August the last time that -- was that like the

17   last treatment date, or do you guys schedule

18   appointments on an as-needed basis?

19          A.    As needed; when I feel down.

20                But I just got tired of reliving --

21   I need to move on from the rape.  I got tired of --

22          THE REPORTER:  I'm sorry.  I can't hear

23   you --

24          THE WITNESS:  I got tired of reliving the
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                                Page 228

```
 1    rape and stuff, so I just thought -- she suggested I

 2    should keep coming, but I couldn't do it.

 3              MR. BROWN:  Okay.  I don't have anything

 4    else.

 5                     REDIRECT EXAMINATION

 6                     BY MR. LA POINTE:

 7         Q.   Ms. Anderson, you mentioned that men

 8    were not fired for drinking on the job?

 9         A.   Correct.

10         Q.   Who were those men?

11         A.   As I said, I don't remember the names

12    like that off the top of my head.

13         Q.   And how do you know that management knew

14    they were drinking on the job?

15         A.   They were there.

16         Q.   Who was there?

17         A.   Management was there.

18         Q.   Who?

19         A.   Nate was there.

20         Q.   And they observed these men drinking on

21    the job, is what you're saying?

22         A.   Yes.

23         Q.   You saw Nate observing an employee of

24    the -- of the Mott Street drinking on the job?
```



1        A.    Correct.

2        Q.    But you can't recall who that man was?

3        A.    No, not right now.

4              Not just man, it was men, more than

5  one man.

6        Q.    Okay.  And did management -- or, I'm

7  sorry, did Nate or Vicki or, you know, the upper

8  level management of the organization of Mott Street

9  know about you being raped?

10       A.    Like I said, I told Lola -- well, I

11 didn't tell Lola.  Johanna told Lola.  Lola called

12 me.

13             At the wedding, Nate came and gave

14 me a hug and said, "I'm so sorry" at the bar.  I was

15 sitting at the bar; he gave me a hug at the bar.

16       Q.    But my question is, do you know whether

17 Nate or Vicki or any of the owners knew about you

18 being raped?

19       A.    From my understanding, Lola told Nate,

20 from my understanding.

21       Q.    But you don't know for sure that they

22 knew about the rape; correct?

23       A.    I'm not sure.

24       MR. LA POINTE:  Okay.  No further questions.



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                    Page 230

```
 1         MR. BROWN:  Nothing further.

 2         THE VIDEOGRAPHER:  This concludes the

 3   deposition.  We're going off the record at 12:53

 4   p.m.

 5         MR. LA POINTE:  Do you want to reserve

 6   signature, Sean?

 7         MR. BROWN:  No, we'll waive.

 8         MR. LA POINTE:  Waive.  Okay.

 9         THE REPORTER:  Are you ordering this, Marty?

10         MR. LA POINTE:  Yes.

11         THE REPORTER:  Did you want a copy, Sean?

12         MR. BROWN:  Sure.

13

14

15

16

17

18

19

20

21

22

23

24
```



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                      Page 231

```
 1   STATE OF ILLINOIS      )
                            )      SS.
 2   COUNTY OF DU PAGE      )

 3          I, Kathleen M. Grove, CSR No. 84-002197,
     RPR, CRR, do hereby certify that NIKKOLAI ANDERSON
 4   was first duly sworn by me to testify the truth;
     that the foregoing deposition, Pages 132 through
 5   230, was recorded stenographically by me via video
     conferencing and computer-transcribed under my
 6   personal direction; and that the said deposition
     constitutes a true record of the testimony given by
 7   the deponent at the time and place aforesaid.

 8          I further certify that the reading and
     signing of the deposition was not requested by the
 9   deponent or a party Pursuant to Rule 30(e) of the
     Federal Rules of Procedure.

10
            I further certify that I am not counsel for
11   nor in any way related to any of the parties to this
     suit, nor am I in any way, directly or indirectly,
12   interested in the outcome thereof.

13          This certification applies only to those
     transcripts, original and copies, produced under my
14   direction and control; and I assume no
     responsibility for the accuracy of any copies which
15   are not so produced.

16          IN WITNESS WHEREOF I have hereunto set my
     hand this 23rd Day of January, 2023.

17

18

19                     Certified Shorthand Reporter

20

21

22

23

24
```



**Exhibits**

**2023-878100 Anderson Exhibit No. 5**
156:15 157:17 158:3,7,9 159:17 161:15 164:21

**2023-878100 Defendant's Exhibit No. 10**
185:17,21 193:8

**2023-878100 Defendant's Exhibit No. 11**
209:8,9,12

**2023-878100 Defendant's Exhibit No. 12**
211:20,21,24

**(**

**(inaudible)--**
197:14

**0**

**000073** 157:7

**001** 212:2

**002** 209:14

**003** 212:3

**1**

**10** 161:9 185:17,21 193:8

**10,000** 203:1,4

**10:22** 135:4

**10:31** 144:17

**10:45** 144:20

**11** 209:8,9,12

**11:36** 185:8

**11:50** 185:11

**12** 211:20,21,24

**12:28** 216:14

**12:37** 216:19

**12:53** 230:3

**12th** 135:3

**17th** 213:19 215:21 216:6,7

**18** 196:19 203:21 204:5

**18,000** 204:2

**19** 196:19 203:20, 21 206:22,23

**1:20-cv-07721** 135:8

**2**

**2** 135:7 158:20

**20** 183:24 186:24 203:23

**20,000** 194:19

**2000** 203:22,23

**2015** 180:23 186:15

**2016** 180:23

**2016-2017** 138:3

**2017** 151:19 160:23 174:4 179:22 186:15,24 213:20 216:3 217:18

**2018** 174:4 193:18 194:23 210:21

**2019** 174:4 186:19, 22 187:4,24 188:3 193:18 194:23 200:5,6 202:23

**2020** 203:24 204:5 205:2

**2021** 184:1

**2022** 174:7,8 205:2,3,5,22 206:9,10 227:4,7, 13

**2023** 135:3 174:8

**23rd** 224:17

**26** 160:23 224:16

**3**

**30th** 136:8 137:15

**32** 168:23

**33** 171:22

**34** 173:17

**4**

**4** 191:16 210:21

**46** 191:22,23 208:6

**5**

**5** 156:15 157:3,17 158:3,7,9 159:17 161:15 164:21

**52** 191:23 208:6

**56** 191:17

**7**

**7** 193:11,14,17

**73** 157:23

**74** 157:7,23

**8**

**8** 185:20 186:3,5

**8/26** 227:12

**A**

**a.m.** 135:4 185:11

**abided** 149:14

**Absolutely** 166:19

**access** 157:14

**accurate** 197:11

**accuse** 202:16

**action** 160:6,8

**actions** 170:12

**addition** 148:15

**address** 159:16 161:6 178:10,11, 12 195:21 207:16

**addressed** 208:18

**addressing** 161:3 164:13

**advances** 214:23

**Advil** 179:1,3,5

**Advils** 179:4

**advised** 226:4

**afford** 223:1

**afraid** 174:1 178:7

**aggressive** 153:20

**ahead** 154:13 200:16

**allegation** 169:3, 10,15 170:2,22

**alls** 161:21

**anderson** 135:7, 8,13,21 136:3 144:22 158:3,6,10 185:24 191:15 208:6 209:13,14 212:2,3,8 228:7

**animated** 159:22

**Annabel** 166:9 167:14,24 168:5

**Annabel's** 166:13

**answering** 163:11

**answers** 185:14 186:1,12 187:19 193:14

**anxiety** 174:1

**anymore** 160:15

**Anything's** 148:8

**apologize** 159:19

**apologized** 151:22 162:11,13,

**21**

**apologizes** 160:4

**apologizing** 159:11,24 160:3 162:9

**apology** 160:2,5 226:18,19

**apparently** 145:13 225:18

**appears** 199:4 209:20 212:11

**application** 194:15 208:1

**applied** 192:10 204:22 207:24 208:10

**applies** 140:9

**apply** 189:17 194:13 199:1 204:5,10,21

**applying** 192:13, 23 204:8 208:4

**appointments** 227:18

**approach** 225:24

**appropriately** 146:11,21

**approximate** 189:22

**April** 200:5 210:21

**apron** 161:2,9 163:3 164:5

**arm** 146:2,3

**as-needed** 227:18

**assault** 212:9 213:6 223:22

**assertion** 155:2, 12 164:20

**assistant** 151:13 160:12,14 161:1 162:17,23 163:6, 16,20 164:6,14

**assistants** 214:7, 10,11



**associate** 214:21

**Associate's** 181:22,23

**assume** 175:2 204:9

**ate** 155:10

**attention** 155:5 156:9 159:5

**attorney** 137:19 178:15 183:12,16 190:14 195:11 209:13,16

**attorney's** 185:24 212:1

**attorneys** 135:9

**August** 151:19 160:23 217:18 224:11,14,16 227:13,16

**aware** 147:12 151:11 156:12 166:4 218:14,15,16

---

**B**

**back** 142:1 144:19 161:9 178:6,9 179:17 181:15 185:10,13 193:8 213:13 216:18 226:12,14

**bankruptcy** 201:4,5

**bar** 229:14,15

**Barneys** 188:19, 21 193:3,4 196:5 199:5,9,24 200:22 201:11 203:4,10

**bartender** 220:18, 19

**bartenders** 220:17

**based** 147:7 164:23 218:24

**Basically** 222:7

**basis** 227:18

**Bates** 157:4,6 191:14,15 209:14 212:2

**beauty** 201:18

**begged** 226:12

**behalf** 135:13,15

**Bell** 175:21 180:9, 14,15,16 186:6,15

**benefits** 199:1 205:14

**bickering** 139:8, 13

**bigger** 212:18,20

**biggest** 215:5

**bit** 136:11 143:11

**bitch** 141:16 144:23 145:1

**blaming** 214:8

**blur** 189:24 192:12

**body** 139:14 172:7

**bother** 225:6

**bothered** 162:8 165:11

**bottom** 193:17

**bounds** 172:1

**break** 144:15 185:6 216:11,16

**bring** 184:20 204:18 224:4

**bringing** 156:8 225:23

**brought** 155:5 156:11 159:3 183:7

**Brown** 135:12 136:24 144:14 154:4,10 157:1,6, 12,23 158:1 170:6, 9 183:13,16 184:1, 4,9 185:5 187:14 191:13,17,22 192:1,5 208:8 212:19 216:11 218:19,21 219:5, 11 221:14 228:3

230:1,7,12

**bunch** 190:14

**butt** 138:1,12,13 139:14 142:15,17, 20,21 143:16,17, 21,24 144:5 216:22 218:13

---

**C**

**calendar** 216:4

**call** 218:4

**called** 135:22 141:16 145:1 177:9,10 198:8 202:9 229:11

**calling** 144:23

**calls** 154:10

**camera** 135:2

**captioned** 135:7

**care** 174:12 179:10 198:12

**caress** 142:18

**case** 135:7,8 183:16 184:10 209:17 210:12 211:6

**cell** 167:15,24 168:5

**certificate** 187:10

**certification** 197:13

**change** 160:10,11 215:3 224:9

**changing** 170:19

**charge** 209:20 210:21

**check** 180:11

**Chicago** 175:18 199:18 210:1

**Chung** 216:23

**circumstances** 149:7 165:24

**city** 175:17,18

**claim** 136:13,14 141:8 147:2,5,6 150:4,9 152:9,14 155:17 161:14,18 165:16 168:20 171:24 172:9,13 177:2 183:7,10 184:20 204:18 218:22 222:10

**clarified** 139:12

**clarifying** 140:17

**client** 157:9

**close** 138:19,21 217:16

**closed** 171:9 200:24

**closer** 137:1,2

**closing** 214:12

**clothes** 146:17 154:18 215:3

**clothing** 145:21, 24 146:2,9 214:24 215:6

**Coast** 199:12 200:1

**companies** 206:18

**company** 149:21 152:22,23 153:1,4 155:22 162:21,22 163:5,15,16,19 164:12 167:24 168:4,24 169:3,10, 22 170:21 171:6, 11 202:19

**company's** 171:6

**comparable** 149:2

**comparison** 217:14

**compass** 172:21

**complain** 139:1 150:16,21,23 211:15

**complained** 138:22 151:7 202:10 211:16

**complaint** 137:21 141:20 145:19 161:15,22 168:23, 24 169:7,8 170:23, 24 171:5 172:15 177:5,7,8,12 213:5

**complaints** 155:18,20,21,24 156:1 161:22,23 188:23 189:8

**completely** 197:11

**comprised** 136:13,14 137:21 141:7,20

**comprises** 147:2

**computer** 137:1,2 212:14

**concept** 161:12

**concern** 164:13

**concerned** 172:14

**concerns** 159:4, 16 161:4,16 166:2 224:12 226:1

**concludes** 230:2

**conclusion** 154:11

**conditions** 223:17,20,21 224:12

**conduct** 171:24 172:1,4,13 173:5, 18 189:9 208:17 221:16,19 222:19

**Congress** 205:14

**conjunction** 176:4

**consult** 177:14 181:1

**consulted** 175:20 181:8 185:14 186:15,19 187:24

**consulting** 180:2, 21

**Cont'd** 136:1



context 159:20

continue 188:22

copy 157:11 195:8
230:11

correct 136:8
137:15,16,23
138:1,2,4 139:15,
16 141:21 142:10,
16 143:24 147:10
148:2 149:2,5,6,9,
19,21 150:1,2,7
154:9,23 155:19
158:8 161:1,4
162:10,24 163:6,
17,21,22 164:7,14
167:15 168:1
172:15 173:11,19,
20 176:11 179:14
183:6,8,9,11
184:11 185:4
186:8,12,22 187:4,
20,23 188:14
194:23 195:8
200:7,12 203:5
204:10,24 206:13
209:2,3,22 210:24
213:4 218:8
225:22 228:9
229:1,22

correlate 225:2

count 177:24

counterpart
221:8,18

court 135:16
156:14

covered 181:24

coworker 221:18

Craigslist 189:17

cries 162:16 215:4

cross 199:19

CROSS-
EXAMINATION
218:20

customer 138:11,
13,24 142:3,14
216:22

cut 137:18

cute 163:9

---

**D**

date 151:20 188:3
215:20,21 225:9,
11 227:17

dated 210:21
213:19

dates 226:23

dating 144:12,13

day 137:18 155:6
161:10,11 215:10,
17,23 217:10,12
224:16 225:18,20

days 176:15 216:4

dealing 176:17

dealt 162:1

December 136:8
137:15 179:20,22
183:17,19,20,22

decency 172:1

defendant 135:15

defendant's
185:21 209:9
211:21

defining 163:2

degree 181:23

dental 206:3,16,21
207:11 208:16

deposition 135:5,
6 136:8,12 137:15,
17,18 140:23
142:24 158:7
163:15 185:18
230:3

depressed
173:24 179:12,13
181:6

describe 143:11
173:21

desk 199:14
201:13,21 202:7
207:4

Deutsch 182:18,
22

---

diagnosis 179:9,
14

differently 171:2
219:7,13 221:8

DIRECT 136:1

direction 161:6
164:11

directly 145:4

disagree 149:3,10

disagreed 185:2

disagreement
145:8,11

disciplined 189:5
198:18

discriminate
152:24

discriminated
152:18,22 153:5
155:2,12 218:24

discrimination
147:5 153:22,23
154:9 173:9
209:21 218:23

discussed 151:10

display 156:15
157:10 185:17
193:9 209:7
211:19

displayed 186:4

displaying 156:17

distinction 220:2

distress 168:21
169:1,5,11,23
170:10,14 171:8,
12,15,23 173:19,
22 177:2,12
178:24 179:7
180:4 222:11,15,
21

doctor 174:20,21,
22 180:17,18,20
181:8

document 157:9
158:10 209:13,18
210:5 212:7

documentation

---

178:20 196:16

documents
178:16,17 191:8,
10 192:3 195:11
208:5,11 212:2
213:11

downloaded
156:17

downsizing
184:19,22

downtown 194:8,
9 199:18,22,23

downward 223:4

dress 146:11,12,
13,14,20,21

dressing 146:20

drinking 220:8,10,
13,21 221:1,3
228:8,14,20,24

driver 214:16

due 141:2

duly 135:22

---

**E**

earlier 140:23
214:12

early 214:7,10

Ed 226:4

education 181:21

EEOC 172:18,24
226:17

effect 146:12,15

efforts 189:14
192:8 208:3

email 151:16,17,
18,20 152:3 156:4
158:8 159:2,3,14,
17 160:9,23
161:16 162:8,10
164:21 165:11,17
217:17,18 224:10,
14 225:9,13,16,17,
20

emailed 225:4
226:2,6,14

---

emails 166:1
225:5

Emily 150:20
220:7,19,21

Emma 139:3
150:19,24 218:14
224:4,7

emotional 168:21
169:1,5,11,23
170:10,13 171:8,
12,15,23 173:18,
22 177:2,11
178:24 179:6
180:3 222:11,14,
20

employ 221:18

employed 205:24
211:12

employee 228:23

employees
147:12,21 148:11,
16 149:1 150:16
152:10 165:23
166:5 219:8

employer 208:18

employers
176:23 177:3
195:16 196:1
208:12,23 209:4

employment
148:11 152:20
153:6 155:3,14,23
183:5 188:13,24
208:1 209:2
210:23 217:15

end 136:11
145:12,13,14
194:23 195:20
202:12

ended 159:11
162:9 188:13
204:9 210:23

Endo 206:5,6,17

endure 172:3
173:7

enforcing 149:21,
23,24 167:13,23
168:4

---



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023

4

engaged 221:16

Engel 182:18,22

environment
150:12,16 151:7,
11,12 154:17
197:19 224:9

equivalent
219:20,22

essentially
222:18 224:6

event 138:10

events 136:14
137:20 145:18
172:8 173:10

Eventually
219:23

evicted 192:11

EXAMINATION
136:1 228:5

examined 135:23

Excuse 136:21

exhibit 156:15
157:2,17 158:3,7,9
159:17 161:15
164:21 165:20
185:17,21 187:9,
16 193:8 209:8,9,
12 211:20,21,24
213:14

exhibits 156:16,
24 157:15

expect 160:8
195:19

expected 172:3
173:6

explain 146:6
218:23

extreme 171:24

eye 224:20

F

face 145:3 200:18
222:3

fact 160:24 161:20
164:13 168:11

176:9 186:1
215:12 216:7
220:10 225:3,4

facts 145:17 147:6
155:1,11 161:13,
17 164:19 169:2,9,
14,20 170:1,21
171:10,16,20
172:12,14

fairly 160:16

family 176:21

Fast 194:4

fault 215:8

fearful 174:1

February 193:18
196:19

feel 174:6 218:24
227:19

felt 141:8 226:9

female 150:15
185:3 192:20,21
219:1,8

file 195:13

filed 195:4 196:8,
9,10 201:4

find 184:7 189:12,
14 192:8 208:14

fine 162:2 164:17

fire 184:24

fired 148:19
149:16 161:7,11
185:1 198:3,10
202:13,14,17
219:24 220:9,21
221:1,3 224:13
226:3 228:8

Firehouse
193:18,22,24
194:13,19 196:4,
18 197:15,20
198:11,14,19
199:16 203:8

firing 170:15
223:3,5

firm 146:17
182:15,16 183:4
184:13,15 188:12,

23 189:6,9

five- 216:15

fix 212:14 223:10,
11

fixes 211:15

follow-up 218:19

food 155:10 194:4

foot 178:6

forced 154:16

foreclosed
200:23,24

form-fitting 146:9

frame 138:6,14,16
161:20,21 162:5
189:20

Freeman 136:17,
20

Fringe 177:9,17
184:10 196:7
201:6,16 203:12,
15 209:1

front 199:14
201:12,21 202:7
207:4

full-time 207:1

G

Gabe 136:16,20
137:24 139:2
142:15,17,18,22
143:4 218:13

Gabe's 142:3

game 163:11

gave 161:2,9
163:3 164:5 196:2
222:19 229:13,15

gender 147:7
150:10 152:15
172:19 219:13

general 156:2
159:4

generic 226:15

Gill 135:15

Ginny 226:5

give 156:20 157:4,
12 178:14 195:8
212:19 223:7

giving 197:7

gladly 208:15

glasses 146:3

glaze 144:2

glide 142:19
143:14 144:1,2

goal 160:15

Gold 199:12,24

good 197:19
211:13,14

Google 191:24
208:5

grab 143:15,23
156:21

grabbed 142:17,
21 143:17,20

grabbing 137:24

graduate 182:2

Grove 135:17

guess 156:5 181:3
187:21 194:5
196:20 199:14
204:13,14 208:5
210:4 219:6
222:22 226:12,13

guys 139:21
227:17

H

haircuts 201:18

hand 142:20
200:18

handle 218:11

hands 144:5

hang 157:19

happen 188:10
217:15

happened 148:24
173:23 176:8

215:11 217:12
224:15 226:10,20

harassment
136:13,15 137:21
141:7,20 145:18
147:2 172:9,15
173:8

hard 176:5

hated 223:24
224:2

head 178:13 190:9
228:12

headaches 179:2

health 174:12
175:19 177:15
179:10 180:7
181:4,8,12

hear 179:16
221:10 227:22

heard 215:5,9

hearing 162:16

Heartland 175:10,
11

helped 180:10

helping 178:2,4,5,
8

high 182:2,5,6,7,
10,13,14

highest 181:21

hold 163:24
216:11

home 166:16
195:3,20 222:2,8
226:11

homeless 194:24
195:7,18 196:24
197:3

honest 153:7
223:4

hope 190:20
194:17 195:9

hoped 190:23

host 141:9 155:8
161:1 164:2,3,14
166:14,22 194:12
199:14 218:2



Case: 1:20-cv-07721 Document #: 62-3 Filed: 05/25/23 Page 105 of 110 PageID #:791
Case: 23-2765    Document: 18    Filed: 02/05/2024    Pages: 278
Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023

5

hostess 201:13

hostile 150:12,16

hosting 160:14

hour 206:23

House 210:1 211:2

hug 139:22 140:1, 2,18 142:9,19,22 143:4,12 229:14, 15

hugged 140:3,4,5, 11,17,20,21 143:10,23 215:17

hugging 224:2

huggy 139:22,23 140:6,8,13 141:5

hugs 140:15

hundred 159:9

hurt 176:19

**I**

idea 190:8

identified 185:22 209:10 211:22

identify 135:9

III 222:5

immediately 224:14

implemented 149:15

inanimate 152:23 153:1

inappropriately 141:5

inaudible 141:2 154:4 160:19 204:13 205:17 221:9

incident 162:12 212:9 216:21,23 217:12 223:22

increased 205:14

Indicating 220:20

industry 197:18

infliction 168:21 171:23 172:13 222:11

information 195:15 196:14

informing 224:11

inject 168:14

instance 220:7 221:7,15

instances 142:14

intended 168:24 169:4,11,22 170:7, 10 171:8,11 222:14,20

intentional 168:20 170:13 171:23 172:13 222:11

intentionally 171:14

Internet 191:19,20

interrogatories 186:2,11 187:19 193:15

interrogatory 197:12

intimate 144:7,9

investigation 202:12

involuntarily 209:5

involved 149:20, 23

ipad 151:24 152:4 166:8,9,10,17,24 167:5,14 168:1,5, 10

irrelevant 163:13

issue 148:14 176:17 211:17

issues 181:9,12 208:17 226:23

item 150:3

items 166:24

168:1,6

**J**

Jaelen 150:19 209:21 210:17 211:1 212:11,13 213:2 223:23

January 135:3 203:22,24

job 146:18 181:15 182:5,6,7,13,14 188:11,16 189:12, 15 190:6,16,19 191:18 192:4,9,23 193:1,5,7 194:16 198:13 199:4 201:10,20 202:6 203:14 205:21 207:3 220:8,10,13, 22 221:2,4 222:9, 24 226:9,12 228:8, 14,21,24

jobs 178:3,4 181:17 192:10,13 204:6,9 207:22,24 208:11

Johanna 150:19 214:15 229:11

July 193:18 196:19 200:6 202:23 204:4

June 203:23,24 204:5 205:1

**K**

Kathie 137:10 157:14 158:21 185:16 193:9,11 209:7 211:19 212:5 213:14

Kathleen 135:17

kicked 155:7

kind 168:13 174:19 200:4

Kiran 135:14

knew 166:23 215:12 216:23

218:13,15 219:16 228:13 229:17,22

knowing 222:22, 23,24

knowledge 151:8 174:20

Kristen's 216:2

**L**

LA 135:11,14 136:2,23 137:4,9, 12,13 144:21 154:5,12 156:14, 19,23 157:3,7,13, 18,20,24 158:5,20, 23 159:1 165:21, 22 170:17 184:2 185:12,16,20,23 187:12,15,17 191:15,21,24 192:2,6,7 193:9, 11,13 200:14,21 205:20 208:7,9 209:7,11 211:19, 23 212:4,6,22 213:13,15 216:12, 15,20 218:17 219:3,9 228:6 229:24 230:5,8,10

laid 184:16,17 208:24

Lapointe 135:14

Lapointe's 222:12

late 148:17,22 149:1 152:12 219:20,21

law 146:16,17 182:15,16 183:4 184:13,15 188:12, 23 189:5,6,9 208:24

lawsuit 172:24 181:14 214:4 225:23

lawyer 170:18 186:2 193:15

laying 184:18,21

layoff 185:2

lead 166:21

learn 160:19

leave 197:15 200:15,22 202:8

led 215:5 223:3

left 155:10 188:12 189:11 192:9 194:16 197:23 198:24 201:3 204:15,16,22 205:21 208:1 210:19 211:2 214:15 218:2

legal 154:11

level 181:21 229:8

Levy 182:18,22

Lexitas 135:2,17

life 180:4 181:3,8 192:12

light 156:11

lights 222:2

list 137:22

listed 141:19

listener 179:17

Liv's 214:19 216:1

living 192:16

located 175:13 194:6,7 199:11,12

location 207:15

Lola 138:22 139:1, 3 150:19,22 151:6, 11 153:8,11 156:6 159:3,5 160:17 161:16 162:6,7,8, 18 164:21 165:7 167:3,6,13,23 168:3 214:17 215:14 217:2,5,6, 23 218:6,15 224:4, 7 225:3 226:4 229:10,11,19

long 169:16 180:21 189:20,23 225:12



looked 146:8

loose 145:21,24
146:2

lose 222:7,8

lot 140:10,15
168:16,18 177:23,
24 179:2

**M**

Madam 156:14

made 153:2
155:24 161:17,21,
22 179:14 194:19
202:22 203:1,4
204:2 207:11
208:4 212:20

mail 191:24 208:5

main 160:15
221:21

make 137:22
145:18 154:19,20
172:8,14 189:14
192:8 206:20
212:17

makes 172:17,21

making 161:23
170:24

male 192:20
221:7,17,18

mall 207:19

man 155:8,9
229:2,4,5

management
150:21 166:23
224:11 225:13
228:13,17 229:6,8

manager 149:18,
22 150:1,22,23
151:7 156:10
165:14 167:13
169:21 184:23
185:3 202:10

managers 153:2
169:4 171:7,11

Margo 186:6,15

marked 185:17

209:12

Martin 135:11,14

Marty 136:21
156:18 230:9

matter 190:22
191:1

Matty's 142:3

meaning 174:7

medical 174:22
180:18

medication
178:24 179:6
181:11

meeting 151:15
217:22 218:2,4,5

Melazzo 141:13,
14 144:23

memory 197:1

men 219:17,24
220:3,10,12 221:3
228:7,10,20 229:4

mental 174:12
175:19 177:15
179:10 180:7
181:4,8,12 223:2

mentioned
136:16 137:24
139:7 141:7,11
142:9 144:22
147:7 148:15
150:4 151:15
152:10 153:22
154:6 159:10
180:14 221:22
228:7

message 226:15

met 218:6

Michael 135:1

microphone
137:2

Mike 141:12
144:23

Mike's 141:12

Milwaukee 202:4

mine 171:1 213:17

minute 144:15
153:15

minutes 156:21

mis-scan 213:8

mis-scanned
213:11

mistaken 178:16

Mistakes 188:10

mistreating
162:15

moment 152:17
210:10

Monday 215:22,
23 216:1

monetary 226:17

money 222:7,8

month 225:14

months 177:21
180:1 190:2,3,4
200:9,11

moral 172:1

motivate 178:8

Mott 144:7 150:6
157:7 160:24
169:22 173:23
175:24 176:2,3,5,
8,19 181:15,18
183:5 188:13,17
189:11 192:9
193:1 194:16
198:24 208:1
209:1 210:13,18,
23 211:2 214:4
215:8 225:24
228:24 229:8

mouth 184:8

move 146:1,2
157:20 164:16
227:21

moving 164:6,13
222:23

Mya 150:19

**N**

nails 201:19

names 220:14
228:11

Nate 145:20,23
146:6,10,19
151:10,11 153:8,
13,14,17 155:2,12
156:9,10 159:11,
22 162:8,9,21
165:12 167:18
214:18 215:12
216:23 217:6,23
218:1,6,7,13
221:24 224:18
228:19,23 229:7,
13,17,19

Nate's 218:9

necessarily
159:18

needed 226:9,10
227:19

Newell 135:1

nice 139:13,14

nigger 177:10
202:9

night 214:15

Nikka's 218:10

Nikkolai 135:7,13,
21

no-show 198:8

norm 160:4

north 175:14,15

Notice 212:9

November 179:22
205:2,3,5,22
206:9,10

number 157:4,6
191:14

**O**

oath 197:7,13

object 153:1
154:10

objection 154:4
219:3,9

obligation 191:7
195:8,14 196:13

observed 228:20

observing 228:23

occasion 146:11

occur 160:10

occurred 223:22

occurring 224:9

October 202:23

office 206:3,17,21
207:12 208:16,24
227:10

online 208:4

open 148:3

operator 135:2

opposed 219:8

ordering 230:9

organization
229:8

Orland 207:17,19,
20

outcome 211:10,
11

outcomes 226:8

outrageous
171:24 172:2
173:5

owner 169:21

owners 153:2
169:4 171:7,11
229:17

**P**

p.m. 230:4

pages 191:18
211:24 212:8

Pandemic 204:17
205:13

paperwork 187:6
188:6 223:9

paragraph 168:23
171:22 173:17



Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023     7

**Park** 202:1 207:20

**part** 154:23 173:14 176:2 177:12 209:17 223:16

**partners** 156:12

**parts** 172:7

**passive-** 153:19

**passive-aggressive** 224:19

**patient** 155:6

**patio** 151:21 159:12

**patrons** 154:20 198:16

**pay** 192:15 203:8, 19

**payments** 207:6

**penalty** 136:4

**people** 140:3,9,16, 18 148:10 149:8 150:15 154:19 219:16

**people's** 156:9

**percent** 159:9 197:10

**Perfect** 158:1

**performance** 189:9 208:17

**Perio** 206:5,6,17

**perjury** 136:4

**person** 139:22,23 140:6,8,14 141:5 149:15 172:2 173:6 195:23 213:2 222:24

**personal** 165:9 166:24 168:1,6,14 176:20,23 177:1 223:14

**phone** 167:11,15 168:1,5,11 221:23 227:8

**phones** 221:21

**picked** 153:17

**picking** 154:6

**plaintiff** 135:13 169:1,12 171:9 173:18

**play** 163:11

**point** 201:9 225:7

**POINTE** 135:11,14 136:2,23 137:4,9, 12,13 144:21 154:5,12 156:14, 19,23 157:3,7,13, 18,20,24 158:5,20, 23 159:1 165:21, 22 170:17 184:2 185:12,16,20,23 187:12,15,17 191:15,21,24 192:2,6,7 193:9, 11,13 200:14,21 205:20 208:7,9 209:7,11 211:19, 23 212:4,6,22 213:13,15 216:12, 15,20 218:17 219:3,9 228:6 229:24 230:5,8,10

**police** 184:24 213:23

**policies** 149:21,24 168:4

**policy** 149:13,16 168:2,7,12 219:19 220:3

**position** 162:23 163:6,17,20,24 164:3,7,14 166:13 180:19

**positions** 220:15

**positive** 226:7

**possession** 210:6

**possibility** 197:8

**Possibly** 204:3

**practice** 175:7,8,9

**prep** 214:11

**prepared** 193:15

**prescribed** 181:11

**present** 186:20,22 188:1,2 206:12 207:12

**presume** 194:22

**pretty** 148:3

**pride** 226:13

**principle** 210:9,10

**prior** 147:8 148:15 163:24 180:2 225:9,23

**problem** 196:17 207:10

**problems** 174:24 198:14

**proceeding** 173:2

**produce** 196:14 207:8

**produced** 178:15, 17 190:14 191:11 195:11 209:14,16

**production** 212:1

**professional** 174:13,19 175:20 177:15 179:11 180:8

**profit** 222:9

**protected** 155:4

**protection** 150:13

**provide** 195:14

**provided** 195:15

**provocatively** 146:12,13,14,21

**proximity** 162:4 217:16

**psychiatrist** 174:9 177:14

**psychologist** 174:10 177:15

**punished** 220:5

**punishment** 220:4

**pushing** 162:17

**put** 141:24 167:7 178:6 215:8 226:13

**Q**

**question** 140:19 146:19 154:1,3 158:17 163:10,12, 14 164:17 167:22 168:15 169:6,19, 20,24 170:3,5,19, 20 171:4,15,22 186:5 187:23 190:19 197:4 201:15 219:6 222:13,15 226:21 229:16

**questioning** 222:12

**questions** 137:20 205:19 218:18,19 229:24

**quicker** 168:16

**quit** 150:6,14 210:20 223:24 224:7

**quitting** 152:12

**quote** 171:8,9 197:9 202:4 203:20

**quoting** 169:7

**R**

**race** 172:19

**Raffy** 214:14

**rape** 176:4 213:18, 23 214:9 222:22 226:10 227:21 228:1 229:22

**raped** 176:10,16 214:6,16 215:1,13 223:1 229:9,18

**raspy** 137:7

**rate** 203:8,19

**reaction** 162:11

**read** 158:12,14,15, 19

**reason** 153:17 162:3 204:16 210:8,14,15 211:8, 9 220:24 222:19 223:3,6,8 224:24

**reasonable** 172:2 173:6

**recall** 136:7 137:14 138:5,6,17 139:6 140:4,20 142:6 143:9 145:2 146:23 147:3,15, 18,20 148:12,13 151:20 152:6,16 155:15 158:9,16 164:22 165:18 166:3,7 173:16 176:3 180:6,12 181:5,10,13 187:18 190:7 192:24 204:7 205:12,23 207:24 208:2,3 209:6 210:7 224:21 226:24 229:2

**received** 179:9

**receiving** 205:11

**recent** 138:18

**recess** 144:18 185:9 216:17

**recollect** 142:6

**record** 135:3,10 144:16,19 185:7, 10 216:13,18 230:3

**recorded** 135:5

**records** 190:10, 13,15,16,18 191:4, 8 207:5,9

**rectified** 211:11

**REDIRECT** 228:5

**referenced** 158:4 208:4

**referred** 175:22 181:6



**referring** 172:4
173:5 216:10

**reflects** 186:4,5

**relate** 214:4

**related** 178:17,24
183:8 192:3
212:10 213:22

**relationship**
144:7,10 227:15

**relevance** 211:5

**relief** 205:13

**reliving** 227:20,24

**remedy** 226:1,7

**remember** 141:24
142:2,3 143:3
152:1 158:7
166:10,11 182:4,8,
9,12 183:1 187:1,
22 189:4,7,10,21
190:1,20,24 191:2,
6 192:12,13 193:4,
6,7 194:14 198:1,
2,4,22 199:21
203:9,11,13 205:6,
7 210:10,11,16
211:3,7,8,9 215:24
220:14 225:8,11,
12 228:11

**remotely** 135:5

**removed** 155:7

**rent** 192:15 223:1

**repeatedly**
148:18

**report** 184:24

**reporter** 135:16
136:21,24 137:5,
11 156:14,16,20
157:16,19,22
158:2,22 165:19
185:19 193:10,12
200:13,17 205:18
212:20 221:10
227:22 230:9,11

**reporting** 213:23

**repository** 156:21

**represented**
171:7 184:9

**reprimanded**
221:17,19

**request** 191:8

**required** 207:8

**reserve** 230:5

**resigned** 150:6

**respect** 218:22
222:10

**respond** 222:17

**response** 193:17
218:9 222:13

**restaurant** 194:3
197:16,17 199:16

**result** 173:17,22

**resulted** 155:21

**retail** 199:10

**retain** 183:15

**retained** 184:5

**retaliated** 161:18

**retaliation**
155:16,18,22
161:15 164:21,24
165:16 172:21
173:8 223:15

**reword** 222:15

**roommate**
192:19,20

**roughly** 204:2

**rules** 149:14
167:14,23

**run** 146:3

––––––––––

**S**

**S-E-A-N** 135:12

**sad** 174:2,4

**salon** 177:8
184:10 201:16,18,
23 209:1

**sandwiches**
194:2

**sat** 151:10,21

**satisfied** 160:2,5

**schedule** 227:17

**scheduling** 159:4

**school** 182:3,5,6,
7,11,13,14

**screen** 135:4
158:6 186:4

**screenshots**
191:20

**Sean** 135:12
156:23 157:8
183:12,16 184:3,9
187:12 192:2
208:7 210:8,9
218:18 221:13
230:6,11

**search** 190:16,19

**searches** 191:18

**seeking** 181:14
225:24

**send** 166:1 195:21
208:15 213:10

**sense** 144:5

**Separate** 187:15

**separately** 187:14

**September**
179:20 213:19
216:6 224:17

**served** 186:2

**Servers** 220:17

**serving** 151:13
160:12,14 161:1
162:17,23 163:6,
16,20 164:6,14
214:7,10,11

**sessions** 178:18,
21

**set** 159:17

**settled** 183:10

**settlement** 185:1

**severe** 169:1,4,11,
22 171:8,12,15
173:18

**sex** 147:5,7
152:15,19 153:5,

22,23 154:8 155:3,
13 172:19 173:9

**sexual** 136:13,14
137:21 141:7,20
142:10 144:10
145:18 147:2,5
172:9,15 173:8
212:9 213:5
214:22 218:22
223:22

**short** 137:18

**show** 157:9 165:2
171:10

**shows** 178:20

**signature** 230:6

**signed** 186:10
197:13

**signing** 187:18

**similar** 197:17,18

**similarly** 166:5

**Simon** 139:8,13,
19 140:24 142:9
214:15 221:22,23,
24

**simply** 179:12
219:16

**simultaneous**
141:2 198:5

**singled** 156:8

**sir** 136:6 203:18

**sit-down** 194:4,5

**sitting** 229:15

**situated** 166:5

**situation** 149:2
151:24 152:4
166:8 222:5

**slapped** 184:23
185:3

**slide** 144:2 222:4

**slope** 144:2

**Soho** 210:1 211:1,
4

**somebody's**
216:2

**sooner** 168:18

**sort** 223:12

**sound** 138:7

**sounds** 208:23

**speak** 166:1,8
223:20

**speaking** 141:3
154:7 196:4 198:5
200:16

**specific** 173:4
221:15

**speculation**
153:9 154:22
164:23

**Speedwell** 186:8,
19 187:24 226:22
227:1,15

**spell** 182:19

**spiral** 223:4

**spoke** 156:10
162:2 223:15,16,
19

**spring** 227:5,7

**stand** 155:8,9
218:3

**start** 160:24
162:17 179:19
188:3 190:5
192:22 203:7
206:8

**started** 162:22
174:6 180:23
186:23,24 189:17
207:12

**state** 223:2

**stay** 214:13 222:8,
9

**stayed** 214:14

**step** 161:5,6,8
163:4 164:6,8,10

**steps** 161:9

**stood** 166:21

**stopped** 177:21

**storage** 196:6



Case: 1:20-cv-07721 Document #: 62-3 Filed: 05/25/23 Page 109 of 110 PageID #:795

Case: 23-2765     Document: 18     Filed: 02/05/2024     Pages: 278
Anderson vs Mott Street
Nikkolai Anderson, Vol II - 01/12/2023                                                9

**store** 199:10 201:1

**stores** 201:3

**story** 152:2

**street** 135:8 144:8 150:6 160:24 169:22 173:23 176:1,2,4,5,9 181:15,18 183:5 188:14,17 189:11 192:9 193:2 194:16 198:24 199:20 200:2 202:3 208:1 209:1 210:13,18,23 211:2 214:5 225:24 228:24 229:8

**streets** 199:19

**stress** 170:7

**stressful** 176:17

**strike** 206:15

**strong** 218:10

**stuff** 139:24 142:1, 3,4 152:6 160:19 167:11 181:3 189:18 201:19 214:23,24 215:4 228:1

**stunned** 224:23

**sucked** 161:24

**sued** 176:22 202:19

**suffer** 173:22

**suffered** 173:18

**suggest** 140:7

**suggested** 228:1

**suggests** 140:15

**suicidal** 173:24

**summarize** 136:10

**summer** 227:5,7

**Sunday** 214:19 215:19,20,22,24 216:7

**support** 147:6

150:4,9 155:1,12 161:14,17 164:20 169:3,10,14,21 170:1,22 172:12 209:17 210:12

**supports** 152:8, 14 165:15

**suppose** 172:10 177:13

**suppressed** 152:5

**swear** 135:18

**sworn** 135:20,23 136:4

**symptoms** 173:21

---

**T**

**table** 146:4

**takeaway** 215:6

**talk** 146:20 167:3 176:1 182:10 226:4

**talked** 147:23 151:21 159:23 173:11 174:24 175:24 176:7 208:23 221:17,20, 24 226:3

**talking** 142:20 143:21 157:16 159:2 172:23,24 213:3 216:4

**tangents** 168:13

**tardiness** 220:3

**tardy** 148:22 149:1,5,9 152:11 220:4

**taxes** 195:4 196:10

**teach** 160:18

**telling** 167:14,24 168:4 215:3

**ten-minute** 216:16

**terminated** 138:18,20,21 147:6,13 148:11, 17,19,21 149:4 150:5,9 152:11,15 155:17 161:14,19 164:24 165:16,24 166:6 176:13 177:3,17 184:14 208:24 209:1,5 211:16 223:12,13 224:16 225:10,13, 18

**terminating** 152:19 153:6 155:3,13,22

**termination** 138:11 147:9 148:16 149:8 163:8,19 164:1,20 183:8 223:8 225:1, 21

**testified** 135:23 160:22

**text** 227:9

**Thalia** 226:3

**theft** 213:7,9

**therapist** 175:1 181:4 185:14 186:5

**therapy** 152:5 169:16 178:18,21 180:10

**thing** 141:6 153:21 154:8 160:15 165:2 166:11 199:15 215:1 220:1

**things** 139:13,19 140:10,22 141:19 145:17 148:1 152:9,13 156:11 162:20 168:8,9,15 173:23 175:23 176:7 219:18 222:24

**thought** 142:11 148:18 153:7,12, 18,19,20 156:5 176:20,23 228:1

**thousand** 197:10

**time** 135:4 138:6, 14,16,19,21 142:17,20 143:17, 18,20,21 145:9 147:7 160:3,22 161:20,21 162:4,5 166:9,10 169:17 174:2,3,4 176:13, 18 177:18,20 189:20 193:20 197:5 204:4,6 222:1,3 224:19,21 226:24 227:4,9,16

**times** 143:1,2,4,5, 23 144:24 167:17 176:22 177:22 181:7 208:10 219:20,21

**timing** 165:3,4,5

**tired** 227:20,21,24

**today** 135:16 185:18 205:24 223:18

**told** 140:13 142:23,24 145:20, 22 153:8,10,14 162:6,7,8 165:9, 10,11,13 179:1,4 214:13,17,18 215:14 217:3,5,7 218:1,3,7,15 220:23,24 226:16 229:10,11,19

**top** 178:13 190:9 212:10,16,23 228:12

**totally** 163:12

**touch** 139:23

**touched** 138:12, 13 140:24 141:4 142:2 155:6 172:7 222:1 224:1

**touches** 222:3

**touching** 139:2 142:8,14,15 216:22 218:13

**touchy** 198:17

**Tower** 200:4

**town** 137:19

**training** 160:18

**transition** 160:24 163:5,23

**transitioned** 163:7,8

**transitioning** 162:23 163:1,2,4, 16,20

**treat** 219:7

**treated** 160:16 180:3 219:13 221:8

**treatment** 179:6 226:23 227:17

**trouble** 161:23

**true** 164:9 187:19

**truth** 136:4

**turn** 137:4 193:8

**turning** 147:4 155:16

**type** 139:23 199:14,15 201:13 226:7,18

---

**U**

**Uber** 196:8,9,11 203:15 204:15,16, 19,23 205:22 206:16 214:15

**uh-huh** 139:9,15 141:17 143:20 162:5 164:8 167:10 168:22 175:18 183:21 186:17 188:15 200:10 201:17 202:2 204:1 207:21 213:1 218:8 227:8,14

**ultimately** 161:7

**unaware** 197:14

**uncomfortable** 141:8 154:19,20 155:10



**underlying**
155:23

**underneath**
143:12

**understand** 136:5
152:23 153:24
154:2 161:12
169:6 197:3
224:24

**understanding**
171:3 222:16
229:19,20

**unemployment**
199:1 204:22
205:1,10,15 207:5

**unfair** 153:20

**unprofessional**
142:12 219:18

**unsafe** 150:12

**unwanted** 172:7

**upper** 229:7

**upset** 159:22

---

**V**

**vaguely** 158:18,19

**variables** 172:11

**verification**
186:11 187:9,11,
12,18

**Veronica** 174:16,
17 175:22 176:1,8
177:16,18,20,21
179:10 180:3
181:6 186:8,19,23,
24 187:24 226:22

**versus** 135:8
211:15 214:13

**Vicki** 153:8,11,12
229:7,17

**victim** 212:11,24

**video** 135:6,10

**views** 168:15

**violated** 172:5,6

**vocal** 153:19

154:7,15

**voice** 137:6,7

**volume** 135:7
137:4

---

**W**

**W-2** 194:22 195:6,
8,23 196:11

**W-2S** 195:10,13,
16,18,19 196:2

**wage** 203:7

**wages** 195:15

**waist** 143:13

**Wait** 153:15

**waive** 230:7,8

**wanted** 160:12,13,
16,17 215:9

**wanting** 141:24

**War** 222:5

**Water** 200:4

**wear** 145:20
154:17,18 215:9

**wearing** 215:2

**wedding** 214:18,
19 215:17,18
216:1,2,9 229:13

**week** 161:11

**weeks** 138:11

**Wicker** 201:24
202:1

**wine** 146:3

**winter** 138:3,8,9

**woman** 150:5

**women** 150:5,6,
12,13 152:12
197:19 220:1,4

**word** 144:2 171:2
184:8

**words** 152:23
153:16 224:23

**wore** 145:24
146:17 215:7,9

**work** 144:7 146:16
150:12,16 151:7,
11,12 154:16,17
178:7,9 182:23
183:2 206:17
207:17,18,19
210:18 211:1,4
222:9 223:21

**work-related**
166:18

**worked** 184:13
193:22 196:18
197:20 200:5
201:6 202:22
203:22 220:16

**working** 141:8
166:24 175:24
183:5 188:24
197:5 201:9 206:8
223:21 224:11

**World** 222:5

**write-up** 219:21

**write-ups** 223:9

**written** 147:8,13,
22 148:6,15
149:16 152:10
189:2 198:20

**wrong** 214:8
219:18 223:10

**Wylie** 209:21
210:17 211:1
212:13 213:2

---

**Y**

**y'all** 224:23

**year** 174:5,7
179:21 183:22,23
194:23 195:20
206:9 227:3

**years** 182:23
183:2 190:2

**yelled** 162:12,22

**York** 199:5,24
200:22 203:5



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Nikkolai Anderson, | ) | |
| | ) | Case No.: 1:20-cv-07721 |
| Plaintiff, | ) | |
| | ) | Honorable Judge Thomas M. Durkin |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| Mott Street, | ) | |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT MOTT STREET'S
## LOCAL RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS

---

Martin K. LaPointe (#6195827)
Brian J. Sharpe (#6310156)
LAPOINTE LAW, P.C.
1200 Shermer Road, Suite 425
Northbrook, IL 60062
Telephone: 847-786-2500
Fax: 847-786-2650
mlapointe@lapointelaw.com
bsharpe@lapointelaw.com

*Attorneys for Defendant Mott Street*

**DEFENDANT MOTT STREET'S EVIDENCE**
**IN SUPPORT OF ITS ADDITIONAL STATEMENT OF MATERIAL FACTS**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 13 | **Nathaniel Chung's** Second Declaration ("Chung Decl. II") |
| 14 | **Edward Kim's** Second Declaration ("E. Kim Decl. II") |

In support of its Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgement and pursuant to Local Rule 56.1(b)(3), Defendant Mott Street submits that the following additional material facts are undisputed:

### The "Lead Host"

1.    At Mai Chi Corp. d/b/a Mott Street ("Mott Street" or the "Restaurant"), when two hosts are on duty, such as during busy weekend shifts, one host usually focuses on reviewing online reservations and determining seating arrangements. This person is referred to as the "lead host." (Chung Decl. II ¶ 6.)

2.    Plaintiff Nikkolai "Nikka" Anderson usually served as the "lead host" when she worked on a shift that had two hosts. At some point during her employment, Anderson also became one of the longest tenured hosts, so Mott Street General Manager ("GM") Nathanial "Nate" Chung informally referred to Anderson as the "lead host." (Chung Decl. II ¶ 7.)

### The Social Media Reviews in Plaintiff's Exhibit 5

3.    Mott Street typically employs one or more "Front of the House" Managers ( "FOTH Manager"). Mott Street also typically employs one or more Bar Managers. (Chung Decl. II ¶ 8.)

4.    Among other things, the FOTH and Bar Managers are expected to periodically review social media postings from guests and bring negative reviews to GM Chung's attention. (Chung Decl. II ¶ 9.)

5.    No FOTH Manager or Bar Manager (or any other person for that matter) brought the social media reviews attached as "Exhibit 5" to *Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* and *Plaintiff's Response to Defendant's Rule 56.1 Statement of Facts* (Dkt. #62-5 and #63-5) to GM Chung's attention or to CEO/Executive Chef Edward Kim's attention. (Chung Decl. II ¶ 10; *see also* E. Kim Decl. II ¶ 4.)

6.    Neither GM Chung nor CEO Edward Kim were aware of the negative social media reviews attached as Exhibit 5 to Plaintiff's Responses (Dkt. #62-5 and #63-5) until Plaintiff filed them with the Court in May 2023 in this lawsuit. Neither GM Chung nor CEO Edward Kim were aware of any other negative social media reviews about a host being "rude" since Anderson's termination in 2017. (Chung Decl. II ¶ 11-12; *see also* E. Kim Decl. II ¶ 4-5.)

Dated: June 15, 2023                              Respectfully submitted,
                                                  Mott Street


                                                  By: ___/s/ Brian J. Sharpe___
                                                       One of its Attorneys

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on June 15, 2023, I caused a copy of the foregoing **DEFENDANT MOTT STREET'S LOCAL RULE 56.1 STATEMENT OF ADDITONAL MATERIAL FACTS** to be filed electronically with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record via email.


                                              /s/ Brian J. Sharpe

 **Gmail**

Sean Brown <attorneyseanbrown@gmail.com>

## Fwd: Scheduling and General Concerns
1 message

**Niq Love** <niqandlove@gmail.com>
To: Sean Brown <attorneyseanbrown@gmail.com>

Mon, Dec 21, 2020 at 11:34 AM

---------- Forwarded message ----------
From: **Nikka Anderson** <nikkolaianderson@gmail.com>
Date: Monday, December 21, 2020
Subject: Fwd: Scheduling and General Concerns
To: niqandlove@gmail.com

---------- Forwarded message ----------
From: **Nikka Anderson** <nikkolaianderson@gmail.com>
Date: Saturday, August 26, 2017
Subject: Scheduling and General Concerns
To: lola.olateju@gmail.com
Cc: lola@mottstreetchicago.com

Hi Lola,

THIS IS CONFIDENTIAL LOLA

This email is regarding my schedule and other concerns I have been and currently still experience. I have been with Mott St. for almost 2 years now, and I've had the same schedule which has been approved and all of a sudden now my schedule is fluctuating and not as consistent. When I first got hired at Mott St. I wanted the consistency because I have a job that I have to attend and lately that has not been accommodated. I even forwarded the correspondence between Nate, Kristen, and I. Hence, why I don't use the app because I always have to same schedule unless people were taking off which required me to take more shifts. I rarely request off, call off, and I have open availability for when I am needed to host any other day. I even step in when I'm called if someone does call off. But my preference has always been the weekend, ever since Emily, Jack, and you stopped hosting. I just don't understand why my preference of the shifts is not accommodated, when people like Simon, Raffy, and Madonna's are. I requested 3 to 4 shifts a week, and if I am needed whatever days you need me to work. As I have proven time and time again, I was able to do the whole six days when other hosts would call off or take off I was flexible in arranging to come in to help and to do my job. I believe that if you can't accommodate my preferences, then when you don't have a host because all of the hosts don't want to be there, call off, or request off all I believe that if you can't accommodate my preferences, then don't expect me to step in and help out because I am needed.

Another concern I have been battling with, is the fact that I feel as though I'm being disrespected and dismissed and regards to progression and other tasks I wish to take on. I have asked for several months to begin as a SA since Nate and you weren't giving me this hosts shifts I have requested I would do another job so I could accommodate out the days that I don't work. I have seen multiple people come in and out and the same family member that wants to do more and work more I keep getting dismissed over and over. I have been called the "mama host" just like Raffy is for SA's and yet I don't feel as such. When I look at others lead I feel as though my position is taking away from the managers. I believe that if I want to grow and progress I should be given the opportunity to do such, and not be dismissed no matter how someone may feel as though I can't or if I'm not capable of doing the task at hand.

The work environment is extremely hostile, men at Mott St. do and say very inappropriate things which I find to be very disrespectful and uncomfortable. From my clothes to even me just following the Mott Rules, i get criticized. Not the fact that I convinced guests today that had reservations to sit outside in the rain, because we had no space inside. Or being called a "bit%%" because I'm following Mott rules and then a manager steps in, not stand by me but allows the door to be open that the host is damn near incompetent of seating people. I don't know what else to do or say, because time and time again I have voiced my concerns. Today while on the iPad I showed Karina the apartment that I was moving from

Pages: 278 Filed: 02/05/2024 Document: 18 Case: 23-2765

and Nate came to the host stand and ask if I were on the on the clock and that I shouldn't be doing that, which is fair. But the not even a minute later I was disrespected in a similar manner like my purse incident. He then insisted aggressively I clock out and leave. Mind you I almost never be on my phone or anything at that when I'm working but the one time he decides to capitalize aggressively and emotionally dismiss and embarrass me. When I have seen people that have done and do far worst things. I have seen many people do more serious actions like being tardy or consistently slacking on their job, or even go toe to toe with managers, but never have to clock out and go home in the manner that happened, now twice. I have even witnessed people yell at him but for some reason the moment I do something he has to send me home and cut me. Karina was right there while he basically dismissed the "Mama host". Last time it was Jaelen. Karina just kept saying "He's kidding right? Why did he talk to you like that?". And I'm asking myself the same question. I was embarrassed like I was the last time. Hurt yet again, because not just him, but many others (managers, co-workers, and guests) can just blatantly disrespect me. I'm being disrespected from all angles. I don't feel any protection. We had a hosting meeting voiced all concerns and needs to succeed, only for that to go nowhere. It's not a family at Mott St. because family just don't do what's been done. I guess everyone can get away with things, but when I do something it needs the most crucial punishment.

I have talked to you many times about most of my concerns, and I know it's not all up to you. I'm just sending this, because now it's a point where I feel unappreciated, ignored, dismissed, disrespected, degrading for women, unfairly treated, and torn down..: Not only as an employee, but as a human.

Thank you,
Nikka

Sent from my iPhone

Sent from my iPhone

From: **Lola olateju** <lola.olateju@gmail.com>
Date: Sun, Sep 24, 2017 at 12:03 AM
Subject: Fwd: Concerns
To: Nate Chung <nate@mottstreetchicago.com>

I didn't see this until today! However, I wanted to pass this on. I find it to be a tad concerning on the timing by the way.

Lola

Sent from my iPhone

Begin forwarded message:

> **From:** Nikka Anderson <nikkolaianderson@gmail.com>
> **Date:** September 22, 2017 at 3:56:11 PM CDT
> **To:** lola.olateju@gmail.com
> **Subject: Concerns**
>
> Hey Lola,
>
> CONFIDENTIAL
>
> I just wanted to let you know of the concerns that I have shared with you and concerns that still continue. I know you said you would send an email a few weeks back in regards to the respect EVERYONE should show each other. Haven't seen one and I don't really see a difference in that. Not from you whatsoever. But males in management/BOH/FOH say and do inappropriate things that I find to be very uncomfortable.
>
> Some males mock women (mine included) menstrual cycle. "Are you on your monthly thing?!" Some men do inappropriate gestures and touching. I can elaborate if you'd like. I just wanted to express this with you, because it's not only and its other females as well. I wanted to bring thing to you attention. The comments on my clothing (someone in management told me "NOT to wear loose clothing" but to wear an attire that is "tight" on my body. Things like that should not be said and done. I think your idea of a house meeting is necessary and will be informative. Not only am I mistreated and violated by guests, but it's also by co-workers. I think we need to find a way to create a safe and non-sexual environment.
>
> Gender matters at Mott St. and it shows with the treatment of the ladies.





MOTT000077

Discriminated by gender and sexually harassed by men at Mott St whether it be co-workers or guests with no protection.

Again, when you are there I know that if conflict like that arose you would try to take care of it. But it happens more of then not when you are not there.

We can definitely talk about it.

Thanks always!
Nikka

Sent from my iPhone

MOTT000078

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NIKKOLAI ANDERSON,

                          Plaintiff,

          v.

MOTT STREET,

                          Defendant.

No. 20 C 07721

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Plaintiff Nikkolai Anderson ("Anderson") sues her former employer, Mott Street, alleging she was subject to sexual harassment, discrimination on the basis of her sex, retaliation for complaining about the harassment and discrimination, and intentional infliction of emotional distress ("IIED"). Mott Street now moves for summary judgment on Anderson's claims. R. 57. For the following reasons, that motion is granted.

## I.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and

1

must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.    Failure to Comply with Local Rule 56.1

This District's Local Rule 56.1 requires each party opposing a summary judgment motion to file a response to the movant's Local Rule 56.1 Statement of Material Facts ("SOF"), either admitting, denying, or admitting/denying in part each numbered paragraph of the SOF. N.D. Ill. L.R. 56.1(b)(2). The Rule also provides that in its response, a party "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." *Id.* § 56.1(e)(2). If the respondent desires for the Court to consider facts not set forth in the movant's SOF, the party is required to file a separate Statement of Additional Material Facts ("SOAF"). *Id.* § 56.1(b)(3). Here, in response to Mott Street's motion for summary judgment, Anderson filed a response to Mott Street's SOF that asserted additional facts, but failed to file a SOAF. Many of her denials also cite to evidence that does not actually controvert the fact or to her Complaint, which is not evidence. *See, e.g.*, R. 62 ¶ 36 (denying the fact that she used an iPad for personal reasons, citing to the

transcript of her own deposition, in which she instead stated she did "not remember the iPad situation"); *id.* ¶ 51 (discussing new facts regarding sexual harassment and citing only to the Complaint and a portion of Anderson's deposition which does not support the facts). And Anderson asserts facts not contained in the SOF throughout her response brief by citing directly to the record.

Anderson's failure to file a SOAF and her citations directly to the record to establish additional facts is a "serious violation of Local Rule 56.1" that has led courts in this district to disregard those additional facts in deciding the motion before it. *De v. City of Chicago*, 912 F. Supp. 2d 709, 715 (N.D. Ill. 2012) (disregarding additional facts asserted in response to SOF and not in a separate SOAF); *see also Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 644 (N.D. Ill. 2015) (collecting cases); *LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1046 (N.D. Ill. 2011) ("The Court also disregards any citations to the record in the parties' legal memoranda that do not reference their Local Rule 56.1 Statements of Fact."). This Court should therefore disregard any additional facts to which Anderson cited in her brief and response to Mott Street's SOF, as well as those which are not supported by the evidence. But ultimately, it does not matter, because even if this Court considered Anderson's additional facts, Mott Street's motion must still be granted.

## III.    Facts

Mott Street is a high-end Asian-fusion restaurant located in Chicago. R. 58 ¶ 1. It is co-owned by CEO Edward Kim ("Edward"), General Manager Nathaniel Chung ("Chung"), Jennifer Kim ("Jennifer"), and Victoria Kim ("Victoria"). *Id.* ¶ 2.

The restaurant's stated policies prohibit harassment or discrimination and encourage employees to bring such concerns to management without fear of retaliation. *Id.* ¶ 7.

Chung hired Anderson as a "host" in September 2015. *Id.* ¶ 11. Hosts are considered "Front of the House" ("FOTH") employees and primarily report to a "FOTH Manager" and Chung, as well as the other partners. *Id.* ¶¶ 8, 10. Hosts are typically the first employee to greet a guest and are expected by Mott Street management to make a good first impression and display a warm and welcoming demeanor. *Id.* ¶ 9. The FOTH handbook requires hosts to provide a "cheerful and gracious greeting/farewell," smile, make eye contact, use "positive body language," compliment guests, express appreciation, and follow a script when answering the phone in a friendly manner. *Id.* At some point, Anderson began serving as a "lead host" during busy shifts when multiple hosts were on duty due to her seniority. R. 69 ¶¶ 1–2.

During Anderson's employment, Chung alleges he observed Anderson being impatient, short, and cold with guests. R. 58 ¶ 16. Chung states that he repeatedly witnessed Anderson avoiding eye contact, failing to smile, not exchanging pleasantries with guests, and answering the phone with "Mott Street," instead of the script she was instructed to follow, which was, "Good afternoon, Mott Street, how may I help you?" *Id.* Chung also testified that he witnessed Anderson being edgy or unpleasant with guests which, at least once per month, escalated to the point where Chung would have to intervene and calm the guests down. *Id.* ¶ 17. Chung stated this never happened with any other host. *Id.* ¶ 18. Edward also stated that he witnessed Anderson display a "negative demeanor toward guests," curtly answer the

4

phone, and use an electronic device in front of customers. *Id.* ¶ 19. Victoria and Jennifer, who did not regularly work onsite at Mott Street, believed Anderson treated them "rude[ly]" when they came to dine on multiple occasions by answering their questions with one or two words and failing to smile or welcome them. *Id.* ¶¶ 20–22. Both Victoria and Jennifer reported their observations to Edward. *Id.* ¶¶ 21–22.

In November 2016, three guests posted reviews on Yelp which negatively mentioned a female host. *Id.* ¶ 24 ("Hostess was rude and snobby;" "[W]aiters are friendly. Hostess was not;" and "Instead of the host graciously placing us . . . she just pointed [and] said, 'here.' . . . [I]t was pretty weird and we were all in shock over the brash rudeness of it all."). Because negative Yelp and other online reviews can seriously impact business, and Mott Street generally enjoys positive reviews, Mott Street management immediately addresses negative reviews. *Id.* ¶¶ 23–24. Therefore, Chung reviewed the schedules and determined that Anderson was the host on duty the same day as the negative reviews. *Id.* ¶ 26. This, coupled with his own observations, led him to believe that the subject of the negative reviews was Anderson. *Id.* Bar Manager Mike Melazzo ("Melazzo"), who was often able to observe the host stand, sent an email to Chung relaying expectations for hosts, for example, "[s]imply gesturing at a guest with our hands is not acceptable, waving someone off, or speaking in a curt fashion is not acceptable." *Id.* ¶ 27. Shortly thereafter, Chung and Melazzo called a meeting with all hosts to discuss the points in Melazzo's email and to emphasize the importance of being friendly so that Mott Street could avoid future negative reviews. *Id.* ¶ 29.

But in spring and summer of 2017, Mott Street received four additional negative reviews that mentioned a rude female host. *Id.* ¶ 31 ("[T]he hostess was terrible. . . . She was rude, frazzled . . . ;" "I found the hostess to be rude. . . . She refused to make eye contact when we tried to approach her about sitting outside. She was very unfriendly . . . [and] made a snarky comment;" "Hostess was rude and not accommodating;" and "[W]hoever answered the phone today (hostess probably) was incredibly impatient and rude. When a guest calls . . . it's rude to cut them off on the phone and not try and help to figure out how long a wait time is."). Chung again matched Anderson's shifts to the dates of these reviews and determined she was most likely the host referenced in the reviews. *Id.* ¶ 32.

Chung further explains that Anderson was "insubordinate" on multiple occasions. For example, he stated that she repeatedly refused to enter her scheduling preferences in the correct manner, but then complained about her schedule.[1] *Id.* ¶ 33. She also repeatedly stored her bag and personal belongings at the host stand where they could be seen by guests and were in the way, despite being instructed not to do this (which Anderson denies). R. 58 ¶ 34; R. 62 ¶ 34. In early- to mid-August 2017, Chung saw Anderson use her phone for personal reasons in front of guests, which is not permitted. R. 58 ¶ 35. Then, on August 26, 2017, Chung observed Anderson use

---

[1] Anderson denies this in her response to the SOF, R. 62 ¶ 33, however, in an email, Anderson stated, "I don't use the app [to enter scheduling preferences] because I always have [the] same schedule . . . ." R. 62-4 at 2.

6

A- 209

an iPad for personal reasons at the host stand, and as a result, Chung sent her home for insubordination.[2] *Id.* ¶¶ 36–37.

That same day, on August 26, 2017, Anderson sent an email to FOTH Manager Lola Olateju ("Olateju") labeled "Confidential" (the "August 26 email"). *Id.* ¶ 38. Most of the email contained her concerns relating to not receiving her scheduling preferences, not progressing, being "disrespected," and being sent home by Chung for using the iPad for personal reasons. *Id.* ¶¶ 36–37. It also stated:

> The work environment is extremely hostile, men at Mott St. do and say very inappropriate things which I find to be very disrespectful and uncomfortable. From my clothes to even me just following the Mott Rules, I get criticized. . . . I'm just sending this, because now it's a point where I feel unappreciated, dismissed, disrespected, degrading [sic] for women, unfairly treated, and torn down.

R. 62-4 at 2–3. The email was sent to Olateju only. *Id.* Chung and Edward allege they were not aware of the email until after Anderson's termination a month later. R. 58 ¶ 39.

Then, on September 20, 2017, Olateju forwarded an email to Chung containing yet another negative guest review about a female host:

> I honestly think the grumpy hostesses would have ruined my night if it were not for the incredible food and the incredible service we received once we (finally sat down). . . . Except for the shit-show that was the hostess station. I understand that it is a stressful job . . . . But holy shit,

---

[2] Anderson now denies she used the iPad for personal reasons in her response to the SOF. R. 62 ¶ 36. However, in the deposition testimony she cites to support her denial, she actually said she did not remember the incident. R. 62-2 at 51. And, in an email, she admitted she used the iPad to show her co-host an apartment, and she should not have done that on the clock. R. 62-2 at 2–3 ("Today while on the iPad I showed [a co-worker] the apartment that I was moving from and [Chung] came to the host stand and ask [sic] if I were on the . . . clock and that I shouldn't be doing that, which is fair.").

> you're the first point of contact for a customer and can't 1. [s]mile, [or] 2. [r]emember my name WHEN ITS LISTED ON A RESERVATION. . . . I was asked 5 different times who I was by the same hostess, sat 10 minutes late to a reservation. . . . [S]omeone tighten up the screws at the hostess booth and give them a lesson on customer service."

*Id.* ¶ 43. Chung once again determined that Anderson was the host on duty the day of the negative review. *Id.* ¶ 44. Olateju recommended to Chung that Anderson be terminated for her rudeness. *Id.* ¶ 42. Chung agreed and decided to terminate Anderson. *Id.* ¶ 45. The reasons for his decision were his own observations, repeated negative guest reviews, Anderson's insubordinate conduct, Olateju's recommendation, and Victoria's observations of Anderson. *Id.* Chung ran the decision by Edward, who had no objections, based on his own observations, the negative reviews, Chung's thoughts, and Jennifer's report to him of Anderson's rude demeanor. *Id.* ¶ 46. Therefore, on September 22, 2017, at about 3:00 p.m., Chung met with Anderson in his office and informed her that her employment with Mott Street was terminated.[3] *Id.* ¶ 47.

That same day, at 3:57 p.m., Anderson sent Olateju another email (the "September 22 email"), in which she complained about males mocking women for their menstrual cycles, making inappropriate gestures, and touching women, as well as "someone in management" telling Anderson "NOT to wear loose clothing," but to wear tight clothing. She concluded, "[g]ender matters at Mott St. and it shows with

---

[3] In her response to Mott Street's SOF, Anderson denies she was terminated at 3:00 p.m., and cites to her deposition transcript. R. 62 ¶ 47. That transcript reveals that Anderson thought it might have been later than 3:00 p.m., but she repeatedly stated she did not remember. R. 62-2 at 72–73.

the treatment of the ladies. Discriminated by gender and sexually harassed by men at Mott St. whether it be co-workers or guests with no protection." R. 58-4 at 78–79. No one else was copied on the email. Olateju forwarded it to Chung two days later, on September 24, 2017, with the caption, "I didn't see this until today! However, I wanted to pass this on. I find it to be a tad concerning on the timing." *Id.*

Mott Street alleges that, after Anderson's termination, the negative host reviews ceased, though Anderson has produced multiple (about seven) reviews since her termination that contain negative language about a host. R. 58 ¶ 50; R. 62 ¶ 50; R. 62-5. Mott Street states it was unaware of these reviews until Anderson attached them to her motion. R. 69 ¶¶ 3–6. Anderson's replacement was a female, and in the following year, nine of the ten hosts hired were female. R. 58 ¶ 5. Mott Street further alleges that it has fired other male FOTH employees who did not report any form of harassment or discrimination for similar reasons as Anderson: Jonathan Tribbey was terminated in 2020 for his negative demeanor and for being abrasive; Eric Blass was terminated in 2022 for being insubordinate; and Garrett Douthitt was terminated in 2018 for violating policies. *Id.* ¶ 68.

Anderson filed a Complaint with the Equal Employment Opportunity Commission and received a notice of right to sue. R. 1-1. She brought this lawsuit against Mott Street on December 24, 2020. R. 1. She complains of sexual harassment, discrimination based on her sex, retaliation, and IIED. Specifically, she claims that, during her employment at Mott Street, she experienced sexual harassment when a co-worker named Gabe Freeman and a customer touched her buttocks in separate

incidents and management did nothing, when she bickered with a server, when Melazzo called her a "bitch," and when Chung told her to not wear loose clothing.[4] She also claims that male employees were treated better than female employees and were not disciplined for tardiness or drinking on the job, but that female employees were. R. 62 ¶ 6. She argues that Mott Street's stated reasons for terminating her were a pretext because she never received a write-up or any form of progressive discipline prior to her termination, no one ever mentioned the negative reviews to her, and because she was promoted to lead host at some point in her employment. *Id.* ¶¶ 16–22, 26, 30, 32. She instead claims she was terminated because of her sex and in retaliation for sending the August 26 and September 22 emails to Olateju complaining of sexual harassment. *Id.* ¶ 60. Finally, she bases her IIED claim on the fact that, immediately prior to her termination, she had informed management that she was a rape victim, and that they were aware she was moving to a new apartment

---

[4] In her response to Mott Street's SOF, Anderson claims that "[m]ale co-workers and patrons of the restaurant touched, caressed, and squeezed Plaintiff's body in ways that were offensive, unwanted, and sexually harassing; . . . Restaurant patrons and co-workers regularly referred to Plaintiff as a bitch; . . . Restaurant patrons and co-workers would regularly rub their hands on Plaintiff and touch her waist, breasts, or buttocks without her consent and in a sexually offensive manner; . . . Male co-workers regularly made lewd and offensive statements to Plaintiff; . . . Male employees requested sex or sexual acts from Plaintiff which were offensive, unwanted, and sexually harassing." R. 62 ¶ 51. But the only evidentiary support for these claims that she cites is her own testimony that the male employees "all talked about sex" at work. R. 68-2 at 40. She instead cites to her allegations in her Complaint to support these claims. But "[a]llegations in a complaint are not evidence," *Nisenbaum v. Milwaukee Cty.*, 333 F.3d 804, 810 (7th Cir. 2003), and therefore cannot be cited to support a motion for summary judgment. *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999) (Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.").

and needed the income from her employment but terminated her for no reason. *Id.* ¶ 66.

**Analysis**

## I.  Sexual Harassment Claim

Plaintiffs alleging a theory of sexual harassment based on a hostile work environment under Title VII face a "high bar" to establish actionable conduct. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018). "Merely offensive conduct does not give rise to liability, for 'Title VII is not a civility code.'" *Enriquez v. U.S. Cellular Corp.*, No. 06 C 3135, 2008 WL 4925012, at \*9 (N.D. Ill. Nov. 14, 2008) (quoting *Patton v. Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir. 2006)). To establish a case, the harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (explaining that "relatively isolated instances of non-severe misconduct will not support a claim of a hostile environment"). "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975–76 (7th Cir. 2004). In order to analyze the severity or pervasiveness of the conduct, a plaintiff must come forward with specific facts; vague non-specific testimony will not do. *See Brooks v. Avancez*, 39 F.4th 424, 442 (7th Cir. 2022).

11

Here, besides vague and unspecified claims that women were not "treated right" at Mott Street, Anderson has identified four instances over a two-year period that she alleges were harassment directed at her. She claims that coworker Gabe Freeman touched her buttocks once; she bickered with coworker Simon DuFour ("DuFour"); Melazzo called her a "bitch;" and Chung told her once that she "shouldn't wear loose clothing."[5] In each instance, Anderson states she made pleas to management that were dismissed. But these instances, even taken together over two years, were non-serious and isolated and therefore not actionable. *Mercer v. Cook Cty.*, 527 F. App'x 515, 521 (7th Cir. 2013) ("[B]oorish or offensive stray remarks," like being called a "bitch," and isolated touching are not "severe or pervasive."); *Patton*, 455 F.3d at 816 ("[M]ore crude physical acts . . . [such as] a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation.") (citations omitted).

Perhaps acknowledging the weakness of her claim, Anderson expends little effort refuting Mott Street's arguments, cites to her Complaint (which is not evidence, *Nisenbaum*, 333 F.3d at 810), and does not distinguish or address any of Mott Street's case law or cite to any authority of her own. She does not claim, for example, that she was unable to do her job because of the harassment. On the other hand, Mott Street points to plentiful examples in this Circuit of dismissal of harassment claims based

---

[5] She also alleges a customer touched her buttocks on one occasion and that customers disrespected her, but Mott Street "is not vicariously liable for the sexual harassment of its employee by a customer." *Equal Emp't Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 627 (7th Cir. 2018).

on similar or more serious conduct than Anderson experienced. *See, e.g.*, *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 464 (7th Cir. 2002) (two instances of unsolicited back rubs and a uniform inspection during which a supervisor stared at the employee's chest and asked her to raise her arms did not constitute harassment); *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (teasing, comments about low-neck tops, staring, and four incidents in which a co-worker briefly touched an employee's arm, fingers, or buttocks were not severe or pervasive enough to be actionable). Because Anderson has not provided sufficient evidence of harassment that is objectively so severe or pervasive to constitute an abusive working environment, her sexual harassment claim must be dismissed.

## II.     Discrimination and Retaliation Claims

Anderson's discrimination and retaliation claims are similarly meritless. When a plaintiff alleges that she suffered adverse employment actions because of a protected characteristic the "central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). "Employers are also prohibited under Title VII from retaliating against an employee who 'filed a complaint or participated in an investigation of an unlawful employment practice.'" *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing 42 U.S.C. § 2000e-3(a)). On summary judgment, "the correct standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or

other proscribed factor caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

One way in which a plaintiff can proceed is through the now-familiar *McDonnell Douglas* burden-shifting framework, under which she first must establish a prima facie case of discrimination. *See Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (*McDonnell Douglas* is a "common, but not exclusive" method to establish a "triable issue of intentional discrimination."). To demonstrate a prima facie case of discrimination or retaliation under *McDonnell Douglas*, a plaintiff generally must show: (1) that she is a member of a protected class or engaged in protected activity; (2) that she was performing her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that similarly situated individuals who were outside her protected class or did not engage in protected activity were treated more favorably. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Once established, the employer then presents evidence of a non-discriminatory reason for its decision, and the burden ultimately shifts back to the plaintiff to establish that the employer's reason is pretextual. *Id.*

But ultimately, and regardless of the method of proof used, all evidence is placed "in a single pile," and the question is "whether the evidence would permit a reasonable factfinder to conclude that [the plaintiff's] [protected class or activity] caused" the adverse action. *Ortiz*, 834 F.3d at 765–66. As to Anderson's discrimination and retaliation claims, the Court finds that the answer is no.

### a. Discrimination Claim

14

In arguing that her discrimination claim should survive summary judgment, Anderson relies exclusively on the *McDonnell Douglas* framework. Mott Street does not challenge that Anderson, a female, is part of a protected class, nor that she experienced an adverse employment action when she was terminated. Rather, it contests that Anderson has not pointed to a similarly situated male employee, otherwise called a "comparator," who was treated more favorably. It likewise argues that Anderson was not meeting expectations, and that she can present no evidence of pretext.

### i. Similarly Situated Employees

To establish that others outside the plaintiff's protected class are adequate comparators, the plaintiff should at least show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (cleaned up). "Although similarly situated employees 'need not be identical in every conceivable way,' they 'must be directly comparable to the plaintiff in all material respects.'" *Id.* (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)).

Anderson points to DuFour and other unidentified male servers and bartenders who she claims were not written up or terminated for being tardy or drinking on the job, and claims that other unspecified female employees were

disciplined for the same behavior.[6] But Anderson herself was never disciplined for being late or drinking on the job, and she does not allege that DuFour was the subject of negative reviews, was observed being unfriendly to customers, or was insubordinate to his supervisors. In fact, Anderson admitted that she did not know of another Mott Street employee who had the same "track record" as her. R. 58-2 at 126.

On the other hand, Mott Street has provided evidence that male FOTH employees who reported to the same supervisors as Anderson were terminated when they engaged in similar wrongdoing as Anderson. *See* R. 58-5 ¶ 61 (Three male FOTH employees who reported to Chung were terminated for "having a negative demeanor and being combative," "being insubordinate," and violating the restaurant's cash policy.). Anderson has therefore failed to demonstrate that individuals outside her protected class received better treatment than she did. *Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012) (employee who did not establish that comparators engaged in similar misconduct could not provide "circumstantial evidence" of discrimination). This dooms Anderson's attempt to make out a prima facie case of discrimination under *McDonnell Douglas*.[7]

---

[6] In her brief, Anderson claims that DuFour was treated more favorably with respect to "utilizing work equipment, scheduling, and performance expectations." R. 63 at 4. But the deposition transcript to which she cites does not support this claim. Rather, in the cited transcript, Anderson merely said, "Women weren't treated right at Mott Street. . . . [DuFour] was like, he could do no wrong. He could come in late . . . . But if any of us were late . . . we were in trouble, so to speak." R. 63-2 at 117–18, 125.

[7] Mott Street also contends that Anderson cannot establish a prima facie case of discrimination because she was not satisfactorily performing her job at the time of her termination. And it is for these same reasons that Anderson was terminated. Because the second prong of the *McDonnell Douglas* test—whether Anderson was meeting expectations by performing her job in a satisfactory manner—merges with

16

A- 219

### ii. Pretext

Even if Anderson could make out a prima facie case of discrimination, she does not establish that Mott Street's stated reasons for her termination were a pretext for discrimination. Under the *McDonnell Douglas* pretext analysis, Mott Street must present evidence of non-discriminatory reasons for its termination of Anderson. To survive summary judgment, Anderson must then demonstrate that Mott Street's stated reasons are a pretext for discrimination. To establish a material issue of fact as to pretext, Anderson must show that "it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or [ ] that an employer's explanation is not credible." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006). But if Mott Street "honestly believed" its non-discriminatory reasons for the adverse employment action, even if the reasons were "foolish, trivial, or baseless," Anderson loses. *Coleman v. Donahue*, 667 F.3d 835, 853 (7th Cir. 2012) (quoting *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006)).

Mott Street has offered legitimate, non-discriminatory reasons for terminating Anderson: Chung and Edward, the decision makers who ultimately agreed to terminate Anderson, believed Anderson was insubordinate and rude to customers based on their own observations, guest complaints, and the reports of other employees and managers. Indeed, all four owners of Mott Street claim they independently

---

the issue of pretext, the Court should assume Anderson established a prima facie case and instead consider Mott Street's argument in the context of the pretext analysis. *Curry v. Menard, Inc.*, 270 F.3d 473, 477–78 (7th Cir. 2001) (citing *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999)).

observed Anderson being rude, curtly answering the phone, avoiding eye contact, and displaying a cold demeanor. Then, throughout late 2016 and 2017, Mott Street received eight negative guest reviews about a rude female host. Chung determined these complaints to be about Anderson based on the days she worked and his own observations. Further, according to Chung, Anderson was insubordinate by failing to enter her scheduling preferences into the correct software, storing her personal belongings at the host stand, and repeatedly using electronic devices for personal reasons in front of guests. The final straw, according to Mott Street, was when FOTH manager Olateju forwarded to Chung the eighth negative review which she attributed to Anderson and recommended she be terminated.

Anderson disputes that she was rude or short with guests, that she was insubordinate, or that the negative guest reviews are attributable to her. But Anderson's perception of her own performance is inconsequential. The proper inquiry looks at whether Mott Street honestly believed it had a legitimate basis for termination. *See, e.g.*, *Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017) ("Lauth's belief that he was performing his job adequately is not relevant to the question" of pretext). She also claims that Oleteju could not have recommended her termination because Olateju informed her that it was Chung who initiated the decision. But it is equally likely that Olateju did not want to admit to Anderson that she played a part in the decision.

Anderson also claims that Mott Street's disciplinary policy requires a worker to receive progressive discipline of a verbal warning, written warning, suspension,

18

and final warning prior to being fired, and that she never received any warnings prior to her termination. *See* R. 63-6 at 48. But the Mott Street handbook does not actually require progressive discipline. Instead, it lists out these potential forms of discipline depending on the severity of conduct, and states that first-time violations such as insubordination "may result in disciplinary action up to and including termination." *Id.* Absent a "rigorously enforced" progressive discipline policy, a failure to follow progressive discipline does not "suggest discrimination." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (when firm policy allowed for termination for some first-time offenses, failure to follow progressive discipline did not suggest discrimination). Anderson also speculates that the negative reviews could not have been about her, because if they were, the FOTH managers would have said something to her. But this is not based on any particular personal knowledge Anderson has of the FOTH managers' practices and is not enough to create a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) ("[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience," (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991))).

Anderson further points to the fact that she received a promotion to lead host during her tenure. But it cannot be that if a person is promoted once, any subsequent termination is immediately suspect. What matters is the employer's belief about the

employee's performance at the time of termination. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991) (prior positive performance reviews did not contradict the employer's claim that the employee was not performing well at the time of his termination). Moreover, this argument undercuts her claim that she was discriminated against for her sex, because the same decisionmakers who hired and promoted her (knowing she was a woman) also terminated her. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013) ("[I]t is reasonable to assume that if a person was unbiased at Time A (when he decided to hire the plaintiff), he was also unbiased at Time B (when he fired the plaintiff).").

And finally, Anderson argues that Mott Street hosts have continued to receive negative reviews after her termination, and then speculates, without indicating the source of her knowledge, that none of those hosts have been fired for poor work performance or a negative demeanor. *See Payne*, 337 F.3d at 772. She also supplies no information about who the hosts were, whether they were female or male, whether any of the hosts received as many as eight negative reviews, or whether Chung or Edward knew about these reviews (they claim they did not, R. 69 ¶¶ 3–6).

In sum, Anderson has not presented evidence that would cause a reasonable factfinder to conclude that Anderson's sex caused her termination. *Ortiz*, 834 F.3d at 765–66 (the Court must consider the evidence of discrimination in a "single pile"). Mott Street is 50% woman-owned; women serve in management positions (including FOTH manager Olateju who recommended Anderson's termination); Anderson's replacement was a female; nine of ten hosts hired after her termination were female;

20

Anderson was hired and promoted by the same people who terminated her; Anderson can point to no similarly situated male employees who were treated more favorably than her; Mott Street provided examples of male employees who were fired for similar conduct; and Mott Street has put forth legitimate, non-discriminatory reasons for Anderson's termination. Therefore, Anderson's discrimination claim fails.

### b. Retaliation Claim

Anderson also claims that she was terminated because she reported discrimination and harassment in her August 26 email and reiterated her concerns in the September 22 email. It is Anderson's burden to establish the elements of retaliation, including a "protected activity," an adverse employment action, and a "causal connection" between the two. *Miller v. Polaris Labs., LLC*, 909 F.3d 858, 866 (7th Cir. 2015). The fundamental question is whether a reasonable trier of fact could infer retaliation occurred. *Id.*

In her brief opposing summary judgment, Anderson seems to base her retaliation claim primarily on the September 22 email, which contained specific complaints as to harassment, and which Anderson sent the same day she was terminated. Mott Street argues Anderson sent this email at 4:00 p.m., an hour *after* she was terminated, and retaliation claims require that the decisionmaker know about the protected activity *prior* to the termination. *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 633 (7th Cir. 2020). Anderson argues there is a genuine issue of material fact as to whether she sent the September 22 email prior to her termination, and that this precludes summary judgment. But the only evidence she cites is her

deposition testimony in which she said she could not remember if she sent the email prior to her termination, R. 58-2 at 82, nor could she remember what time she was terminated. *Id.* at 71–73. Statements that Anderson could not remember certain things are not sufficient to create a genuine issue of material fact as to those things. But even assuming the email was sent prior to Anderson's termination, it does not seem that Chung, the decision maker, was aware of the email until two days post-termination. Anderson sent the email only to Olateju, and Chung received it when Olateju forwarded it to him two days later, on September 24, 2017. R. 58-4 at 78. The evidence therefore reveals that Chung, the decision maker, was not aware of the September 22 email when he terminated Anderson. *Kotaska*, 966 F.3d at 633 ("A valid retaliation claim requires that the decisionmaker know of the protected activity."). And notably, during Anderson's deposition, when asked whether she "believe[d] that [the September 22] email had anything to do with [her] termination," she answered "no," and stated that she thought she was terminated because of the August 26 email. *Id.* at 82.

The problem is that the August 26 email is not a protected activity. Anderson's August 26 email largely complained about scheduling concerns, advancement opportunities, and Chung's decision to send her home for using an iPad for personal reasons in front of customers. The only mention it made of gender-related concerns was when Anderson vaguely stated that she thought the work environment was "extremely hostile," and that "men at Mott St. do and say very inappropriate things which I find to be very disrespectful and uncomfortable." R. 62-4 at 2–3. Anderson

22

admitted in her deposition that there was nothing specific related to "harassment" or "discrimination" in the email. R. 58-2 at 70. And the language of the email is rather ambiguous, as it makes no mention of specific incidents of harassment or discrimination and does not allege her complaints were connected to her protected class. "[M]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class . . . is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *see also Woolner v. Flair Comms. Agency, Inc.*, No. 01 C 6043, 2004 WL 2032717, at *9–10 (N.D. Ill. Aug. 30, 2004) (holding that plaintiff's complaints to her supervisor that a co-worker touched her in a "sexually offensive manner," that the coworker's behavior was "worrisome," and that his "working style . . . was . . . aggressive and offensive," without mentioning specific details or incidents of the harassment, was not protected activity). Because a reasonable trier of fact would not infer that Anderson's termination was based on retaliation for the August 26 and September 22 emails, Anderson's retaliation claim also misses the mark.

## III.    IIED Claim

Anderson's IIED claim is based on her allegations that Mott Street knew she had recently been raped and that she needed the income to afford her rent but fired her for "no reason." This claim fails principally because it is time barred. The statute of limitations for IIED claims is two years. 735 ILCS 5/13-202. Anderson's employment with Mott Street was terminated on September 22, 2017, but she did not file her Complaint until December 24, 2020, over three years later. It is also

preempted by the Illinois Human Rights Act ("IHRA"), which preempts common law IIED claims that are "inextricably linked" to a civil rights violation, such as discrimination. *Davis v. Palos Health*, No. 18 C 4345, 2019 WL 214916, at *4 (N.D. Ill. Jan. 16, 2019). The same conduct—Mott Street's termination of Anderson—is the basis for both her discrimination and retaliation claims and her IIED claim. Accordingly, her IIED claim is preempted by the IHRA. The IIED claim also fails on the merits because "[i]n the employment context, a claim of IIED requires more than what is necessary to establish a claim of sexual harassment," and Anderson's sexual harassment claim itself did not pass muster. *Mazeika v. Architectural Specialty Prods., Inc.*, No. 05 C 415, 2005 WL 8179133, at *4 (N.D. Ill. July 26, 2005) (citations omitted) (collecting cases). Anderson's IIED claim thus meets a similar fate as her other claims.[8]

## CONCLUSION

For the foregoing reasons, Mott Street's motion for summary judgment (R. 57) is granted, and Anderson's case is dismissed with prejudice.

---

[8] Anderson failed to address any of Mott Street's arguments on her IIED claim, so her opposition waived. *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (A failure to oppose an argument "operates as a waiver.").

ENTERED:


_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: August 14, 2023

25

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

Case: 1:20-cv-07721 Document #: 72 Filed: 08/14/23 Page 1 of 1 PageID #:1139
Case: 23-2765     Document: 18     Filed: 02/05/2024     Pages: 278

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Nikkolai Anderson, | |
| Plaintiff(s), | |
| v. | Case No. 20-cv-07721 |
| | Judge Thomas M. Durkin |
| Mott Street, | |
| Defendant(s). | |

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
        and against defendant(s)
        in the amount of $      ,

              which ☐ includes     pre–judgment interest.
                     ☐ does not include pre–judgment interest.

       Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

       Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
        and against plaintiff(s)

.

       Defendant(s) shall recover costs from plaintiff(s).

---

☒     other: Mott Street's motion for summary judgment (R. 57 ) is granted, and Anderson's case is dismissed with prejudice.

---

This action was *(check one)*:

☐ tried by a jury with Judge     presiding, and the jury has rendered a verdict.
☐ tried by Judge     without a jury and the above decision was reached.
☒ decided by Judge Thomas M. Durkin on a motion for summary judgment.

Date:   8/14/2023             Thomas G. Bruton, Clerk of Court

                                    Kerwin Posley, Deputy Clerk